Kristen L. Nelson (SBN 269318)
Patrick Maloney (SBN 287667)
**HECHT PARTNERS LLP**
2121 Avenue of the Stars, Suite 800
Los Angeles, California 90067
212.851.6821
knelson@hechtpartners.com
pmaloney@hechtpartners.com

Charles J. Nerko (*pro hac vice* forthcoming)
John C. Cleary (*pro hac vice* forthcoming)
Walter E. Swearingen (*pro hac vice* forthcoming)
**NERKO PLLC**
1178 Broadway, 3rd Floor
New York, NY 10001
518.363.9100
cnerko@nerko.com
jcleary@nerko.com
wswearingen@nerko.com

*Attorneys for Plaintiff*
*POLAM Federal Credit Union*
*[Additional counsel on signature block]*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

**POLAM FEDERAL CREDIT UNION,**

        *Plaintiff,*

-against-

**FISERV SOLUTIONS, LLC f/k/a FISERV SOLUTIONS, INC., and FISERV, INC.,**

        *Defendants*.

Case No.:  2:26-cv-2352

**COMPLAINT**

**JURY TRIAL DEMANDED**

### COMPLAINT AND JURY TRIAL DEMAND

Represented by NERKO PLLC and HECHT PARTNERS LLP, plaintiff POLAM Federal Credit Union ("**POLAM**"), alleges as follows against defendants Fiserv Solutions, LLC f/k/a Fiserv Solutions, Inc. ("**Fiserv Solutions**") and Fiserv, Inc. (collectively, "**Fiserv**"):

### PRELIMINARY STATEMENT

1.      POLAM is a not-for-profit credit union. Fiserv, one of the world's largest providers of outsourced technology to financial institutions, sold itself to POLAM as a trusted custodian of the most sensitive data a financial institution can hold: consumers' transaction histories, account numbers, and personal information.

2.      POLAM brings this action and seeks relief to prevent ongoing and irreparable harm caused by Fiserv's deficient and misrepresented cybersecurity practices. Fiserv falsely represents that it employs appropriate safeguards to protect sensitive and confidential financial data of POLAM's credit union members; Fiserv fails to implement basic industry standard controls, leaving POLAM's systems and member information vulnerable to unauthorized access.

3.      These risks are not hypothetical – they are present and continuing.

4.      Under its Master Agreement, Fiserv pledged to protect that data with the same high-tech safeguards it uses for its own information and in full compliance with federal standards. But the reality was starkly different. Fiserv sold and operated systems that were so insecure that no regulated financial institution should have been asked to run its confidential data through them. Fiserv's systems lack basic security controls. They easily expose consumer data. And Fiserv kept selling them—while falsely assuring POLAM and its other financial institution customers that everything was secure.

5. For its own corporate data, Fiserv uses layered, possession-based multi-factor authentication (MFA), token generators, and biometric controls. For POLAM's data, however, Fiserv withheld those protections. On at least one system housing POLAM's data, Fiserv had no MFA at all. On others, Fiserv substituted MFA with an "email passcode challenge"—a method of security that is so weak and susceptible to hacking that federal standards ban its use.

6. POLAM cannot fix these security problems on its own because Fiserv controls the systems housing POLAM's data. While POLAM's systems remain inadequately secured, POLAM'S members remain exposed to harms such as identity theft, account takeover fraud, and other forms of abuse.

7. Then comes the squeeze. If POLAM seeks to leave and transfer its data to a safer provider, Fiserv would demand a hefty "early termination" and deconversion payment as the price of release. Fiserv's ultimatum is simple: pay the ransom, or keep your data exposed on systems Fiserv refuses to adequately secure.

8. Staying offers no refuge. Acknowledging its own deficiencies, Fiserv announced that it will discontinue its existing "Enhanced Authentication" or "Intelligent Authentication" product and force credit unions to purchase an upgrade marketed as "SecureNow," supposedly to provide additional security.

9. SecureNow does not solve the problem. It is insecure. It does not comply with federal standards for MFA. It falls far below the standard Fiserv uses to protect its own corporate data. And SecureNow does not address the myriad of other Fiserv systems that are insecure. So, even after paying for the upgrade to SecureNow, a financial institution remains exposed to hacking risks, and further improper extracontractual demands for upsells.

10.    In sum, Fiserv has attempted to monetize its own security failures by forcing credit unions to choose between paying to escape unsafe systems or paying again for ostensible security upgrades that do not provide proper protection.

11.    This is Fiserv's business model. According to *The Wall Street Journal,* Fiserv's misconduct is part of a pattern of victimizing small financial institutions and the consumers they serve. After decades of acquiring other technology providers, Fiserv now dominates the market. Fiserv's strategy is to buy up its smaller competitors to stymie competition. Meanwhile, Fiserv ceases to make the proper financial investments to keep up with emerging technology and security risks—while attempting to lock financial institutions into long-term contracts, attempting to intimidate and silence its customers from disclosing to other affected customers when there are security problems, and holding customers' data hostage when those customers seek to go to competitors. This gambit has fattened Fiserv's profits but exploited small financial institutions and the customers they serve. *See* "Frustrated by the Tech Industry, Small Banks Start to Rebel," *The Wall Street Journal*, April 11, 2019, https://www.wsj.com/articles/small-banks-rebel-against-the-most-important-tech-firms-you-have-never-heard-of-11554975000. **Exhibit 1** is a true and correct copy of *The Wall Street Journal* article.

12.    POLAM brings this action to recover payments for deficient services and to obtain declaratory and equitable relief that blocks Fiserv's improper exit charges and protects POLAM's members.

## PARTIES

13.    Plaintiff POLAM is a federally chartered, not-for-profit credit union with a principal place of business and localized activities in California. POLAM has a principal place of business at 589 N. Larchmont Blvd., Los Angeles, CA 90004.

14.    Upon information and belief, defendant Fiserv Solutions, LLC, formerly known as Fiserv Solutions, Inc., is a limited liability company organized under the laws of Wisconsin, with a principal place of business at 600 N. Vel R. Phillips Avenue, Milwaukee, WI 53203. Upon information and belief, Fiserv Solutions is a wholly owned subsidiary of Fiserv, Inc.

15.    Upon information and belief, defendant Fiserv, Inc. is a corporation incorporated under the laws of Wisconsin, with a principal place of business at 600 N. Vel R. Phillips Avenue, Milwaukee, WI 53203.

16.    At all relevant times, each defendant acted as the agent of the other defendant and within the scope of that agency. Each defendant acted with the other defendant's authority, knowledge, consent, and ratification of the acts and omissions alleged in this Complaint.

## JURISDICTION AND VENUE

17.    This Court has original subject-matter jurisdiction over POLAM's Defend Trade Secrets Act claim under 28 U.S.C. § 1331 (federal question) because it arises under the laws of the United States. Further, this Court has supplemental jurisdiction over POLAM's state-law claims 28 U.S.C. § 1367(a) because these claims are so related to the claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

18.    This Court also has subject-matter jurisdiction over POLAM's claims under 28 U.S.C. § 1332 (diversity) because there is complete diversity of citizenship among the parties because POLAM is a citizen of a different state than either defendant, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

19.     Venue in this district is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the misconduct occurred in this district, and a substantial part of the property that is the subject of the action is situated in this district.

20.     This Court has personal jurisdiction over Fiserv because Fiserv operates in this district and/or has contacts with this jurisdiction sufficient to subject it to personal jurisdiction.

## FACTUAL BACKGROUND

21.     POLAM is a not-for-profit cooperative financial institution owned by individual consumers, who pool their resources to provide credit and financial services to one another on fair terms. POLAM offers a range of banking and financial services for individuals and small businesses, including checking accounts, savings accounts and money markets, savings certificates (CDs), individual retirement accounts (IRAs), debit and credit cards, online banking, loan products (such as home loans, car loans, personal loans), and business banking. POLAM was chartered in 1969 by a small group of volunteers in the Polish American community in Southern California (originally as the Polish-American Congress Federal Credit Union, which later became POLAM). With over $70 million in assets and serving thousands of members, POLAM is a community-focused and growing not-for-profit financial institution.

22.     POLAM's members include friends and families of Polish-Americans living in Southern California. POLAM was formed to serve as a financial cooperative resource to serve the needs of the Polish-American community. It is professionally managed financial institution offering personalized service and a wide array of financial services.

23.     Fiserv is among the largest technology vendors to credit unions and banks. It claims approximately 10,000 financial institution clients and provides technology to more than one in three U.S. financial institutions.

24.     POLAM contracted with Fiserv to provide technology services under a Master Agreement dated June 1, 2014. **Exhibit 2** are true and correct copies of the Master Agreement and amendments dated December 28, 2022 and October 27, 2023.

25.     Among the documents that Fiserv provided to POLAM during the term of the Master Agreement and prior to the 2022 and 2023 amendments was Fiserv's *Enterprise Risk Management, Security and Privacy Program Overview (Updated: April 2019)* (the "*Security Overview*").

26.     The *Security Overview* contains representations of present fact concerning Fiserv's then-existing "enterprise approach to information and physical security, risk management, incident response, business continuity management, and the privacy and protection of confidential data."

27.     The *Security Overview* represents, among other things, that Fiserv has "enterprise standards and policies … designed to meet the objectives of applicable security and privacy laws, regulations, industry standards and contractual requirements. All Fiserv business units are required to comply with the Program."

28.     The *Security Overview* further represents that Fiserv aligned its cybersecurity program with the National Institute of Standards and Technology's ("NIST") Cybersecurity Framework, that the Fiserv cybersecurity program and framework are built on the NIST framework with the NIST framework providing guidance regarding cybersecurity program elements and their associated effectiveness:

**NIST Cybersecurity Framework**

The National Institute of Standards and Technology (NIST) issues and maintains the "Framework for Improving Critical Infrastructure Cybersecurity." This framework provides guidance regarding cybersecurity program elements and their associated effectiveness. Fiserv is a service provider to the Financial Services Sector, which is considered by the Department of Homeland Security to be a critical infrastructure sector. The Fiserv cybersecurity program and framework are built on the NIST framework.

29.    Fiserv also assured POLAM that its Legal Department continuously monitors legal, regulatory, and other third-party standards and that Fiserv's Legal Department will coordinate communications regarding these topics throughout Fiserv.

30.    These statements in the *Security Overview* described Fiserv's then-existing cybersecurity posture and compliance practices. They were false and misleading when made. At the time Fiserv furnished the *Security Overview* to POLAM, Fiserv had not aligned its cybersecurity standards and practices with the representations in the *Security Overview*, including the NIST framework. Nor is the Fiserv cybersecurity program built on the NIST framework. Moreover, and as further explained below, Fiserv does not comply with the NIST framework, including associated updates.

31.    Fiserv made these representations knowingly, or with reckless disregard for their truth, to induce POLAM to sign amendments to the Master Agreement, to pay for additional services from Fiserv, to furnish the credit union's extraordinarily sensitive confidential information to Fiserv, and to continue POLAM's relationship with Fiserv. Had Fiserv supplied truthful information to POLAM, it would have not allowed Fiserv to become the credit union's vendor having core responsibility over mission-critical banking systems.

32.    POLAM reasonably relied on Fiserv's representations concerning its existing cybersecurity program in agreeing to expand Fiserv's role to that of core technology provider, to sign amendments to the Master Agreement, to provide and continue to provide the credit union's confidential information to Fiserv, to continue doing business with Fiserv, and to make payments to Fiserv.

33.    POLAM discovered Fiserv's fraud shortly after January 20, 2026, when Fiserv, through counsel, asserted in open court in data-security litigation from one of its other financial institution clients that NIST is not mandatory or binding on Fiserv, and that there is nothing in Fiserv's contract that requires Fiserv to adopt NIST standards.

34.    Fiserv's recent admissions revealed that Fiserv's prior representations concerning its alignment with the NIST standards did not reflect Fiserv's actual cybersecurity practices.

35.    Moreover, given Fiserv's claim that the Master Agreement imposes no contractual obligation for Fiserv to incorporate or maintain alignment with the NIST standards, Fiserv's prior representations concerning its compliance with NIST standards were extra-contractual statements of fact that are actionable as fraud.

36.    Fiserv stores and processes POLAM's most sensitive information, including member names, dates of birth, Social Security Numbers, banking account numbers, balances, transaction histories, and other highly sensitive, personally identifying information, across various Fiserv systems.

37.    **Contractual Standard of Care.** Under the Master Agreement, Fiserv was required to follow the following standards of care:

> a.  Section 3(b) of the Master Agreement requires Fiserv to "use the same care and discretion to avoid disclosure of information as it uses with its own similar information that it does not wish disclosed, but

in no event less than a reasonable standard of care and no less than is required by law." (**Exhibit 2** at § 3(b).)

    b. Section 4(a) of the Master Agreement requires Fiserv to implement and maintain an information security program that is designed to meet the following objectives:

        i. "protect the security and confidentiality of customer information;"

        ii. "protect against any anticipated threats or hazards to the security or integrity of such information;"

        iii. "protect against unauthorized access to or use of such information that could result in substantial harm or inconvenience to any customer;" and

        iv. "ensure the proper disposal of 'consumer information.'" (**Exhibit 2** at § 4(a).)

38.    Fiserv protects its own confidential data with robust, high-assurance measures, including token-generated codes, biometric identifiers, and other layered authentication controls, in addition to phishing-resistant multi-factor authentication.

39.    **What POLAM Received.** Despite these contractual obligations, Fiserv failed to implement equivalent protections for POLAM's confidential information. Instead, Fiserv deployed materially weaker controls.

40.    **Why MFA Matters.** MFA is an additional security control that counters the most common hacking vector, a compromised password, by requiring two or more distinct factors: something the user knows (password), has (a device or token), or is (biometric).

41.    Not all MFA is created equal. Some forms, such as codes sent by email or text, are susceptible to hacking by interception, SIM-swap, or account takeover.

42.    Federal standards and supervisory guidance reinforce these differences. The Federal Financial Institutions Examination Council's *Authentication and Access to Financial Institution Services and Systems*[1] adopts the *Digital Identity Guidelines* of the National Institute of Standards and Technology ("NIST"), which mandates: "Methods that do not prove possession of a specific device, such as … email, SHALL NOT be used for out-of-band authentication." *See* NIST SP 800-63B § 5.1.3.1.[2] This further requires that "[i]n the absence of a trusted statement that it is a multi-factor device, the verifier SHALL treat the authenticator as single-factor." *Id.* § 5.1.5.2.

43.    A July 2025 update to NIST's *Digital Identity Guidelines* reinforces that codes sent by email are insufficient to provide proper MFA: "Email SHALL NOT be used for out-of-band authentication because it may be vulnerable to:

    • Access using only a password

    • Interception in transit or at intermediate mail servers

    • Rerouting attacks, such as those caused by Domain Name System (DNS) spoofing."[3]

44.    Codes sent by text message are insecure. The United States Cybersecurity and Infrastructure Security Agency describes text message codes as a "last resort MFA option" and appropriate only as a "temporary solution when organizations transition to a stronger MFA implementation."[4] This is because it is

---

[1]    https://www.ffiec.gov/sites/default/files/media/press-releases/2021/authentication-and-access-to-financial-institution-services-and-systems.pdf.

[2]    https://pages.nist.gov/800-63-3/sp800-63b.html.

[3]    https://nvlpubs.nist.gov/nistpubs/SpecialPublications/NIST.SP.800-63B-4.pdf.

[4]    https://www.cisa.gov/sites/default/files/2023-01/fact-sheet-implementing-phishing-resistant-mfa-508c.pdf.

fairly simple to intercept or redirect text messages, so a text message code is insufficient to satisfy the "what you have" factor.

45.     On at least one system housing POLAM's confidential information, Fiserv has not required any MFA or email passcode challenge at all.

46.     For other systems housing POLAM's confidential information, Fiserv relied on an email passcode challenge instead of MFA. Email does not establish possession of a specific device and does not qualify as a second factor under federal regulatory guidance. Nor does Fiserv use this weak method to secure its own confidential information. It therefore fails to meet the standard of care Fiserv owes under the Master Agreement.

47.     Fiserv's failure to deploy promised safeguards has resulted in POLAM paying for services that were not properly performed. Meanwhile, Fiserv has materially increased the risk of hacking and unauthorized access to POLAM's extraordinarily sensitive confidential information.

48.     Fiserv has failed to handle POLAM's and other financial institutions' data with basic and reasonable care, disclosing them to unauthorized third parties. Fiserv has sent another credit union's extraordinarily sensitive confidential information to POLAM.  Likewise, Fiserv disclosed POLAM's extraordinarily sensitive confidential information to other credit unions. Fiserv's safeguards are grossly deficient, noncompliant, and below any reasonable standard of care.

### *Fiserv's Pattern: Known Security Gaps, False Assurances, and Active Concealment*

49.     Fiserv has long known that the authentication controls on its systems sold to financial institutions suffer from serious security defects. Yet Fiserv continued to sell, deliver, and operate those platforms while assuring financial-institution clients that their systems and data remained secure. Fiserv's knowing and

willful misconduct—a combination of knowledge of security problems, false assurances its systems had certain security controls, and concealing the absence of security controls—amounts to fraud.

50.     Fiserv received repeated warnings that its controls failed to protect financial institutions. Instead of fixing root causes, Fiserv relied on outdated practices and patchwork responses. Those choices exposed POLAM's member information to compromise by hackers and forced POLAM—and other institutions—to operate under hidden, avoidable risk.

51.     In August 2018, *Krebs on Security* reported a Fiserv defect that allowed unauthorized access to consumers' account and transaction records and allowed changes to phone numbers and email addresses used for transaction alerts.[5]

52.     Customers attempted to alert Fiserv. Yet Fiserv did not treat the defect as urgent. Fiserv acted only after media scrutiny made inaction reputationally costly.

53.     Despite customer efforts to notify Fiserv directly (including messages sent to the social media accounts of Fiserv's CEO and various other individuals who were identified as affiliated with Fiserv), Fiserv ignored these warnings until media scrutiny compelled it to implement a fix.

54.     Fiserv spokesperson Ann Cave admitted publicly that Fiserv delayed addressing these known problems until media exposure forced its hand, confirming its reckless disregard for customer security. Ms. Cave confirmed that Fiserv did not make efforts to remediate this known threat until ***after*** receiving an inquiry from a ***reporter***—when negative press coverage was imminent. According to Ms. Cave, "[a]fter receiving [the reporter's] email, [Fiserv] promptly engaged appropriate

---

[5]  "Fiserv Flaw Exposed Customer Data at Hundreds of Banks," https://krebsonsecurity.com/2018/08/fiserv-flaw-exposed-customer-data-at-hundreds-of-banks/.

resources and worked around the clock to research and remediate the situation. [Fiserv] developed a security patch within 24 hours of receiving notification and deployed the patch to clients that utilize a hosted version of the solution. [Fiserv] will be deploying the patch this evening to clients that utilize an in-house version of the solution." Thus, only after Fiserv faced the imminent prospect of negative press attention did Fiserv "promptly engage[] appropriate resources" to fix its security lapse. This delay, however, left hundreds of financial institutions vulnerable long after Fiserv knew of the risk.

55.    Fiserv's lackadaisical approach to cybersecurity persists to this day.

56.    Unfortunately, Fiserv's corporate culture discouraged emphasis on data security. For example, even one of Fiserv's own employees recognized the inadequacy of Fiserv's support and outreach channels. In a post responding to the *Krebs on Security* article, Adam Kinder, Fiserv's Information Security Manager, publicly invited customers to message him through his personal social media account[6] so that he "can use what influence [and] means I have at our company,

---

6    Fiserv's Code of Conduct & Business Ethics, which was in effect at or around the time of Kinder's comment, contains a social media policy that covers the use of LinkedIn, Twitter, Facebook, forums, and blogs, and Fiserv regulates its employees' use of Fiserv's trademarks on social media. Fiserv notes that social media "is an established part of many people's personal and professional lives- and the lines have blurred." https://web.archive.org/web/20230601125645/https://investors.fiserv.com/static-files/2cef514b-b67b-45c7-9aaa-70ccedbdb25c. The current version of Fiserv's Code of Conduct & Business Ethics, which contains the same social media policy is available at https://d1io3yog0oux5.cloudfront.net/_583f477852403c9df0b7b630e3701167/fiserv/db/2275/21421/file/Code+of+Conduct+%26+Business+Ethics.pdf. Accordingly, Fiserv knows, or should have known, about communications sent

---

above and beyond customer support and outreach branches, to address their concerns." That public admission tracks what Fiserv's customers experienced: Fiserv's formal channels did not reliably surface or remediate high-risk security defects.

57.   For Fiserv, serious efforts at compliance often begin at the proverbial courthouse steps. When regulated financial institutions demand that Fiserv honor its security and oversight obligations, Fiserv resists until litigation forces the issue and compels action. Public filings reflect that pattern.

58.   In 2022, the U.S. Courthouse SDNY Federal Credit Union, the credit union serving judges and employees of the U.S. District Court for the Southern District of New York, sued Fiserv over online-banking security failures and to challenge Fiserv's asserted early-termination fee when that credit union was seeking to exit Fiserv while undergoing a merger with another credit union. *U.S. Courthouse SDNY Federal Credit Union et al. v. Fiserv Solutions, LLC et al.*, No. 1:22-cv-09329 (S.D.N.Y. 2022). Fiserv resolved the case shortly after it was filed.

59.   Other litigation raising security concerns includes *Bessemer System Federal Credit Union v. Fiserv Solutions, LLC et al.*, No. 2:19-cv-00624-RJC (W.D. Pa. 2019), *Cencap Federal Credit Union v. Fiserv Solutions, LLC*, Case No. 3:25-cv-00913-VDO (D. Conn. 2025), *Self-Help Credit Union v. Fiserv Solutions, LLC*, Case No. 1:25-cv-01112-TDS-LPA (M.D.N.C. 2025), and *FiCare Federal Credit Union v. Fiserv Solutions, LLC*, Case No. 8:26-cv-00231-JLB-TGW (M.D. Fla. 2026).

60.   Instead of candidly disclosing known defects to its clients and coordinating remediation, Fiserv worked to keep defects from becoming known to

_____

to the social media accounts of its agents who have identified themselves as Fiserv representatives on social media platforms.

its clients. When another credit union reported security problems, Fiserv responded with threats and litigation pressure designed to silence disclosure. That conduct did not protect Fiserv's customers; it protected Fiserv's reputation and revenue.

### Fiserv's "Sunset" Play: Remove Security Features Mid-Contract, Then Sell Those Features Back as "SecureNow" with Additional Pricing

61.   Fiserv puts revenue first. On January 8, 2026, it sent its credit union customers an "Enhanced Authentication Product Sunset Notice." The notice stated that Fiserv would discontinue the existing "Enhanced Authentication" feature for Virtual Branch Next effective May 31, 2026. A copy of the notice is annexed hereto as **Exhibit 3**.

62.   "Enhanced Authentication" is a lie: as shown above, Fiserv has not even provided baseline authentication for POLAM, much less any "advanced" authentication.

63.   Fiserv paired the withdrawal of Enhanced Authentication with a sales deadline. Fiserv's notice said that credit unions must sign a new agreement by March 2, 2026 to receive a replacement service Fiserv markets as "SecureNow," which Fiserv touts as "additional security" for Virtual Branch Next.

64.   SecureNow is not an "upgrade." It is a mid-contract shake-down. Fiserv already owes POLAM and its other customers a contractual duty to safeguard their confidential information. Fiserv cannot pull back security features mid-contract and then sell them back under new terms and higher pricing.

65.   SecureNow does not solve the problem it claims to address. The name sounds reassuring; its functionality is not. SecureNow does not provide possession-based MFA and therefore fails to address the root cause of online banking account takeovers. In short, even a credit union that pays for SecureNow remains exposed to

hackers and still cannot meet evolving regulatory expectations for protecting member information.

66.     In a February 12, 2026 webinar for its clients, Fiserv's representatives disclosed that SecureNow's authentication process was weaker than advertised. Those representatives confirmed that rather than requiring the use of a one-time password for each and every login attempt, SecureNow would only require the use of OTPs for every log in initially, a term they did not define. Once the system "learned the behavior" of the users, it would only require an OTP if there was something out of the ordinary, such as a login from a new device or a new location.

67.     Fiserv continues to pressure its credit union customers to sign up for SecureNow, sending docusign links to POLAM employees as recently as February 25, 2026.  A copy of the February 25, notice is attached as **Exhibit 4**.

68.     Fiserv's intent is to compel enrollment in SecureNow. In the February 12, 2026 webinar, Fiserv's representatives stated that implementation of SecureNow was mandatory. One of Fiserv's executives confirmed during the webinar that consumers' access to their online banking accounts would be "paused" after the May 31, 2026 deadline imposed by Fiserv until the credit union put SecureNow in place.

### *Fiserv Defrauds Its Financial Institution Customers, Including POLAM*

#### 1.      *Fiserv Provides a Fraudulent "Compliance Package" to Financial Institutions Misrepresenting the Security Controls Fiserv Has on Its Systems*

69.     As a regulated financial institution, POLAM must conduct oversight of third-party vendors such as Fiserv. To facilitate and influence that oversight, Fiserv provides its financial-institution customers a "Compliance Package" that represents

Fiserv has implemented security measures to meet financial-institution regulatory requirements.

70.    Fiserv updates its compliance package from time to time and assures POLAM that Fiserv continues to comply with evolving regulatory and industry requirements. The representations in Fiserv's compliance package were false and misleading.

71.    Among the materials in Fiserv's compliance package is Fiserv's *Standardized Information Gathering Questionnaire*. POLAM and other Fiserv customers use this questionnaire to assess Fiserv's security posture and vendor risk.

72.    The questionnaire asks: "Are policies and standards based on accepted control standards, frameworks, and industry practices?"

73.    Fiserv answered "Yes," and further represented that Fiserv's cybersecurity policies and standards track NIST and other recognized standards. Specifically, Fiserv represented, among other things:

> Fiserv has established a Global Cybersecurity and Technology Management Policy based on NIST's CSF (National Institute of Standards and Technology, Cyber Security Framework) which is a subset of controls within the comprehensive NIST SP 800-53 standard. The Global Cybersecurity and Technology Management Policy and standards have been designed to meet applicable industry and regulatory requirements.

• Interagency Guidelines Establishing Information Security Standards and on Response Programs for Unauthorized Access to Customer Information and Customer Notice

• EU General Data Protection Regulation (GDPR)

• Applicable European Banking Authority (EBA) guidelines

• Fair Credit Reporting Act (FCRA)

- Gramm-Leach-Bliley Act (GLBA)

- Health Insurance Portability and Accountability Act (HIPAA)

- Numerous state and /or country specific privacy and security laws including the IT Security Act 2.0 from the German Federal Office for Information Security

- International Organization for Standardization (ISO) 27001, Information Security Management

- National Institute of Standards and Technology (NIST) Cyber Security Framework

- Payment Card Industry Data Security Standard (PCI DSS)

74.    Those statements were false and misleading. As described above, Fiserv did not comply with accepted control standards, frameworks, and industry practices, including NIST authentication requirements.

75.    The questionnaire also asks: "Is Multi-Factor Authentication (MFA) utilized?" Fiserv answered: "Yes."

76.    That statement was false and misleading. As described above, Fiserv did not utilize MFA on at least one of its systems, and the authentication process used does not meet recognized standards for MFA.

77.    Fiserv also provided POLAM with a *Fiserv Cybersecurity Fact Sheet 2025*, which again represented that "Fiserv has established a Global Cybersecurity and Technology Management Policy based on authoritative sources that include regulatory and industry publications such as NIST's CSF (National Institute of Standards and Technology, Cyber Security Framework) which is a subset of controls within the comprehensive NIST SP 800-53 standard."

78.    The *Fiserv Cybersecurity Fact Sheet 2025* further represented that Fiserv's policy and standards "have been designed to meet applicable industry and

regulatory requirements," including NIST's "Cyber Security Framework, 800-53, 800-63-3."

79.   Those statements were false and misleading. As set forth above, Fiserv's use of an "email passcode challenge" as a purported second factor for MFA violates NIST Special Publication 800-63-3, which expressly prohibits email from being used for MFA.

80.   Fiserv's *Global Data Ethics and Privacy Program Fact Sheet 2025* represents that Fiserv that adopted privacy principles – regardless of location – which use "appropriate security safeguards" and "[r]ecognizes the importance of data privacy and holds [Fiserv] accountable to [its] data protection standards." Those statements were false and misleading; Fiserv fails to adequately use MFA leaving sensitive accounts exposed and fails to meet applicable industry and regulatory standards including NIST standard.

### 2.   *Fiserv Publishes a False and Misleading Privacy Notice*

81.   Fiserv, Inc. publishes a publicly available "Privacy Notice" that states, as present fact, the security measures Fiserv claims it has in place to protect customer data. The Privacy Notice purports to apply to Fiserv, Inc. and all subsidiaries and affiliates, including Fiserv Solutions.[7]

82.   In Section 6, Fiserv represents: it has "in place appropriate security measures to prevent…personal data from being lost, used or accessed in an unauthorized way, altered or disclosed."

83.   That statement was false and misleading when made. Contrary to Fiserv's representation, Fiserv did not have appropriate security measures in place to prevent POLAM's data from being used or accessed in an unauthorized way.

---

[7]   A copy appears at https://www.fiserv.com/en/about-fiserv/privacy-notice.html.

84.    Fiserv's misrepresentations and concealments harmed POLAM in a straightforward way: it deprived POLAM of material facts that would have altered POLAM's decisions about risk, vendor oversight, and continued use of Fiserv services. Fiserv withheld the truth while continuing to accept payment for services it represented as secure and compliant with contractual and legal requirements.

85.    Fiserv had strong financial motives to sustain the appearance of robust cybersecurity to maintain market and customer confidence in its systems. Fiserv's public filings reflect that goodwill and intangible assets comprise a significant portion of Fiserv's corporate assets, and as a publicly traded company, Fiserv's valuation depends on market and customer confidence in its systems. By suppressing adverse security information and downplaying risk, Fiserv misleadingly obtained customer revenue, reduced its customers' switching pressure, and fattened corporate goodwill—at its customers' expense.

86.    Fiserv's incentives to deceive intensified recently as Fiserv's share price fell sharply. Fiserv's stock is down approximately 70% over the past year, heightening Fiserv's pressure to avoid disclosures that could further impair market confidence and customer retention.

87.    Fiserv's misconduct was far from accidental. Fiserv knew about material security defects, minimized or misrepresented them, delayed remediation until external exposure threatened, and pressed to suppress the truth from its customers.

88.    That course of conduct shows willful, wanton, and reckless disregard for the privacy and security of financial-institution customers and their members and supports an award of punitive damages.

89.    As a direct result, POLAM has incurred and will continue to incur substantial costs to protect members, monitor for fraud, investigate suspicious

activity, and mitigate long-tail identity-theft risks created by Fiserv's security failures.

### 3. *The Severe Impact on POLAM and Its Members*

90. The information entrusted to Fiserv includes highly sensitive personal and financial data. If compromised, identity thieves can weaponize that data to drain accounts, change contact credentials, defeat fraud alerts, and impersonate members across other systems.

91. The harm does not end with a single incident. Once exposed, member information can circulate indefinitely, including through illicit marketplaces. Members face continuing risk of identity theft, account takeover, and downstream fraud—often months or years after the original exposure.

92. Cybercriminals also exploit stolen data to inflict non-monetary harms, including harassment, extortion attempts, and targeted stalking. Transaction times and locations can reveal personal routines and physical whereabouts.

93. Most importantly, members face irreparable harm when hackers gain access to their most sensitive financial information. Transactional data can reveal intimate facts of a members' lives, including, for example, which members paid retainers to a divorce attorney or which members receive care from a psychiatrist, drug-rehabilitation clinic, cancer center, fertility clinic, or abortion clinic.

94. Public reporting has recognized the hidden emotional toll of data breaches, a unique form of irreparable harm. While some victims report direct financial impacts, many more—50%—report emotional harm. Nearly one-third said a breach had affected their physical well-being, and nearly a quarter said their relationships were personally affected. Data breaches can expose diagnoses, medical procedures, and other highly sensitive personal information while leaving victims living with persistent anxiety: when will criminals use my data, and how? *See* "The

Hidden Emotional Toll on Victims of Data Breaches," *The Wall Street Journal*, Nov. 25, 2025, https://www.wsj.com/tech/cybersecurity/data-breach-victims-0b01a5ab?mod=Searchresults&pos=2&page=1. **Exhibit 5** is a true and correct copy of *The Wall Street Journal* article.

95.    Criminals can also use POLAM's member information for embarrassment, blackmail, or harassment in person or online, or to commit other types of fraud, including obtaining ID cards or driver's licenses, fraudulently obtaining tax returns and refunds, and obtaining government benefits. For example, the times and locations members use their debit cards can be used to stalk and victimize those individuals. A report from the United States Government Task Force on Identity Theft explains the harm to POLAM:

> Businesses suffer most of the direct losses from ... identity theft because individual victims generally are not held responsible for fraudulent charges. Individual victims, however, also collectively spend billions of dollars recovering from the effects of the crime.
>
> In addition to the losses that result when identity thieves fraudulently open accounts or misuse existing accounts, monetary costs of identity theft include indirect costs to businesses for fraud prevention and mitigation of the harm once it has occurred (e.g., for mailing notices to consumers and upgrading systems). Similarly, individual victims often suffer indirect financial costs, including the costs incurred in both civil litigation initiated by creditors and in overcoming the many obstacles they face in obtaining or retaining credit....
>
> In addition to out-of-pocket expenses that can reach thousands of dollars for the victims of new account identity theft, and the emotional toll identity theft can take, some victims have to spend what can be a considerable amount of time to repair the damage caused by the identity

thieves. Victims of new account identity theft, for example, must correct fraudulent information in their credit reports and monitor their reports for future inaccuracies, close existing bank accounts and open new ones, and dispute charges with individual creditors.[8]

96.     To put it into context, the FBI Internet Crime Complaint Center's 2024 Internet Crime Report reveals that, between 2020 and 2024, it received 4.2 million complaints related to various internet scams impacting American citizens around the globe, amounting to a staggering $50.5 billion in reported losses, and an average of 836,000 complaints received per year. In 2024 alone, the crime categories of personal data breach, general data breach, credit card/check fraud, and identity theft accounted for $2.19 billion in losses. The average reported loss per complaint in 2024 was $19,372.[9]

97.     Stolen data can also be offered for sale on the "dark web," a heavily encrypted part of the internet that makes it difficult for authorities to detect a website's location or owners. The dark web is not indexed by normal search engines such as Google and is accessible only by using a Tor browser (or similar tool), which aims to conceal users' identities and online activity. The dark web is notorious for hosting marketplaces selling items such as weapons, drugs, and personal information. Sites on the dark web appear and disappear quickly, providing cover for illegal transactions.

98.     Once a bad actor buys member information, it can then be used to gain access to different areas of the victim's digital life, including financial accounts, social media, and credit card details. During that process, other sensitive data may

---

[8]   The President's Identity Theft Task Force, Combating Identity Theft: A Strategic Plan, Federal Trade Commission, 11 (April 2007).

[9]   *See* https://www.ic3.gov/AnnualReport/Reports/2024_IC3Report.pdf.

be harvested from the victim's accounts, as well as from those belonging to family, friends, and colleagues.

99.    In addition to member information that can be accessed, a hacked online banking account can be very valuable to cyber criminals for other attacks. Since online banking accounts are linked to other accounts (for example, to transfer funds between financial institutions), a hacked online banking account can serve as a gateway for additional criminal activity.

100.    The problems associated with identity theft are exacerbated by the fact that many identity thieves will delay exploiting stolen information, extending the threat of identity theft long after the initial breach. The stolen data may be listed for sale on the dark web years after the initial breach, enabling unauthorized individuals to purchase and exploit it after the security incident has faded from immediate concern.

101.    Compounding this risk is the practice known as "dwell" by hackers, where unauthorized access remains undetected for extended periods, amplifying long-term harm. During this time, cybercriminals can continue exploiting across multiple systems within the same network, gather additional sensitive information, and fortify their control over compromised data without triggering immediate detection. This latency often results in the theft going unnoticed until long after the initial breach, amplifying the potential for further exploitation.

102.    Because hackers can remain undetected for extended periods and delay the use of stolen information, the full scope of the breach may not be immediately apparent. Indeed, to protect its member information, POLAM will need to remain vigilant against compromise and unauthorized use of its member information for years and decades to come.

**4.**     *POLAM Delivers a Notice of Breach and Requests Information Pursuant to the Master Agreement; Fiserv Ignores Its Obligations*

103.   POLAM has experienced many security and technological deficiencies in FiServ's products during the course of the Master Agreement.  In light of these material problems, POLAM conducted a review of the security controls Fiserv provides to POLAM.

104.   POLAM's review identified that compliant MFA was not implemented on POLAM's online banking website and mobile application used by members to conduct online banking activities.

105.   The Client360 system, which is used by credit union and Fiserv employees for service tickets, change orders, and communications that can include confidential information and requests affecting system security, did not have proper MFA implemented. This system has an email-delivered passcode.

106.   The security review identified that other systems used by credit union employees to host confidential information were not protected by proper MFA, including:  Portico   Reporting   Analytics,   Fiserv   Xchange   platform, Compass/TransferNow portal, and upon information and belief, WC3 and Instant Issue Advantage.

107.   Given the ongoing security risks, and Fiserv's refusal to deal with them in a timely manner, POLAM sent Fiserv a Notice of Breach on or about July 3, 2025. A copy of the Notice of Breach is annexed hereto as **Exhibit 6**.

108.   In addition to notifying Fiserv of its breaches of the Master Agreement and demanding that those breaches be remedied, POLAM also exercised its right under the Master Agreement for information concerning Fiserv's performance (or lack thereof). Specifically, POLAM's requests included:

*a.* Copies of audits, summaries of test results, and other equivalent evaluations of Fiserv's security, as required by § 4(a) of the Master Agreement and 12 C.F.R. Part 748, Appendix A;

*b.* A summary of Fiserv's written information security plan for the services provided to POLAM within 30 days, as required by § 4(b) of the Master Agreement;

*c.* Documentation supporting the amounts invoiced by Fiserv for the 12-month period prior to the date of the Notice of Breach, as required § 10(b) of the Master Agreement;

*d.* Copies of Fiserv's most recent security certifications for the service centers providing services to POLAM, as required by § 4(d) of the ASP Services Exhibit to the Master Agreement;

*e.* Copies of the independent audit reports of the Fiserv service centers providing service to POLAM, as required by § 4(h) of the ASP Services Exhibit to the Master Agreement; and

*f.* Results of Fiserv's tests of its Disaster Recovery Plan, as required by § 6(c) of the ASP Services Exhibit to the Master Agreement.

109.    By letter dated August 28, 2025, Fiserv responded to POLAM's request for audit documentation by sending a copy of Fiserv's Information Security Plan, refusing to provide invoice audit documentation required under Section 10(b), and assuring POLAM that "any remaining audit and evaluation information requested…to the extent it exists, will be provided in due course." A copy of Fiserv's response is annexed hereto as **Exhibit 7**.

110.    On September 18, 2025, POLAM issued a Supplemental Notice of Breach regarding Fiserv's failure to provide audit documentation, a copy of which is annexed hereto as **Exhibit 8**.

111.   To date, Fiserv has not provided other documents in response to POLAM's audit request, in breach of Fiserv's audit obligations.

**5.     *POLAM's Claims Are Timely, as Both the Statute of Limitations and Contractual Limitations Period Have Been Tolled***

112.   POLAM exercised reasonable diligence but could not discover Fiserv's misconduct earlier due to Fiserv's deliberate and active concealment.[10]

113.   POLAM became aware of the harm caused by Fiserv's security deficiencies only recently, well within the applicable limitations period.

114.   POLAM previously did not suspect, and had no reason to suspect, that Fiserv's products and services caused damages and harm.

115.   The highly technical nature of Fiserv's products and services prevented earlier detection of these serious cybersecurity problems.

116.   Fiserv maintained exclusive knowledge of the material defects and vulnerabilities designed and implemented into its products and services, actively misleading POLAM.

117.   In addition, Fiserv's fraudulent concealment and/or other tortious conduct has tolled the running of any statute of limitations.

118.   Fiserv was actually aware of the material defects in its systems, and its failure to comply with regulatory and contractual requirements. Fiserv also knowingly, affirmatively, and actively concealed from POLAM the risks associated

---

[10] "As the discovery rule has developed, the salient point giving rise to its application is the inability of the injured, despite the exercise of reasonable diligence, to know what he is injured and by what cause." *Bessemer Sys. Fed. Credit Union v. Fiserv Sols., LLC*, 472 F. Supp. 3d 142, 168 (W.D. Pa. 2020) (quoting *Fine v. Checcio*, 582 Pa. 253, 870 A.2d 850, 858 (Pa. 2005)) (denying Fiserv's motion to dismiss the plaintiff credit union's claim as time-barred, relying on the discovery rule).

with the defects of its products and services, and that these defects caused damages and harm to POLAM.

119.   Fiserv's purpose in concealing these facts was to induce POLAM to continue relying on its services and to delay POLAM's discovery of its claims. By concealing material information, Fiserv sought to avoid early detection of its misconduct and to prevent POLAM from initiating legal action within the applicable limitations period.

120.   Fiserv committed tortious and/or fraudulent acts that continue to this day. As of the date of this Complaint, Fiserv still has not disclosed, and continues to conceal, that it designed and implemented insecure features into its products and services, and that the representations it made about the security of its services are false. Despite its knowledge of the defects and their attendant risks, Fiserv continues to market its products and services to financial institutions while simultaneously omitting the disclosure of known and foreseeable harms.

121.   POLAM was unaware and could not have reasonably known or learned through reasonable diligence that it had been exposed to the defects and risks alleged herein and that those defects and risks were the direct and proximate result of Fiserv's acts and omissions.

122.   Moreover, Fiserv's obligations under the Master Agreement are ongoing and include the continued implementation of appropriate information security measures, adherence to regulatory requirements, and the exercise of good faith and fair dealing in not exposing POLAM to vastly greater harm than bargained for and well outside commercially reasonable norms. Each act of non-compliance with these contractual obligations renewed the limitations period under the continuing duty doctrine.

123.    For the foregoing reasons, Fiserv is estopped from relying on any statutes of limitation or repose, or other time-based defenses in this action. All applicable statutes of limitation and repose have been tolled by operation of the discovery rule, the continuing duty doctrine, and by Fiserv's active concealment with respect to all claims against it.

### FIRST CLAIM FOR RELIEF
**Breach of Contract: Monetary Damages**
**(Against Fiserv Solutions Only)**

124.    POLAM repeats and re-alleges the allegations set forth in paragraphs 1-123 above.

125.    The Master Agreement is a valid contract binding Fiserv Solutions.

126.    In addition to the express terms of the Master Agreement, the implied covenant of good faith and fair dealing applies to the Master Agreement. To vindicate the parties' apparent intentions and reasonable expectations, Fiserv Solutions was obligated to invoice only for services actually and properly performed and to provide security appropriate for a federally regulated credit union that stores extraordinarily sensitive consumer financial information.

127.    POLAM has duly performed all obligations and satisfied all conditions required of it under the Master Agreement, except for those that were waived or excused by Fiserv Solutions.

128.    Fiserv Solutions materially breached the Master Agreement, including by:

    a.    violating Section 3(b) of the Master Agreement by failing to use the same care and discretion to prevent unauthorized disclosure of POLAM's confidential information as Fiserv uses with its own similar information that it does not wish disclosed, but in no event less than a reasonable standard of care and no less than is required by law;

b.   violating Section 4(a) of the Master Agreement by failing to implement and maintain an information security program that appropriately protects the security and confidentiality of POLAM's information;

c.   violating Section 4(a) and 4(b) of the Master Agreement, and Sections 4(d), 4(h) and 6(c) of the ASP Services Exhibit to the Master Agreement, by failing to provide the documentation required to be produced to POLAM;

d.   violating Section 10(b) of the Master Agreement by refusing to provide POLAM with documentation supporting the amounts invoiced by Fiserv;

e.   violating N.Y. General Obligations Law § 5-903 by purporting to effectuate an automatic renewal of the Master Agreement without providing the required personal or certified mail notice to POLAM beforehand;

f.   repudiating its obligations, including by discontinuing Enhanced Authentication services mid-contract and insisting that POLAM agree to additional and different contract terms and pay additional charges for "SecureNow" or other ostensible security upgrades that Fiserv is under a preexisting contractual duty to provide; and

g.   violating the implied covenant of good faith and fair dealing by issuing invoices for services not properly performed and exposing POLAM to hacking and fraud risks vastly greater than it had bargained for and well outside of commercially reasonable norms.

129.   Fiserv Solutions' contract breaches were, at a minimum, grossly negligent. Fiserv had actual knowledge, through reports from financial institutions and others, that Fiserv's security controls were absent or woefully insecure and have

led to significant fraud losses and hacking at other financial institutions. Fiserv Solutions, however, failed to properly investigate or secure its systems. Nor did Fiserv Solutions alert POLAM of the security problems. Fiserv Solutions' contract breaches smack of intentional wrongdoing and evince a reckless indifference to POLAM's rights.[11]

130.    Fiserv Solutions' misconduct was not an isolated incident; it is part of a dangerous pattern that put life savings and extraordinarily sensitive financial information of scores of consumers into the reach of hackers. By withholding basic safeguards from POLAM's systems despite known hacking risks, Fiserv exposed thousands of consumers to hacking, fraud, and identity theft. And POLAM is not alone: Fiserv's deficient approach to cybersecurity for its clients has also endangered countless other financial institutions and their customers. Fiserv's misconduct is actionable as an independent tort as well as egregious, repeated, and directed at POLAM as part of a broader course of conduct that endangers the public. Fiserv's misconduct reflects a high degree of moral turpitude and such wanton dishonesty as to imply a criminal indifference to Fiserv's civil obligations. Punitive damages are appropriate to deter Fiserv from endangering others in the same way again.

---

[11] New York law governs the Master Agreement. New York public policy bars parties from contracting away liability for gross negligence, even in business-to-business contracts signed by sophisticated parties. The limitation-of-liability clause in the Master Agreement therefore offers Fiserv no protection because its failure to fulfill its obligation to secure POLAM was, at a minimum, grossly negligent. In *Abacus Federal Savings Bank v. ADT Security Services, Inc.*, 967 N.E.2d 666, 670 (N.Y. 2012), New York's highest court held that a financial institution could recover full, uncapped damages from a security vendor whose gross negligence left the institution insecure. Fiserv's misconduct here is no less grave. The same principle applies, and the damages here are not subject to any contractual cap.

131.   As a direct and proximate result of Fiserv Solutions' contract breaches, POLAM has suffered and will continue to suffer damages and harm.

## SECOND CLAIM FOR RELIEF
### Rescission[12]
### (Against Fiserv Solutions Only)

132.   POLAM repeats and re-alleges the allegations set forth in paragraphs 1-123 above.

133.   POLAM may have the Master Agreement rescinded due to Fiserv's breaches. The breaches are so material, willful, substantial, and fundamental that they have defeated the object of the parties in making the Master Agreement. These breaches have left POLAM in a position substantially different from what the parties intended at the time they entered into the Master Agreement.

134.   POLAM may have the Master Agreement rescinded because Fiserv misrepresented to POLAM the existence and nature of Fiserv's security controls. These representations were material to POLAM, and it reasonably relied on them in deciding whether to enter into and continue performing under the Master Agreement, which did not disclaim reliance on these types of specific representations, and the falsity of Fiserv's representations was within Fiserv's peculiar knowledge and could not have been reasonably discovered by POLAM.

135.   POLAM may have the Master Agreement rescinded due to commercial impracticability and frustration of purpose because unforeseeable events not caused by POLAM have altered the essential nature of the Master Agreement, and POLAM has been unable to obtain its expected bargain from Fiserv.

136.   POLAM has no adequate remedy at law. Accordingly, this Court should rescind the Master Agreement.

---

[12] As permitted by Fed. R. Civ. P. 8(a)(3), POLAM is demanding different types of relief, including in the alternative, on its breach of contract claim.

### THIRD CLAIM FOR RELIEF
### Breach of Contract: Specific Performance
### (Against Fiserv Solutions Only)

137.   POLAM repeats and re-alleges the allegations paragraphs 1-123 above.

138.   The Master Agreement is a valid contract binding Fiserv Solutions.

139.   POLAM has performed or substantially performed its obligations under the Master Agreement, except for those, if any, that were waived or excused by Fiserv Solutions.

140.   POLAM is ready, willing, and able to perform its remaining obligations until the contract terminates or is rescinded by an order of this Court.

141.   Fiserv Solutions is presently breaching, and absent relief will continue to breach, its contractual obligations to safeguard POLAM's confidential information.

142.   Fiserv Solutions has repudiated the Master Agreement, and absent relief will continue to breach the Master Agreement, by withdrawing security offerings provided under the Master Agreement and compelling POLAM to accept new service offerings (such as "SecureNow"), at increased prices, in order for Fiserv to continue performing its preexisting duty to safeguard POLAM's confidential information.

143.   Fiserv is capable of performing the Master Agreement, including by deploying phishing-resistant, possession-based MFA and other enhanced security controls that it uses to safeguard its own sensitive data.

144.   The loss of confidentiality and risk of unauthorized access constitute irreparable harms not adequately compensable by money damages alone.

145.   Accordingly, the Court should issue an order of specific performance compelling Fiserv Solutions to specifically perform its obligations to POLAM,

including securing POLAM's confidential information as required by the Master Agreement.

<u>**FOURTH CLAIM FOR RELIEF**</u>
**Declaratory Relief**
**(Against Fiserv Solutions Only)**

146.    POLAM repeats and re-alleges the allegations set forth in paragraphs 1-123.

147.    Genuine disputes exist between the parties concerning the Master Agreement and its existence, meaning, enforceability, and applicability. This Court's declarations of the parties' rights would resolve the legal relations of the parties to justiciable controversies.

148.    **No Obligation to Pay for or Contract for "SecureNow" (Preexisting Contractual Duty; Inadequate Security).** POLAM seeks a declaration that it has no obligation to enter into any agreement for Fiserv's "SecureNow" service. Under the Master Agreement, Fiserv bears a preexisting duty to safeguard POLAM's information in accordance with governing contractual and regulatory standards. Fiserv may not condition its performance of that duty on POLAM's agreement to new or different contractual terms or on the payment of additional fees. POLAM further seeks a declaration that Fiserv's "SecureNow" product does not satisfy Fiserv's existing contractual and regulatory obligations to appropriately protect POLAM's information.

149.    **Unenforceability of Master Agreement's Exculpatory and Limitation-of-Liability Provisions (Public Policy).** POLAM is entitled to a declaration that the exculpatory and limitation-of-liability provisions in the Master Agreement are unenforceable because they purport to allow Fiserv to exempt itself from liability for damages caused by its grossly negligent, intentional, fraudulent,

tortious, or other conduct for which an exculpatory provision or a limitation-of-liability provision is against public policy.

150. **Fiserv's Defective Purported Automatic Renewal of the Master Agreement (N.Y. General Obligations Law § 5-903).** POLAM is entitled to a declaration that, pursuant to N.Y. General Obligations Law § 5-903, the Master Agreement is unenforceable by Fiserv because it failed to give the statutorily required notice to POLAM before purporting to effectuate an automatic renewal of the Master Agreement.

151. **No Obligation to Pay Outstanding Accounts Receivable (AR) or Future Invoices.** POLAM disputes any obligation to pay the outstanding AR or future invoices on the grounds that:

  a. Fiserv's material breaches and repudiation excuse further performance by POLAM;

  b. Fiserv's failure of consideration discharges POLAM's payment obligations;

  c. Fiserv's prior material breach and repudiation bars enforcement of the Master Agreement's payment provisions; and

  d. The Master Agreement is subject to rescission.

152. **No Obligation to Pay Early Termination Fees, Liquidated Damages, Deconversion, or Post-Termination Fees (Contract Defenses and Public Policy).** POLAM is entitled to declarations that it has no obligation to pay Fiserv early termination fees, liquidated damages, "deconversion," or other post-termination fees because of the following:

  a. Fiserv has no right to enforce the Master Agreement due to its material breaches, fraudulent performance, failure of consideration,

commercial impracticability, frustration of purpose, and violation of N.Y. General Obligations Law § 5-903.

b. The fees at issue, other than liquidated damages, are not quantified in the Master Agreement and therefore unenforceable under the doctrine of indefiniteness and because they are not reasonable.

c. The early termination fees or liquidated damages provisions are unenforceable in a renewal term of the Master Agreement. The Master Agreement contemplated an initial term, during which POLAM paid and Fiserv received the complete economic benefit of the parties' bargain, including recurring fee revenue. Fiserv's attempt to impose early termination fees or liquidated damages during a renewal term is improper because the purpose of the liquidated damages clause (if valid during the initial term) was to compensate Fiserv for unrecovered upfront investments. In the renewal term, those investments have already been recouped in full or substantially recouped, and the clause serves no compensatory function. The liquidated damages provision is not calibrated to reflect any actual damages arising from an early termination during a renewal term. The same amount is demanded regardless of whether the Master Agreement is terminated in an initial term or renewal term. The formula—80% of all fees remaining in an initial or renewal term—creates a perverse and unreasonable result. Had the parties chosen not to renew at the conclusion of the initial term, no liquidated damages would have applied. Yet if the relationship ended just one day after, Fiserv would claim entitlement to liquidated damages in the millions. This arbitrariness renders the

clause punitive in nature, unrelated to any reasonable forecast of actual damages, and unenforceable as a matter of law. The provision fails to be enforceable because it imposes a penalty rather than approximating actual damages, does not decrease or scale based on the elapsed term, bears no reasonable relationship to Fiserv's actual damages, and seeks to unjustly enrich Fiserv by awarding a windfall for services not rendered.

d.  The early termination fees or liquidated damages provisions are unenforceable penalties because they purport to entitle Fiserv to payment without regard to Fiserv's own wrongful conduct, and without regard to the substantial independent reasons why POLAM may seek to terminate the Master Agreement to ensure its members are properly protected. The only legitimate purpose of such provisions would be to compensate for actual harm that is difficult to quantify. But if such provisions coerce action or punish—as they do here—they are unenforceable penalties. The plain purpose of these provisions is to coerce POLAM into maintaining its relationship with Fiserv. Moreover, even if these provisions are not unenforceable penalties, to the extent Fiserv relies on them for indemnification or recovery of amounts incurred as a result of its own wrongful acts, such provisions are unenforceable under New York law.

## **FIFTH CLAIM FOR RELIEF**
### **Unjust Enrichment**
### **(Against Fiserv Solutions Only)**

153.  POLAM repeats and re-alleges the allegations set forth in paragraphs 1-123 above.

154.    Fiserv Solutions induced POLAM to pay it by issuing invoices. These invoices, delivered on a recurring basis, conveyed expressly and by implication that the invoiced services had been properly performed and that the invoiced amounts were owed to Fiserv Solutions.

155.    In reality, Fiserv Solutions had not performed as promised. Fiserv Solutions' invoices overstated the amounts POLAM owed, and Fiserv Solutions withheld material facts about the security deficiencies in its systems. Fiserv Solutions' systems were so insecure that they were not even minimally suitable for storing a regulated credit union's confidential information.

156.    As a result of this misconduct, POLAM mistakenly conferred a benefit on Fiserv Solutions in the form of payments for deficient or non-performed services.

157.    Fiserv Solutions was unjustly enriched by those payments. Equity and good conscience require Fiserv Solutions disgorge and make restitution of the amounts POLAM paid, with interest.

## SIXTH CLAIM FOR RELIEF
### Defend Trade Secrets Act
### (18 U.S.C. § 1836, *et seq.*)

158.    POLAM repeats and re-alleges the allegations in paragraphs 1-123 above.

159.    POLAM is the owner of all right, title, and interest in and to certain valuable trade secrets relating to its business operations. POLAM's trade secrets include, but are not limited to, the identities and contact information of its members and employees, the compilation of members' financial history and transactions as reflected on account records and information, and credit information.

160.    POLAM's trade secrets are related to products and services used in and intended to be used in interstate and foreign commerce.

161. Other than through unlawful acquisition, the trade secrets are not known to the public and are not readily ascertainable by proper means to persons who could derive value from their disclosure or use.

162. POLAM has taken reasonable measures to maintain the secrecy of its trade secrets, including insisting that Fiserv protect their secrecy pursuant to the Master Agreement, Fiserv's Privacy Notice, and in accordance with the policies, procedures, and commitments announced by Fiserv.

163. POLAM has invested substantial resources in developing and protecting its trade secrets. POLAM's trade secrets provide it with economic advantages over its competitors.

164. Fiserv knew or should have known that POLAM's information at issue comprised POLAM's trade secrets.

165. Fiserv misappropriated and continued to misappropriate POLAM's trade secrets by acquiring and continuing to acquire them through improper means, including by misrepresenting to POLAM the existence and nature of Fiserv's security controls. Had Fiserv provided truthful information to POLAM, it would not have furnished its trade secrets to Fiserv and allowed, and continued to allow, those trade secrets to be stored and accessible on Fiserv's insecure systems.

166. Fiserv has also misappropriated POLAM's trade secrets by unlawfully disclosing them to third parties.

167. At the time of Fiserv's use and disclosure of POLAM's trade secrets, Fiserv knew or had reason to know that it acquired the trade secrets by improper means, under circumstances giving rise to a duty to maintain their secrecy or limit their use, from or through a person who had a duty to POLAM to maintain the trade secrets' secrecy and limit their use, or by mistake prior to a material change of Fiserv's position.

168.    Fiserv's misappropriation of POLAM's trade secrets was done for its own commercial advantage, allowing Fiserv to obtain and retain excessive payments from POLAM.

169.    Fiserv's acts constitute violations of the Defend Trade Secrets Act, 18 U.S.C. § 1836, *et seq.*

170.    Fiserv's misappropriation was willful and malicious, entitling POLAM to exemplary damages under 18 U.S.C. § 1836(b)(3)(C) and reasonable attorneys' fees under 18 U.S.C. § 1836(b)(3)(D).

171.    As a direct and proximate result of Fiserv's misappropriation of POLAM's trade secrets, POLAM has suffered and will continue to suffer damages and harm.

## SEVENTH CLAIM FOR RELIEF
### Fraud

172.    POLAM repeats and re-alleges the allegations in paragraphs 1-123 above.

173.    Fiserv fraudulently misrepresented its data security practices and knowingly concealed their profound deficiencies. Relying on these deceptive assurances, POLAM entrusted Fiserv with highly sensitive confidential information, a trust Fiserv intentionally violated.

174.    As set forth above, Fiserv fraudulently misrepresented the existence and nature of the security controls that were in place to protect POLAM's confidential information.

175.    As set forth above, Fiserv also fraudulently represented its performance and intention to perform under the Master Agreement, including by withdrawing security features mid-contract and forcing upgrades to "SecureNow."

176.   Likewise, statements in Fiserv's *Security Overview* were false and misleading when made.  At the time Fiserv furnished the *Security Overview* to POLAM, Fiserv had not aligned its cybersecurity standards and practices with the representations in the *Security Overview*, including the NIST framework. Nor is the Fiserv cybersecurity program built on the NIST framework. Moreover, and as further explained below, Fiserv does not comply with the NIST framework, including all associated updates.

177.   Fiserv also fraudulently represented its "Enhanced Authentication" service to POLAM. As set forth above, "Enhanced Authentication" fails to provide MFA that meets baseline standards for authentication. It is therefore not sufficient authentication at all. And it is certainly not "advanced."

178.   Statements in the *Fiserv Cybersecurity Fact Sheet 2025* further fraudulently represented that Fiserv's policy and standards "have been designed to meet applicable industry and regulatory requirements," including NIST's "Cyber Security Framework, 800-53, 800-63-3." As set forth above, Fiserv's use of an "email passcode challenge" as a purported second factor for MFA violates NIST Special Publication 800-63-3, which expressly prohibits email from being used for MFA.

179.   Moreover, Fiserv's failure to implement multi-factor authentication constitutes both fraud and fraudulent misrepresentation. By accepting payment for security services it had no intention of providing, Fiserv deliberately deceived POLAM about the actual level of protection afforded to its confidential information. Fiserv intentionally and willfully defrauded POLAM while placing thousands of members at risk.

180.   Even after being directly confronted about this fraud, Fiserv continues the deception. On July 3, 2025, counsel for POLAM sent a demand letter to Fiserv

explicitly identifying the failure to implement two-factor authentication despite receiving payment for such services. *See* **Exhibit 6**. Rather than implementing the promised security measures, Fiserv responded by disputing its breach. *See* **Exhibit 7**. Fiserv then pivoted, insisting on "sunsetting" its existing authentication protocol and demanding that POLAM implement another deficient product, "SecureNow," and pay more for the privilege.

181.    Fiserv's continued failure to provide two-factor authentication after being put on notice of this issue demonstrates the fraudulent nature of the original transaction. A company acting in good faith would have immediately implemented the security measures upon discovering an oversight. Instead, Fiserv's response confirms that its original acceptance of payment without even intending to hold its end of the bargain was intentional.

182.    Further, independent of any specific misrepresentations made by Fiserv, POLAM reasonably and justifiably relied on Fiserv to provide a service with at least minimally adequate measures to protect the confidentiality of POLAM's information and POLAM is entitled to presume, and did expect, that Fiserv would take appropriate measures to keep its information safe. Fiserv did not disclose at any time to POLAM that its information was vulnerable to hackers because Fiserv's security was inadequate. Fiserv was the only one in possession of that material information, which it had a duty to disclose. Fiserv misrepresented, both by affirmative conduct and by omission, the security of its systems, their ability to authenticate authorized users, and their ability to safely store and process POLAM's information, and the security measures and services that have been provided to POLAM. Fiserv also engaged in deception by actively concealing (a) Fiserv's failure to implement reasonable and appropriate security measures, (b) Fiserv's failure to follow industry standards and regulatory guidelines for data security; (c) information about Fiserv's

security problems (including by threatening another Fiserv customer who uncovered a security problem with litigation); (d) Fiserv's failure to comply with its own policies, notices, and agreements. justifiably relied on Fiserv, which had a duty to disclose material facts that would undermine POLAM's reasonable reliance on these subjects. Fiserv has special knowledge of information regarding these subjects that is not reasonably ascertainable by POLAM.

183.    POLAM reasonably and justifiably relied on Fiserv's misrepresentations, concealments, acts, and omissions to its detriment by, among other things, entering into the Master Agreement and other transactions with Fiserv, making payments to Fiserv, and furnishing confidential information to Fiserv.

184.    Fiserv knew or should have known that its misrepresentations, concealments, acts, and omissions were false or recklessly made without regard to their falsity, were material to POLAM, and were made with the intent of misleading POLAM into relying upon them, and POLAM did so justifiably rely. Further, the falsity of Fiserv's misrepresentations, concealments, acts, and omissions was within Fiserv's peculiar knowledge and could not have been reasonably discovered by POLAM.

185.    By Fiserv's misrepresentations, concealments, acts, and omissions, Fiserv defrauded POLAM, including fraudulently inducing POLAM to contract with, and continue to receive services from, Fiserv.

186.    As a direct and proximate result of Fiserv's fraud, POLAM has suffered and will continue to suffer damages and harm.

1
2
3

### EIGHTH CLAIM FOR RELIEF
**Cal. Bus. & Prof. Code § 17200 *et seq.***
**California's Unfair Competition Law**

4    187.   POLAM repeats and re-alleges the allegations set forth in paragraphs

5    1-123 above.

6    188.   Plaintiff is a California-chartered credit union that provides financial

7    services to its members and is governed by federal and California law.

8    189.   At all relevant times, Fiserv conducted substantial business in the State

9    of California and engaged in conduct affecting California consumers and financial

10   institutions, including credit unions.

11   190.   Fiserv provides core processing, digital banking, authentication, and

12   data security services to and credit unions, including POLAM.

13   **Unlawful, Unfair, and Fraudulent Business Practices**

14   191.   The UCL prohibits any "unlawful, unfair or fraudulent business act or

15   practice."

16   192.   Fiserv misrepresented, both by affirmative conduct and by omission,

17   the existence and nature of Fiserv's security controls, the security of its systems,

18   their ability to authenticate authorized users, and their ability to safely store and

19   process POLAM's information.

20   193.   These representations were material to POLAM's decision to select and

21   maintain the Fiserv platform.

22   194.   California's Unfair Competition Law prohibits "any unlawful, unfair or

23   fraudulent business act or practice."  Bus. & Prof. Code § 17200.

24   195.   Fiserv engaged in unfair and deceptive trade acts and practices by:

25
26
27
28

(a) failing to implement and maintain security procedures and practices appropriate to the nature of the information in violation of: California Civil Code § 1798.81.5 (Reasonable Security of Personal Information);

(b) misrepresenting both by affirmative conduct and by omission, the existence and nature of Fiserv's security controls, the security of its systems, their ability to authenticate authorized users, and their ability to safely store and process POLAM's information;

(c) actively concealing (i) Fiserv's failure to implement reasonable and appropriate security measures, (ii) Fiserv's failure to follow industry standards and regulatory guidelines for data security; (iii) information about Fiserv's security problems; (iv) Fiserv's failure to comply with its own policies, notices, and agreements.

196.   Fiserv proximately caused POLAM actual injury.  Had Fiserv provided POLAM with truthful information, POLAM would not have entered into the Master Agreement and other transactions with Fiserv, made payments to Fiserv, furnished confidential information or trade secrets to Fiserv, or allowed trade secrets or confidential information to be stored and accessible on Fiserv's insecure systems.

197.   The harm to POLAM and its members from inadequate services provided by Fiserv substantially outweighs any utility of Fiserv's conduct.

198.   Fiserv's conduct contravenes established public policy favoring reasonable security and privacy controls such as MFA.

199.   As a direct and proximate result of Fiserv's unfair and deceptive practices, POLAM has suffered and will continue to suffer damages and harm.

## JURY TRIAL DEMAND

POLAM requests a trial by jury of all issues so triable.

**DEMAND FOR RELIEF**

WHEREFORE, POLAM respectfully requests that the Court enter final judgment on the Complaint in favor of POLAM and against Fiserv and grant the following relief:

(i) **Monetary damages**, including, without limitation, restitutionary, compensatory, consequential, incidental, reliance, statutory, and punitive—all in amounts to be determined at trial;

(ii) **Rescission of the Master Agreement**, unwinding the parties' relationship;

(iii) **Restitution and disgorgement**, restoring POLAM to the status quo ante, including, without limitation, recovery of amounts POLAM paid to Fiserv under the Master Agreement for services that were materially deficient, nonconforming, or rendered valueless by Fiserv's breaches and repudiation;

(iv) **Indemnification** of POLAM's losses;

(v) **Declaratory relief** declaring the parties' respective rights and obligations in connection with the Master Agreement;

(vi) **Specific performance** compelling Fiserv to perform its obligations to POLAM;

(vii) **Preliminary and permanent injunctive relief** protecting POLAM against additional harm;

(viii) **Costs of litigation**, including, without limitation, POLAM's attorneys' fees and costs, and the maximum prejudgment and postjudgment interest allowed by law; and

(ix) **Any further relief** that may be necessary to achieve justice.

Dated: March 5, 2026

Respectfully submitted,

*/s/ Kristen L. Nelson*
Kristen L. Nelson (SBN 269318)
Patrick Maloney (SBN 287667)
**HECHT PARTNERS LLP**
2121 Avenue of the Stars, Suite 800
Los Angeles, California 90067
212.851.6821
knelson@hechtpartners.com
pmaloney@hechtpartners.com

Charles J. Nerko*
John C. Cleary*
Walter E. Swearingen*
**NERKO PLLC**
1178 Broadway, 3rd Floor
New York, NY 10001
518.363.9100
cnerko@nerko.com
jcleary@nerko.com
wswearingen@nerko.com

Lori G. Feldman*
**HECHT PARTNERS LLP**
125 Park Avenue, 25th Floor
New York, New York 10017
lfeldman@hechtpartners.com
888.421.4529

*Attorneys for Plaintiff*
*POLAM Federal Credit Union*

* *Pro hac vice application*
forthcoming.