# Exhibit 2

**[PUBLIC REDACTED VERSION]**

2601 Network Boulevard, Suite 600
Frisco, TX 75034
888-287-3371
www.fiserv.com

fiserv.

November 5, 2014

Christopher Hiller
CEO
Polam Federal Credit Union
589 N. Larchmont Blvd.
Los Angeles, CA 90004

Dear Mr. Hiller,

Thank you for renewing your relationship with Fiserv. As we continue to build on our partnership, we promise to deliver the same proven solutions, superior support and innovative thought leadership you have come to expect from us.

We appreciate your business and are honored to count Polam Federal Credit Union among the thousands of credit unions that depend on Fiserv to deliver solutions and services designed to help you boost operational efficiencies, enhance member service and achieve your business goals.

Enclosed is the signed Master Agreement for your files.

Sincerely,

Albert J. Ku

Enclosure

cc: Rebecca Gilbert

fiserv.

# MASTER AGREEMENT

MASTER AGREEMENT ("**Agreement**") dated as of June 1, 2014 ("**Effective Date**") between Fiserv Solutions, Inc., a Wisconsin corporation with offices located at 2601 Network Boulevard, Suite 600, Frisco, TX 75034 ("**Fiserv**"), and Polam Federal Credit Union, a federally chartered credit union with offices located at 589 N. Larchmont Boulevard, Los Angeles, CA 90004 ("**Client**").

---

Fiserv and Client hereby agree as follows:

1. Deliverables.

(a) General. Fiserv, itself and through its Affiliates (as defined herein), agrees to provide to Client, and Client agrees to obtain from Fiserv, the services ("**Services**") and products ("**Products**") (collectively, "**Deliverables**") described in the attached Exhibits, subject to the terms set forth in this Agreement and in the applicable Exhibit. "**Affiliate**" means an entity that controls, is controlled by, or is under common control with a party, where "control" means the direct or indirect ownership of more than 50% of the voting securities of such entity or party. Each Exhibit will be deemed to incorporate all of the terms of this Agreement. Use of the term "Exhibit" throughout this Agreement shall include any Schedules attached to such Exhibit. Exhibits and Schedules attached as of the Effective Date are listed below.

ASP Services Exhibit
- Account Processing Services Schedule to the ASP Services Exhibit
- EFT Services Schedule to the ASP Services Exhibit
- eFichency Services Schedule to the ASP Services Exhibit
- ID Verification Services Schedule to the ASP Services Exhibit
- Virtual Branch Services Schedule to the ASP Services Exhibit

Equipment Exhibit
- Firewall Schedule to the Equipment Exhibit

Professional and Development Services Exhibit

Software Products Exhibit
- Signature Capture and Laser Checks Software Schedule to the Software Products Exhibit

(b) Additional Entities and Deliverables. The parties or their Affiliates may add Deliverables to this Agreement by adding an appropriate new Exhibit or Schedule to this Agreement incorporating the added Deliverables and/or Affiliates, as applicable. When Deliverables are received by a Client Affiliate or provided by a Fiserv Affiliate under an Exhibit, then for the purposes of that Exhibit, references to "Client" or "Fiserv" in this Agreement will be deemed to include the applicable Client Affiliate or Fiserv Affiliate. An Affiliate's execution of an amendment to receive or provide Deliverables hereunder shall constitute such Affiliate's agreement to be bound by the terms of this Agreement.

2. Fees for Deliverables.

(a) General. Client agrees to pay Fiserv: (i) fees for Deliverables as specified in the Exhibits, (ii) out-of-pocket and other additional charges pursuant to Section 2(b), and (iii) Taxes as defined in Section 2(c). Fees may be increased as set forth in the Exhibits.

(b) Additional Charges. Client shall pay travel and living expenses and other out-of-pocket expenses reasonably incurred by Fiserv in connection with the Deliverables. As applicable, such out-of-pocket expenses shall be incurred in accordance with Fiserv's then-current corporate travel and expense policy. If an out-of-pocket expense is listed in an Exhibit, such expense may be changed to reflect changes issued by the applicable vendor.

(c) Taxes. Client is responsible for the payment of all sales, use, excise, value added, withholdings and other taxes and duties however designated that are levied by any taxing authority relating to the Deliverables ("**Taxes**"). All fees and other charges under any Exhibit are exclusive of Taxes. Client shall reimburse Fiserv for those Taxes that Fiserv is required to remit on behalf of Client. In no event shall Taxes include taxes based on Fiserv's income.

(d) Payment Terms. Invoices are due and payable upon Client's receipt of such invoice. Client shall pay Fiserv through the Automated Clearing House unless otherwise set forth in the Exhibits. If any invoiced amounts remain unpaid 30 days after Client's receipt of invoice, Client shall pay a monthly late charge based on the unpaid amounts equal to the lesser of 1.5% or the highest amount allowed by law until such invoice amount is paid in full. Client shall neither make nor assert any right of deduction or set-off from amounts invoiced.

3. Confidentiality and Ownership. The provisions of this Section 3 survive any termination or expiration of this Agreement.

(a) Definitions.

(i) "**Client Information**" means the following types of information of Client and its Affiliates obtained or accessed by Fiserv from or on behalf of Client or its Affiliates in connection with this Agreement or any discussions between the parties regarding new services or products to be added to this Agreement: (A) trade secrets and proprietary information; (B) customer lists, business plans, information security plans, business continuity plans, and proprietary software programs; (C) any personally identifiable information, defined as information that can be identified to a particular person without unreasonable effort, such as the names and social security numbers of Client's individual customers ("**Client PII**"); and (D) any other information received from or on behalf of Client or its Affiliates that Fiserv could reasonably be expected to know is confidential.

(ii) "**Fiserv Information**" means the following types of information of Fiserv and its Affiliates obtained or accessed by Client from or on behalf of Fiserv or its Affiliates in connection with this Agreement or any discussions between the parties regarding new services or products to be added to this Agreement: (A) trade secrets and proprietary information (including that of any Fiserv client, supplier, or licensor); (B) client lists, information security plans, business continuity plans, all information and documentation regarding the Deliverables, all software Products (including software modifications and documentation, databases, training aids, and all data, code, techniques, algorithms, methods, logic, architecture, and designs embodied or incorporated therein), and the terms and conditions of this Agreement; (C) any personally identifiable information, defined as information that can identified to a particular person without unreasonable effort, such as the names and social security numbers of Fiserv employees; and (D) any other information and data received from or on behalf of Fiserv or its Affiliates that Client could reasonably be expected to know is confidential.

(iii) "**Information**" means Client Information and/or Fiserv Information, as applicable. No obligation of confidentiality applies to any Information that: (A) the receiving entity ("**Recipient**") already possesses without obligation of confidentiality, develops independently without reference to Information of the disclosing entity ("**Discloser**"), or rightfully receives without obligation of confidentiality from a third party; or (B) is or becomes publicly available without Recipient's breach of this Agreement.

(b) Obligations. Recipient agrees to hold as confidential all Information it receives from the Discloser. All Information shall remain the property of Discloser or its suppliers and licensors. Recipient will use the same care and discretion to avoid disclosure of Information as it uses with its own similar information that it does not wish disclosed, but in no event less than a reasonable standard of care and no less than is required by law. Recipient may only use Information for the lawful purposes contemplated by this Agreement, including in the case of Fiserv use of Client Information for fulfilling its obligations

under this Agreement, performing, improving and enhancing the Deliverables, and developing data analytics models to produce analytics-based offerings. Client agrees that prior to providing Fiserv access to any Client PII, Client shall ensure that any necessary consent has been obtained that is required by law or regulation for Fiserv to access the information and to use it pursuant to the terms set forth in this Agreement. Fiserv specifically agrees not to use or disclose any "non-public personal information" about Client's customers in any manner prohibited by Title V of the Gramm-Leach-Bliley Act or the regulations issued thereunder ("**GLB**"), as applicable to Fiserv. Recipient may disclose Information to: (i) its employees and employees of permitted subcontractors and Affiliates who have a need to know; (ii) its attorneys and accountants as necessary in the ordinary course of its business; and (iii) any other person with Discloser's prior written consent. Before disclosure to any of the above persons, Recipient will have a written agreement with (or in the case of clause (ii) a professional obligation of confidentiality from) such person sufficient to require that person to treat Information in accordance with the requirements of this Agreement, and Recipient will remain responsible for any breach of this Section 3 by any of the above persons. Fiserv as Recipient may also disclose Client Information to third party vendors designated by Client. Recipient may disclose Information to the extent required by law or legal process, provided that: (A) Recipient gives Discloser prompt notice, if legally permissible, so that Discloser may seek a protective order; (B) Recipient reasonably cooperates with Discloser (at Discloser's expense) in seeking such protective order; and (C) all Information shall remain subject to the terms of this Agreement in the event of such disclosure. At Recipient's option, Information will be returned to Discloser or destroyed (except as may be contained in back-up files created in the ordinary course of business that are recycled in the ordinary course of business over an approximate 30- to 90-day period or such longer period as required by applicable law) at the termination or expiration of this Agreement or the applicable Exhibit and, upon Discloser's request, Recipient will certify to Discloser in writing that it has complied with the requirements of this sentence. Recipient acknowledges that any breach of this Section 3 may cause irreparable harm to Discloser for which monetary damages alone may be insufficient, and Recipient therefore acknowledges that Discloser shall have the right to seek injunctive or other equitable relief against such breach or threatened breach, in addition to all other remedies available to it at law or otherwise.

(c) Ownership. With the exception of Client Information, all information, reports, studies, object and source code (including without limitation the Products and all modifications, enhancements, additions, upgrades, or other works based thereon or related thereto), flow charts, diagrams, specifications, and other tangible or intangible material of any nature whatsoever produced by Fiserv or jointly with Client or by any of Fiserv's or Client's employees or agents, through or as a result of or related to any of the Deliverables provided hereunder or development of any data analytics models hereunder, and all patents, copyrights, and other proprietary rights related to each of the foregoing, shall be the sole and exclusive property of Fiserv or its Affiliates. Client hereby irrevocably assigns and transfers to Fiserv all rights, title, and interest in any such works referenced in the foregoing sentence, including without limitation copyrights, patent rights, trade secrets, industrial property rights, and moral rights, and shall execute all documents reasonably requested by Fiserv to perfect such rights. Client shall be entitled to use all such work product in accordance with the applicable terms and conditions of this Agreement.

(d) Restrictions. Without limiting any other obligation set forth in this Section 3, Client shall not use, transfer, distribute, interface, integrate, or dispose of any information or content contained in Deliverables in any manner that competes with the business of Fiserv. Except as expressly authorized in an Exhibit, Client shall not: (i) use the Deliverables to provide services to third parties; or (ii) reproduce, republish or offer any part of the Deliverables (or compilations based on any part of the Deliverables) for sale or distribution in any form over or through any medium.

4. Information Security.

(a) General. Fiserv has implemented and shall maintain an information security program that is designed to meet the following objectives: (i) protect the security and confidentiality of customer information (as defined in GLB); (ii) protect against any anticipated threats or hazards to the security or integrity of such information; (iii) protect against unauthorized access to or use of such information that could result in substantial harm or inconvenience to any customer; and (iv) ensure the proper disposal of "consumer information" (information obtained from "consumer reports" as defined in the Fair Credit Reporting Act). Fiserv agrees to use security safeguards for all personal information pertaining to

Massachusetts residents in accordance with Massachusetts Regulation 201 CMR 17.00. Upon Client's written request, Fiserv shall allow Client to review any associated audit reports, summaries of test results or equivalent measures taken by Fiserv to assess whether its information security program meets the foregoing objectives, to the extent and on the same terms such information is made generally available to Fiserv's other clients. Fiserv shall also take appropriate actions to address incidents of unauthorized access to Client's "sensitive customer information" (as defined in GLB), including notification to Client as soon as possible of any such incident. As required by an applicable industry security organization (e.g. PCI-SSC) or the applicable regulatory agency having jurisdiction over Client, Fiserv may disclose information regarding any such incident to such organization and such agency.

(b) Fiserv Plan. Within 30 days of Client's written request, Fiserv shall provide to Client a summary of Fiserv's written information security plan for the applicable Services received by Client, and thereafter upon Client's request will provide updates on the status of such information security plan.

(c) Data Encryption. As applicable to the Deliverables received by Client, Client agrees to comply with Fiserv's then-current data encryption policies and controls regarding transmission to and from Fiserv of tapes, images, and records maintained and produced by Fiserv for Client in connection with the Deliverables ("**Client Files**"), or other data transmitted to and from Fiserv in connection with the Deliverables (collectively with Client Files, "**Data**"). If Client requests or requires Fiserv to send, transmit, or otherwise deliver Data to Client or any third party in a non-compliant format or manner, or Client (or third party on Client's behalf) sends, transmits or otherwise delivers Data to Fiserv in a non-compliant format or manner, then, notwithstanding any other provision of this Agreement: (i) Client understands and accepts all risk of transmitting Data in an unencrypted or otherwise noncompliant format; and (ii) Client releases, discharges, and shall indemnify and hold harmless Fiserv and its employees, officers, directors, agents, and Affiliates from any and all liability, damage, or other loss under this Agreement or otherwise suffered by or through Client or suffered by any of the indemnified entities arising out of the transmission, destruction, or loss of such Data, including without limitation any information security or privacy breach related to such Data.

(d) Examination of Client Files. Client Files may be subject to examination by such federal, state, or other governmental regulatory agencies as may have jurisdiction over Client's business to the same extent as such records would be subject if maintained by Client on its own premises. Client agrees that Fiserv may give all reports, summaries, or information contained in or derived from the data or information in Fiserv's possession relating to Client when formally requested to do so by a regulatory or government agency. Fiserv reserves the right to charge Client at Fiserv's then-current rates for any assistance provided in response to regulatory requests, government agency requests, and legal process requests such as subpoena or search warrant, in each case to the extent related to Client, Client Files and/or Client Information, whether issued during or after the term of this Agreement.

5. Hiring and Employment.

(a) Background Checks. Neither party shall knowingly permit any of its employees to have access to the premises, records or data of the other party when such employee: (i) uses drugs illegally; or (ii) has been convicted of a crime in connection with a dishonest act or a breach of trust, as set forth in Section 19 of the Federal Deposit Insurance Act, 12 U.S.C. 1829(a) (a "**Conviction**"). Consistent with Fiserv's employment practices, newly hired Fiserv employees are required to pass both a pre-employment criminal background check and are required to pass a pre-employment drug screening, as permitted by law, and Fiserv periodically confirms that employees have not acquired any Convictions subsequent to hiring. Upon Client's reasonable request and at Client's expense, Fiserv may perform more frequent confirmation checks or utilize additional reasonable background checking criteria for those of Fiserv's employees who will have access to Client facilities or Client's networks and computer systems located at Client facilities. The results of all such background checks shall be retained solely by Fiserv or the third party performing such screening on behalf of Fiserv.

(b) Equal Employment. Each party agrees that it shall not discriminate against any employee or applicant for employment because of race, color, national origin, indigenous status, religion, marital status, sex, sexual orientation, age, physical or mental disability, veteran status or other characteristics

protected by law, and each party shall comply with all applicable requirements of the Equal Opportunity Clause set forth in Executive Order 11246, as amended, and its implementing instructions, the Rehabilitation Act of 1973, the Vietnam Era Veterans' Readjustment Assistance Act of 1974, as well as the equal opportunities and affirmative action requirements set forth in 41 C.F.R. Part 60-1.4(a) (women and minorities), 41 C.F.R. Part 60-300.5(a) (covered veterans) and 41 C.F.R. Part 60-741.5(a) (individuals with disabilities).

6. Warranties.

(a) By Fiserv. Fiserv warrants that: (i) no contractual obligations exist that would prevent Fiserv from entering into this Agreement; (ii) it has the requisite authority to execute, deliver, and perform its obligations under this Agreement; and (iii) it will comply with all regulatory requirements applicable to Fiserv's operations used in the performance of its obligations under this Agreement.

(b) By Client. Client represents and warrants that: (i) no contractual obligations exist that would prevent Client from entering into this Agreement; (ii) it has the requisite authority to execute, deliver, and perform its obligations under this Agreement; and (iii) it will comply with all regulatory requirements applicable to its receipt and use of Deliverables under this Agreement.

(c) THE WARRANTIES STATED ABOVE AND IN THE EXHIBITS, IF ANY, ARE LIMITED WARRANTIES AND ARE THE ONLY WARRANTIES MADE BY THE PARTIES. FISERV DOES NOT REPRESENT THAT THE DELIVERABLES MEET CLIENT'S REQUIREMENTS OR THAT THE OPERATION OF THE DELIVERABLES WILL BE UNINTERRUPTED OR ERROR-FREE. CLIENT ACKNOWLEDGES THAT IT HAS INDEPENDENTLY EVALUATED THE DELIVERABLES AND THEIR APPLICATION TO CLIENT'S NEEDS. FISERV DISCLAIMS, AND CLIENT HEREBY EXPRESSLY WAIVES, ALL OTHER REPRESENTATIONS, CONDITIONS, OR WARRANTIES, EXPRESS AND IMPLIED, INCLUDING WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT, AND ANY ARISING FROM A COURSE OF DEALING OR USAGE OR TRADE. CLIENT MAY NOT MAKE ANY WARRANTY OF ANY KIND, EXPRESS OR IMPLIED, ON BEHALF OF FISERV, ITS AFFILIATES OR THEIR RESPECTIVE THIRD PARTY PROVIDERS OR LICENSORS TO ANY AUTHORIZED USER OR ANY OTHER PARTY IN CONNECTION WITH THE DELIVERABLES WITHOUT FISERV'S EXPRESS PRIOR WRITTEN CONSENT.

7. Limitation of Liability. IN NO EVENT SHALL FISERV BE LIABLE FOR LOSS OF GOODWILL, OR FOR SPECIAL, INDIRECT, INCIDENTAL, CONSEQUENTIAL, PUNITIVE, EXEMPLARY, OR TORT DAMAGES ARISING OUT OF OR RELATING TO THIS AGREEMENT, REGARDLESS OF WHETHER SUCH CLAIM ARISES IN TORT, CONTRACT, OR OTHERWISE. EXCEPT FOR CLAIMS RELATED TO PROPRIETARY RIGHTS OR PAYMENT OBLIGATIONS, NEITHER PARTY MAY ASSERT ANY CLAIM AGAINST THE OTHER RELATED TO THIS AGREEMENT MORE THAN 2 YEARS AFTER SUCH CLAIM ACCRUED. FISERV'S AGGREGATE LIABILITY TO CLIENT AND ANY THIRD PARTY FOR ANY AND ALL CLAIMS OR OBLIGATIONS RELATING TO THIS AGREEMENT SHALL BE LIMITED TO THE TOTAL FEES PAID BY CLIENT TO FISERV UNDER THE SCHEDULE RESULTING IN SUCH LIABILITY IN THE 2 MONTH PERIOD PRECEDING THE DATE THE CLAIM ACCRUED.

8. Term and Termination.

(a) Term. This Agreement shall be effective on the Effective Date and shall remain in effect until the term of all outstanding Exhibits has expired or such Exhibits have terminated, unless otherwise terminated as provided herein. The term for Deliverables may be set forth in the applicable Exhibit. An Exhibit that does not state a term will be effective from its last date of execution until terminated in accordance with this Agreement or the Exhibit.

(b) Termination. In addition to termination rights set forth in any Exhibit:

(i) Either party may, upon written notice to the other, terminate: (A) any Schedule if the other party materially breaches its obligations under that Schedule or under this Agreement with respect to that Schedule; or (B) this Agreement if the other party materially breaches its obligations with respect to the non-breaching party's Information or other intellectual

property; and the breaching party fails to cure such material breach within 90 days following its receipt of written notice stating, with particularity and in reasonable detail, the nature of the claimed breach.

(ii) If any invoice remains unpaid by Client 30 days after due, Fiserv may, upon 30 days' written notice to Client, terminate: (A) the Schedule and/or Client's access to and use of Deliverables to which the payment failure relates; or (B) this Agreement if the unpaid amounts constitute a material portion of annual charges due under this Agreement.

(c) Remedies. Remedies contained in this Section 8 are cumulative and are in addition to the other rights and remedies available to Fiserv under this Agreement, by law or otherwise.

9. Dispute Resolution. Before initiating legal action against the other party relating to a dispute herein, the parties agree to work in good faith to resolve disputes and claims arising out of this Agreement. To this end, either party may request that each party designate an officer or other management employee with authority to bind such party to meet to resolve the dispute or claim. If the dispute is not resolved within 30 days of the commencement of informal efforts under this paragraph, either party may pursue formal legal action. This paragraph will not apply if expiration of the applicable time for bringing an action is imminent and will not prohibit a party from pursuing injunctive or other equitable relief to which it may be entitled.

10. Audit.

(a) Fiserv Operations and Security. Client acknowledges and agrees that Fiserv is subject to certain examinations by the Federal Financial Institutions Examination Council ("**FFIEC**") regulators and agencies. Client acknowledges and agrees that reports of such examination of Fiserv business units are available to Client directly from the relevant FFIEC agencies. Fiserv employs an internal auditor responsible for reviewing the integrity of its processing environments and internal controls.

(b) Billing Records. Upon Client's reasonable request in writing no more frequently than once every 12 months, Fiserv shall provide Client with documentation supporting the amounts invoiced by Fiserv hereunder for the 12-month period preceding such Client request. If such documentation reveals the amounts paid to Fiserv exceed the amounts to which Fiserv is entitled and such amounts are independently verified, Fiserv shall promptly remit or otherwise credit to Client the amount of such overpayment. Conversely, if such documentation reveals the amounts paid to Fiserv are less than the amounts owed, Client shall promptly remit the amount of such underpayment to Fiserv. Invoices dated prior to the 12-month review period hereunder shall be deemed correct. Fiserv reserves the right to charge Client for any assistance required in connection with an audit at Fiserv's then-current rates.

11. General.

(a) Binding Agreement; Assignment. This Agreement is binding upon the parties, their participating Affiliates, and their respective successors and permitted assigns. Neither this Agreement nor any part thereof or interest therein may be sold, assigned, transferred, pledged, or otherwise disposed of by Client, whether pursuant to change of control, by operation of law or otherwise, without Fiserv's prior written consent. Client agrees that Fiserv may assign all or part of this Agreement and may subcontract any obligations to be performed hereunder; provided that any such subcontractors shall be required to comply with all applicable terms and conditions of this Agreement, and Fiserv shall remain primarily liable for the performance of any such subcontractors.

(b) Entire Agreement; Amendments. This Agreement, including its Exhibits and Schedules, which are expressly incorporated herein by reference, constitutes the complete and exclusive statement of the agreement between the parties as to the subject matter hereof and supersedes all previous agreements with respect thereto and the terms of all existing or future purchase orders and acknowledgments. Each party hereby acknowledges that it has not been induced to enter into this Agreement by virtue of, and is not relying on, any representation made by the other party not embodied herein, any term sheets or other correspondence preceding the execution of this Agreement, or any prior course of dealing between the parties, including without limitation any statements concerning product or service usage or the financial

condition of the parties. The protections of this Agreement shall apply to actions of the parties performed in preparation for and anticipation of the execution of this Agreement. Modifications of this Agreement must be in writing and signed by duly authorized representatives of the parties. If the terms of any Exhibit or Schedule conflict with the terms of this Agreement, this Agreement shall control unless the applicable Exhibit or Schedule expressly states that its terms control. If the terms of any Schedule conflict with the terms of the Exhibit to which such Schedule is attached, the terms of the Schedule shall control.

(c) Severability. If any provision of this Agreement is held to be unenforceable or invalid, the other provisions shall continue in full force and effect.

(d) Governing Law; Jury Trial Waiver. This Agreement will be governed by the substantive laws of the State of New York, without reference to provisions relating to conflict of laws. The United Nations Convention on Contracts for the International Sale of Goods shall not apply to this Agreement. Both parties agree to waive any right to have a jury participate in the resolution of any dispute or claim between the parties or any of their respective Affiliates arising under this Agreement.

(e) Force Majeure. With the exception of Client's payment obligations, neither party shall be responsible for delays or failures in performance resulting from acts of God, acts of civil or military authority, fire, flood, strikes, war, epidemics, pandemics, shortage of power, telecommunications or Internet service interruptions or other acts or causes reasonably beyond the control of that party. The party experiencing the force majeure event agrees to give the other party notice promptly following the occurrence of a force majeure event, and to use diligent efforts to re-commence performance as promptly as commercially practicable.

(f) Notices. Any written notice required or permitted to be given hereunder shall be given by: (i) Registered or Certified Mail, Return Receipt Requested, postage prepaid; (ii) confirmed facsimile; or (iii) nationally recognized overnight courier service to the other party at the addresses listed on page 1 or to such other address or person as a party may designate in writing. All such notices shall be effective upon receipt.

(g) No Waiver. The failure of either party to insist on strict performance of any of the provisions hereunder shall not be construed as the waiver of any subsequent default of a similar nature.

(h) Prevailing Party. The prevailing party in any arbitration, suit, or action brought by one party against the other party to enforce the terms of this Agreement or any rights or obligations hereunder, shall be entitled to receive, in addition to such other relief as the arbitrators or court may award, its reasonable costs and expenses, including without limitation all attorneys' fees, expert witness fees, litigation-related expenses and arbitrator and court or other costs incurred in such proceeding or otherwise in connection with bringing such arbitration, suit, or action. For purposes of this Agreement, a party is "prevailing" if that party prevails on the central issue raised in the action or claim, regardless of the amount of damages awarded or otherwise owed, if any. A party may prevail by judgment or decision in that party's favor, consent decree, settlement agreement or voluntary dismissal with or without prejudice.

(i) Survival. All rights and obligations of the parties under this Agreement that, by their nature, do not terminate with the expiration or termination of this Agreement shall survive the expiration or termination of this Agreement.

(j) Recruitment of Employees. Client shall not, without Fiserv's prior written consent, directly or indirectly, solicit for employment or hire any Restricted Employee (as defined herein) while such person is employed by Fiserv and for the 12-month period starting on the earlier of: (i) termination of such Restricted Employee's employment with Fiserv; or (ii) termination or expiration of this Agreement. "**Restricted Employee**" means any former or current employee of Fiserv or its Affiliates that Client became aware of or came into contact with during Fiserv's performance of its obligations under this Agreement.

(k) Publicity. Client and Fiserv shall have the right to make general references about each other and the type of Deliverables being provided hereunder to third parties, such as auditors, regulators, financial analysts, and prospective customers and clients, provided that in so doing Client or Fiserv does

not breach Section 3 of this Agreement. Fiserv may issue a press release regarding this Agreement, including its renewal and the addition of Deliverables, subject to Client's review and approval, which shall not be unreasonably withheld or unduly delayed. Except as authorized herein, Client will not use the name, trademark, service mark, logo or other identifying marks of Fiserv or any of its Affiliates in any sales, marketing, or publicity activities, materials, or website display without the prior written consent of Fiserv. Any such authorized or approved use shall at all times comply with Fiserv's Trademark Usage Guidelines (or such other requirements and/or guidelines) set forth on Fiserv's corporate website and other requirements issued or otherwise made available by Fiserv.

(l) Independent Contractors. Client and Fiserv expressly agree they are acting as independent contractors and under no circumstances shall any of the employees of one party be deemed the employees of the other for any purpose. Except as expressly authorized herein or in the Exhibits, this Agreement shall not be construed as authority for either party to act for the other party in any agency or other capacity, or to make commitments of any kind for the account of or on behalf of the other.

(m) No Third Party Beneficiaries. Except as expressly set forth in any Exhibit hereto, no third party shall be deemed to be an intended or unintended third party beneficiary of this Agreement.

(n) Counterparts; Signatures. This Agreement and any Exhibits hereto may be executed in counterparts, each of which shall be deemed an original and which shall together constitute one instrument. Client and its Affiliates may execute this Agreement and any Exhibit or amendment hereto in the form of an electronic record utilizing electronic signatures, as such terms are defined in the Electronic Signatures in Global and National Commerce Act (15 U.S.C. §7001 et seq.). Client and its Affiliates will not dispute the validity or authenticity of electronic signatures submitted to Fiserv by Client or its Affiliates, nor will Client or its Affiliates dispute the legal authority, validity or authenticity of those who sign with such electronic signatures to bind Client and its Affiliates. Electronic signatures by Client and its Affiliates, as well as signatures by either party transmitted by facsimile or electronically via PDF or similar file delivery method, shall have the same effect as an original signature.

---

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by their duly authorized representatives as of the Effective Date.

| For Client: | For Fiserv: |
|---|---|
| **Polam Federal Credit Union** | **Fiserv Solutions, Inc.** |
| By: [signature] | By: [signature] |
| Name: CHRISTOPHER HILLER | Name: Albert J. Ku |
| Title: CEO | Title: Authorized Signatory |
| Date: 7-28-2014 | Date: Oct 30, 2014 |

---

## ASP Services Exhibit to Master Agreement

1. ASP / Processing Services. The parties shall add individual Schedules to this ASP Services Exhibit for Fiserv's provision of ASP, processing, or other service bureau Services to Client. The terms of this ASP Services Exhibit shall apply to the Services set forth in Schedules attached to this Exhibit.

2. Additional Services.

(a) Implementation Services. Services: (i) to convert Client's existing applicable data and/or information to the Services, and/or (ii) to implement the Services (collectively, "**Implementation Services**") will be provided by Fiserv to the extent applicable to the Services, for the fees, if any, set forth in the Schedules to this Exhibit. Client agrees to provide all necessary cooperation, information and assistance in connection with Implementation Services to facilitate conversion and/or implementation.

(b) Training Services. To the extent applicable to the Services, Fiserv shall provide training, training aids, user manuals, and other documentation for Client's use as Fiserv finds necessary to enable Client personnel to become familiar with Services, for the fees, if any, set forth in the Schedules to this Exhibit. If requested by Client, classroom training in the use and operation of Services will be provided at a training facility designated by Fiserv.

(c) Optional Services. If optional services are listed on a Schedule to this Exhibit, such optional services shall become part of the Agreement upon Client's use of such optional services.

3. Fiserv System and Client Systems. Fiserv systems used in the delivery of Services (the "**Fiserv System**") and Client's networks and computer systems ("**Client Systems**") contain information and computer software that are proprietary and confidential information of the respective parties, their suppliers, and licensors. Each party agrees not to attempt to circumvent the devices employed by the other party to prevent unauthorized access thereto, including without limitation modifications, decompiling, disassembling, and reverse engineering thereof.

4. Fiserv Obligations.

(a) Client Policies. While assigned to provide Services at a Client location or otherwise visiting Client's facilities, Fiserv employees will: (i) comply with Client's reasonable safety and security procedures and other reasonable Client rules applicable to Client personnel at those facilities to the extent such procedures and rules are provided to Fiserv in writing and in advance, (ii) comply with all reasonable requests of Client personnel, as applicable, pertaining to personal and professional conduct, and (iii) otherwise conduct themselves in a professional and businesslike manner.

(b) Changes. Fiserv may make changes in its methods of delivering the Services, including but not limited to operating procedures, type of equipment or software resident at, and the location of Fiserv's service center(s). Fiserv will notify Client prior to implementing any material change that affects Client's normal operating procedures, reporting, or internal service costs.

(c) Client Systems Access. If Fiserv accesses Client Systems, Fiserv will: (i) use this access only to provide Services to Client; and (ii) ensure that the Fiserv System includes up-to-date anti-viral software designed to prevent viruses from reaching Client Systems through the Fiserv System.

(d) Security Testing. Fiserv may use a third party to provide monitoring, penetration and intrusion testing with respect to certain Services. Upon Client's written request, Fiserv agrees to provide Client with a copy of its most recent security certification, if any, for the applicable Fiserv service center providing such Services.

(e) Services Warranties. Fiserv represents and warrants that: (i) Services will conform to the specifications set forth in the Schedules to this Exhibit; (ii) Fiserv will perform Services accurately provided that Client supplies accurate data and information, and follows the procedures described in all Fiserv documentation and notices; (iii) Fiserv personnel will exercise due care in provision of Services; and (iv) functionality provided by the Fiserv System will enable Client to comply in all material respects with Federal regulations generally applicable to Fiserv's clients in the industry in which the functionality is intended to be used.

(f) Error Correction. In the event of an error or other default caused by Fiserv personnel, systems, or equipment, Fiserv shall correct such error or default at no additional charge to Client, provided that Client supplies Fiserv with a written request for correction of the error within 7 days after Client's receipt of the work containing the error. Work reprocessed due to errors in data supplied by or through Client or by Client's failure to follow procedures set forth by Fiserv shall be billed to Client at Fiserv's then current time and material rates.

(g) Infringement Claims. Fiserv shall, at its expense, defend Client against any third party claim or action alleging that the Fiserv System infringes a United States patent, copyright, or other proprietary right of such third party ("**Infringement Claim**"), and shall pay all amounts payable by Client under any judgment, verdict, or court order entered by a court of competent jurisdiction or settlement agreed upon by Fiserv in any Infringement Claim, provided that Client: (i) notifies Fiserv promptly of such Infringement Claim, (ii) grants Fiserv the sole right to control the defense and disposition of such Infringement Claim, and (iii) provides Fiserv with reasonable cooperation and assistance in the defense and disposition of such Infringement Claim. The obligations set forth in this paragraph are Fiserv's entire liability and Client's sole and exclusive remedy for any Infringement Claim.

(h) Audit. In addition to the audit provisions set forth in Section 10 of the Agreement, Fiserv provides for periodic independent audits of its operations, which shall include an annual SSAE 16 Type II audit to the extent required by law or regulation. Fiserv shall provide Client with a copy of such independent audit report of the Fiserv service center providing Services within a reasonable time after its completion, and may charge Client a fee based on the pro rata cost of such audit apportioned among Fiserv's clients. If material deficiencies affecting the Services are noted in such audit report, Fiserv will develop and implement an action plan to address and resolve any such deficiencies within a commercially reasonable time at Fiserv's expense.

5. Client Obligations.

(a) Procedures; Processing Priority. Client agrees to comply with Fiserv's procedures and operating instructions for use of Services and the Fiserv System. Client acknowledges that Fiserv does not subscribe to any processing priority; all users receive equal processing consideration.

(b) Communication Lines, Terminals, Equipment, Software. All communication lines, terminals, equipment, computer software, and interface devices required to access the Fiserv System and to transmit and receive data and information between Client's location(s), Fiserv's service center(s), and/or other necessary location(s) (collectively, "**Client Equipment**") are subject to approval by Fiserv and shall be compatible with the Fiserv System. Client is responsible for the expense of either procuring Client Equipment from Fiserv or providing Client Equipment itself, provided that all communication lines shall be procured from Fiserv. If Client has elected to provide Client Equipment itself, Fiserv shall provide Client with a list of compatible equipment and software. Client agrees to pay Fiserv's standard fee for recertification of the Fiserv System resulting from Client's use of non-compatible Client Equipment. If Fiserv provides such items, Client agrees to pay charges relating to the installation and use of Client Equipment as set forth in the Schedules to this Exhibit.

(c) Input. Client shall be solely responsible for the input, transmission, or delivery to and from Fiserv (whether delivered to or from Client site(s) or any applicable clearinghouse, regulatory agency, or Federal Reserve Bank) of all information and data required by Fiserv to perform Services unless Client has retained Fiserv to handle such responsibilities, as specifically set forth in Schedules to this Exhibit. The information and data shall be provided in a format and manner approved by Fiserv. Client is responsible for providing all instructions requested by Fiserv as necessary to perform the Services. Client shall determine and be responsible for the authenticity, accuracy, and completeness of all information, data, and instructions submitted to Fiserv. Fiserv is not obligated to check for errors or omissions in any such information, data, or instructions and/or to correct, cancel or amend any action in connection with any Services once Fiserv has received instructions to complete such action.

(d) Client Personnel. Client shall designate appropriate Client personnel for training in the use of the Services, shall supply Fiserv with reasonable access to Client's site during normal business hours for Implementation Services, and shall cooperate with Fiserv personnel in their performance of Services.

(e) Client Review; Responsibility for Accounts. Client shall review all reports furnished by Fiserv for accuracy, and shall work with Fiserv to reconcile any out of balance conditions or discrepancies. As

applicable, Client shall be responsible for balancing its accounts each business day and notifying Fiserv promptly of any errors or discrepancies. If Client so notifies Fiserv, Fiserv shall, at its expense, promptly recompute accounts affected by discrepancies solely caused by the Fiserv System or provide for another mutually agreeable resolution. Fiserv will use commercially reasonable efforts to correct errors attributable to Client or Client's other third party servicers. Reconstruction of error conditions attributable to Client or to third parties acting on Client's behalf will be done at Fiserv's then-current professional services rates.

(f) Client Systems. Client shall ensure that Client Systems: (i) are capable of passing and/or accepting data from and/or to the Fiserv System, and (ii) include up-to-date anti-viral software designed to prevent viruses from reaching the Fiserv System through Client Systems.

(g) Client Notification. Client agrees that it shall notify Fiserv as soon as possible upon becoming aware of any incident of unauthorized access to any Information or the Fiserv System.

(h) Indemnity. Client shall indemnify and hold harmless Fiserv, its officers, directors, employees, and affiliates against: (i) any and all claims or actions arising out of (A) the use by Client of the Fiserv System in a manner other than that provided in the Agreement, and (B) access by Client's customers, through a voice response system or through such customers' personal computers or mobile devices, to Client Files or any Fiserv files (including the files of other Fiserv clients) or the Fiserv System or other Fiserv systems; and (ii) any and all claims by third parties through Client arising out of the performance and non-performance of Services by Fiserv, provided that such indemnity shall not preclude Client's recovery of damages from Fiserv pursuant to the terms and subject to the limitations of the Agreement.

(i) Regulatory Requirements. As applicable to Client's receipt of Services and as required by regulatory authorities having jurisdiction over Client, Client agrees to: (i) provide adequate notice to the appropriate regulatory agencies of the termination of the Agreement or any material changes in Services, (ii) retain records of its accounts, and (iii) obtain and maintain at its own expense any required Fidelity Bond and casualty and business interruption insurance coverage for loss of records from fire, disaster, or other causes.

6. Business Continuity / Disaster Recovery.

(a) General. Fiserv maintains a business continuity plan ("**Business Continuity Plan**") for each Service that describes measures it will implement to recover from a Disaster. A "**Disaster**" shall mean any unplanned impairment or interruption of those systems, resources or processes that enable standard performance of the applicable Service's functionality. Each Business Continuity Plan shall include a plan for the recovery of critical technology systems (a "**Disaster Recovery Plan**"), as well as procedures for restoring business operations at the primary location or at a designated recovery site, if necessary. Fiserv shall work with Client to establish a plan for alternative communications in the event of a Disaster.

(b) Disaster Occurrence. Fiserv shall notify Client as soon as possible after the occurrence of a Disaster and shall comply with the Business Continuity Plan. Fiserv shall move the processing of Client's standard services to the recovery site as expeditiously as possible if operations cannot be satisfactorily restored (in Fiserv's sole discretion) at the primary location. If a recovery site is used, Fiserv shall coordinate the cut-over to back-up telecommunication facilities with the appropriate carriers. Client shall maintain adequate records of all transactions under the reasonable control of Client during the period of service interruption and shall have personnel available to assist Fiserv in implementing the switchover to the recovery site. During a Disaster, optional or on-request services shall be provided by Fiserv only to the extent adequate capacity exists at the recovery site and only after stabilizing the provision of base services.

(c) Disaster Recovery Test. Fiserv shall test the Disaster Recovery Plan periodically. Client agrees to participate in and assist Fiserv with such test, if requested by Fiserv. Upon Client's request, test results will be made available to Client's management, regulators, auditors, and insurance underwriters.

(d) No Warranty. Client understands and agrees that the Business Continuity Plan is designed to minimize, but not eliminate, risks associated with a Disaster affecting Fiserv's service center(s). No performance standards shall be applicable for the duration of a Disaster. Client maintains responsibility for adopting a disaster recovery plan relating to disasters affecting Client's facilities and for securing

business interruption insurance or other insurance necessary for Client's protection. Fiserv agrees to release information necessary to allow Client's development of a disaster recovery plan that operates in concert with the Business Continuity Plan.

7. Lost Records. Notwithstanding Section 7 of the Master Agreement, if Client's records or other data submitted for processing are lost or damaged as a result of any failure by Fiserv, its employees, or agents to exercise reasonable care to prevent such loss or damage, Fiserv's liability on account of such loss or damages shall not exceed the reasonable cost of reproducing such records or data from Fiserv's back-up data or from exact duplicates thereof in Client's possession.

8. Term and Termination; Deconversion.

(a) Term. Unless otherwise set forth in an applicable Schedule to this Exhibit, (i) with respect to the Schedules attached to this Exhibit as of the Effective Date, the initial term of Services provided hereunder shall end May 31, 2019, and (ii) with respect to Schedules added to this Exhibit after the Effective Date, the initial term of Services provided thereunder shall end 5 years following the date Services are first used by Client in live production. Unless written notice of non-renewal is provided by either party at least 180 days prior to expiration of the initial term or any renewal term, the Services shall automatically renew for additional term(s) of 5 years.

(b) Convenience; Early Termination. If Client terminates the Agreement or reduces (other than as a result of account attrition or volume fluctuation in the ordinary course of business) or terminates Services for any reason other than pursuant to Section 8(b)(i) of the Agreement, Client shall pay a termination fee based on the remaining unused term of the Services. Such fee shall be determined by multiplying the average of the monthly invoices (prior to any issued credits or rebates) for each Service received by Client during the 6-month period preceding the effective date of termination (or if no monthly invoice has been received, the estimated monthly billing for each Service to be received hereunder) by 80% times the remaining months of the term. Client shall also pay any unamortized conversion fees or third party costs existing on Fiserv's books on the date of termination.

(c) Defaults. If Client: (i) fails to cure its material breach or fails to pay amounts due, each as set forth in Section 8(b) of the Agreement; (ii) deconverts any data or information from the Fiserv System either without Fiserv's prior written consent or in violation of the Agreement; or (iii) commits an act of bankruptcy or becomes the subject of any proceeding under the Bankruptcy Code or becomes insolvent or if any substantial part of Client's property becomes subject to any levy, seizure, assignment, application, or sale for or by any creditor or governmental agency; then, in any such event, Fiserv may, upon written notice, terminate the Agreement in whole or in part and be entitled to recover from Client as liquidated damages for such early termination an amount equal to the present value of all payments remaining to be made for the remaining unused term of the Agreement or the applicable Exhibit, plus any unamortized conversion fees or third party costs existing on Fiserv's books on the date of termination. For purposes of the preceding sentence, present value shall be computed using the "prime" rate (as published in *The Wall Street Journal*) in effect at the date of termination and "all payments remaining to be made" shall be calculated by multiplying the average monthly invoices for the 6 months immediately preceding the date of termination by the remaining months of the term.

(d) Liquidated Damages. Client understands and agrees that Fiserv losses incurred as a result of early termination of the Agreement, this Exhibit, or any Schedule would be difficult or impossible to calculate as of the effective date of termination since they will vary based on, among other things, the number of clients using the Fiserv System on the date the Agreement (or applicable part thereof) terminates. Accordingly, the amounts set forth in Sections 8(b) and 8(c) above and Section 10(e) below represent Client's agreement to pay and Fiserv's agreement to accept as liquidated damages (and not as a penalty) such amount for any such termination.

(e) Return of Client Files. Upon expiration or termination of the Agreement or any Schedule to this Exhibit, Fiserv shall furnish to Client such copies of Client Files as Client may request in a Fiserv standard format, and shall provide such information and assistance as is reasonable and customary to enable Client to deconvert from the Fiserv System; provided, however, that Client authorizes Fiserv to retain Client Files until: (i) Fiserv is paid in full for all amounts due for all Services provided through the date such Client Files are returned to Client; (ii) Fiserv is paid its then standard rates for the services necessary to return such Client Files; (iii) if the Agreement or applicable Schedule is being terminated, Fiserv is paid any applicable termination fee pursuant to Section 8(b) or (c) above; and (iv) Client has

returned or destroyed all Fiserv Information in accordance with Section 3(b) of the Agreement. Fiserv shall be permitted to destroy Client Files any time after 30 days from the final use of Client Files for processing, unless: (A) Fiserv is directed by Client in writing to retain such files for a longer period, provided that Client may not require Fiserv to retain Client Files for longer than 90 days unless Fiserv agrees to such longer retention period, or (B) otherwise specified in a Schedule.

(f) Miscellaneous. Client is responsible for the deinstallation and return shipping of any Fiserv-owned equipment located on Client's premises.

9. Exclusivity. Client agrees that Fiserv shall be the sole and exclusive provider of the services that are the subject matter of the Schedules to this Exhibit. Client agrees not to enter into an agreement with any other entity to provide these services (or similar services), and not to perform these services (or similar services) for itself, during the term of this Exhibit without Fiserv's prior written consent. If Client acquires another entity, the exclusivity provided to Fiserv hereunder shall take effect with respect to such acquired entity as soon as practicable after expiration or earlier termination of such acquired entity's previously existing arrangement for these services. If Client is acquired by another entity, the exclusivity provided to Fiserv hereunder shall apply with respect to the level or volume of services provided immediately prior to the signing of the definitive acquisition agreement relating to such acquisition and shall continue with respect to the level or volume of such services until any termination or expiration of this Exhibit.

10. Additional Fee Provisions.

(a) Annual Adjustment. Fiserv's fees for Services may be increased annually effective each January 1 upon 30 days' notice to Client. Each increase shall be limited to the increase in the U.S. Department of Labor, Consumer Price Index for All Urban Consumers ("**CPI**") for the most recently available 12-month period preceding such 30-day notice period, or 5%, whichever is greater.

(b) Holdover. Upon any termination or expiration of the Agreement or an Exhibit, Services provided after the applicable termination date, expiration date, or final processing date specified by Client will be provided subject to Fiserv's capacity and will be invoiced at then current fees under the applicable Schedule plus a holdover premium of 25%, unless such holdover is due to Fiserv's action or inaction.

(c) Deconversion Charges. Client agrees to pay Fiserv's then current deconversion charges in connection with Client's deconversion from the Fiserv System.

(d) Regulatory and Compliance Charge. Fiserv reserves the right to charge Client for Client's share of direct Fiserv costs of maintaining regulatory compliance as required by Section 4(e)(iv) of this Exhibit and/or meeting relevant third party standards (such as PCI-SSC's Payment Card Industry Data Security Standard).

(e) Assumptions. Fees set forth in the Schedules to this Exhibit are based on completion of the initial term of all Services. If Services are reduced or terminated pursuant to Section 8(b) or (c) above, or if Client renegotiates pricing before expiration of the initial term, Client shall reimburse Fiserv for all credits, rebates, discounts, and incentives granted on all Services. Any such credits, rebates, discounts, and incentives will no longer be granted through the remainder of the term for any continuing Services.

11. Residuals. Nothing contained in the Agreement shall restrict Fiserv from the use in its business of any ideas, concepts, know-how, or techniques contained in Client Information accessed by Fiserv in connection with the Services that are related to Fiserv's business activities and retained in the unaided memory of Fiserv's employees.

**Account Processing Services Schedule**
**to the ASP Services Exhibit**

1. **DESCRIPTION OF SERVICES.** Fiserv agrees to provide to Client the following Services ("Account Processing Services"):

(a) Base Services:
Basic Member Processing
Share Account Processing
General Ledger Processing
Certificate Processing
Loan Processing
Payroll Processing

(b) Standard On-Line Reports:
As defined and periodically updated on the porticousers.com website.

(c) Standard Off-Line Reports:
Standard media is a hardcopy or the advanced storage option of Client's choice. Additional report copies are available as an optional service. Additionally, as an optional service, reports may be received at frequencies other than those stated.

(d) Optional Services:
Optional Services are listed in paragraph 2(c) Fees, Optional Services. Only those optional services selected by Client, the Selected Services, are included in the Services provided by Fiserv, as further described in Section 2(c).

(e) Optional Reports:
As defined and periodically updated on the porticousers.com website.

(f) Interfaces:
Fiserv agrees to make available to Client access to certain Interfaces or extract files identified in Section 2(c) below, and any additional interfaces or extract files agreed by the parties from time to time, in accordance with the terms set forth in this subsection and subject to subsection (d) of the Additional Terms section below ("Third Party Interfaces"). Fiserv agrees to work with Client to determine whether Fiserv, Client or the applicable third party can develop and support such Third Party Interfaces, whether such Third Party Interfaces are based on extracts Client, Fiserv or the third party will provide, or whether such Third Party Interfaces are web service interfaces to be provided by Fiserv, Client or an applicable third party. Access to any Third Party Interface and any development by Fiserv or the third party with respect thereto is subject to Fiserv entering into a reasonable agreement with such third party and such agreement remaining in full force and effect; provided, that Fiserv will work in good faith to enter into a reasonable agreement as promptly as possible. Any such development by Fiserv is also subject to Fiserv's resource availability. Upon completion of such agreement and development of such Third Party Interface, Fiserv will certify the Third Party Interface with the third party. To the extent Fiserv has entered into an agreement with such third party and the development and certification have been completed prior to the date the Account Processing Services are first used in live production, Fiserv shall make such Third Party Interface available to Client. Any access to Third Party Interfaces which are based on extracts Client or such third party will provide, any development to be provided by Client or a third party, or web service interfaces provided by a third party are subject to Client and the applicable third party fulfilling their obligations with respect thereto and Fiserv shall not be liable for any delay or failure to receive access or use such Third Party Interface. Client agrees that Fiserv may provide any Client Information to any third party with whom Fiserv has a Third Party Interface used or accessed for Client. Notwithstanding anything in the Agreement to the contrary, Third Party Interfaces and access thereto are provided "as is" and Fiserv shall not be liable for any damages, whether direct, indirect, incidental, or consequential arising from use of or access to any Third Party Interfaces.

2. **FEES.** Client agrees to pay Fiserv the fees set forth below for Account Processing Services. Such fees will be invoiced to Client on a monthly basis unless otherwise indicated.

(a) Base Services:
Monthly On-Line Use Fee $1.50677 per member per month

(b) Telecommunication Services.
The monthly telecommunication fees shall be billed to Client at a rate of $468.17 per month which includes bandwidth of 384K. The monthly telecommunication fees include Client's current locations and will be subject to increase or decrease by Fiserv in direct proportion to any increase or decrease in Fiserv's associated costs from the telecommunications vendor. If Client adds any branch locations during the term of this Schedule, Fiserv will invoice Client at Fiserv's then current standard charges for any telecommunication charges associated with any such Client branch locations. In addition, any changes or upgrades to the Fiserv-provided telecommunications network connections requested by Client will be provided at Fiserv's then current standard rates.

(c) Optional Services:
Client agrees to pay Fiserv the Fees set forth below for the Account Processing Services. The boxes marked below with an "X" indicate the Optional Services selected by the Client as of the Effective Date ("Selected Services"). Such Selected Services will be charged and paid by Client monthly at the rates set forth below, which shall be subject to modification as set forth in the Agreement and this Schedule. If Client adds Selected Services after the Effective Date, Client shall pay Fiserv's then standard rates, unless otherwise agreed by the parties for such additional Services. For purposes of this Account Processing Services Schedule, "Included" means the fee for a specific service has been factored into the monthly on-line use fee outlined above. If, subsequent to the Effective Date, Client desires to add an Optional Service to the Selected Services, Client will notify Fiserv which notice may be provided via email or orally and Client will purchase the new Service at Fiserv's then current standard charges, unless specified otherwise in this Account Processing Services Schedule. Notwithstanding Section 11(b) of the Agreement, upon receipt of a purchase or sales order or an amendment to the Agreement for such Service executed by Client, Fiserv and Client agree that such Service will then be deemed a Selected Service and be subject to the terms of this Schedule and the Agreement.

| | |
|---|---|
| ☒ Basic Share Draft Processing | Included |
| ☒ General Ledger Processing | Included |
| ☒ Expanded General Ledger Processing | Included |
| ☒ Online GL History Base – 180 Days | Included |
| ☒ Expanded Member Processing | Included |
| ☒ Expanded Share Draft Processing | Included |
| ☒ Expanded Share Draft Repost Base Fee | Included |
| ☒ IRA Processing | Included |
| ☒ Mortgage Loan Processing | Included |
| ☐ Student Loan Processing | |
| ☒ ACH Monthly Base | $35.70 per month |
| ☒ ACH Notification of Change | Included |
| ☒ ACH NSF Fees and Notices | Included |
| ☒ ACH NSF History | Included |
| ☒ ACH On-line Posting | Included |
| ☒ ACH Origination | Included |
| ☒ ACH Origination Item | Included |
| ☒ ACH Pend Feature | Included |
| ☒ ACH POS Transactions | Included |
| ☒ ACH Returns | Included |
| ☒ ACH Stop Payment | Included |
| ☒ ACH Transactions | Included |
| ☐ Account Analysis | |
| ☒ Aires Download | Standard rates |
| ☐ American Express Interface | |
| ☒ ATM Services: | |
| ☐ Automated Network Balancing | |
| ☐ Automatic ATM Card Re-Issue Program | |
| ☒ ATM Cardholder Record | Included |
| ☒ Debit Cardholder | Included |

| | |
|---|---|
| ☒ Exception Processing for On-Line Network ATMs (settled networks) | Included |
| ☒ Network ATM Transaction Posting | Included |
| ☐ On-Line ATM Card Ordering | |
| ☐ Positive Balance File | |
| ☒ Audio Response | |
| ☒ Audio Sessions | $0.0861 per session |
| ☒ Authorized User Record | Included |
| ☒ National Audio Response Center* | |
| WATS – Interstate | $0.06458 per minute |
| WATS – Intrastate | $0.06458 per minute |
| WATS – International | $0.35021 per minute |

**With respect to the 800# provided to Client by Fiserv in its provision of NARC services to Client, such 800# is owned by Fiserv, can only be used by Client during the term of this Schedule, and may not be sold by Client to any third party.*

| | |
|---|---|
| ☒ 400 Day History | $78.63 per month |
| ☐ ACH Courtesy Pay | |
| ☐ Share Draft Courtesy Pay | |
| ☒ Automatic Closing and Re-opening of Self-Service Tellers | Included |
| ☒ Bundled History | Included |
| ☒ Cash Control | Included |
| ☒ Certificate Automatic Rate Change | Included |
| ☒ Check Protection Feature | Included |
| ☒ Collection | Included |
| ☒ Collection Letter Printing | Included |
| ☒ Credit Bureau Reporting | Included |
| ☒ Credit Card Payments Supported On-Line | Included |
| ☒ Data Match – Child Support | Included |
| Data Match – Delinquent Tax Support | Standard rates |
| ☒ Dividend Check Printing | Included |
| ☒ Electronic Teller Journaling | Included |
| ☒ Enhanced CD On-Line History | Included |
| ☒ Enhanced Loan On-Line History | Included |
| ☒ Escheat Processing | Included |
| ☒ Expanded Journal Voucher | Included |
| ☒ Flexible Fees Program | Included |
| New Program Set Up | $250.00 per new fee schedule |
| Testing | Included |
| ☒ Forms Management | Included |
| ☐ Health Savings Accounts | |
| ☐ Holiday/Vacation Club Checks/Transfers | |
| ☐ Indirect Lending | |
| ☒ Laser Notices | Included |
| ☒ Loan Origination Processing | |
| ☒ Loan Advantage | Included |
| ☒ Loancierge | Included* |
| ☒ Loan Advantage to Loancierge Migration & Data Conversion | Waived |

**The Loancierge pricing will replace the Loan Advantage pricing upon Loancierge's installation.*

| | |
|---|---|
| ☒ Credit Bureau Report Retrieval | Included |
| ☐ Forms Mapping | |
| ☐ Instant Pre-Approval | |
| ☐ Risk Based Pricing | |
| ☐ Secure Public Viewer | |
| ☒ Member Notepad Capability and Reporting | Included |
| ☒ Member On-Line History | Included |
| ☒ Multiple Share Draft Processing | Included |
| ☒ Multiple Statement Sort Options | Included |
| ☒ Non-Financial History – 365 Days | Included |
| ☒ Notices Printed by Fiserv | Standard rates |
| ☒ Online Delinquency History | Included |

☒ Online Payroll Posting — Included
☒ Payroll Description — Included
☒ Payroll Transmission
  ☒ Positive Payroll Transmission — Included
  ☒ Payrolls Transaction — Included
  ☒ Payrolls Transmission — Included
☒ Periodic Address Standardization, Including ZIP+4 Updates and Bar Coding — Included
☒ Portico Data Download — Included
☒ Portico User Automation Applications
  ☐ Cash Dispenser
  ☐ Contact Manager
  ☒ Cross Sell and Sales Tracking — $0.02152 per month
  ☒ DocumentIT (includes 8) — Included
  ☒ ID Capture (eFichency Imaging Interface) — Included
  ☒ Member Warnings & Alerts — Included
  ☐ Safe Deposit Box
  ☒ Teller Automation Platform/New Member Origination — Included
☒ Relationship Pricing — Included
☒ Reporting Analytics (1 Admin, 8 Consumer User, 10 Report Author) — Included
  ☐ Loancierge Data
  ☒ Non-Financial Data — Included
  ☐ Wisdom Data
  ☐ VirtualBranch Data
☐ Residual Loan Support
☒ Share Draft & Regular Statements Combined — Included
☒ Shared Service Center
  ☐ Transactions
  ☒ Issuer Capability — Included
  ☒ Acquirer Capability — Included
☐ Single Interest Insurance
☒ Statement Message for JV Transactions — Included
☒ Statement Processing:
  ☒ Standard Plus — Included
  ☐ Plus-Duplex
  ☐ Bulk Standard
  ☒ Loan Billing Statements — $14.80 per month
☒ Teller Administration — Included
☒ Teller Security System — Included
☒ Transfer File — Included
☐ Workflow Processing

Third Party Interfaces/Extracts:
Gateway Access:
☐ Card Production Services:
  ☐ Deluxe
  ☐ Faraday
☒ Credit Card Interface:
  ☐ Westlake Global Payment Systems (Clients Settle and Balance)
  ☐ Westlake Crittson (Clients Outsource Settlement and Balancing)
  ☒ Fidelity Card Services — $53.81 per month
  ☐ FDR (Town North, PSCU, and other certain leagues)
  ☐ Fiserv CPS
☒ Credit Card Integration for Inquiry Purposes (186/66C Transactions - Payment, and Automated Collections)
  ☐ Westlake Global Payment Systems
  ☐ Westlake Crittson (Clients Outsource Settlement and Balancing)
  ☒ Fidelity Card Services
  ☒ Credit Card Daily Activity Report 740

- ☒ Credit Card Daily Exception Report 741
- ☐ Fiserv CPS

☒ Share Draft Services:

- ☐ Harland Clarke
- ☒ Deluxe One — Included
- ☒ Liberty — $37.67 per month

☐ Implementation/Conversion Services*

**Travel expenses are not included and will be billed according to the terms of the Agreement.*

(d) Optional Reports:
Unless otherwise indicated herein, all Optional Reports shall be billed at Fiserv's then current rates.

3. **HOURS OF OPERATION.** The Fiserv data center will be in operation for on-line Account Processing Services during the following hours:

(a) The Portico system is available for online usage 365 days per year except during normal nightly maintenance windows (as defined on the porticousers.com website and updated from time-to-time as requirements change) which vary by processing region, or "zone," and during scheduled extended maintenance windows for which Fiserv will provide as much lead time notice as possible.

(b) The customer service group is available Monday through Friday, 6:00 AM Central Time until 8:00 PM Central Time and on Saturdays from 8:00 AM Central Time until 3:00 PM Central Time, with the exception of the following holidays: New Year's Day, Labor Day, Memorial Day, Thanksgiving Day, Independence Day, and Christmas Day and will be available 8:00 AM Central Time until 5:00 PM Central Time on the following holidays: New Year's Eve, Veterans' (Armistice) Day, Martin Luther King Day, Columbus Day, President's Day Friday After Thanksgiving, and Christmas Eve.

4. **ADDITIONAL TERMS.** The following additional terms apply to Account Processing Services:

(a) Annual Histories. As applicable, Fiserv maintains annual histories for its clients, which can be used to reconstruct Client Files in an emergency. However, in order to permit prompt and accurate reconstruction of accounts, Client agrees to retain at all times and make available to Fiserv upon request the most recent data printout(s) received from Fiserv, together with copies or other accurate and retrievable records of all transactions to be reflected on the next consecutive printout(s).

(b) Forms and Supplies. Client assumes and will pay the charges for all customized forms, supplies, and delivery charges. Custom forms ordered through Fiserv will be subject to a 15% administrative fee for warehousing and inventory control.

(c) Communication Lines. Client acknowledges that access to Account Processing Services shall be across public and private lines and that Fiserv has no control over such lines or the information available from non-Fiserv sources. Fiserv shall have no liability for failed access over public lines or compromised data delivered over such lines. Client acknowledges and understands its responsibility and liability as they relate to Client's access to the Internet. Fiserv assumes no liability or control over the Internet access of Client or Client's on-site systems and remote employee or affiliate access.

(d) Third Parties. In the event any of Fiserv's obligations under this Schedule are directly or indirectly dependent on entering into an agreement with a third party, or otherwise directly or indirectly dependent on the actions or omissions of a third party, Fiserv shall use commercially reasonable efforts to enter into such agreement on reasonable terms and conditions, or use commercially reasonable efforts to obtain such action, and provided that Fiserv has complied with the terms hereof and if Fiserv is unable to enter into an agreement with such third party or obtain such action, Fiserv's obligations hereunder shall immediately terminate and Fiserv shall not be liable for its inability to perform such obligations and shall be relieved of any such obligations hereunder.

(e) Credit. Client will receive a monthly credit in the amount of $300.00 during the initial term of this Schedule.

## EFT Services Schedule to the ASP Services Exhibit

1. **Fees.** Client agrees to pay Fiserv the Fees set forth below for the EFT Services. The boxes marked below with an "X" indicate the Optional Services selected by the Client as of the Effective Date ("Selected Services"). Such Selected Services will be charged and paid by Client monthly at the rates set forth below, which shall be subject to modification as set forth in the Agreement and this Schedule. If Client adds Selected Services after the Effective Date, Client shall pay Fiserv's then standard rates, unless otherwise agreed by the parties for such additional Services. If, subsequent to the Effective Date, Client desires to add an Optional Service to the Selected Services, Client will notify Fiserv which notice may be provided via email or orally and Client will purchase the new Service at Fiserv's then current standard charges, unless specified otherwise in this EFT Services Schedule. Notwithstanding Section 11(b) of the Agreement, upon receipt of a purchase or sales order or an amendment to the Agreement for such Service executed by Client, Fiserv and Client agree that such Service will then be deemed a Selected Service and be subject to the terms of this Schedule and the Agreement.

   a. **Standard Gateway Services**

| | One-Time Fee | Monthly Fee |
|---|---|---|
| TPP EFT Gateway Services | | |
| ☒ Base Gateway Services Fee | N/A | $0.00 |
| ☒ ATM/POS Gateway Transaction Rate | N/A | $0.02179 per transaction |
| ☒ Shared Service Center Transaction Rate | N/A | $0.05449 per transaction |
| ☒ Network Gateway, CO-OP and FSCC | Waived | $79.97883 per network |
| ☒ Network Gateways, each (additional) | Standard rates | Standard rates |
| Reports, Files, Data Transmissions & Microfiche Report Creation | | |
| ☒ Monthly Activity Report (BDX) | N/A | $0.00 |
| Network Gateway Services | | |
| ☒ Network Gateways, each (CO-OP, FSCC) | Previously paid | $79.97883 each |
| ☒ Network Gateways, each (additional) | Standard rates | Standard rates |
| ☐ Network Pass-Through Charges | Pass Through | Pass Through |
| ☐ Shared Service Center – Network Add | $1,500.00 | N/A |
| ☐ Shared Service Center – Network Monthly Support | N/A | $100.00 |
| Other ATM Services | | |
| ☒ Audit & Compliance | N/A | $66.35 |

2. **Hours of Operation.**

   Fiserv will provide access to its EFT Services 24 hours a day, 365 days per year, except for planned downtime reserved for scheduled maintenance. Client will be notified in advance of such downtime.

   Client support assistance will be available during normal business hours, Monday through Friday, with the exception of the following holidays: New Year's Day, Memorial Day, Independence Day, Labor Day, Thanksgiving Day, and Christmas Day. When a holiday falls on Saturday, Fiserv will observe the preceding Friday; when a holiday falls on Sunday, Fiserv will observe the following Monday.

3. **Additional Terms.**

   (a) Network Support Services. Fiserv will provide Network Support Services (monitoring, service, and maintenance for equipment) in accordance with instructions supplied by Client. If any or all

of the communication network should fail, Fiserv or its designated agents will locate the problem and correct any malfunction not associated with equipment or circuits provided by common carriers. If the problem is located in the equipment or circuits of the common carriers, Fiserv will contact the common carriers and request that the problem be corrected. Maintenance fees incurred by Fiserv for repairs caused by faulty electrical power, inadequate physical facilities, physical abuse, or other Client-supplied or controlled factors will be reimbursed by Client.

(b) Reports. Fiserv will provide standard output reports to Client for daily, weekly, monthly, and annual transactions.

(c) Backup Records. Fiserv currently retains historical files at a location separate from the data center sufficient to recreate files for the most recent week and month-end. A daily transaction log of all Client transactions for the most recent ten business days will also be maintained at this location.

(d) Software Modifications.

(i) Customer Programming. Fiserv will develop a preliminary estimate of the anticipated hours and costs plus or minus fifty (50) percent associated with the implementation of said change. This estimate will be returned to the Client within four weeks. Written acceptance by Client to proceed with the project will be required prior to beginning final specifications. Fiserv will assign a projected completion date to the project, provided no additional changes or modifications to the original specifications occur once the project is in development.

(ii) Regulatory Software Changes. Software changes required by government bodies will be quoted in accordance with subsection (i) above and such costs will be distributed to all clients on an equitable basis.

(iii) Major Software Enhancements. All major software enhancements will be subject to additional charges for processing and development. Fiserv is under no obligation to upgrade its software during the term of this Schedule.

(e) Hardware. Client will obtain written approval from Fiserv prior to connecting any equipment to the data communication equipment provided by Fiserv. Equipment, if any connected to the Fiserv System must be configured in a manner acceptable to Fiserv. Client agrees to pay Fiserv for the testing and acceptance of such equipment by Fiserv at its then current rates. Client shall at all reasonable times permit the authorized personnel of Fiserv and the equipment manufacturers to have access to any Fiserv owned or leased equipment provided under this Schedule, and shall permit removal of such equipment upon termination of this Schedule.

(f) Protection of Data. Fiserv has developed an operations backup center for which Client has agreed to pay the charges indicated above. Fiserv tests the procedure periodically to ensure compliance. Copies of transaction files are maintained by Fiserv off premises in secure vaults.

(g) On-Line Security. Fiserv will provide Client access, after the execution of appropriate "on-line" security measures, to allow Client to perform Cardholder maintenance on Client Files in the Fiserv System.

(h) Network Agreement. Fiserv provides access to electronic fund transfer networks for the purpose of participating in the exchange of transactions on an inter-network basis. Client may participate in such networks subject to the following terms and conditions: (i) Client will enter into an agreement with each such Network in which Client elects to participate, and will operate within and abide by the operating rules established by each such network, and pay any associated fees imposed by each such network; and (ii) the clearing of transactions and reconciliation of payments will be in accordance with settlement procedures established between Fiserv and each such network; and

(i) Settlement Accounts. (i) Client shall provide access to a demand deposit account at a financial institution acceptable to Fiserv, which is accessible by Fiserv (the "Settlement Account"), and shall maintain at all times in the Settlement Account funds in the amount sufficient to enable Fiserv to perform the settlement procedures set forth herein. Client authorizes Fiserv, at Client's expense, to access the Settlement Account through the Automated Clearing House ("ACH") for any purpose described in paragraph (ii) below, and, similarly, for the transfer of funds owing to Client in the Settlement Account. Client guarantees that the funds in the Settlement Account shall at all times be accessible to Fiserv for the above-referenced purposes and shall ensure that Fiserv shall be able to make the withdrawals and transfers required under this Agreement by providing overdraft protection for the Settlement Account in an amount reasonably required by Fiserv.

(ii) Fiserv may use Client's Settlement Account for the following purposes:

(A) daily settlement of all Network transactions;

(B) daily settlement of all fees and assessments charged by the Network (or Network sponsor) to the Client or charged to Fiserv on behalf of the Client as a participating member institution; and

(iii) The provisions of this Section (i) shall survive the termination of this Agreement for any reason for a period of not less than 6 months to accommodate any post-termination transaction activity, including but not limited to transaction adjustments or chargebacks.

**eFichency Services Schedule**
**to ASP Services Exhibit**

1. **Description of Services.** Fiserv agrees to provide to Client the following Services ("eFichency Services").

(a) This electronic file management system ("eFichency System") (i) allows Fiserv to store and index Client's electronic files which are generated by the Fiserv System (as listed in Section b below) and (ii) allows Client to store, index and purge the eFichency Documents (as defined in Section b (iii) below). Client may view and perform searches on such information through Client's utilization of the Internet.

(b) The electronic files which may be accessed by Client using the eFichency System include:

(i) all standard or optional reports provided under the Account Processing Services Schedule ("Host System Reports"),

(ii) if applicable, all standard output reports provided as part of the EFT Services Schedule ("EFT Reports"), and all standard output reports provided as part of Credit Card Processing Schedule ("Credit Reports"), and

(iii) all imaged documents either (A) scanned and loaded by Client, (B) imported into the eFichency System by Client or (C) imported electronically by Fiserv on Client's behalf through a separate Service ("eFichency Documents"). The reports set forth in (i) and (ii) above are hereinafter referred to as the "eFichency Reports."

2. **Fees.** Client agrees to pay Fiserv the fees set forth below for the eFichency Services. Such fees will be invoiced to Client on a monthly basis unless otherwise indicated. The boxes marked below with an "X" indicate the Optional Services selected by the Client as of the Effective Date ("Selected Services"). Such Selected Services will be charged and paid by Client monthly at the rates set forth below, which shall be subject to modification as set forth in the Agreement and this Schedule. If Client adds Selected Services after the Effective Date, Client shall pay Fiserv's then standard rates, unless otherwise agreed by the parties for such additional Services. If, subsequent to the Effective Date, Client desires to add an Optional Service to the Selected Services, Client will notify Fiserv which notice may be provided via email or orally and Client will purchase the new Service at Fiserv's then current standard charges, unless specified otherwise in this eFichency Services Schedule. Notwithstanding Section 11(b) of the Agreement, upon receipt of a purchase or sales order or an amendment to the Agreement for such Service executed by Client, Fiserv and Client agree that such Service will then be deemed a Selected Service and be subject to the terms of this Schedule and the Agreement.

☒ Host System Reports Set-Up Fee: Previously paid

Provides Client i) access to the eFichency System, ii) the appropriate number of User ID's and passwords, iii) creation of User Security Profiles for each User ID, iv) standard and customary indexes, and v) Remote Training.

☒ Host System Reports Monthly Fee:

| | |
|---|---|
| ☐ 0 - 2,500 members | $150.00 / |
| ☒ 2,501 - 5,000 members | $0.00 |
| ☐ 5,001 – 10,000 members | $500.00 |
| ☐ 10,001 - 25,000 members | $750.00 |
| ☐ Over 25,000 members | $975.00 |

☒ EFT Reports Set-Up Fee: Previously paid

Provides Client (i) access to Client's EFT Reports via the eFichency System, and (ii) Fiserv's configuration and User Security Profiles for each User ID who will have access to the EFT Reports.

☒ EFT Reports Monthly Fee:

| | |
|---|---|
| ☐ 0 - 2,500 members | $50.00 |
| ☒ 2,501 - 5,000 members | $56.54 |
| ☐ 5,001 - 10,000 members | $75.00 |
| ☐ 10,001 - 25,000 members | $100.00 |
| ☐ Over 25,000 members | $100.00 |

☐ Credit Reports Set-Up Fee: $500.00 one-time

Provides Client (i) access to Client's CredIT Reports via the eFichency System, and (ii) Fiserv's configuration and User Security Profiles for each User ID who will have access to the CredIT Reports.

☐ Credit Reports Monthly Fee: $50.00

☐ Credit Reports Daily Transmission: $150.00 per month

☒ eFichency Documents Set-up Fee: Previously paid

Payment of the eFichency Documents fee provides Client access to all imaged documents either (i) scanned and loaded by Client or (ii) imported into the eFichency System by the Client or (iii) imported electronically by Fiserv on Client's behalf through a separate Service.

☒ eFichency Documents Monthly Fee:

| | |
|---|---|
| ☐ 0 - 2,500 members (10 gigabytes) | $150.00 |
| ☒ 2,501 - 5,000 members (15 gigabytes) | $0.00 |
| ☐ 5,001 - 10,000 members (25 gigabytes) | $500.00 |
| ☐ 10,001 - 25,000 members (75 gigabytes) | $750.00 |
| ☐ Over 25,000 members (Quote) | Quote |

☐ eFichency Desktop Capture Set-up Fee: $250.00 one-time

<u>Additional Gigabytes</u>. If Client exceeds the number of gigabytes as listed in the chart above, Fiserv will increase the number of gigabytes and charge client at Fiserv's then current charges for increased storage capacity, unless specified otherwise in this eFichency Services Schedule.

| GB Increase | Additional Monthly Fee | Tier Upgrade |
|---|---|---|
| 10 | $100.00 | $10 per GB |
| 20 | $150.00 | $7.50 per GB |
| 50 | $375.00 | $7.50 per GB |
| 100 | $675.00 | $6.75 per GB |
| 150 | $1,013.00 | $6.75 per GB |
| 200 | $1,350.00 | $6.75 per GB |

3. Hours of Operation.

(a) Subject to scheduled maintenance, scheduled downtime and causes beyond the control of Fiserv, Fiserv will use reasonable efforts to cause the eFichency Services to be available to Client, 24 hours a day, 365 days per year.

(b) Fiserv will process eFichency Report information on a daily basis and Fiserv will use commercially reasonable efforts to make the eFichency Reports available to Client within 24 hours of the Fiserv System processing such information. In addition, Fiserv will use commercially reasonable efforts to make month-end and quarterly eFichency Report data available to Client within 48 hours of the Fiserv System processing such data.

**4. Additional Terms.**

(a) Fiserv Responsibilities. (i) Fiserv will provide to Client the appropriate number of user identifications ("User ID's") and passwords as requested by Client as of the eFichency System Installation. The Client staff member whom Client designates as its system administrator will be one of those individuals issued a User ID and password by Fiserv (the "System Administrator").

(ii) Fiserv will work with the System Administrator to complete installation of the eFichency Services according to an implementation schedule agreeable to both parties. The eFichency Services will be deemed installed when Client has received User ID's (as defined in Section b(iii) from Fiserv and the eFichency Services are available for use by Client ("eFichency System Installation").

(iii) As soon as practicable, Fiserv will schedule Client to receive eFichency Services' "train-the-trainer" training for the System Administrator remotely via the telephone ("Remote Training").

(iv) During eFichency System Installation and pursuant to Client's direction, Fiserv will set-up eFichency System access restriction profiles for each User ID that will designate which of the eFichency Reports or eFichency Documents each User ID has been authorized by Client to access ("User Security Profiles").

(iv) As soon as practicable upon receipt of a written request from the System Administrator, Fiserv may implement "add", "change", and/or "delete" actions concerning Client User ID's, including changes to passwords and User Security Profiles.

(viii) Fiserv will archive the eFichency Reports beginning on eFichency System Installation and continuing for 7 years thereafter or upon expiration or termination of the Account Processing Services Schedule, whichever comes first.

(b) Client Responsibilities. (i) In order to access the electronic files, Client will be responsible, at Client's expense, to acquire its own personal computers each of which will be equipped with industry standard browser software and the capability to access the Internet. Client acknowledges that access to eFichency Services shall be across public and private lines and that Fiserv has no control over such lines or the information available from non-Fiserv sources. Fiserv shall have no liability for failed access over public lines or compromised data delivered over such lines. Client acknowledges and understands its responsibility and liability as they relate to Client's access to the Internet. Fiserv assumes no liability or control over the Internet access of Client or Client's on-site systems and remote employee or affiliate access.

(ii) Client acknowledges and agrees that the eFichency System is the exclusive property of Fiserv and is subject to all of the protections set forth in Section 3 of the Agreement. Client will acquire neither title nor ownership rights to the eFichency System. Fiserv will disclose to Client only such information concerning the eFichency System which is necessary in order for Client to access the eFichency Services.

(iii) The System Administrator will i) attend the Remote Training conducted by Fiserv, ii) control distribution of User ID's and passwords, and iii) possess the authority to request that Fiserv implement "add", "change", or "delete" actions for each User ID, which will include changes to User Security Profiles and passwords.

(iv) Approximately 30 days after Client's completion of the Remote Training described in Section b(iii) above, Client acknowledges and agrees that it will cease receiving the eFichency Reports on any other advanced storage option available under the Account Processing Services Schedule. Any request to continue such service would be considered an optional service and billable at Fiserv then standard rates.

(v) Client will be responsible for all communications costs associated with Client accessing the eFichency Services.

(vi) Client will be responsible for the supervision, management and control of its use of the eFichency Services, including without limitation, implementing sufficient procedures to satisfy its requirements for the security and accuracy of data. Fiserv is entitled to rely upon and act in accordance with any instructions, guidelines or information provided by Client which is given by persons having actual or apparent authority to provide such instructions, guidelines or information.

(vii) If required, Client will provide at its own expense or procure from Fiserv a scanner ("Scanning Hardware") for the purpose of scanning the eFichency Documents into the eFichency System. In addition, Client will be responsible for the maintenance of the Scanning Hardware. If Client has elected to provide such Scanning Hardware itself, Fiserv shall provide Client with a list of compatible Scanning Hardware. Client agrees to pay Fiserv's then standard fee for certification of non-compatible Scanning Hardware.

(c) Continued Access of Electronic Files. Upon the expiration or termination of the Account Processing Services Schedule for any reason, Client may choose one of the following options with respect to the eFichency Services:

(i) Option One: Client may terminate this Schedule and for the requisite charge, Fiserv will, upon written request from Client, provide Client, in Fiserv's then current electronic media format, with copies of those electronic files received by Client from Fiserv during the term of this Schedule. The fee for this service will be based upon Fiserv's then current rates; or

(ii) Option Two: eFichency Services will be modified to provide Client with the ability to continue to view existing electronic files on the eFichency System. The dates of such eFichency Reports will be as of the date of the eFichency System Installation until the date of expiration or termination of the Account Processing Services Schedule. The fee for these services will be based upon Fiserv's then current rates.

(iii) Option Three: Client may elect to purge all electronic files received by Client from Fiserv during the term of this Schedule. Should Client fail to provide Fiserv with written notice at least 90 days after termination or expiration of the Account Processing Services Schedule of its intent to choose Option One or Option Two, Fiserv will automatically purge all electronic files received by Client from Fiserv during the term of this Schedule.

(d) Customization. Should Client request customization or modifications to the eFichency System in addition to the standard eFichency Services, such customization or modification will be considered an optional service and billable at Fiserv's then standard rates.

**ID Verification Services Schedule**
**to the ASP Services Exhibit**

1. **Description Services.** Fiserv agrees to provide to Client the following Services ("ID Verification Services").

- ID Verification (IDV)
- Web Delivery of New Account Data
- Processing of the New Account Data
- Maintenance of the Data Repository
- OFAC Screening, bi-weekly
- FinCEN Screening
- Reports
- Administrative Functionality
- Training

(a) Fiserv Responsibilities:

(i) Client acknowledges and understands that use of ID Verification Services may be subject to unavailability due to congestion or overload on public circuits supplied by third parties or due to downtime by such third parties.

(ii) Fiserv agrees to provide second level support to Client if the event Client is unable to resolve issues related to the normal operation of ID Verification Services adequately during normal business hours. Fiserv's sole obligation is to provide timely response to Client for requests for support.

(iii) Fiserv itself or through its vendor or subcontractor (in the sole discretion of Fiserv), will provide reasonable free training via the Internet during the term of this Schedule, provided that such training is provided by Fiserv's vendor or subcontractor during such term.

(b) Client Responsibilities:

(i) Client will be responsible for sending new customer data for OFAC and FinCEN validation in order to research and resolve any possible matches. A message is returned that provides a "pass" or "fail" answer on the information submitted. If a "fail" message is returned, the message includes a notation of the information that did not match or the name submitted appeared on one more of the government lists. Client also has the option to log on to ID Verification Services via the Internet to research and resolve any possible matches for OFAC.

(ii) Client will review and approve all applications for use of ID Verification Services, using any validation procedures Client determines.

(iii) Client is, and shall remain, solely and exclusively responsible for any and all financial risks associated with its employees and/or customers (as applicable) accessing ID Verification Services.

(iv) Client will use, and will instruct its employees to use ID Verification Services in accordance with such reasonable rules as may be established by Fiserv from time to time as set forth in any materials furnished by Fiserv to Client.

(v) Client is expressly prohibited from extending any warranty or warranties on Fiserv's behalf to any person.

(vi) Client acknowledges and understands its responsibility and liability as they relate to Client's access to the Internet. Fiserv assumes no liability or control over the Internet access of Client's on-site systems and remote employee or affiliate access.

(vii) Merger Responsibilities: In the event of any merger or acquisition involving Client, Client agrees to promptly notify Fiserv. Fiserv will inform Client whether Client is responsible for transitioning the data of such merged or acquired institution, whether Fiserv will coordinate with its third party subcontractor on Client's behalf to transition such data into Fiserv's third party subcontractor's database, or if such data cannot be merged and transitioned into Fiserv's third party subcontractor's database and Client will be required to maintain two databases. In the event Client is required to notify Fiserv's third party subcontractor or any other third party, Client agrees to do so promptly and to relieve Fiserv from any and all liability or obligations arising directly or indirectly out of any delay or failure by Client or any failure of such data to transition into Fiserv's third party subcontractor's database. In the event Fiserv will coordinate data transition on Client's behalf, Fiserv shall provide Client with notice (which may be via email) of all amounts due Fiserv and Client agrees to pay such amounts, provide Fiserv with all requested assistance and information that may be needed in connection with such data transition, and to promptly enter into any agreements or amendments required by Fiserv or its third party subcontractor.

2. **Fees**. Client shall pay Fiserv the fees set forth below for ID Verification Services. Fiserv shall invoice Client monthly in advance for fixed fees and recurring monthly fees, and on a current basis for all transaction and customer fees and third party services. Except as otherwise set forth in this Schedule, fees may be increased annually on the anniversary date of this Schedule upon 30 days' notice to Client.

One-Time Set-up Fee (includes Training): Previously paid

Monthly Recurring Fees:

Client's ID Verification Services Monthly Fee is calculated utilizing the chart set forth below:

| Current Tier | Number of Members | Monthly Fee* | Free IDV Transactions per Month | IDV Transaction Fee Charged after Free IDV's |
|---|---|---|---|---|
| ☒ | 0 – 10,000 | $55.16 ✓ | 10 | $2.69065 each |
| ☐ | 10,001–30,000 | $150.00 | 20 | $2.50 each |
| ☐ | Over 30,000 | $200.00 | 30 | $2.50 each |

**Includes the following:*

- Unlimited OFAC Screenings
- Unlimited 314(a) Screenings
- Maintenance of the Data Repository
- Administrative Functionality
- Annual Maintenance

3. **Hours of Operation**. Fiserv shall provide use of ID Verification Services that Fiserv controls in a 7 x 24 environment, subject to reasonable downtime for maintenance. Fiserv will attempt to limit its downtime to those hours of operation least impacted by customer usage, when such options are available.

4. **Additional Terms.**

(a) Equipment and Supplies. Client shall obtain and maintain at its own expense such equipment as may be necessary or appropriate to facilitate the proper use and receipt of ID Verification

Services. Client shall be responsible for paying for all supplies to be used in connection with ID Verification Services.

(b) Effect of Termination. In the event Fiserv's agreement with its third party service provider shall expire or terminate for any reason, Fiserv may terminate this Schedule immediately upon notice to Client. Upon any termination or expiration of this Schedule, Client shall continue to be responsible for fees related to ID Verification Services unless Fiserv receives written notice to delete Client files from the Fiserv System. Client shall continue to be responsible for all data communications and modem fees until (i) all circuits are disconnected and the telecommunications company ceases invoicing Fiserv; and (ii) Fiserv receives back all equipment supplied to Client by Fiserv.

(c) Trademark and Content License. Client hereby grants to Fiserv a non-exclusive, non-assignable right to use Client's trademarks, trade names, service marks, service names (collectively, "Trademarks"), and Content (as defined below) in connection with Fiserv's provision of ID Verification Services. Client will indemnify and hold harmless Fiserv, its officers, directors, employees, designated supplier, and affiliates against any claims or actions arising out of Fiserv's use of Trademarks and/or Content.

(d) Client Warranties. Client represents and warrants that (a) any work, content, or identification verification ("Content") provided to Fiserv is either original or that Client has the legal right to provide such Content; and (b) Content does not impair or violate any intellectual property or other rights of Fiserv or any third party. Client will indemnify and hold harmless Fiserv, its officers, directors, employees, designated supplier, and affiliates against any claims or actions arising out of any breaches of the foregoing; or any improper use of information gathered through any co-branded site as part of ID Verification Services. Client acknowledges that Fiserv shall not monitor, review, or approve any Content.

(e) Technical Support. Client agrees to provide all end user technical support. Fiserv will provide "second level" Technical Support to Client's user support representatives. "Technical Support" means Fiserv will take an initial technical support inquiry from Client and initiate the troubleshooting process. Fiserv shall use commercially reasonable efforts to determine the source of technical support issues, and to remedy the issue. Technical Support is available as described in this Schedule.

(f) During the term of this Schedule, Fiserv may provide written notice to Client that it is offering a product and/or service of substantially similar functionality and use as the services provided herein. Following such notice, either party may elect to transition Client to such product or service, subject to (i) providing the other party with written notice at least 60 days prior to such transition and (ii) Fiserv and Client entering into a separate Schedule to the Agreement for such product and/or service.

(g) Third Party Required Terms and Conditions. Notwithstanding anything set forth in the Agreement, the following additional terms and conditions shall apply to use of ID Verification Services provided pursuant to this Schedule. These Third Party Required Terms and Conditions are required by Fiserv's third party subcontractor and shall not be modified by the Client. In the event of a conflict between the Third party Required Terms and Conditions of this Schedule and the Agreement, these Third Party Terms and Conditions shall control, unless otherwise specified below; provided however, to the extent comparable provisions in the Agreement are more restrictive than those set forth below, the provisions in the Agreement shall control.

(i) License of Information.

A. General. Fiserv grants a non-exclusive license to Client to use the information provided through ID Verification Services only as described in this Schedule. Client may reproduce or store the information obtained through ID Verification Services solely for each of their respective

uses in accordance with this Schedule, and will hold all information licensed under this Schedule in strict confidence and will not reproduce, reveal or make it accessible in whole or in part, in any manner whatsoever, to any others unless required by law, or unless Client first obtains Fiserv's written consent; provided, however, that Client may discuss information in a report with the subject of that report when Client has taken adverse action against the subject based on the report. Client will not provide a copy of the report to the consumer, except as may be required or permitted by law or approved in writing by Fiserv, except in any state where this contractual prohibition would be invalid. Client will not interpret the failure of Fiserv to return information regarding the consumer's identity as a statement regarding that consumer's identity, because that failure may result from one or more factors unrelated to identity validation. Client warrants that it is the end user of the information.

B. Restrictions. Client will not use any alert messages generated by ID Verification Services as a part of the eligibility determination for granting credit, insurance or employment. Client acknowledges that any such alert message is merely an indication that the application information should be further verified prior to a business decision. Client may only use the data from ID Verification Services for the specific transaction for which the alert message is provided. ID Verification Services is proprietary and Client may not use ID Verification Services as a component of any database or file built or maintained by Client. Client understands that the information supplied by ID Verification Services may or may not apply to the consumer who has made the application to Client.

C. International Supplier. Client may from time to time request ID Verification Services for consumers having identity information accumulated outside of the United States. If that information is available under the terms of this Schedule, Fiserv may facilitate Client's access of that information through a Fiserv affiliated company, affiliate or independent supplier (collectively, "International Supplier"). Client's receipt and use of that information will be subject to all the terms of this Schedule and this Schedule will be deemed to be a separate agreement between Client and the applicable International Supplier directly, with Fiserv having entered into that agreement with Client on behalf of the International Supplier. Client further recognizes that Fiserv will merely facilitate access to the information. In addition, Client acknowledges that the receipt and use of that information may be governed by various laws and regulations of the country, state or province in which the subject resides or from which the information originates, and Client will comply with those applicable laws and regulations regarding Client's receipt and use of that information.

D. Third Party Beneficiary. Notwithstanding anything set forth in the Agreement to the contrary, Client agrees that Fiserv's third party subcontractor is designated as a third party beneficiary of this Schedule as it relates to the use of the subcontractor's software and/or access to the subcontractor's system as contemplated by the terms of this Schedule.

(ii) Compliance with Laws. Client will comply with the provisions of the Fair Credit Reporting Act (the "FCRA"), the Federal Equal Credit Opportunity Act, as amended (the "ECOA"), all state law counterparts of them, and all applicable regulations promulgated under any of them, including, without limitation, any provisions requiring adverse action notification to the consumer. In addition the Client will comply with the following:

A. Client Use Limitations. Client acknowledges that Fiserv and/or any third party involved in the provision of ID Verification Services or information contained therein ("Third Parties") retain all right, title and interest under applicable contractual, copyright and related laws in the databases and materials contained therein used to provide ID Verification Services, and Client shall not use such materials in any manner that is inconsistent with such right, title and interest and notify Fiserv of any threatened or actual infringement thereof. Client shall notify Fiserv immediately of any changes to the information contained in Client's application for ID Verification Services. Client shall at no time represent that it is the

authorized agent or representative of Fiserv or any Third Party providing information or any part of ID Verification Services.

B. Client Use Limitations – Fair Credit Reporting Act. Client agrees not to use ID Verification Services or any data, which is the subject of this Schedule, for consumer credit purposes, consumer insurance underwriting, employment purposes, tenant screening purposes, or for any other purpose(s) covered by the FCRA or other similar and applicable law.

C. Client Use Limitations – Driver's Privacy Protection Act. Client agrees to use ID Verification Services and any data received therefrom, in strict conformance with the Federal Drivers Privacy Protection Act (18 U.S.C. Section 2721 et seq.) or other similar and applicable law.

D. Client Use Limitations – Gramm-Leach-Bliley Act. Client agrees to use ID Verification Services and any data received therefrom, which is the subject of this Agreement, in strict conformance with the Gramm-Leach Bliley Act (U.S.C. Title 15, Chapter 94, Section 6801 et seq.) and similar state statutes, if applicable.

E. Misuse of Services or Information. Client agrees to take appropriate measures so as to protect against the misuse of ID Verification Services. Client agrees that Fiserv may, if it is concerned about Client's use, temporarily suspend Client's access for up to 10 business days pending an investigation of such use. Client agrees to cooperate fully with any and all investigations. If misuse is confirmed through investigation, Fiserv may immediately terminate this Agreement.

F. Changes in Use or Access. Fiserv may, at any time, impose restrictions and/or prohibitions on the Client's use of ID Verification Services or certain data. Client understands that such restrictions or changes in access may be the result of a modification in Fiserv or one of its Third Parties' policies, a modification of Third Party agreements, a modification in industry standards, or a change in law or regulation. Upon written notification by Fiserv of such restrictions, Client agrees to comply with such restrictions.

(iii) Data Security. This Section (iii) applies if Client will access ID Verification Services via personal computer or direct access terminals (in either case, a "DAT"). Client will: (a) restrict access to each DAT to those employees who have completed training offered by Fiserv, (b) inform users of ID Verification Services of Client's FCRA and other obligations with respect to the access and use of consumer reports, (c) ensure that neither trained operators nor other employees will obtain any reports for personal reasons or provide them to any third party, and (d) take all necessary measures to prevent unauthorized use of the DAT by any persons other than the trained operators for permissible purposes. Those measures will include limiting knowledge of the Client number(s), access codes, and telephone access number(s) Fiserv provides, and any DAT user passwords Client may use, to train DAT operators and other employees with a need to know, changing the user passwords on the DAT at least every 180 days, or sooner if an employee trained to operate the DAT is no longer responsible for accessing reports, or if Client suspects an unauthorized person has learned the password, and using all security features in the software and hardware Client uses to access ID Verification Services or the Fiserv System. Client will immediately notify Fiserv if Client suspects or knows of unauthorized access to the Fiserv System. Client will not ship hardware or software between Client's locations or to third parties without deleting all Client number(s), access codes, telephone access number(s) and user passwords. Client will inform trained DAT users and other employees with a need to know that unauthorized access to consumer reports may subject them to civil and criminal liability under the FCRA punishable by fines and imprisonment. Fiserv may suspend or terminate DAT service to Client at any time Fiserv reasonably believes that Client has violated this Section.

(iv) Indemnification. Client hereby agrees to protect, indemnify, defend and hold harmless Fiserv and all Third Parties from and against any and all costs, claims, demands, damages, losses and liabilities (including actual attorneys' fees) arising from or in any way related to use of information by Client (or any third party receiving such information from or through Client) furnished by or through ID Verification Services by Fiserv to the extent such costs, claims, demands, damages, losses or liabilities (including actual attorneys' fees) do not result from the grossly negligent acts or omissions of Fiserv or Third Parties. Provisions hereof related to release of claims, indemnification, use of information and ID Verification Services, payment for ID Verification Service and disclaimer of warranties shall survive any termination of this Agreement.

(v) Warranty, Indemnification and Limitation of Liability. NEITHER FISERV, ITS AFFILIATES, DIRECTORS, OFFICERS, AGENTS, EMPLOYEES, CONTRACTORS, LICENSORS, VENDORS OR THIRD PARTIES, NOR ANY PERSONS OR ENTITIES AFFILIATED WITH THE FOREGOING (COLLECTIVELY, "FISERV AFFILIATES") SHALL BE LIABLE TO CLIENT OR TO ANY PERSON CLAIMING THROUGH CLIENT OR TO WHOM CLIENT MAY HAVE PROVIDED SERVICE-RELATED INFORMATION FOR ANY LOSS, DAMAGE OR INJURY ARISING OUT OF OR CAUSED, IN WHOLE OR IN PART, BY THEIR NEGLIGENT ACTS OR OMISSIONS IN PROCURING, COMPILING, COLLECTING, INTERPRETING, REPORTING, COMMUNICATING, OR DELIVERING THE SERVICE OR IN OTHERWISE PERFORMING THIS AGREEMENT. CLIENT ACKNOWLEDGES THAT EVERY BUSINESS DECISION INVOLVES THE ASSUMPTION OF RISK, AND THAT THE FISERV AFFILIATES DO NOT UNDERWRITE THAT RISK IN ANY MANNER WHATSOEVER. IF, NOTWITHSTANDING THE FOREGOING, LIABILITY CAN BE IMPOSED ON A FISERV AFFILIATE, THEN CLIENT AGREES THAT THE AGGREGATE LIABILITY FOR ANY AND ALL LOSSES, DAMAGES OR INJURIES ARISING OUT OF SAME, REGARDLESS OF THE CAUSE (INCLUDING NEGLIGENCE), AND REGARDLESS OF THE NATURE OF THE LEGAL OR EQUITABLE RIGHT CLAIMED, SHALL NOT EXCEED, IN THE AGGREGATE, THE FEES PAID FOR THE SERVICE TO WHICH THE CLAIM RELATES BY CLIENT DURING THE 6 MONTHS IMMEDIATELY PRECEEDING THE FIRST SUCH CLAIM. CLIENT FURTHER COVENANTS AND PROMISES THAT IT WILL NOT SUE A FISERV AFFILIATE FOR AN AMOUNT GREATER THAN SUCH SUM EVEN IF THE FISERV AFFILIATE WAS ADVISED OF THE POSSIBILITY OF SUCH DAMAGE, CLIENT SHALL NOT SEEK NOR BE ENTITLED TO RECOVER PUNITIVE, CONSEQUENTIAL, INCIDENTAL, INDIRECT, EXEMPLARY OR SPECIAL DAMAGES, INCLUDING LOST PROFITS IN ANY SUIT AGAINST A FISERV AFFILIATE. THE FOREGOING WAIVERS, DISCLAIMERS AND LIMITATIONS OF LIABLITY ARE PROVIDED BY CLIENT IN CONSIDERATION OF THE RECEIPT OF THE ID VERIFICATION SERVICES AT THE RATES CHARGED UNDER THIS AGREEMENT, WHICH ARE FAR LOWER THAN WOULD BE AVAILABLE TO CLIENT ABSENT THOSE WAIVERS, DISCLAIMERS AND LIMITATIONS OF LIABILITY. THE FISERV AFFILIATES DO NOT MAKE, AND FULLY DISCLAIM, ANY WARRANTY, EXPRESS OR IMPLIED. THE FISERV AFFILIATES DO NOT GUARANTEE OR WARRANT THE CORRECTNESS, COMPLETENESS, CURRENTNESS, MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OF THE SERVICE OR THE COMPONENTS THEREOF. IN NO EVENT SHALL AN FISERV AFFILIATE BE LIABLE FOR ANY DIRECT, INCIDENTAL OR CONSEQUENTIAL DAMAGES, HOWEVER ARISING, INCURRED BY CLIENT.

(vi) Confidentiality. Client agrees to hold in confidence all information received through ID Verification Services, except as specifically permitted in this Schedule. Each recipient of confidential information will hold those materials and that information in strict confidence, and will restrict its use of those materials and that information to the purposes anticipated in this Schedule. If the law or legal process requires recipient to disclose confidential and proprietary data, recipient will notify the disclosing party of the request. Thereafter, the disclosing party may seek a protective order or waive the confidentiality requirements of this

Schedule or the Agreement, provided that recipient may only disclose the minimum amount of information necessary to comply with the requirement. Recipient will not be obligated to hold confidential any information from the disclosing party which (a) is or becomes publicly known, (b) is received from any person or entity who, to the best of recipient's knowledge, has no duty of confidentiality to the disclosing party, (c) was already known to recipient prior to the disclosure, and that knowledge was evidenced in writing prior to the date of the other party's disclosure, or (d) is developed by the recipient without using any of the disclosing party's information. Each party will indemnify, defend and hold harmless the other from and against any direct and actual loss, cost, liability and expense (including reasonable attorneys' fees) resulting from the indemnifying party's breach of this Section (vi).

(vii) Assignment. Client may not assign its rights or obligations under this Schedule without the written consent of Fiserv; provided, however, unless prohibited by the terms of the Agreement, Client may assign or transfer this Schedule, by operation of law or otherwise, to any person that becomes the successor entity of Client, in connection with a change of control (which shall include a direct or indirect transfer of all or substantially all of Client's stock or assets to a third party, a merger, reorganization or other such transaction, or any such transaction by a parent corporation of Client) and Fiserv consents to such assignment or transfer in advance. Subject to the foregoing, this Schedule shall be binding upon all successors and assigns. The legal successor(s) resulting from such aforementioned assignment or transfer shall succeed to and be bound by this Schedule. Fiserv may subcontract any of the work, services, or other performance required of Fiserv under this Schedule without the consent of Client.

(viii) Termination. If the continued provision of all or any portion of ID Verification Services becomes impossible, impractical, or undesirable due to a change in applicable federal, state or local laws or regulations, as determined by Fiserv in its reasonable judgment, Fiserv may either (a) cease to provide the affected ID Verification Services service within, or pertaining to persons residing within, the affected jurisdiction, or (b) establish new prices which will apply to the affected ID Verification Services service when provided or delivered within, or pertaining to persons residing within, the affected jurisdiction, which prices will be reasonably calculated to cover the costs incurred by Fiserv in complying with the applicable laws or regulations and will become effective on the date specified in such notice unless Client objects in writing, in which case Fiserv may exercise its rights under clause (a) above. Fiserv will attempt to provide written notice of its actions as far in advance of the effective date as is reasonably possible under the circumstances.

## Virtual Branch® Services Schedule to the ASP Services Exhibit

### 1. SERVICES

(a) Description of Services. Fiserv will provide to Client the following services: (i) online banking, (ii) bill payment, (iii) new member applications, (iv) loan applications, (v) website design and hosting, and (vi) online statements and notices by Internet or Internet-enabled devices (collectively, "Virtual Branch Services"). Where Virtual Branch Services require connectivity to an account processing ("AP") system, the services are offered only for an institution utilizing a Fiserv supported account processing system. Functionality and processes will vary between account processing systems.

(b) Fiserv Responsibilities:

(i) Fiserv will provide Virtual Branch Services directly to Client's customers ("Members") on Client's behalf. In the course of providing Virtual Branch Services to a particular Member, Client authorizes Fiserv to choose the most effective method to process a Member payment instruction, including, without limitation, electronic, paper or other draft means.

(ii) Fiserv will be responsible for storage, telecommunications, appropriate operating system maintenance, and security monitoring of Virtual Branch Services at Fiserv's site.

(iii) Fiserv will present all new web site builds to Client for review prior to going live to its Members.

(iv) Fiserv shall retain ownership of all designs and software code prepared by Fiserv for the web site.

(c) Client Responsibilities:

(i) Client will provide and make available to Fiserv appropriate management and technical personnel of Client who will work with Fiserv and will perform, on a timely basis, the activities referenced in this Schedule, the responsibility for which is required therein to be assumed by Client. In addition, Client will cooperate with Fiserv through making available such personnel, management decisions, information, authorizations, approvals and acceptances in order that Fiserv's performance of the Virtual Branch Services may be properly, timely and efficiently accomplished.

(ii) Client will complete and perform any and all validation procedures it determines, in its sole discretion, are necessary to authenticate the identity and ensure the financial integrity of a particular Member or potential Member.

(iii) Client will provide necessary hardware, software and connectivity to access the Virtual Branch systems.

(iv) Client acknowledges that Fiserv will not monitor, review or approve any Client Content (as defined below), including without limitation grammar, spelling, copyrighted information and claims regarding services and products. Client shall review the web site and promptly inform Fiserv if there are any errors or inaccuracies in the web site.

(v) With respect to all Virtual Branch Services, Client is and shall remain solely and exclusively responsible for any and all financial risks, including, without limitation, insufficient funds, associated with each Member accessing the Virtual Branch Services. Fiserv shall not be liable in any manner for such risk.

(vi) Client acknowledges that if it does not select Primary Customer Service offered by Virtual Branch ("VB"), Client will provide level 1 technical support to its Members.

(vii) Client agrees that it will use, and will instruct its Members to use, the Virtual Branch Services in accordance with such rules as may be established by Fiserv from time to time. Client will be responsible for the supervision, management and control of its use of Virtual Branch Services, including without limitation, implementing sufficient procedures to satisfy its requirements for the security and accuracy of data. Fiserv is entitled to rely upon and act in accordance with any instructions, guidelines or information provided by Client which is given by persons having actual or apparent authority to provide such instructions, guidelines or information.

(viii) Client shall execute separate agreements with third party vendors as directed by Fiserv when needed for Virtual Branch Services including, but not limited to, check image presentment, estatements, credit bureau information and identity verification services. Any charges from these third parties are the responsibility of Client. Client is responsible for contacting the third party vendors in the event of technical issues. If Fiserv resources are required for consultation or to resolve issues caused by the third party vendor, and those issues are determined to not be caused by Fiserv, Fiserv will bill Client at Fiserv's then current hourly rate.

(ix) Client acknowledges that it and its Members are responsible for obtaining access to the site through an Internet service provider, using current third party supported Internet browser software, including any associated plug-in applications and support software and having email access for system notifications.

(x) Client acknowledges that it has certain notice requirements to its Members in connection with its receipt of Virtual Branch Services. Client acknowledges and agrees that it is responsible for ensuring its Members are provided with any applicable privacy disclosures prior to such Members' enrollment and use of the Virtual Branch Services. Client further acknowledges and agrees that it shall comply with all applicable laws, rules and regulations in connection with its receipt of Virtual Branch Services.

(xi) With respect to bill payment services, tax payments and court ordered payments ("Exception Payments") may be scheduled through bill payment services; however, such payments are scheduled at Client's risk and in no event shall Fiserv be liable for any claims or damages resulting from the scheduling of Exception Payments. Client acknowledges that Fiserv has no obligation to research or resolve any claim resulting from an Exception Payment. All research and resolution for any misapplied, mis-posted or misdirected payments shall be the sole responsibility of Client.

(xii) With respect to bill payment services, Client shall designate a bank settlement account such as a Federal Reserve account or a separate clearinghouse account ("Settlement Account") which will be used by Fiserv to settle, in the aggregate, all financial transactions requested via the Virtual Branch Services by each Member. In certain instances, financial transactions requested via the Virtual Branch Services will be settled utilizing a Member's account as opposed to the Settlement Account. Client shall be solely responsible for the auditing and balancing of Member accounts.

(xiii) With respect to online statements, Client agrees that it will, or will cause a third party, if applicable, to provide statement data to Fiserv, or Fiserv's designated third party subcontractor, in the format specified by Fiserv, or by such Fiserv third party subcontractor, on a monthly and/or quarterly basis, or such other basis as determined by Fiserv or such Fiserv third party subcontractor, in order for Fiserv to provide Client with the online statement services pursuant to this Agreement. Notwithstanding anything to the contrary in the Agreement, in the event Fiserv, or Fiserv's third party subcontractor, does not receive the statement data as set forth herein,

Fiserv will not be responsible for any failure to provide to the Client or Member the online statement services and Fiserv may terminate this Schedule for cause pursuant to the terms of the Agreement.

(xiv) With regard to online statements and notices, Client will be solely responsible for the accuracy and integrity of the information reflected on each of its Members' statements and notices.

**2. FEES**

(a) Client agrees to pay Fiserv the fees set forth below for Virtual Branch Services. Such fees will be invoiced to Client on a monthly basis unless otherwise indicated. Client agrees to pay Fiserv the Fees set forth below for the Virtual Branch Services. The boxes marked below with an "X" indicate the Optional Services selected by the Client as of the Effective Date ("Selected Services"). Such Selected Services will be charged and paid by Client monthly at the rates set forth below, which shall be subject to modification as set forth in the Agreement and this Schedule. If Client adds Selected Services after the Effective Date, Client shall pay Fiserv's then standard rates, unless otherwise agreed by the parties for such additional Services. If, subsequent to the Effective Date, Client desires to add an Optional Service to the Selected Services, Client will notify Fiserv which notice may be provided via email or orally and Client will purchase the new Service at Fiserv's then current standard charges, unless specified otherwise in this Virtual Branch Services Schedule. Notwithstanding Section 11(b) of the Agreement, upon receipt of a purchase or sales order or an amendment to the Agreement for such Service executed by Client, Fiserv and Client agree that such Service will then be deemed a Selected Service and be subject to the terms of this Schedule and the Agreement.

| | |
|---|---|
| ☒ **VB Online Banking** | |
| Implementation | Previously paid |
| Monthly Maintenance Fee | $0.00 |
| Monthly User Fee | $1.07627 per User |
| ☒ **VB Bill Pay** | |
| Implementation | Previously paid |
| Monthly Maintenance Fee | $0.00 |
| Monthly User Fee | $4.84317 per User |
| Payment Investigation Fee | $25.00 per investigation |
| Stop Payment Request Fee | $25.00 |
| Payment Funding Fee (based on method funded – must select one) [1] | |
| ☐ Per transaction – ACH | $0.08 |
| ☐ Per transaction – AP or File-Based Processing | $0.08 |
| ☒ Per transaction – Fiserv EFT EPOC Network | no charge |
| ☒ **VB Links and Single Sign On (SSO)** | |
| Link to non-Virtual Branch (VB) system [2] | |
| Fiserv system with interface currently in VB library | |
| Implementation | $750.00 |
| Monthly Maintenance | $75.00 |
| Non-Fiserv system with interface currently in VB library | |
| Implementation | $1,500.00 |
| Monthly Maintenance | $150.00 |
| Link or SSO with interface NOT currently in VB library | Quote |
| ☒ Check Image Retrieval | $107.62603 per month |

☐ Electronic Statement
☐ Credit Card Information System
☐ Check Reorder
☐ Mortgage Information System
☐ Other

**Other Features**

| | |
|---|---|
| ☐ Online Check Deposit (4) | |
| Implementation | $1,000.00 |
| Monthly Maintenance | $150.00 |
| ☐ Account Alerts | |
| Implementation | $1,000.00 |
| Monthly Maintenance | $150.00 |
| ☐ Spanish Language Support for OLB | |
| Implementation | $1,000.00 |
| Monthly Maintenance | $150.00 |
| ☐ Web Trends Reporting | |
| Implementation | $1,000.00 |
| Monthly Maintenance | $150.00 |
| ☐ Quicken® / QuickBooks® Web Connect (5) | |
| Implementation | $1000.00 |
| Monthly Maintenance | no charge |
| ☐ Quicken® / QuickBooks® Direct Connect (5) | |
| Implementation | $2,500.00 |
| Monthly Maintenance | $250.00 |
| Transaction fee – per logon | $0.15 |
| ☐ Virtual Branch SAS70 – annual fee | $350.00 |
| ☐ Demographic update to/from APS (4) | |
| Implementation Fee | $1,000.00 |
| Monthly Maintenance | $150.00 |
| ☐ Virtual Branch Forms | |
| Basic Forms package (6) | no charge |
| Premium Forms package (6) | |
| Implementation fee | $1,000.00 |
| Annual fee | $500.00 |
| ☐ Mobile Deposit Monthly Maintenance | $150.00 |
| ☒ **Enhanced Authentication** | |
| Implementation | Previously paid |
| Annual User Fee (3) | $0.30756 per User |
| ☐ **Account Create** | |
| ☐ <$250M in assets | |
| Implementation | $6,000.00 |
| Monthly Maintenance | $150.00 |
| ☐ $250M - $750M in assets | |

Implementation $7,500.00
Monthly Maintenance $300.00

☐ >$750M in assets
Implementation $10,000.00
Monthly Maintenance $450.00

All asset levels
Per submitted application $9.00
Per submitted new account application (for existing member via online banking) $3.00

☐ **Account to Account Transfer Program (A2A)**
Implementation $1,000.00
Monthly Maintenance $150.00
Per transaction $0.75
NSF fee $25.00

☐ **VB Loan Delivery Services** (11)
☐ 5 loan types
Implementation Fee $3,650.00
Monthly Maintenance $125.00

☐ Each Additional loan type
Implementation Fee $375.00

Per application submitted $3.00
Per application submitted and delivered to loan origination system $6.00
Per application submitted, delivered to loan origination system w/credit report or decision $9.00

☐ **VB Primary Member Support (includes Phone, Live Chat and Secure Messaging)**
Implementation $1,000.00
Monthly minimum $250.00
Primary Customer Support Usage Fees
Phone – per call $2.50
PLUS per minute $2.50
Live Chat – per session $10.00
Secure messaging – per email $10.00

☐ Primary support via phone for 60-days post implementation (7) no charge

☐ **VB Chat**

| Asset Tier | # of seats | Implementation Fee | Monthly Maintenance |
|---|---|---|---|
| ☐ < 25M | 20 | $1,000 | $125 |
| ☐ $25M – <50M | 30 | $1,000 | $165 |
| ☐ $50M – <100M | 40 | $1,000 | $235 |
| ☐ $100M – <200M | 60 | $1,000 | $310 |
| ☐ $200M – <500M | 80 | $1,000 | $460 |
| ☐ $500M – <750M | 125 | $2,500 | $600 |
| ☐ $750M – <1B | 200 | $2,500 | $750 |
| ☐ $1B – <2B | 300 | $2,500 | $1,000 |
| ☐ >$2B | | Quote | Quote |
| ☐ Additional seats | | Quote | Quote |

☐ **VB Website Design and Hosting**
Development and Hosting

| | |
|---|---|
| ☐ 5 page site | |
| Implementation | $1,325.00 |
| Monthly Maintenance | $80.00 |
| ☐ 10 page site | |
| Implementation | $1,950.00 |
| Monthly Maintenance | $90.00 |
| ☐ 20 page site | |
| Implementation | $3,100.00 |
| Monthly Maintenance | $100.00 |
| ☐ Over 21 pages | |
| Implementation | Quote |
| Monthly Maintenance | Quote |

| | |
|---|---|
| ☐ Hosting Transfer | Quote |
| ☐ SSL Certificate [8] | Quote |
| ☐ Additional Domain Name – annual fee | $25.00 |
| ☐ Additional Email Account – monthly fee | $6.00 |
| ☐ Host a former domain name – annual fee | $100.00 |
| ☐ Support – hourly rate | $125.00 |

☒ **VB Online Statement Services** [4]

| | |
|---|---|
| ☒ Statement Express [9] | |
| Interface Fee (if needed) | Quote |
| One-time Set-up Fee (statements direct from APS) | |
| Implementation Fee | Previously paid |
| Monthly Minimum | $150.00 ✓ |
| Per Loaded Statement Fee (with 6 months retention) | $0.30 ✓ |
| Per Loaded Statement Fee (per 6 months additional retention) | $0.02 |
| Custom Statement Backer Creation (FOS only) | $1,000.00 |

| | |
|---|---|
| ☐ VB Statements [9] | |
| Interface Fee (if needed) | Quote |
| Implementation Fee | $1,500.00 |
| Monthly Minimum | $150.00 |
| Per Loaded Statement Fee (with 6 months retention) | $0.30 |
| Per Loaded Statement Fee (per 6 months additional retention) | $0.02 |

☐ **VB Online Electronic Notices** [10]

| | |
|---|---|
| Implementation Fee | $1,500.00 |
| Monthly Maintenance | $150.00 |
| Electronic Notice Alert Fee – per alert sent | $.02 |

☐ **Connectivity (In-house credit unions)** [12]

| | |
|---|---|
| Dedicated Frame Relay Circuit | Quote |
| Point-to-Point Virtual Private Network (VPN) | Quote |

**VB Professional Services**

| | |
|---|---|
| Hourly rate - configuration, research or project management services | Standard rate |

**Notes**

*(1) Not all funding methods are available for each AP system. While VB does not have additional charges for funding through EFT, EFT or the AP system may charge extra for this funding method.*

*(2) Links availability may vary by core account processing system. Virtual Branch will only interface to third-party systems in a single-sign-on model where the third-party has a published, web-facing API. All third party integrations must be approved through the Credit Union Solutions Vendor Management Process. Virtual Branch reserves the right to decline to integrate with specific third party or client-hosted products. Virtual Branch does not link to products to supply account data (other than for authentication purposes), or to retrieve account data for use within Virtual Branch. Examples of links: Check images, check reorder, electronic statements, credit cards, Geezeo, source capture, loan origination systems, cross-sell engines, etc.*

*(3) Annual Fee is due in advance and is based on the number of Virtual Branch Users on the anniversary date.*

*(4) This option may require integration between the account processing system and Virtual Branch.*

*(5) Activation of Quicken® / QuickBooks® Web Connect / Direct Connect requires additional considerations:*

- *a. CU responsible for agreement and associated fees from Intuit.*
- *b. Intuit requires certification for each unique OLB and core account processing system integration for both Web Connect and Direct Connect. If VB & core account processing system integration has not been certified, certification fees apply:*
  - *i. Web Connect = $15,000*
  - *ii. Direct Connect = $30,000*
- *c. Once one client has been certified by Intuit using the VB and core account processing system integration, additional fees for certification are not required for each additional client added.*

*(6) Basic forms include check stop pay request, check reorder form, statement copy request form, check copy request form, VB Bill Pay research request. All other forms are part of the Premium forms package.*

*(7) Conditions apply to 60-day customer support that may be offered to new Virtual Branch clients and including but not limited to adherence to the VB Conversion Communication Plan. Support hours for complimentary support are only available on business days only, does not include after hours or weekends.*

*(8) SSL Certificate charges are subject to change at any time*

*(9) Statement Express is offered to Charlotte, CUBE, CubicsPlus and Portico ASP Credit Unions. VB Statements Archive is offered to CUSA, OnCU and Reliance Credit Unions. Per statement charges are assessed the month the statement is loaded, a statement loaded with 12 month retention would incur a charge of $.30 + ($.02 x 6) for a total charge of $.42 per statement.*

*(10) VB Electronic Notices are currently available for Portico AP system credit unions.*

*(11) Loan Delivery Services functionality and pricing models vary from system to system. Additional fees from other services as part of the loan delivery process may apply (examples: the AP system, loan origination system, scoring system, credit bureau, etc.). Per application pricing is cumulative.*

*(12) Client side equipment may be required and is the responsibility of the client.*

(b) Scheduling. After the effective date of this Schedule Fiserv will work with Client in good faith to establish a mutually agreeable implementation schedule and date the Virtual Branch Services will first be used in live production ("Virtual Branch Live Date") subject to Fiserv's availability, which Virtual Branch Live Date shall in any event be no later than 9 months following the effective date of this Schedule, unless otherwise agreed in writing by Fiserv. In any event, once a Virtual Branch Live Date has been set and agreed to, if within 30 days of the scheduled Virtual Branch Live Date Client notifies Fiserv of a need to delay its implementation, an additional fee equal to 50% of the implementation one-time charges set forth in this Schedule will apply. In addition, retraining costs, if applicable, will be limited to the lesser of Fiserv's standard hourly rate or $500 per session. The rescheduling fee is not applicable if the implementation delay is the result of any issue exclusively under Fiserv's control. In the event Client does not implement the Virtual Branch Services within 9 months following the effective date of this Schedule, and such failure is not due exclusively to the fault of Fiserv, (i) Client agrees to pay Fiserv the applicable Set-Up Fee upon receipt of an invoice from Fiserv, and (ii) notwithstanding anything in the Agreement to the contrary, with written notice to Client, Fiserv may terminate this Schedule and Client agrees to pay early termination fees due pursuant to Section 8(c) of the ASP Services Exhibit in connection with such termination upon receipt of an invoice from Fiserv.

**3. PERFORMANCE**

(a) Hours of Operation. Fiserv will use reasonable efforts to make the Virtual Branch Services available to Client 24 hours a day, 7 days a week, subject to scheduled maintenance, scheduled downtime and causes beyond the reasonable control of Fiserv.

(b) Customer Support.

(i) Primary. Fiserv will provide all end user customer support in connection with Virtual Branch Services. Fiserv will take an initial technical support inquiry from Client and Client's Members and initiate the troubleshooting process.

(ii) Secondary. Fiserv will take an initial technical support inquiry from Client and initiate the troubleshooting process. Client will provide all end user customer support and Fiserv will provide "second level" Customer Support to Client's user support representatives.

(iii) Fiserv will use commercially reasonable efforts to determine the source of Customer Support issues, and to remedy the issues. Customer Support is currently available Monday through Friday from 6:00 am to 10:00 pm CT and 7:00 am to 4:00 pm CT on Saturdays. No Customer Support will be available on Thanksgiving Day, Christmas Day and New Years Day. Customer Support is available on all other Federal holidays, with Saturday hours on Memorial Day, Independence Day and Labor Day. Customer Service hours are subject to change.

**4. ADDITONAL TERMS**

(a) Equipment and Supplies. Client shall obtain and maintain at its own expense such equipment as may be necessary or appropriate to facilitate the proper use and receipt of Virtual Branch Services. Client shall be responsible for paying for all supplies to be used in connection with Virtual Branch Services.

(b) Effect of Termination. Upon any termination or expiration of this Schedule, Client shall continue to be responsible for fees related to the Virtual Branch Services unless Fiserv receives written notice to delete Client Files from the Fiserv System. Client shall continue to be responsible for all data communications and modem fees until (i) all circuits are disconnected and the telecommunications company ceases invoicing Fiserv; and (ii) Fiserv receives back all equipment supplied to Client by Fiserv.

(c) Client Trademark and Content License. Client hereby grants to Fiserv a non-exclusive, non-assignable right to use Client's trademarks, tradenames, service marks, and service names (collectively, "Client Trademarks"), and Client's work, content or information ("Client Content") in connection with Fiserv's provision of Virtual Branch Services. Client will indemnify, defend, and hold harmless Fiserv, its officers, directors, employees, designated suppliers, and affiliates against any claims or actions arising out of Fiserv's use of Trademarks and/or Client Content. Fiserv acknowledges that all of the goodwill associated with the use of the Client Trademarks shall be owned by Client.

(d) Fiserv Trademark and Content License. Fiserv hereby grants to Client a non-exclusive, non-assignable right to use the trademark related to Virtual Branch Services owned by Fiserv, (the "Fiserv Trademark"), and Fiserv work, content, or information ("Fiserv Content") in connection with Client's receipt of Virtual Branch Services. Fiserv will, at its expense, defend Client against any third party claim or action alleging that the Fiserv Trademark and/or Fiserv Content infringes a United States patent, trademark, or other proprietary right of such third party and shall pay all amounts payable by Client under any judgment, verdict, or court order entered by a court of competent jurisdiction or settlement agreed upon by Fiserv in any such claim; provided that Client (i) promptly notifies Fiserv of such claim, (ii) grants Fiserv the sole right to control the defense and disposition of such claim, and (iii) provides Fiserv with reasonable cooperation and assistance in the defense and disposition of such claim. The obligations set forth in this subsection are Fiserv's entire liability and Client's sole and exclusive remedy for any infringement claim

with regard to the Fiserv Trademark or Fiserv Content. Client acknowledges that all of the goodwill associated with the use of the Fiserv Trademark shall be owned by Fiserv.

(e) Client shall use the Fiserv Trademark only in the manner and with appropriate legends prescribed at any time by Fiserv. Client shall not use any other trademark, tradename, service mark, service name or logo in combination with the Fiserv Trademark without the prior written approval of Fiserv, except if required by law. Client shall not use any other trademark, trade name, service mark, service name or logo similar to or resembling the Fiserv Trademark that is likely to cause confusion, deception or mistake.

(f) Client Warranties. Client represents and warrants that (i) any Client Content provided to Fiserv is either original, or that Client has the legal right to provide such Client Content; and (ii) Client Content doesn't impair or violate any intellectual property or other rights of Fiserv or any third party. Client will indemnify and hold harmless Fiserv, its officers, directors, employees, designated supplier and affiliates against any claims or actions arising out of any breaches of the foregoing; or any improper use of information gathered through any co-branded site as part of Virtual Branch Services. Client acknowledges that Fiserv shall not monitor, review or approve any Client Content. Client acknowledges that access to Virtual Branch Services shall be across public and private lines and that Fiserv has no control over such lines or the information available from non-Fiserv sources.

(g) Marketing. Client agrees to market, promote and sell the Virtual Branch Services to Client's Members and potential members. In addition, and as may be reasonably requested, Client will assist Fiserv and its authorized representatives in marketing, promoting and selling the Virtual Branch Services to its Members and potential members.

(h) Service Modifications. In connection with Fiserv's provision of Virtual Branch Services, either party may terminate Virtual Branch Services, or any part thereof, immediately upon notice to the other party of any legislative, regulatory, or judicial (i) impairment of the provision thereof; and/or (ii) restrictions or conditions that would materially affect the integrity thereof.

(i) Communication Lines. Client acknowledges that access to Virtual Branch Services shall be across public and private lines and that Fiserv has no control over such lines or the information available from non-Fiserv sources. Fiserv shall have no liability for failed access over public lines or compromised data delivered over such lines and assumes no liability or control over the Internet access of Client's on-site systems and remote employee or affiliate access. Client acknowledges and understands its responsibility and liability as they relate to Client's access to the Internet.

(j) FedImage Access. In the event Client elects to use the Federal Reserve as its image provider, Fiserv, Client and the Federal Reserve shall be required to enter into a letter agreement for such use and access ("Letter Agreement"). Client acknowledges and agrees that any dispute, claim, liability, legal action, damage, arbitration or court ordered award, fee, or expense of any kind that arises between Client and Fiserv in connection with such Letter Agreement shall be governed by the terms and conditions of the Agreement and this Schedule. Fiserv and Client each agree that as between Fiserv and Client, in the event of a conflict between the terms of the Letter Agreement and the terms of the Agreement (including this Schedule), the terms of the Agreement shall control. Client agrees to indemnify, defend, and hold harmless, and hereby releases Fiserv and its Affiliates and each of their directors, officers, agents, and employees, and any successors or assigns of the foregoing (individually an ("Indemnified Party") and collectively, ("Indemnified Parties")), from and against any and all liability, losses, costs (including but not limited to litigation and settlement costs and reasonable attorneys' fees), charges, or judgments brought or alleged against any Indemnified Parties arising from, relating to or in connection with Client's use of the Federal Reserve as its image provider, or any of Fiserv's acts or omissions taken in accordance with or pursuant to the instructions of Client. Client shall, at its own cost and expense, not subject to reimbursement, defend all such actions and Fiserv shall provide Client with prompt notice of any claim for indemnification, cooperation in the defense and settlement of such claim at Client's expense, and grant Client sole control over the defense and settlement of such claim.

## Equipment Exhibit to the Master Agreement

1. **Equipment**. Components of hardware being purchased by Client through Fiserv are described in each Schedule attached hereto and executed by the parties ("Equipment"). Client understands that Fiserv is acting as an independent sales organization representing each manufacturer or supplier (each, a "Supplier") identified in each Schedule.

2. **Payment**. Client shall pay Fiserv 50% of the total price for Equipment specified in each Schedule upon execution of such Schedule, and 50% upon delivery of Equipment to the site or sites designated on each Schedule (collectively, "Installation Site"). Client shall be responsible for all freight charges associated with shipment of Equipment from Supplier or Fiserv, as the case may be, to the Installation Site. In the event of any price increase by a Supplier, Fiserv shall accordingly increase the prices for Equipment.

3. **Fiserv Obligations**. The ability of Fiserv to obtain Equipment may be subject to availability and delays due to causes beyond Fiserv's control. Fiserv shall promptly place any orders submitted under this Exhibit with each Supplier and shall, at Client's direction, request expedited delivery whenever available.

4. **Insurance**. Client shall be responsible for appropriate property insurance for all Equipment, whether Client-owned or Fiserv-owned, within Client's premises.

5. **Delivery and Installation**. (a) Delivery. On Client's behalf, Fiserv shall arrange for delivery of Equipment to the Installation Site on or about the date requested by Client ("Delivery Date"). In the absence of shipping instructions, Fiserv shall select a common carrier on Client's behalf.

(b) Installation. Fiserv shall arrange for the installation of the items of Equipment for the installation fees listed on each Schedule. Client shall not perform any installation activities without Fiserv's written consent. Fiserv or its designee shall have full and free access to Equipment and the Installation Site until installation is completed. If a suitable installation environment is not provided by Client, then Fiserv shall be required to perform only as many normal installation procedures as it deems to be practicable within the available facilities. Installation of Equipment will take place during normal Fiserv business hours, Monday through Friday, exclusive of Fiserv holidays, unless otherwise agreed by Fiserv.

(c) Installation Environment. Client shall provide a suitable installation environment for Equipment as specified by Fiserv or its agents and any and all other specifications provided to Client by Supplier or Fiserv. Unless Fiserv agrees to so provide, Client shall also be responsible for (i) furnishing all labor required for unpacking and placing Equipment in the desired location for installation; and (ii) physical planning including, but not limited to, floor planning, cable requirements, and safety requirements in accordance with the installation manual and any and all applicable building, electrical, or other codes, regulations, and requirements. All such physical planning shall be completed on or before the Delivery Date

6. **Shipment and Risk of Loss**. All prices shown on each Schedule are F.O.B. Supplier's plant. All transportation, rigging, drayage, insurance, and other costs of delivery of Equipment to the Installation Site shall be paid by Client. Risk of loss shall pass to Client upon shipment.

7. **Title to Equipment**. Title to all Equipment shall remain with Supplier or Fiserv, as the case may be, until all payments are made by Client and, until such time, Client agrees that it shall not sell, transfer, pledge, or otherwise dispose of such items without Fiserv's prior written consent.

8. **Security Interest**. Client grants Fiserv a security interest in each component Equipment and the proceeds thereof until the purchase price due Fiserv is paid in full. Client shall execute any instruments or documents Fiserv deems appropriate to protect the security interest and, in any event, this Exhibit shall constitute a financing agreement within the meaning of Article 9 of the Uniform Commercial Code and a copy of this Exhibit may be filed at any time after signature by Fiserv as a financing statement for that purpose. In the event of default in payment or other breach by Client, Fiserv shall have all rights and remedies of a

secured creditor upon default as provided by applicable law. Fiserv shall, at its sole expense, file releases for any financing statements recorded pursuant to this Exhibit promptly upon receipt of final payment.

**9. Acceptance.** Equipment shall be deemed to have been accepted when it has passed either Fiserv's or Supplier's standard post-installation test procedures at the Installation Site.

**10. Warranties.** Fiserv warrants that Client will acquire good and clear title to all hardware items comprising Equipment free and clear of all liens and encumbrances. Fiserv assigns to Client all warranties Supplier has granted to Fiserv with respect to Equipment as set forth in each Schedule. Client agrees to all of the terms and conditions applicable to those warranties and acknowledges that:\

(i) neither Supplier nor Fiserv warrants that use of Equipment will be uninterrupted or error free; and

(ii) Supplier's warranties, and the assignment of such warranties by Fiserv to Client, shall not impose any liability on Fiserv due to the services or assistance provided to Client by Fiserv with respect thereto.

**11. Liability.** Notwithstanding the limitation of liability provisions set forth in the Agreement, Fiserv's aggregate liability for a default relating to Equipment shall be limited to the amount paid by Client to Fiserv for the applicable Equipment.

**Firewall Schedule to the Equipment Exhibit**

**1. EQUIPMENT, SUPPLIER AND FEES.**

(a) Components of Equipment being purchased by Client through Fiserv are described in the following table ("Equipment").

| Equipment | Description | Supplier | Qty | Fee |
|---|---|---|---|---|
| Firewall | | | | Previously paid |
| | | | | |

(b) Client acknowledges that the Equipment is provided for use on a licensed term basis. The above fee reflects the term selected by Client. Client agrees to remain licensed to use the Equipment during the entire term of this Schedule and to relicense use rights to the Equipment and pay applicable fees as required during the term.

(c) Installation Site(s). 589 N. Larchmont Boulevard, Los Angeles, CA 90004

(d) Warranty and Maintenance. Fiserv agrees to pass through the warranties and maintenance services provided by the Supplier at the time of shipment of the Equipment.

**2. MANAGED FIREWALL SERVICES.**

In connection with Client's use of the Equipment described in this Schedule, Fiserv will provide to Client the managed firewall services described in subsection (a) below ("Firewall Services") and the intrusion prevention services described in subsection (b) below ("Intrusion Detection Services") and together with the Firewall Services, the ("Managed Firewall Services").

(a) Firewall Services. The Firewall Services include the following:

(i) Custom analysis and initial design of the Firewall feature set to determine what network traffic Client will allow to move through the Firewall;

(ii) Backup of critical configuration files for disaster recovery and application of necessary software upgrades and patches as deemed necessary by Fiserv for proper functioning of the Firewall;

(iii) Security policy management and rule base changes as requested by Client via Fiserv approved electronic method; all change requests are reviewed by Fiserv prior to implementation;

(iv) Provide Firewall upgrades as determined are necessary, in the sole discretion of Fiserv;

(v) Administrative changes of the Firewall feature set as reasonably requested by Client;

(vi) Support and maintenance for Firewall hardware and software to the extent provided by Supplier;

(vii) To the extent Client elects to receive hardware assurance services, next day repair or replacement of the Firewall at the sole discretion of Fiserv in the event of a hardware failure, provided that if Client does not elect to receive hardware assurance services, Fiserv shall use reasonable efforts to replace the Firewall within a reasonable period of time at the sole discretion of Fiserv in the event of a hardware failure;

(viii) Automated classification and logging of security events; and

(ix) If elected by Client, authenticated and encrypted web access to firewall security events, logs, summary reports and statistics.

(b) Intrusion Prevention Services. Fiserv shall provide Client with the following Intrusion Prevention Services:

(i) Work with Client to configure the Firewall to allow the minimum levels of access to both internal and external resources;

(ii) Managed intrusion prevention and response service including a recognition engine placed in the Client's location that provides continuous and real-time monitoring of network traffic passing through a single network segment of Client;

(iii) Classification and logging of access attempts that violate the access policy or exhibit anomalous behavior ("Violation Attempts"), as determined by the security engine; such logging shall be based on potential impact and relevance to the Client's systems;

(iv) Prevention of Violation Attempts not reported in error or specifically allowed by Client;

(v) Email notification of Violation Attempts upon request of Client;

(vi) Automated generation of data reports for potential misuse or unauthorized activity; a copy of such reports shall be made available to Client upon request; and

(vii) Notification of corrective or preventative measures determined necessary by Fiserv.

(c) Client Responsibilities.

(i) Client agrees to provide Fiserv with reasonable access to the Client's network as necessary to perform the Managed Firewall Services;

(ii) Client acknowledges that Fiserv's policy is to continually improve its products and services and may from time to time change the Managed Firewall Services provided to Client under this Schedule;

(iii) Client is responsible for the content contained on its system, whether its own, that of any of its system users or any content hosted by Client or its users on behalf of third parties;

(iv) Client agrees that its and its users' use of the Managed Firewall Services will not interfere with or disrupt other network users, network services or network equipment;

(v) Client shall implement security procedures and controls reasonably necessary to limit access to the Managed Firewall Services to Client's authorized users and shall maintain facilities and procedures external to the Managed Firewall Services for reconstruction of lost or altered files, data or programs;

(vi) Client is solely responsible for the availability of any and all facilitative resources, including but not limited to, electrical facilities, personal computers, and communications infrastructure, and for the configuration of any such device that allows for the circumvention of the security controls provided by the Managed Firewall Services;

(vii) Client is responsible for maintaining technical, procedural, and administrative security controls required for ensuring the ongoing security and integrity of Client's overall environment, including without limitation, having an internal approval process for access requests, performing access reviews, having strong remote access password policies,

performing remote access password rotation, revoking terminated staff access, and hardening publically exposed systems;

(viii) Client is solely responsible if it or any other user of Managed Firewall Services has, at any time, any modem, modem pools, or remote communications software packages which reside on any computer, circuit or other equipment which could create a potential point of entry through the Firewall;

(ix) Client acknowledges that Fiserv shall not be liable for any loss or damage resulting from the Firewall not preventing unauthorized access or otherwise for the security of the Client's system and internal environment;

(x) Client acknowledges that Fiserv shall not be liable for any loss or damage resulting from any VPN connection downtime experienced by Client. Fiserv shall use commercially reasonable efforts to limit Client's VPN connection downtime resulting from use of the Firewall. However, Client acknowledges that Fiserv cannot guarantee any level of VPN uptime and Client's VPN uptime may vary due to the nature of the internet and the level of service provided by Client's internet service provider;

(xi) Client acknowledges that Fiserv shall not be liable for any loss or damage resulting from any system, environment or Firewall downtime experienced by Client resulting from or relating to Client's use of or connection to the internet;

(xii) Client agrees to comply with any click through license agreement or other terms imposed by the Supplier with respect to the Equipment; and

(xiii) External vulnerability assessments are Client's responsibility.

**3. FEES.**

(a) On the effective date of this Schedule, Client shall pay Fiserv $0.00 for the license, configuration and installation of the Firewall and Firewall Software.

| | |
|---|---|
| (b) Managed Firewall Services Fees (2 as of Effective Date): | $80.71952 each per month |
| (c) Branch VPN Service: | $80.72 per month |
| (d) Firewall Assurance (2 as of Effective Date): | $18.90018 each per month |

**4. ADDITIONAL TERMS.**

(a) If Client requests expedited shipping, price will be adjusted accordingly and Client will pay for any such adjustment.

(b) NOTWITHSTANDING THE LAST SENTENCE OF SECTION 7 OF THE AGREEMENT TO THE CONTRARY, FISERV'S AGGREGATE LIABILITY TO CLIENT AND ANY THIRD PARTY FOR ANY AND ALL CLAIMS OR OBLIGATIONS RELATING TO THIS SCHEDULE SHALL BE LIMITED TO THE TOTAL FEES PAID BY CLIENT TO FISERV FOR THE FIREWALL.

(c) The term of this Schedule shall be coterminous with the term of the Account Processing Services Schedule.

(d) Firewall Software. Fiserv agrees to furnish any software contained on the Firewall ("Firewall Software") to Client and hereby grants to Client a non-exclusive, nontransferable, non-sublicensable, limited license to use the Firewall Software with the Firewall at the installation site listed in this Schedule

during the term of this Schedule subject to the termination rights set forth in the Agreement. Any rights not expressly granted in this Schedule are expressly reserved. Client may change the location of the Firewall Software with prior written notice to Fiserv. Client shall not copy, decompile, disassemble, or otherwise reverse engineer the Firewall Software. Firewall Software is provided "as is", and neither Fiserv nor Supplier shall be liable for any damages, whether direct, indirect, incidental, or consequential arising from the use of Firewall Software. Supplier is hereby designated as a third party beneficiary of this Schedule as it relates to its software.

(e) Convenience; Early Termination. If Client (i) terminates the Agreement or reduces or terminates Managed Firewall Services for any reason other than pursuant to Section 8(b)(i) of the Agreement, or (ii) fails to cure its material breach or fails to pay any amounts due, each as set forth in Section 8(b) of the Agreement; or (iii) commits an act of bankruptcy or becomes the subject of any proceeding under the Bankruptcy Code or becomes insolvent or if any substantial part of Client's property becomes subject to any levy, seizure, assignment, application, or sale for or by any creditor or governmental agency; then Fiserv may terminate this Schedule upon notice to Client and Client shall pay a termination fee based on the remaining unused term of the Managed Firewall Services. Such fee shall be determined by multiplying the average of the monthly invoices for Managed Firewall Services received by Client during the 6-month period preceding the effective date of termination (or if no monthly invoice has been received, the estimated monthly billing for Managed Firewall Services to be received hereunder) by 80% times the remaining months of the term, plus any unamortized conversion fees or third party costs existing on Fiserv's books on the date of termination. Client understands and agrees that Fiserv losses incurred as a result of early termination of the Agreement or this Schedule would be difficult or impossible to calculate as of the effective date of termination since they will vary. Accordingly, the amounts set forth in this subsection represents Client's agreement to pay and Fiserv's agreement to accept as liquidated damages (and not as a penalty) such amount for any such termination.

(f) Annual Adjustment. Fiserv's fees for Managed Firewall Services may be increased annually effective each January 1 upon 30 days' notice to Client. Each increase shall be limited to the increase in the U.S. Department of Labor, Consumer Price Index for All Urban Consumers ("**CPI**") for the most recently available 12-month period preceding such 30-day notice period, or 5%, whichever is greater.

(g) Holdover. Upon any termination or expiration of the Agreement or this Schedule, Managed Firewall Services provided after the applicable termination date, expiration date, or final processing date specified by Client will be provided subject to Fiserv's capacity and will be invoiced at then current fees under this Schedule plus a holdover premium of 25%, unless such holdover is due to Fiserv's action or inaction.

(h) Assumptions. Fees set forth in this Schedules are based on completion of the initial term of the Managed Firewall Services. If Managed Firewall Services are reduced or terminated pursuant to subsection (e) above, or if Client renegotiates pricing before expiration of the initial term, Client shall reimburse Fiserv for all credits, rebates, discounts, and incentives granted on all Managed Firewall Services. Any such credits, rebates, discounts, and incentives will no longer be granted through the remainder of the term for any continuing Services.

(i) Third Parties. In the event any of Fiserv's obligations under this Schedule are directly or indirectly dependent on entering into an agreement with a third party, or otherwise directly or indirectly dependent on the actions or omissions of a third party, Fiserv shall use commercially reasonable efforts to enter into such agreement on reasonable terms and conditions, or use commercially reasonable efforts to obtain such action, and provided that Fiserv has complied with the terms hereof and if Fiserv is unable to enter into an agreement with such third party or obtain such action, Fiserv's obligations hereunder shall immediately terminate and Fiserv shall not be liable for its inability to perform such obligations and shall be relieved of any such obligations hereunder.

**Professional and Development Services Exhibit**
**to the Master Agreement**

**1. Professional and Development Services.** Fiserv will provide Client with modifications, enhancements, and other customized programming services related to Services and Fiserv's proprietary Products ("Development Services"), and professional services related to Deliverables ("Professional Services", and together with Development Services, "P&D Services") for particular projects (each, a "Project") as described in individual Schedules executed by the parties and attached hereto. P&D Services shall be performed in accordance with the procedures set forth below.

a. Business Requirements List. Client shall provide Fiserv with all necessary information concerning its requirements for P&D Services in a business requirements list ("Business Requirements List"). Fiserv shall review and suggest revisions to such Business Requirements List on a timely basis. The parties shall mutually agree in writing on the final Business Requirements List for any Project.

b. Functional Specifications. Development Services shall be based upon specifications created by Fiserv and approved by Client ("Functional Specifications") as provided below:

(i) Fiserv shall develop Functional Specifications based on the Business Requirements List for Client's written approval. Fiserv shall not be obligated to perform any further development work until Functional Specifications are approved in writing by Client, which approval shall not be unreasonably withheld or unduly delayed.

(ii) Modifications, changes, enhancements, conversions, upgrades, or additions to the agreed upon work beyond those stated in Functional Specifications shall be added only upon mutual written agreement. In the event the parties agree to add any such items, the Functional Specifications and applicable Project Plan (as defined below) shall automatically be modified to the extent necessary to allow for the implementation or provision of the items.

c. Project Plan. Fiserv shall develop a project plan for each Project based on the Business Requirements List (for Professional Services Projects) or Functional Specifications (for Development Services Projects) (each, a "Project Plan"). Each Project Plan shall contain a listing of the nature and timing of tasks for the project to be performed by each party, including the development of an acceptance test if applicable as set forth below. Any dates for performance are dependent upon the timely performance by each party of the tasks assigned under the Project Plan for such P&D Services. Fiserv shall use commercially reasonable efforts to meet the dates set forth in the Project Plan. Modifications and changes to the Project Plan shall be only by mutual written agreement of the parties.

d. Acceptance Test. Fiserv shall prepare an acceptance test for the testing of deliverables provided under each Schedule for Development Services ("Acceptance Test"). Client shall timely review the proposed Acceptance Test. The Acceptance Test shall be adopted upon Client's written approval, which shall not be unreasonably withheld or delayed.

e. Acceptance Testing. Each Development Services Project shall be deemed successfully completed upon the earlier of completion of the Acceptance Test or by live operation and use of the deliverables provided under the applicable Schedule in Client's business for a period of 10 days, unless Client notifies Fiserv promptly in writing (and with reasonable particularity) upon conclusion of the Acceptance Test or earlier upon discovery of any failure of the Project deliverable to operate in accordance with the Functional Specifications (each, a "Specification Non-conformity") disclosed by such testing or use. Fiserv shall correct any such Specification Non-conformities within a reasonable time of receipt of Client's notice.

**2. P&D Fees.**

a. Client shall pay Fiserv fees and other charges for each Project as set forth in each Schedule ("P&D Fees"). Any estimates of P&D Fees and completion dates are referenced solely for the purpose of

allowing Client to plan its budgets and schedules based upon information available at the time the Schedule is executed. Daily or hourly rates quoted in a Schedule, if any, will be valid for 3 months from the effective date of such Schedule. Thereafter, they will be subject to change by Fiserv on 30 days' prior written notice to Client. A higher rate may be applied for an individual whose support to Client has advanced to a new job grade or after 30 days' notice if such individual's general development warrants a job upgrade by Fiserv.

b. Fees for any installation, conversion, or training services to be provided by Fiserv for a Project shall be specified in each Schedule.

c. Unless otherwise set forth in a Schedule, P&D Fees shall be paid 50% upon execution of such Schedule and 50% upon Project completion.

d. If applicable, Fiserv reserves the right to (i) increase the applicable maintenance fees for the Deliverable to which a Development Services Project relates, and (ii) charge Client at Fiserv's then current professional services rates for any necessary retrofitting services when releases of the Fiserv System(s) to which a Development Services Project relates are made generally available.

**3. Project Termination.** At Client's sole option, Client may terminate any Project upon 30 days' prior written notice to Fiserv, provided that Client agrees to pay Fiserv for any outstanding P&D Fees for P&D Services rendered and any out-of-pocket expenses incurred prior to the effective date of termination. In no event shall Fiserv be liable for refund of any P&D Fees already paid by Client.

**4. Rescheduling.** If Client is unable to provide access to required facilities or personnel or is unable to meet its tasks assigned on a Project Plan in a timely manner, Fiserv will endeavor to reschedule tasks to minimize non-productive time. All such non-productive time is chargeable to Client, provided that if such non-productive time is expected to be significant, Fiserv will endeavor to reassign its personnel to other suitable work. If Fiserv is successful in such reassignment efforts, Client will not be charged for the time personnel were reassigned.

**Software Products Exhibit to the Master Agreement**

1. **Software Products**. The parties shall add individual Schedules to this Exhibit for Fiserv's license of software Products and provision of related software maintenance services to Client. The terms of this Exhibit shall apply to any such Products and related services covered by Schedules to this Exhibit.

2. **Defined Terms**.

(a) "Computer System" means the Client-supplied computer equipment and specified operating environment required for operation of the Software when installed, as identified in each Schedule and/or in the Documentation.

(b) "Documentation" means the technical end-user documentation for the Software, as delivered by Fiserv to Client with the Software, as may be updated by Fiserv from time to time as part of Maintenance Services.

(c) "Enhancements" means modifications made to Software that add program features or functions not originally within the Software and that are provided upon payment of additional license fees.

(d) "Location" means only the Client premises identified as such on each Schedule.

(e) "Maintenance Fee" means the annual (unless otherwise specified) fee set forth in each Schedule for Maintenance Services.

(f) "Maintenance Services" means maintenance services described in Section 5 below. Maintenance Services are available only with respect to the current release of Software.

(g) "Non-conformity" means a failure of Software to perform in substantial accordance with the functions described in the Documentation, for which Client has provided sufficient information for Fiserv to replicate on a computer configuration that is comparable to the Computer System and under Fiserv's control.

(h) "Professional Service Rates" means Fiserv's then current hourly or daily rates for Fiserv's provision of implementation, conversion, and/or training services to Client in connection with the Software.

(i) "Software" means the standard, unmodified computer programs in object code (unless otherwise specified on the applicable Schedule), as specified in each Schedule.

(j) "Software System" means the Software and Third Party Software.

(k) "Third Party" means any party other than Fiserv and its agents and subcontractors, and Client.

(l) "Third Party Software" means the object code version of software that is owned or licensed by Third Parties and provided to Client by Fiserv. Third Party Software shall be identified as such on the applicable Schedule hereto. Third Party Software does not include Third Party code (if any) that Fiserv embeds in the Software.

(m) "Total License Fee" means the total sum specified in each Schedule to be paid by Client for the license to Use the Software granted to Client hereunder. Any fees for Enhancements, modifications, or other additions to the Software are not included in the Total License Fee.

(n) "Updates" means, when and if made available through Maintenance Services to Fiserv's other clients at no additional charge, changes made to correct Non-conformities, to maintain compatibility with new system software releases, or to improve existing features and functions within the Software, but does not include Enhancements or other new modules or products for which Fiserv charges a license fee. Updates provided hereunder are subject to all license rights and related restrictions set forth in this Exhibit with respect to the Software, but provision of Updates does not commence new warranty periods for the Software.

(o) "Use" means copying or loading any portion of Software from storage units or media into any equipment for the processing of data by Software, or the operation of any procedure or machine instruction utilizing any portion of either the computer program or instructional material supplied with Software at the

Location. Use is limited to type of operations described in the Documentation solely to process Client's own work, and is subject to any other restrictions or limitations set forth in each Schedule. Use specifically excludes any service bureau, time-share, training, or facilities management services to Third Parties without Fiserv's prior written consent and Client's payment of additional fees in accordance with mutually agreed terms. Use further excludes any right to enhance, modify, improve or create derivative works of the Software unless any such right is expressly granted in the applicable Schedule.

(p) "Warranty Period" means the period of time ending 90 days after the effective date of the applicable Schedule.

**3. License.**

(a) Fiserv agrees to furnish Software to Client and hereby grants to Client a non-exclusive, nontransferable, non-sublicensable, perpetual (subject to all termination provisions set forth in this Exhibit and in the Agreement) license to Use the Software at the Location on the designated Computer System, subject to any additional limitations as to number of accounts, number of users, asset size, and other matters as specified in each Schedule. Any rights not expressly granted in this Exhibit are expressly reserved.

(b) Upon 60 days advance notice to Fiserv, Client may change the Location if Client transfers its operations to a new location within the same country. Client shall contemporaneously uninstall/delete the Software from the prior Computer System following such transfer to the alternative Client location. Assistance by Fiserv related to the transfer shall be chargeable at the Professional Service Rates plus any out-of-pocket expenses.

(c) Client shall not copy any portions of the Software System, except that Client may copy reasonable quantities of any Documentation, and may utilize non-production copies of the Software at the Location for archive, back-up, or emergency restart purposes or to replace copy made on defective media. The original, and all copies of Software and Documentation, and all parts thereof, Fiserv's property and shall include Fiserv's copyright and other proprietary notices.

(d) Client shall maintain any such copies and the original at the Location and one Client archive site in the same country ("Archive Site"). Client may transport or transmit a copy of Software from the Location or the Archive Site to another location in the same country as the Location for back-up use when required by Computer System malfunction in an emergency or disaster situation, provided that (a) Client must promptly inform Fiserv of the emergency or disaster (but in no event later than five (5) days following the commencement of such use), (b) Client must stop using such copy promptly after the Computer System and facility affected by the emergency or disaster is restored, and (c) the copy or original is destroyed or returned to the Location or Archive Site when the malfunction is corrected.

(e) Client shall not decompile, disassemble, or otherwise reverse engineer the Software System.

(f) Client shall obtain and maintain at its own expense such data processing and communications equipment and supplies as may be necessary or appropriate to facilitate the proper use of the Software System. Client is responsible for undertaking the proper supervision, control and management of its use of the Software, including: (i) assuring a proper Computer System configuration, and (ii) following industry standard procedures for the security of data, accuracy of input and output, and back-up plans, including restart and recovery in the event of hardware or software error or malfunction.

(g) Third Party Software is provided to Client under the following supplemental terms:

- (i) Use of Third Party Software shall be restricted to use as part of the Software System.
- (ii) Third Party Software is provided "as is", and neither Fiserv nor Third Party Software owners shall be liable for any damages, whether direct, indirect, incidental, or consequential arising from the use of Third Party Software.
- (iii) Publication of benchmark tests of Third Party Software is permitted only in a writing signed by an authorized officer of Fiserv and the Third Party Software owner.
- (iv) Third Party Software owners are hereby designated as third party beneficiaries of this Exhibit as it relates to their software.

(v) Fiserv will not provide maintenance or support for Third Party Software, but agrees to pass through to Client any Third Party Software warranties provided by the applicable Third Party Software owner, to the extent Fiserv is able to do so without negatively impacting or diminishing its contractual rights with such Third Party Software owner.

4. **Professional Services Terms.**

(a) Implementation, conversion, and/or training services to be provided by Fiserv in connection with the Software, including the fees for such services, are set forth in each Schedule.

(b) Any other professional services, development services, or operational support services requested by Client in connection with the Software shall be provided by Fiserv in accordance with additional terms set forth in a separate exhibit to be added to the Agreement.

5. **Maintenance Services Terms.**

(a) During each annual period for which Client has paid the Maintenance Fee, Fiserv will provide the following Maintenance Services to Client:

(i) Telephone support during normal business hours for reasonable operator support to Client's employees duly trained in the Use of the Software. If telephone support requests are excessive or made outside of Fiserv's normal business hours, Client will be charged the Professional Service Rates.
(ii) Software program fixes or workarounds with respect to Non-conformities will be provided within a reasonable period of time following receipt of notice from Client. Client agrees to provide Fiserv with reasonable assistance and information in connection therewith.
(iii) Updates will be provided to Client and shall be installed by Client within the time frame specified by Fiserv. Training for Updates may be offered to Client at the Professional Service Rates.

(b) The initial term for Maintenance Services shall begin upon the effective date of the applicable Schedule and shall continue for a period of time set forth in the Schedule. Thereafter, Maintenance Services shall automatically renew for successive 1-year terms at Fiserv's then current fees for all modules then licensed, unless either party provides written notice of non-renewal to the other party at least 90 days prior to expiration of the then current term.

(c) Fiserv may utilize remote diagnostic software and dial-up telephone lines in providing Maintenance Services.

(d) Should Fiserv's review of the Non-conformity indicate, in Fiserv's reasonable opinion, that the reported problem is not a Software defect but is due to other problems, including without limitation input not in accordance with the Documentation, Client's abuse or misuse of the Software System, a modification or addition to the Software System not performed by Fiserv, Client's failure to properly maintain the Computer System, or Client's failure to install the required current system software release, Update, fix or workaround as instructed by Fiserv, then:

(i) Client agrees to reimburse Fiserv for the related costs of work performed by Fiserv in investigating the problem at the Professional Service Rates, and
(ii) At Client's request, Fiserv shall advise Client whether Fiserv can correct or assist in resolving such problem, and the terms under which Fiserv shall undertake the same. Upon acceptance by Client, Fiserv shall correct or assist in resolving the problem in accordance with such terms.

(e) Maintenance Fees shall be payable annually in advance. Maintenance Fees shall be subject to annual increases commencing in the second year of the maintenance term upon 30 days written notice to Client, provided that any such annual increase shall not exceed 10%. Maintenance Fees may also be subject to increase following: (i) changes in accounts processed, user seats, or other license limitations set forth in the applicable Schedule, or (ii) delivery of new Software releases, Enhancements, or custom Software modifications or additions provided by Fiserv as a result of Client-requested development services.

(f) Network-related problems and errors in non-production environments are not covered under Maintenance Services. If Fiserv provides such services, or any other maintenance services beyond those specified in this Section, Client shall pay for such services at the Professional Service Rates.

6. **Equipment Terms.**

(a) If Client agrees to purchase from Fiserv any components of the Computer System, such purchase shall be in accordance with terms specified in a separate exhibit to be added to the Agreement. If Fiserv is to provide installation services for the Computer System, such services and related fees shall be set forth on the applicable Schedule.

(b) Fiserv shall not be responsible for the provision of any maintenance or repairs to the Computer System or of any parts or replacements for the Computer System.

(c) Notwithstanding the limitation of liability provisions set forth in the Agreement, Fiserv's aggregate liability for a default relating to any Third Party equipment or Third Party Software shall be limited to the amount paid by Client to Fiserv for the applicable equipment or software.

7. **Performance.**

(a) Client shall give Fiserv access to the Location, Software System, and Computer System as necessary to enable Fiserv to provide services hereunder and shall make available information, facilities, and personnel reasonably required by Fiserv for the performance of its obligations hereunder.

(b) Client agrees to train current and future support staff employees on Software technical and user operations, and shall require employees to complete ongoing training to maintain minimal proficiency.

(c) Work in determining the nature of any problem or in making Software corrections, amendments, or additions may be carried out at Fiserv premises or the Location, at Fiserv's option.

(d) Upon Fiserv's request, Client shall provide Fiserv with written certification of the following relating to Client's Software Use: (i) total number of Software copies and Documentation related thereto; (ii) total number and location of workstations and servers on which the Software is installed, operated, or accessed; and (iii) total number of accounts, users, or other measurement of Software use for the licensing restrictions set forth in the applicable Schedule. Fiserv reserves the right to audit such certification pursuant to paragraph (e) below.

(e) Client shall permit Fiserv's authorized representatives at all reasonable times during Client's normal hours of operation to audit Client's Use of the Software (such audit may occur at Client's premises) to determine that the provisions of this Exhibit and the Agreement are being faithfully performed. Any such audit shall be conducted in such a manner as to minimize the disruption to Client's business and/or the Use of the Software. If such audit reveals any misuse by Client, Client shall immediately terminate such use unless Fiserv otherwise agrees in writing to allow correction of the misuse by payment of appropriate additional fees. If such noncompliance by Client is material, Client shall also pay Fiserv its costs of conducting the audit.

8. **Warranties.**

(a) Fiserv warrants that, during the Warranty Period, the Software will perform without the occurrence of a Non-conformity when operated on the Computer System and in compliance with the Documentation, this Exhibit, and the Agreement. Fiserv will provide replacements or corrections to Software that does not so perform where such failure is material, provided Fiserv is notified in writing of such failure during the Warranty Period. This warranty shall not apply if the Non-conformity results from modification to the Software by Client or any Third Party, use of the Software in combination with non-Fiserv provided software, or by incorrect Use. Client acknowledges that the Software System is designed to operate on the Computer System and that the warranties given by Fiserv are conditional upon the procurement and maintenance by Client of the Computer System in accordance with the then current specified configuration.

(c) If the Software has been delivered by Fiserv on physical media, Fiserv warrants the media to be free from material physical defects for a period of ninety (90) days after delivery by Fiserv. Fiserv will replace the

copy provided on defective media or deliver the Software via an alternate method selected by Fiserv, provided Fiserv is notified in writing of such defective media with such 90-day period.

(d) Fiserv warrants that the Maintenance Services and professional services provided under this Exhibit shall be performed in a professional and workmanlike manner. Client shall notify Fiserv in writing of any alleged warranty defect within thirty (30) days of the date the defective services were performed, and Fiserv shall correct the services at no additional charge to Client.

(e) FISERV DOES NOT WARRANT THAT ALL NON-CONFORMITIES CAN BE CORRECTED. IN NO EVENT SHALL FISERV BE LIABLE FOR LOSS OF OR DAMAGE TO CLIENT'S DATA RESULTING FROM CLIENT'S USE OF THE SOFTWARE. Client acknowledges that it is responsible for the results obtained from use of the Software, including without limitation the completeness, accuracy and content of such results. Client acknowledges further that it is responsible for independent verification and testing of any such results prior to using them in its business. The corrective actions provided by Fiserv as set forth in this Section 8 shall be Fiserv's entire liability and Client's sole and exclusive remedy for Fiserv's breach of any of the foregoing warranties.

**9. <u>Infringement Claims</u>.**

(a) Fiserv shall, at its expense, defend Client against any Third Party claim or action that alleges Use of the Software infringes a patent, copyright, or other proprietary right of such Third Party enforceable in the Location, and shall pay all amounts payable by Client under any judgment, verdict, or court order entered by a court of competent jurisdiction or any settlement agreed upon by Fiserv in such Third Party claim or action, provided that Client: (i) notifies Fiserv promptly in writing of any such claim, (ii) grants Fiserv sole right to control the defense and disposition of such claim, and (iii) provides Fiserv with reasonable cooperation and assistance in the defense and disposition of any such claim.

(b) If, as a result of such claim, Fiserv or Client is permanently enjoined from using Software by a final, non-appealable decree, or if Fiserv deems entry of such a decree to be reasonably likely, Fiserv, at its sole option and expense, may (i) procure for Client the right to continue to use Software or (ii) provide a replacement or modification for Software so as to settle such claim. If neither option (i) or (ii) is reasonably practical in Fiserv's sole opinion, Fiserv shall discontinue and terminate the applicable Schedule upon written notice to Client and shall pay to Client a pro rata refund of the Total License Fees paid by Client for the infringing Software, depreciated on a five-year straight line basis commencing on the effective date of the applicable Schedule for such Software. In making this determination, Fiserv will give due consideration to all factors, including financial expense.

(c) This Section 9 states Fiserv's entire liability and Client's sole and exclusive remedy for any claims of Software infringement or misappropriation, and Client hereby expressly waives any other liabilities on the part of Fiserv arising therefrom.

(d) Fiserv shall have no obligation under this Section 9 for any claim based upon:

(i) use of any part of Software in combination with materials or software not provided by Fiserv;
(ii) modifications made by Client or any Third Party;
(iii ) use of other than the current release of the Software if infringement would have been avoided by use of such current release;
(iv) use of the Software other than in accordance with the Documentation, the Agreement, or this Exhibit, including without limitation Software use in violation of Section 3 above; or
(v) Fiserv's adherence to Client's specifications or instructions.

**10. <u>Title</u>.** Nothing in this Exhibit shall convey to Client any title to or any rights in Software, including but not limited to all proprietary rights or ownership of any modifications, enhancements, additions, updates, or other works based thereon or related thereto. Client's sole right in relation to Software or any such other works is to Use the same in accordance with the terms and conditions hereof.

**11. Termination.**

(a) The termination of the Agreement or this Exhibit or any individual Schedule hereto shall automatically, and without further action by Fiserv, terminate and extinguish the license(s) granted under the applicable Schedule and Fiserv's obligation to provide Maintenance Services with respect to such Software. Unless Client destroys all copies of the Software and provides written certification to Fiserv of said destruction within ten (10) days of receipt of written notice from Fiserv following termination of the applicable Schedule, Fiserv shall have the right to take immediate possession of the Software and all copies thereof wherever located without further notice or demand. In addition, upon termination for any reason other than Fiserv's uncured material default pursuant to Section 8(b)(i) of the Agreement: (i) all remaining Maintenance Fees through the end of the then current term of Maintenance Services shall be accelerated, and Client shall pay all such accelerated fees to Fiserv pursuant to the payment terms set forth in the Agreement; and (ii) all credits, rebates, discounts, and incentives granted on all Software and Maintenance Services shall be reimbursed to Fiserv, and any such credits, rebates, discounts, and incentives will no longer be granted through the remainder of the term for any continuing Maintenance Services.

(b) If Client violates Sections 3 or 12 of this Exhibit, or the confidentiality provisions of the Agreement in relation to Software, and fails to remedy any such breach within 5 days of notice thereof from Fiserv, Fiserv may terminate this Exhibit or the applicable Schedule without further notice.

(c) Client agrees to pay Fiserv's then current deconversion charges in connection with Client's deconversion from the Software System.

**12. Non-Assignment.**

(a) Client may not transfer or assign this Exhibit (or any individual Schedule) except upon Fiserv's prior written consent and payment of additional license fees for such transfer, if applicable, at Fiserv's then current rates. The sale of 50% or more of Client's common stock, the sale of all or substantially all of Client's assets, or any merger in which Client is not the surviving organization, shall be deemed a "transfer" subject to the provisions of this paragraph.

(b) If the organization to which a transfer subject to paragraph (a) above is proposed derives more than 5% of its gross revenues from providing service bureau, time share, computer software consulting services, computer software licensing, or computer hardware sales, Fiserv shall be under no obligation to consent to such transfer.

**13. Export.**

(a) Subject to restrictions regarding Location, territory, or other applicable geographic limitation set forth in a Schedule, Client shall not export, or re-export, directly or indirectly, any Software or any technical data derived therefrom to any country for which the United States Government or any agency thereof may require an export license or other government approval without first acquiring that license or approval.

(b) Client agrees that with respect to compliance with the U.S. export regulations: (i) Client will comply with such export regulations regarding the Software and technical data; (ii) Client will permit audits or reviews by Fiserv covering the Software and data export activity; (iii) Client understands that Fiserv reserves the right to refuse performance of its obligations hereunder in cases of noncompliance by Client of such export regulations; and (iv) Client will not engage in any transaction or activity with any party, firm, or company that is prohibited by applicable law.

**Signature Capture and Laser Checks Software Schedule**
**to the Software Products Exhibit**

**License Section:**

1. Software and License Fees. The following Software modules are hereby licensed to Client in exchange for Client's payment of the corresponding license fees, subject to the additional limitations set forth below.

| | Signature Capture |
|---|---|
| Total License Fee | Previously paid |
| User Seat (Workstation) Limitations | 3 workstations included; Licenses for additional workstations may be purchased at Fiserv's then standard rates |

| | Laser Checks |
|---|---|
| Total License Fee | Previously paid |
| User Seat (Workstation) Limitations | 1 |

2. License Fee Payment Schedule. All license fees set forth above shall be paid by Client in accordance with the following schedule:

100% due upon delivery of Licenses

3. Location. The Location for this Schedule is as follows:

589 N. Larchmont Boulevard, Los Angeles, CA 90004; all branch locations included

4. Computer System. The Computer System for this Schedule is as follows:

Client is responsible for providing a Computer System that meets the minimum configuration requirements recommended by Fiserv or as separately published and updated from time to time.

**Maintenance Services Section:**

1. Term. The term of Maintenance Services shall end May 31, 2019. Thereafter, Maintenance Services shall automatically renew for successive 5 year terms at Fiserv's then current fees for all modules then licensed, unless either party provides written notice of non-renewal to the other party at least 180 days prior to expiration of the then current term.

2. Maintenance Fees. The Maintenance Fee for the Software licensed under this Schedule is as follows:

| | |
|---|---|
| Signature Capture | $15.75015 each per month |
| Laser Checks | $0.00 per month |

## AMENDMENT TO AGREEMENT

AMENDMENT ("**Amendment**") dated as of December 28, 2022 | 18:47 CST ("**Amendment Effective Date**") between Fiserv Solutions, LLC, a Wisconsin limited liability company with offices located at 255 Fiserv Drive, Brookfield, WI 53045 ("**Fiserv**"), and Polam Federal Credit Union with offices located at 589 N Larchmont Blvd, Los Angeles, CA 90004 ("**Client**"), to the Master Agreement dated June 1, 2014 between Fiserv and Client (as amended through the date hereof, the "**Agreement**").

WHEREAS, Fiserv and Client entered into the Agreement for Fiserv's provision of various Services and Products to Client; and

WHEREAS, Fiserv and Client wish to amend the Agreement to include additional Deliverables;

NOW, THEREFORE, Fiserv and Client hereby agree as follows:

1. Defined Terms. Unless otherwise defined herein, capitalized terms used herein shall have the same meanings assigned them in the Agreement.

2. Renewal of Term. Notwithstanding anything to the contrary in Section 8(a) of the ASP Services Exhibit or in any of the Schedules to the Agreement, the parties agree that upon the expiration of the initial term or current renewal term of the Schedules attached to the Agreement as of the Amendment Effective Date (as such term is set forth in the Exhibits and Schedules to the Agreement), the Schedules shall be renewed until May 31, 2030 (the "Renewal Term"). Thereafter, unless otherwise set forth in the applicable Schedule, the Schedules will renew for additional terms of five (5) years, unless they are cancelled in accordance with the applicable terms of the Agreement.

3. Additional and Replacement Deliverables. The Exhibits and/or Schedules listed below and attached hereto are hereby added to the Agreement for Fiserv's provision of such Deliverables to Client. To the extent a corresponding Exhibit or Schedule to the Agreement already exists, the attached Exhibit or Schedule shall replace and otherwise supersede the existing Exhibit or Schedule in its entirety. For clarity, all Products and Services provided under the following Exhibits and/or Schedules shall be subject to the terms of the Agreement.

- Card Services Schedule to ASP Services Exhibit
- Electronic Document Delivery Services Schedule to ASP Services Exhibit
- File Exchange Services Schedule to the ASP Services Exhibit
- Output Solutions Card Services Schedule to ASP Services Exhibit
- Originate Services Schedule to ASP Services Exhibit
- Statement Processing Services Schedule to the ASP Services Exhibit
- Web Signatures for Credit Unions Services Schedule to the ASP Services Exhibit
- Zelle® Payment Services Schedule to ASP Services Exhibit
- Software Products Exhibit to Master Agreement

4. ASP Services Exhibit to Master Agreement. Section 10(a) of the ASP Services Exhibit is deleted in its entirety and replaced with the following new section:

"(a) Annual Adjustment. Fiserv's fees for Services may be increased annually effective each January 1 upon 30 days' notice to Client. Each increase shall be limited to the increase in the U.S. Department of Labor, Consumer Price Index for All Urban Consumers ("CPI") for the most recently available 12-month period preceding such 30-day notice period, or 3%, whichever is greater; provided, however, that CPI shall not exceed 5% in any given year."

5. Account Processing Services Schedule to the ASP Services Exhibit. The Account Processing Services Schedule is hereby amended as follows:

a) Effective June 1, 2024, Section 2(a), Base Services, shall be deleted in its entirety and replaced with the following new subsection:

"Monthly on-line use fee $0.80 per member per month"

b) Effective January 1, 2023, Section 2(c), Optional Services, is amended by the addition of the following new Selected Services and associated fees. To the extent a corresponding line item already exists, the line items listed below shall replace and otherwise supersede the existing line items in their entirety:

| | |
|---|---|
| "☒ Automated CTR Support | $2,805.00 onetime |
| Monthly Fee | Included |
| ☒ ATM Automated Network Balancing | $2,585.00 onetime |
| Cardholder and/or Terminal | |
| Monthly Fee | $289.00 per month |
| ☒ ATM Temporary ATM/Debit Limit & ATM/Debit Counters or Holds | $1,320.00 onetime |
| Monthly Fee | Included |
| ☒ ATM/Debit Counters | $2,145.00 onetime |
| Monthly Fee | Included |
| ☒ Debit Card Batch File - APBatch4 File – COOP | $792.00 onetime |
| Monthly Fee | $100.00 per month |
| ☒ Shared Branch Acquirer | $550.00 onetime |
| Monthly Fee | $110.00 per month |
| ☒ Reporting Analytics (☐ Level 1 or ☒ Level 2) | $825.00 onetime |
| ☒ NOW Network Integration in support of real-time Zelle P2P Payments | $2,400.00 onetime* |

**Fee does not include generation of Zelle data contribution files (ZOE/ZXF) due to Client having less than 100,000 DDA accounts. If Client DDA size exceeds 100,000 in the future, additional setup (i.e. enablement of data contribution files, etc.) may be required, based on then current Zelle network participation rules and then current cost.*

<u>Third Party Interfaces/Extracts</u>:

| | |
|---|---|
| ☒ Portico Professional Services* | |
| ☒ Shared Branch Issuer/Acquirer Integration | $2,376.00 onetime** |
| ☒ Integrated Desktop Integration | $1,188.00 onetime** |
| ☒ To Host Maintenance Integration | $396.00 onetime** |
| ☒ CardHolder Self Service Integration | $396.00 onetime** |
| ☒ Implementation/Conversion Services* | |
| ☒ Portico eStatement Conversion Fee | $1,500.00 onetime |

*<u>Travel-Related Expenses</u>. Additional charges may include reasonable out of-pocket travel-related expenses incurred in connection with the services provided herein. All travel-related expenses shall be billed on a monthly basis as incurred, and are due and payable upon receipt of invoice.

**<u>Estimated Hours and Fees</u>. The hours and fees set forth above are estimates based upon the scope of the services. All services-related hours worked in excess of the hours quoted in this Schedule shall be billed at Fiserv's then-current professional services rate, and are due and payable in accordance with the payment terms set forth herein."

c) Effective June 1, 2024, Section 2(c), Optional Services, is amended by the addition of the following new Selected Services and associated fees. To the extent a corresponding line item already exists, the line items listed below shall replace and otherwise supersede the existing line items in their entirety:

| | |
|---|---|
| "☒ Portico User Experience | Included |
| ☒ Combined Fed/State Tax Reporting | Included |
| ☒ 400 Day History | Included |
| ☒ Portico Cross Sell and Sales Tracking | Included |
| ☒ Loan Payment Recalc Notices | Included |

☒ VPN Monthly Support $125.00"

d) Effective June 1, 2024, Section 2(d), Optional Reports, shall be deleted in its entirety and replaced with the following new subsection:

"Optional Reports shall be included in Base Services Monthly On-Line Use Fee."

e) Section 4(e), Monthly Credit, is deleted in its entirety.

f) Section 4, Additional Terms, is amended by the addition of the following new subsections:

"(h) Flex Credit. Fiserv agrees to provide Client a flex credit in the amount of [redacted] ("Flex Credit"). The Flex Credit may be applied by Client beginning on the Amendment Effective Date and continuing thereafter until May 31, 2030 of the ASP Services Exhibit against Fiserv invoice(s) for one-time implementation fees and/or monthly processing fees for Account Processing Services, subject to the following: (i) Client shall provide Fiserv's indicated designee with at least 30 days prior written notice (which may be via email) of Client's election to use any portion of the Flex Credit, specifying the amount of the Flex Credit to be applied and the invoiced amount(s) to which such amounts should be applied; (ii) elimination and/or failure to implement any Account Processing Services included in the Agreement as of the Effective Date and/or a reduction in actual customer or member accounts converted and/or processed will result in a reduction of the Flex Credit; and (iii) the Flex Credit may not be applied to any third party software or services fees, deconversion or early termination fees, out-of-pocket expenses, equipment costs, third party costs, or Taxes. In the event of termination of the Agreement, the ASP Services Exhibit, or the Account Processing Services Schedule prior to May 31, 2030 for any reason other than Fiserv's uncured material breach pursuant to Section 8(b)(i) of the Agreement, Client will reimburse Fiserv for the Flex Credit applied by Client pursuant to this section, in addition to any applicable termination fees due from Client. Any unused flex credit as of May 31, 2030 shall be forfeited by Client. The Flex Credit is provided by Fiserv solely as a credit against the applicable fees that would otherwise be due from Client under the Account Processing Services Schedule.

(i) Fiserv Conference. If Client purchases one (1) registration to a Fiserv conference each year during the years 2023 through 2029, Fiserv shall agree to provide Client with one (1) registration to Client in the same year for such conference; provided, however, Client shall be responsible for all out of pocket expenses incurred by Client's personnel attending such conference."

6. EFT Services Schedule to the ASP Services Exhibit. Section 1(a), Standard Gateway Services, in the EFT Services Schedule shall be terminated in its entirety effective as of the date the Card Services are first used by Client in live production.

7. Digital Online Banking Services Schedule to the ASP Services Exhibit. Effective January 1, 2023, Attachment 1 – Fee Attachment of the Digital Online Banking Services Schedule is hereby amended by the addition of the following new line items and associated fees"

| | |
|---|---|
| "EZ Card for Mobiliti SSO | $1,815.00 onetime |
| Monthly Fee | $181.00 per month |
| Electronic Statements SSO | $905.00 onetime |
| Monthly Fee | Included |
| Deposit Essentials SSO | $905.00 onetime |
| Monthly Fee | Included |
| Loan Essentials SSO | $905.00 Onetime |
| Monthly Fee | Included |
| Demographic update to/from APS | $905.00 onetime |
| Monthly Fee | $90.00 per month |
| Account Alerts | $905.00 onetime |
| Monthly Fee | $90.00 per month" |

8. ID Verification Services Schedule to the ASP Services Exhibit. June 1, 2024, ID Verification transaction fee under Section 2 of the IDV Verification Services Schedule is deleted in its entirety and replaced with the following new fee:

| | |
|---|---|
| "IDV Transaction Fee | $2.75 each per month |

9. CyberSecure: Managed Firewall Schedule to the Managed Infrastructure Services Exhibit. June 1, 2024, Attachment 1 of the CyberSecure: Managed Firewall Schedule is hereby amended by the addition of the new line items and associated fees, attached hereto, as of the Amendment Effective Date. To the extent a corresponding line item already exists, the line items in Attachment 1 shall replace and otherwise supersede the existing line items in their entirety.

| | |
|---|---|
| "Firewall Services Monthly Support | $250.00 per month" |

10. Amendment. This Amendment is intended to be a modification of the Agreement. Except as expressly modified herein, the Agreement shall remain in full force and effect. In the event of a conflict between the terms of this Amendment and the Agreement, this Amendment shall control.

IN WITNESS WHEREOF, the parties have caused this Amendment to be executed by their duly authorized representatives as of the Amendment Effective Date.

| For Client:<br>**Polam Federal Credit Union** | | For Fiserv:<br>**Fiserv Solutions, LLC** | |
|---|---|---|---|
| By: | DocuSigned by: Jennifer Audette 213751ED14F0437... | By: | DocuSigned by: Jonathan Sablowski 65ACF2D29169484... |
| Name: | Jennifer Audette | Name: | Jonathan Sablowski |
| Title: | CEO | Title: | Authorized Signatory |
| Date: | December 22, 2022 \| 12:32 CST | Date: | December 28, 2022 \| 18:47 CST |

**Card Services Schedule to ASP Services Exhibit**

1. GENERAL. On the terms and subject to the conditions set forth below, Fiserv and Client hereby enter into this Card Services Schedule (this "**Schedule**"), and agree that this Schedule is incorporated into, made subject to, and governed by the provisions of the Agreement. In the event of any conflict, ambiguity, or inconsistency between this Schedule and the Agreement or any other document that is a part of the Agreement, the terms of this Schedule control.

2. TERM. The term of this Schedule ends when the terms of each of the Services provided under this Schedule have expired or been terminated in accordance with the termination provisions of the Agreement. Client will obtain the Services provided under this Schedule for the initial terms set forth in the subsections below (the initial term for each Service provided under this Schedule that is not identified below will expire on the last day of the month following the fifth (5th) anniversary of its implementation in live production), and they will renew automatically for additional terms of five years each unless written notice of non-renewal is provided by either party at least 180 days prior to the expiration of the then-current term for that Service:

(a) The initial term of Debit Services expires on the last day of the month following the fifth (5th) anniversary of the date Client first uses Debit Services under this Schedule in live production.

(b) The initial term of Accel Network participation expires on the last day of month following the fifth (5th) anniversary of the date Client first participates in Accel Network.

3. CARD SERVICES. Fiserv, itself and through its Affiliates, will provide to Client all of the Services (a) that are described in this Schedule, including an Attachment, or a Service Request completed by the parties pursuant to this Schedule, and (b) for which a fee is identified herein, or in an Exhibit to the Agreement or the applicable Service Request (such Services, collectively, the "**Card Services**"). In return, Client shall pay Fiserv the fees so identified. This Schedule replaces that portion of any existing contract between the parties covering the Card Services provided by Fiserv under this Schedule or a Service Request completed after the date thereof. Card Services may include one or more of the following Services:

(a) Debit Services. Fiserv may provide one or some combination of the following Services and other Services pertaining to the debit cards issued by Client (collectively, the "**Debit Services**"):

(i) Debit Card Processing. Fiserv will transmit transaction authentication requests and responses to and from the Card Networks enabled on the debit cards issued by Client.

(ii) ATM Driving. Fiserv will process transactions performed at Client's automated teller machines (each, an "**ATM**").

(iii) Card Management. Fiserv will make available to Client an automated system for debit card ordering, personal identification number ("**PIN**") ordering, debit card reissuance, and debit card inactivation (referred to in the relevant industry as "Hot Carding").

(b) Credit Services. Fiserv may provide one or some combination of the following Services and other Services pertaining to the credit cards issued by Client (collectively, the "**Credit Services**"):

(i) Credit Card Processing. Fiserv will transmit transaction authentication requests and responses to and from the Card Network(s) enabled on the credit cards issued by Client. For purposes of this Schedule and the fees owed by Client, a credit account is considered "Active" if it has: (a) a non-zero balance, (b) outstanding authorizations, or (c) at least one monetary (debit or credit) transaction during the applicable month. An account that does not qualify as Active is considered "**Inactive**".

(ii) Cardholder Services. Fiserv will provide the following Services with respect to inquiries received by Fiserv from Client's credit card cardholders in accordance with Contact Criteria (defined below) (collectively, the "**Cardholder Services**"):

A. Receive inbound telephone calls and research questions posed using data available to Fiserv;

B. Perform monetary adjustments, such as adjustments for annual fees, finance charges, late fees, and over-limit fees;

C. Account data entry or changes, such as address changes, name changes, account closings, adding additional names or cards to cardholder accounts, and cardholder credit life insurance or debt cancellation agreement commencement or cancellation;

D. Adjustment of account balances for payments received;

E. Balance transfers posted to the cardholder's account balance maintained on the Fiserv System;

F. Card activation and de-activation for lost or stolen cards; and

G. Referral to nearby consumer credit counseling and debt management services.

(iii) Lockbox Services. Fiserv or its third-party provider will provide the following Services with respect to items received at one or more post office boxes or suite numbers assigned to Client (collectively, the "**Lockbox Services**"); these Lockbox Services are expressly conditioned on Client's execution and compliance with all separate, written agreements required by Fiserv's third-party provider:

A. Bankable checks and other items found acceptable for deposit will be batched.

B. Batched items will be encoded with the dollar amount of the item and endorsed for deposit into the account identified in the instructions received by Client during implementation of the Lockbox Services.

C. Each bankable item will be imaged, and a printout of the information contained in each imaged item will be created and delivered to Client.

(iv) ACH Services. Fiserv's third-party provider will serve as the originating depository institution or receiving depository institution for the ACH entries created by Client. Fiserv will provide to Client statements and reports of ACH transfers. Provision of these Services is expressly conditioned on Client's execution and compliance with all separate, written agreements required by Fiserv's third-party ACH services provider, and these ACH Services are subject to the following additional terms:

A. Client shall notify Fiserv in writing of any unauthorized, erroneous, or improperly executed ACH transfers within five days of Client's receipt of the report of such transfer.

B. Client is solely responsible for ensuring that sufficient balances of available funds are on deposit to cover all transactions initiated by Client's customers and all returns in respect thereof. Fiserv may decline to forward transactions if sufficient balances are not available. Client will immediately reimburse Fiserv or its third-party provider, as applicable, for any overdrafts created.

C. Fiserv is not required to cancel or amend any ACH entry once sent, dishonor returns, or refuse notifications or change.

D. All IDs and passwords constitute Fiserv Information, as such term is defined in the Agreement.

E. Any credit given by Fiserv or its third-party provider with respect to an ACH credit entry is provisional until final settlement is received for such entry through a Federal Reserve Bank. If Fiserv or its third-party provider does not receive such final settlement for such entry within five days, Client shall refund the amount credited in connection with such entry, and the party making payment via such entry (i.e., the originator of such entry) will be deemed not to have paid the amount of such entry.

F. Unless Fiserv and Client mutually agree in writing otherwise for a particular Service, for Services that facilitate cardholder payment of account balances by ACH:

(1) Fiserv will comply with the applicable operating rules of the National Automated Clearinghouse Association ("**NACHA Operating Rules**") solely in its capacity as a Third Party Service Provider and a Sending Point if submitting the files to the Operator on behalf of Client, with "Third Party Service Provider", "Sending Point", and "Operator", each as defined in the NACHA Operating Rules.

(2) Fiserv will not be considered an Originator, Originating Depository Financial Institution or Institution or Third Party Sender, as defined in the NACHA Operating Rules: and

(3) Client will comply with the NACHA Operating Rules, including all applicable obligations of the Originating Depository Financial Institution, and decide the settings, options, parameters, and strategies for the Fiserv System, Services or Software that Client selects (or that are selected at Client's direction) in order for Client to receive the Services to support cardholder payments by ACH.

(v) Online Access Services. Fiserv will provide Client and its customers or members access to a browser-based solutions that Client's customers may use to initiate certain business transactions to their registered accounts (collectively, the "**Online Access Services**"). Fiserv may brand the website with Client's logo and designated colors and include links to Client's customer care websites and other information.

(c) ATM Managed Services. Fiserv will provide services related to the management of the ATMs, which may be identified in an attachment to this Agreement, or in a Service Request completed by the parties pursuant to this Schedule or similar document signed by Client and accepted by Fiserv (each, individually and collectively, "**ATM Managed Services**"). The ATM Managed Services are subject to the following additional terms:

(i) Compensating Balance. If Fiserv is providing Client cash delivery Services, Client will provide, as directed by Fiserv, a compensating dollar amount equal to at least the amount of currency placed into such ATMs plus the amount of currency that is in transit to those ATMs (such amount, individually and collectively, the "**Compensating Balance**"). Fiserv may use the Compensating Balance funds in its sole discretion. Title to cash in transit to the ATMs transfers to Client once locked in the ATMs. After the termination of ATM Managed Services and Fiserv's recovery of the cash from the ATMs, Fiserv will return to Client the Compensating Balance funds, less fees and amounts owed Fiserv by Client.

(ii) Specifications and Standards. Client shall comply with all (A) specifications, recommendations, instructions, documentation, and procedures of Fiserv, and its service providers, with regard ATM Managed Services, including those pertaining to ATMs, ATM components, ATM site preparation, software, hardware, and any product or service obtained through Fiserv, and (B) applicable third-party standards. Fiserv will comply in all material respects with the then-current ATM Managed Services product documentation, which Fiserv will provide to Client upon request.

(iii) ATM Purchase. Should Client agree with Fiserv on the purchase of ATMs from Fiserv, Client shall execute and return to Fiserv all documentation required by Fiserv to confirm the terms and conditions of each such purchase. Fiserv will have no obligation to provide ATM Managed Services with regard to an ATM to be purchased by Client unless Client has met all obligations under this Subsection. Client will, upon the cessation of ATM Managed Services with regard to any Client-Purchased ATM for any reason, promptly delete all software off of the subject Client-Purchased ATM and provide Fiserv with written certification such deletion has been completed, or provide Fiserv access to such Client-Purchased ATM to permit Fiserv's deletion of all software from it, as Client understands that Fiserv has not provided Client with a license to such software.

(iv) ATM Supplies. Where Fiserv is providing ATM first line maintenance for the identified ATM, Fiserv shall be responsible for providing ATM supplies which are generally used by Fiserv ATM Managed Services clients (otherwise known as "**generic**" or "**non-custom**" supplies), and Client shall be responsible for providing all other ATM supplies. In all other instances, Client will: (A) purchase and maintain, at a minimum, a thirty day reserve of all ATM supplies, including custom supplies, to support each make and model of ATMs serviced hereunder, (B) monitor the supplies of each such ATM and promptly notify Fiserv when supplies are needed to avoid any disruption in ATM Services or availability, and (C) provide Fiserv or, as directed by Fiserv, the third-party provider(s), with all currency, checks, and alternative media, each distinctively and securely sealed, for use in replenishing the ATMs. Client authorizes Fiserv to order supplies, including custom supplies, on Client's behalf, as Fiserv deems necessary for the provision of ATM Managed Services or for minimizing interruption or impact on ATM availability.

(v) Electricity and Telecommunications. Fiserv shall provide, for an ATM which is listed in the ATM Managed Services fees section of Attachment 1 to this Schedule, that which is identified as the "Telecom" to be provided by Fiserv for the subject ATM, and the cost to Client for same is included in the specified ATM Managed Services Monthly Fee. Fiserv is not otherwise responsible for supplying or maintaining electrical connections or other utility service requirements necessary for the use of the ATMs. Unless otherwise specified in the ATM Managed Services fees section of Attachment 1 (such as where "Telecom" is shown to be included in the subject Monthly Fee), Client is responsible for the costs for telecommunications for each ATM, including installation, relocation, and redeployment, and these must all meet Fiserv specifications.

(vi) Loss. Client shall defend Fiserv and its third-party service providers against all claims, demands, suits, and proceedings, and shall indemnify them against all judgments, settlements, fines, penalties, damages, losses, liabilities, costs, and expenses (including their attorneys' fees and costs related to investigation) arising from or related to: (A) loss in the provision of, or related to, ATM Managed Services resulting from illegal, wrongful, or fraudulent activity or use, skimming devices, force majeure, shortage, and any other type of casualty or loss; or (B) the failure of any Client cardholder to comply with laws, rules, or regulations applicable to any ATM Managed Services under this Schedule or to the goods and services provided by Client to its cardholders (each, an "**Indemnified Loss**"). Client will be solely responsible for each Indemnified Loss.

(vii) ATM Managed Services Early Termination Fees. The fee rate for ATM Managed Services for each ATM is predicated on Client obtaining full ATM Managed Services with regard to such ATM for a continuous period of time at least as long as the length of time of the initial term of the overall ATM Managed Services to be provided hereunder (this period of time, as applicable to each ATM, the "**Recapture Period**"). As such, Client will owe Fiserv a termination fee for each ATM for which ATM Managed Services are not provided in a continuous fashion for at least as long as the Recapture Period. Fiserv has discretion over whether to charge the termination fee upon the reduction, suspension, or termination of ATM Managed Services for the given ATM or upon the

expiration of the term of the overall ATM Managed Services, and the fee will be calculated by multiplying the monthly fee owed for the particular ATM times the number of months remaining in the Recapture Period for that ATM. If Fiserv, in its sole and reasonable discretion, determines that Client's election to discontinue ATM Managed Services, when such election is made for a single ATM, is justifiable based on factors that are all outside of its control, then the termination will be considered "for cause" and, if a termination factor "for cause" is provided for the subject ATM in the ATM Managed Services fee attachment, then the termination fee will reduced by multiplying the termination fee by the termination factor specified.

(viii) Update and Replacement of ATM Terminals. Fiserv may require that the ATM(s) for which ATM Managed Services are provided hereunder be updated or replaced for reasons including, but not limited to, the following: (i) maintenance is no longer cost effective, (ii) laws, regulations, or regulatory guidance necessitate or indicate replacing or updating, (iii) software, hardware, or firmware provider is no longer supported by the manufacturer/provider, or (iv) network operating rules or regulations, or third party standards (ie. PCI-DDS) necessitate or indicate replacing or updating the ATM or a component or technology. In the event Fiserv requires an ATM update or replacement, Client may either (A) allow for such update or replacement to occur and pay for all costs for Fiserv to carry out such update or replacement, or (B) terminate the ATM Managed Services for the given ATM and pay the termination fee described above.

(ix) Only Fiserv is permitted to move or disconnect an ATM. If Fiserv agrees to remove an ATM from active service and store it for later redeployment, Fiserv may charge a monthly storage fee equal to 50% of the ATM Managed Service fee for the particular ATM.

(x) Client shall, at its sole obligation and expense, promptly notify Fiserv, and local law enforcement authorities, of any known or suspected theft, illegal activity, vandalism, skimming devices and skimming events, related to or affecting the ATMs and any related equipment, and shall promptly investigate and advise Fiserv of the results of each such investigation.

(xi) Client shall promptly notify Fiserv of all known or suspected defects and malfunctions related to or affecting the ATMs and any related equipment, and then promptly investigate and notify Fiserv of the root cause of each.

(xii) Client shall grant Fiserv and its service providers free and safe access to each installation site and related systems, and all ATM locations (or locations as otherwise requested by Client), ensure compliance with any site preparation recommendations or other specifications provided by Fiserv or its service providers, including electrical and communication connectivity, and ensure that each ATM location is free of any hazardous or dangerous materials or conditions. If Fiserv, or its service provider, is not given or able to access an ATM for a site survey, and therefore unable to complete a site survey, a "No Access Charge" will be assessed and the physical assessment for such survey will be rescheduled based on availability of Fiserv or its service provider.

(xiii) Client hereby grants permission to Fiserv and its service providers to access, possess, or operate, as Fiserv deems necessary, any Client-owned ATM software, hardware, and equipment, and to access Client Systems for the provision of ATM Managed Services.

(xiv) Client shall provide and maintain all signage, surrounds, and toppers at all ATM locations and ensure compliance with all laws, regulations, and third-party standards with regard thereto.

(xv) Client shall obtain, install, and maintain the computer and communications equipment (including, without limitation, personal computers and modems), software, web browsers, Internet access, and communications services necessary to access web portal service hereunder, which are

necessary for the provision of any ATM Managed Services hereunder, all at Client's sole cost and expense. Fiserv shall not be liable for any delays, interruptions, or malfunctions relating to Client's Internet access or use.

(xvi) Client shall provide Fiserv with the minimum number of Client-owned and leased access keys and Client-owned ATM keys requested by Fiserv for its provision of timely ATM Managed Services.

(xvii) Fiserv is not responsible for Cardholder claims, complaints, chargebacks or any other issues related to currency conversion at the ATM.

(xviii) Fiserv is entitled to determine the amount of cash to be loaded into each ATM for which Fiserv is providing cash delivery Services.

(xix) Fiserv is responsible for the disposal or destruction of parts removed from Client's equipment solely in the course of providing ATM Managed Services, provided Client is responsible for all costs and expenses associated with such disposal or destruction of parts. Except as otherwise set forth in a subject Service Request, Amendment to the Agreement, or specified in the then-current ATM Managed Services product documentation, upon expiration or termination of this Agreement, Client shall be solely responsible for the disposal or destruction of parts, including data storage devices that may contain consumers' confidential or nonpublic personal information.

(xx) Client understands that the anti-skimming device Services are reliant on the accuracy of third-party software, and that the Services are solely offered as a tool to help Client identify skimming events; Client will be solely liable to any third party (including without limitation any cardholder), for any issue including but not limited to any failure or error of the anti-skimming software, for any failure or delay by Fiserv to send a notification, or for any failure of the ATM to discontinue processing or continue processing before the issue is resolved. In the event that Client procures anti-skimming hardware/software from an entity other than Fiserv, Client represents and warrants that it has obtained for Fiserv the right to use the anti-skimming software as contemplated to provide the Services under this Agreement.

(xxi) Unless Fiserv is then providing Client with both ATM first line maintenance and ATM cash delivery Services for the subject ATM, Client will be solely responsible for the following with regard to transaction disputes and adjustments: (A) researching the transaction to verify that the transaction processed correctly; (B) verifying the transaction against the journal information; and (C) providing settlement and documentation to the appropriate Network (for non-Client cardholders) and make the necessary adjusting entries to the appropriate Networks via the Fiserv adjustment tool. Client must verify whether the physical cash count substantiates the adjustment claim.

(xxii) The pricing for ATM Managed Services set forth in this Schedule already includes a 25% discount, which is being provided due to Client's agreement to purchase the other Card Services that do not constitute ATM Managed Services under this Schedule ("**Non-ATM Managed Services**"). If Client terminates any of the Non-ATM Managed Services prior to the expiration of their term, then Fiserv will have the right, at any point after such termination, to increase the fee rates for the ATM Managed Services, to remove the 25% discount and charge the higher rate throughout the remainder of the term of ATM Managed Services. This paragraph does not apply if Client does not purchase Non-ATM Managed Services from Fiserv.

(d) Accel Network Participation. Client hereby elects to participate in the Accel® payments network, Fiserv's authorization, clearing, and settlement network for POS, ATM, and other electronic funds transfer transactions (the "**Accel Network**"). Client will participate in the Accel Network as a Member, as such term is

defined in the Accel Network Operating Rules (as amended from time to time after the date hereof, and including any attachments or appendices thereto, the "**Accel Rules**"), unless otherwise agreed upon by the parties in writing. Client will be bound by, and shall comply with, all terms and conditions of the Accel Rules, including without limitation the fee provisions contained therein except to the extent the fees due under the Accel Rules are expressly modified by the fee provisions of Attachment 1 (Fees) to this Schedule. Client's participation in the Accel Network is subject to the following additional provisions:

(i) Any and all provisions of the Agreement regarding exclusivity or that require Client to obtain Services on an exclusive basis from Fiserv are inapplicable to Client's participation in the Accel Network. Client may add or participate in any Card Network, in its sole discretion, at any time during the term of this Schedule.

(ii) Client shall ensure at all times that all of the debit cards that it has issued or that have been issued by an entity that it acquires, and all of the ATMs that it owns, operates, or acquires, participate in Accel and are enabled to route transactions performed by them, in the case of debit cards, and at them, in the case of ATMs, over the Accel Network. Client shall notify other processors as necessary or directed by Fiserv to ensure their proper recognition of Client's participation in the Accel Network as described herein.

(iii) Fiserv may change the name of the Accel Network, through re-branding or consolidation with another network, and upon notification thereof to Client, all references to the Accel Network in this Schedule will be deemed to refer to the new name or network.

(iv) Certain provisions of the Agreement may be subject to Section 920 of the Electronic Funds Transfer Act and the Federal Reserve Board's Regulation II, Debit Card Interchange Fees and Routing, 12 CFR Part 235 (as amended, collectively, "**Regulation II**"). An essential inducement for each party to enter into the Agreement and this Schedule is their collective understanding that none of the economic provisions contained in the Agreement are inconsistent with Regulation II. Accordingly, if Regulations II's restrictions on interchange transaction fees, including the provisions thereof addressing evasion or circumvention of such restrictions, (a) are interpreted by rule, regulation, order, regulatory guidance, judicial decision, or other action to apply to any economic provisions contained in the Agreement, or (b) become applicable due to a change in the circumstances of Client, then the party that discovers such interpretation or change of circumstances shall provide notice thereof to the other party, and the parties shall meet promptly thereafter to discuss in good faith an agreeable solution to the situation, which may include repayment by Client of amounts previously paid by Fiserv, whether in the form of interchange fees or otherwise. In the event that a payment is owed by Client to Fiserv in order to be in compliance with Regulation II, that payment must be made no later than 45 days after the request is received by Client. If the parties are unable to agree on a solution within 30 days of the first meeting, then Fiserv will not be required to make any future payments of any amounts, provide any economic concessions, or perform any other obligation under the Agreement that would conflict with or violate Regulation II or any other applicable law.

(e) MoneyPass Network Participation. Client hereby elects to participate in Fiserv's MoneyPass® ATM surcharge-free electronic funds transfer network ("**MoneyPass Network**"). Client will participate in the MoneyPass Network pursuant to the MoneyPass Network Operating Regulations (as amended from time to time after the date hereof, and including any attachments or appendices thereto, the "**MoneyPass Rules**"), unless otherwise agreed upon by the parties in writing. Client will be bound by, and shall comply with, all terms and conditions of the MoneyPass Rules, including fee provisions contained therein unless otherwise specified in Attachment 1 (Fees) to this Schedule. Client's participation in MoneyPass Network is subject to the following additional provisions:

(i) Client shall comply and shall cause its Issuer Participants or Acquirer Participants (as applicable) to comply, with and be subject to the MoneyPass Rules and all applicable laws, orders, and regulations. Client shall require by written agreement that its Issuer Processors and Acquirer Processors comply with the MoneyPass Rules and all applicable laws, orders, and regulations, and Client will be responsible to Fiserv for any noncompliance by Client's Issuer Processors or Acquirer Processors with the MoneyPass Rules, or any applicable laws, orders, or regulations.

(ii) Client shall ensure at all times that all of the debit cards that it has issued or that have been issued by an entity that it acquires, and all of the ATMs that it owns, operates, or acquires, participate in the MoneyPass Network and are enabled to route transactions performed by them, in the case of debit cards, and at them, in the case of ATMs, over the MoneyPass Network. Client shall notify other processors as necessary or directed by Fiserv to ensure their proper recognition of Client's participation in the MoneyPass Network as described herein.

(iii) Fiserv may change the name of the MoneyPass Network, through re-branding or consolidation with another network, and upon notification thereof to Client, all references to the MoneyPass Network in this Schedule will be deemed to refer to the new name or network.

(iv) Client shall ensure that the MoneyPass Network is priority routed ahead of all other surcharge-free networks, such that when a payment card used at a Client ATM has more than one payment network enabled on it that requires the transaction to be surcharge-free, and one of those networks is the MoneyPass Network, Client will ensure the transaction is routed to the MoneyPass Network.

(f) STAR Network Participation. Client hereby elects to participate in the STAR ® payments network, Fiserv's authorization, clearing, and settlement network for POS, ATM, and other electronic funds transfer transactions (the "**STAR Network**"). Client will participate in the STAR Network as a Member, as such term is defined in the STAR Network Operating Rules (as amended from time to time after the date hereof, and including any schedules, attachments, or appendices thereto, the "**STAR Rules**"), unless otherwise agreed upon by the parties in writing. Client will be bound by, and shall comply with, all terms and conditions of the STAR Rules, including without limitation the fee provisions contained therein except to the extent the fees due under the STAR Rules are expressly modified by the fee provisions of Attachment 1 (Fees) to this Schedule. Client's participation in the STAR Network is subject to the following additional provisions:

(i) Any and all provisions of the Agreement regarding exclusivity or that require Client to obtain Services on an exclusive basis from Fiserv are inapplicable to Client's participation in the STAR Network. Client may add or participate in any Card Network, in its sole discretion, at any time during the term of this Schedule.

(ii) Client shall ensure at all times that all of the debit cards that it has issued or that have been issued by an entity that it acquires, and all of the ATMs that it owns, operates, or acquires, participate in STAR and are enabled to route transactions performed by them, in the case of debit cards, and at them, in the case of ATMs, over the STAR Network. Client shall notify other processors as necessary or directed by Fiserv to ensure their proper recognition of Client's participation in the STAR Network as described herein.

(iii) Fiserv may change the name of the STAR Network, through re-branding or consolidation with another network, and upon notification thereof to Client, all references to the STAR Network in this Schedule will be deemed to refer to the new name or network.

(iv) Certain provisions of the Agreement may be subject to Section 920 of the Electronic Funds Transfer Act and the Federal Reserve Board's Regulation II, Debit Card Interchange Fees and Routing, 12 CFR Part 235 (as amended, collectively, "**Regulation II**"). An essential inducement

for each party to enter into the Agreement and this Schedule is their collective understanding that none of the economic provisions contained in the Agreement are inconsistent with Regulation II. Accordingly, if Regulations II's restrictions on interchange transaction fees, including the provisions thereof addressing evasion or circumvention of such restrictions, (a) are interpreted by rule, regulation, order, regulatory guidance, judicial decision, or other action to apply to any economic provisions contained in the Agreement, or (b) become applicable due to a change in the circumstances of Client, then the party that discovers such interpretation or change of circumstances shall provide notice thereof to the other party, and the parties shall meet promptly thereafter to discuss in good faith an agreeable solution to the situation, which may include repayment by Client of amounts previously paid by Fiserv, whether in the form of interchange fees or otherwise. In the event that a payment is owed by Client to Fiserv in order to be in compliance with Regulation II, that payment must be made no later than 45 days after the request is received by Client. If the parties are unable to agree on a solution within 30 days of the first meeting, then Fiserv will not be required to make any future payments of any amounts, provide any economic concessions, or perform any other obligation under the Agreement that would conflict with or violate Regulation II or any other applicable law.

(g) Risk Management Services. Fiserv may provide one or some combination of the risk management services to assist Client in detecting and preventing fraudulent transactions processed under this Schedule (collectively, the "**Risk Management Services**"); these Services are subject to the following additional provisions:

(i) Fiserv will perform the Risk Management Services in accordance with the risk mitigation strategy agreed upon by the parties during the implementation process (the "**Risk Strategy**").

(ii) If Client elects to receive case management services, Fiserv will attempt to contact Client and/or the applicable cardholder, by live representative or automated dialing system, depending on the Risk Strategy selected, when a potentially fraudulent transaction is identified. Client is responsible for obtaining all legally required consents for Fiserv to contact Client's customers or cardholders.

(iii) Client recognizes that any delay in reviewing Fiserv reports, confirming Fiserv actions as appropriate or sufficient, or taking corrective or mitigating actions recommended by Fiserv, may diminish the effectiveness of the Risk Management Services.

(iv) Client acknowledges that no fraud detection tool is 100% accurate; therefore, Fiserv will not be held liable for the actual or attempted fraudulent activity of third parties.

(h) Rewards Services. Fiserv's rewards services (the "**Rewards Services**") are configurable to enable Client's customers to accrue Client-funded points, merchant-funded points, or enterprise relationship rewards points, or some combination of them (collectively, "**Points**") through use of their payment cards or other actions agreed upon by the parties; end users may redeem accumulated Points from available rewards items that can be viewed on a rewards redemption website, including ecommerce companies with rewards shopping programs (collectively, "**Rewards Merchants**"). Rewards Services are subject to the following additional terms:

(i) Client will designate the transactions that qualify for Points, the Point valuation of each transaction, and the benefits that are provided when a customer redeems Points.

(ii) Fiserv shall provide Client one training session, without charge other than reasonable travel expenses, covering a general Rewards Services overview, administration of Client's chosen Rewards Services program, and end user training in the use of Rewards Services.

(iii) Client hereby consents to the transmission to, and the processing and retention by, Fiserv's third-party service providers and Rewards Merchants of transaction and account information of Client and its customers in the provision of Rewards Services, including by Fiserv to such entities of historical transaction records in furtherance of the Rewards Services. Client is responsible for providing appropriate notices and obtaining from its customers the consents necessary for Fiserv to share Client's customer information with Rewards Merchants and to enable such customers to use their Points with Rewards Merchants. Fiserv may cease providing the Rewards Services, in whole or in part, if its agreement with any of its third-party service providers or Rewards Merchants terminates before Fiserv is able to secure a suitable replacement. Fiserv is not responsible for any delays or failures of third-party participants in Client's Rewards Services program, including the failure of any merchant to reimburse Client for merchant-funded Points.

(i) SMS. Messaging Services. Client will not permit services related to short message service which uses standardized communications protocols to allow short text messages to be sent from one mobile device to another mobile device or from the Web to a mobile device ("**SMS**") to be used to transmit:

(i) junk mail, spam, or unsolicited material to anyone who has not agreed to receive it or to whom Client or an SMS End User does not otherwise have a legal right to send the material;

(ii) viruses, Trojan horses, worms, back doors, trap doors, time bombs, cancelbots, drop dead devices, worms, spyware, or other malicious programs or files that damage, detrimentally interfere with, disable, intercept, or expropriate any system, data, or information (or that are intended to perform or achieve any of the listed actions);

(iii) any material that: (1) violates any third party's intellectual property rights or rights of confidentiality, privacy, or publicity; (2) violates the rights or obligations of any wireless service provider or any of the wireless service provider's customers or subscribers; (3) is illegal, harassing, coercive, defamatory, libelous, abusive, threatening, obscene, or otherwise objectionable; (4) is harmful to minors; (5) is excessive in quantity; (6) relates to alcoholic beverages, tobacco, weapons, illegal drugs, pornography, crime, violence, death, hate, gambling, or funeral services (all except to the extent that such material is relevant to the underlying transaction which is the subject of the SMS Content (defined below)); (7) is false, misleading, or inaccurate; (8) could expose Fiserv, any mobile network carrier that, directly or indirectly (including through SMS Aggregators), performs, enables, or otherwise supports SMS messaging ("**Network Operator**"), any service provider that maintains direct connections to multiple Network Operators and aggregates SMS messages for delivery ("**SMS Aggregator**"), or any other third party to liability; (9) could diminish or harm the reputation of Fiserv, any Network Operator, or any SMS Aggregator; (10) specifically mentions any Network Operator; or (11) copies or parodies the products or services of any Network Operator;

(iv) any signal or impulse that could cause electrical, magnetic, optical, or other harm to the equipment or facilities of Fiserv, any Network Operator, any SMS Aggregator, or any other third party; or

(v) any other prohibited material or content, as identified by a Network Operator or SMS Aggregator.

(vi) For all SMS related services, Client will provide each cardholder that uses a mobile network operated by a Network Operator ("**SMS End User**") the right to opt in and opt out of receiving any SMS message, or any information or data contained in an SMS message, whether sent by or on behalf of Client or an SMS End User in connection with the SMS-related services ("**SMS Content**") from Client.

(j) Postage Services. Mailing Services that require postage are subject to the following additional terms:

(i) Client will ensure that the account records or address lists that Fiserv relies upon to process Client's mail and perform mailing services on Client's behalf satisfy all requirements established by the United States Postal Service (USPS) for mailing, postage rates or associated discounts, including Full-Service Intelligent Mail requirements, Move Update requirements, and any other applicable program requirements ("**USPS Requirements**");

(ii) Client will take all other actions necessary to ensure that USPS Requirements are satisfied; and

(iii) Client will give Fiserv an executed copy of Fiserv's "Client Certification of Move Update Compliance" form (or its current equivalent) and update the form as necessary to maintain its accuracy.

(k) CardHub Services. CardHub Services are subject to the following additional terms:

(i) CardHub Services are provided under, and governed by, the CardHub Terms of Use Policy, which may be accessed at the following website address: https://www.fiserv.com/content/dam/fiserv-ent/final-files/documents-handouts/CardHub_Terms_Of_Use_Policy_Documents_0921.pdf .

(l) Digital Issuance Services. Digital Issuance Services are subject to the following additional terms:

(i) Digital Issuance Services are contingent upon (A) Client's implementation, and continued receipt, of Fiserv's CardHub Services and Tokenization Services in live production. and (B) Fiserv's integration with the applicable service provider(s) of Client.

(m) Live Agent Services. Live Agent Services are subject to the following additional terms:

(i) The live agent telephone customer services that Fiserv provides Client in connection with direct interaction with a Fiserv customer service representative ("**CSR**") and cardholders or other third parties related to Client's cardholder accounts ("**Live Agent Services**") are not intended, and will not be construed, to (a) constitute telemarketing, a telephone solicitation, or up-selling within the meaning of the Telephone Consumer Protection Act or the Telemarketing Sales Rule, or (b) trigger the application of any other law, regulation, or guidance relating to the offering of products or services via telephone or facsimile (including any duty to register or obtain a license to make such offers).

(ii) The Live Agent Services will be performed during hours to be mutually agreed upon by the parties pursuant to the Contact Criteria (defined below). Any changes to the hours of operation and terms related to such changes (including the timing of implementation of any changes to the hours of operation) will be mutually agreed upon in writing by the parties prior to the effective date of such changes.

(iii) The Live Agent Services will be provided using English language and Spanish language only and will not include support for any other foreign language calls unless otherwise agreed upon in writing by the parties. Spanish language support will be provided using Fiserv personnel and a translation service subcontractor.

(iv) The pricing for Live Agent Services set forth in this Schedule includes the preparation and delivery of Fiserv's standard daily and monthly call statistic reporting package. If other reports are requested outside of the standard reporting package, Client will be assessed fees at Fiserv's then current rates for the development, production and delivery of such reports.

(v) Client and Fiserv agree to each designate a manager with overall program responsibility, which person will coordinate communication and implementation of the Contact Criteria (defined below).

In addition, Client will provide Fiserv with guidance with respect to servicing requirements which are outside the scope of the Contact Criteria (defined below).

(vi) Call volume forecasting from Client will be required.

4. THE CARD SERVICES ARE SUBJECT TO THE FOLLOWING ADDITIONAL TERMS:

(a) Client must enter into a separate written agreement with each payment card network, or the entity that owns or operates the payment card network, that Client desires to participate in or to enable on its payment cards or ATMs (each such network, other than Fiserv's Accel Network, MoneyPass Network or STAR Network, a "**Card Network**"), prior to Fiserv processing transactions for Client with such Card Network under this Schedule. Client shall comply with the terms and conditions of each of its agreements with the Card Networks and shall operate within and abide by the operating rules, requirements, and guidelines established by the Card Networks (as they are updated and amended, collectively, the "**Network Operating Rules**"). Client is solely responsible for the payment of fees and other charges imposed by the Card Networks, and Client shall indemnify Fiserv for all losses and liabilities arising from Client's failure to comply with any of its agreements with the Card Networks or the Network Operating Rules.

(b) Client will obtain from each of its customers consents from cardholders and all information needed by Fiserv to enable the customer to enroll in each of the Card Services and to enable the authentication of each customer accessing the Card Services.

(c) Client is prohibited from extending any warranty, guarantee, covenant, or commitment on behalf of Fiserv, its Affiliates, or their third-party providers, or with respect to any of the Card Services, to any Client customer, cardholder, or other third party.

(d) Client hereby consents to Fiserv and its third-party service providers contacting or attempting to contact Client's cardholders at the phone numbers Client provides to Fiserv, including through the use of autodialers to make prerecorded phone calls and send text messages to both cell phones and landlines, as part of the services provided under the Agreement, including those services designed to assist in the detection, prevention, and mitigation of fraudulent transactions, and tokenization services (these telephonic activities, the "**Cardholder Calls**"). Client is responsible for obtaining all cardholder consents necessary for Fiserv and its service providers to perform the Cardholder Calls, and for maintaining records of the consents, as required to comply with all applicable laws and regulations, including without limitation the Telephone Consumer Protection Act (TCPA) at 47 USC § 227 and the Federal Communication Commission's (FCC) implementing rules at 47 C.F.R. § 64.1200. Client shall defend Fiserv and its third-party service providers against all claims, demands, suits, and proceedings, and shall indemnify them against all judgments, settlements, fines, penalties, damages, losses, liabilities, costs, and expenses (including their attorneys' fees and costs related to investigation) arising from or related to the Cardholder Calls.

(e) Client hereby consents to (i) Fiserv combining Client Information with data obtained from other Fiserv clients for inclusion into one or more consortium databases; (ii) the use of such combined data ("**Consortium Data**") by Fiserv, and its Affiliates, subcontractors and agents, for research or development, the creation of data and analytics models, tools and products, fraud mitigation, or the provision of services to their clients; and (iii) the retention and use of Consortium Data for such use beyond expiration or termination of the Agreement or Services under this Schedule, with no obligation to return Client Information included in Consortium Data to Client or to remove any Client Information from Consortium Data. Client represents and confirms it has obtained all consents of Client's customers and cardholders required by law or regulation for each use addressed herein.

(f) Fiserv's responsibilities and performance of each of the Services under this Schedule are contingent on Client's execution of all documentation and separate written agreements required by Fiserv and, also, those

required by third parties, including, as applicable, the token service provider and digital wallet provider, with regard to Client's receipt of tokenization services. Client understands and acknowledges that such providers may require a direct agreement between Client and the provider.

(g) As between Fiserv and Client:

(i) Client shall review and approve Client's Settings (defined below) and confirm that Client's Settings satisfy Client's business requirements and to comply with applicable laws, rules, and regulations, Network Operating Rules, and Client's agreements with third parties (including cardholders);

(ii) Fiserv will not be responsible for (A) providing Client with legal or compliance advice; and/or (B) ensuring that Client complies with applicable laws, rules, regulations, Network Operating Rules, or the terms and conditions of the cardholder accounts.

(iii) Client must (A) provide or review all proposed Contact Criteria (defined below), and (2) determine whether the Contact Criteria agreed to by Client and Fiserv satisfy Client's obligation to comply with applicable laws, rules, and regulations, Network Operating Rules, and Client's agreements with third parties (including cardholders) and meet Client's business requirements.

(iv) For purposes of the Card Services, "**Client's Settings**" means the settings, options, parameters, and strategies for the Fiserv system, or services or products that Client selects (or that are selected at Client's direction) in order for Client to receive the Services; "**Contact Criteria**" means written criteria for contacting card holders, including Client's Settings used to determine which cardholders to contact and when to contact them, as well as the methods for contact (including e-mail, land-line or mobile voice call, voice or text messaging, or any other electronic means).

(h) If Client begins to receive any service that is not identified in Attachment 1, or in a Service Request completed by the parties pursuant to this Schedule (including by changing Client's Settings), then the service will be treated as a "Service", and Client will pay Fiserv's standard fees for such service as of the date Client began receiving it. The parties will execute an amendment that formally adds such service to Services under this Schedule.

(i) Section 4(e)(iv) of the ASP Services Exhibit does not apply to Card Services provided under this Schedule.

5. FEES. Client shall pay Fiserv the fees set forth in this Schedule, including its Attachment 1, on a monthly basis unless otherwise indicated or invoiced. Fees owed on a per-transaction basis, or the basis of some other unit of measurement that fluctuates based on monthly provision or usage of applicable Services, will be calculated based on the number of transactions processed, or other units provided or used, since the previous invoice for such Services. Tiered pricing is calculated on a blended, per-tier basis, with the rate for each tier applied to the corresponding number of transactions or other units occurring in that tier during the applicable month only, unless otherwise indicated in Attachment 1. Client is responsible for third-party telecommunications costs and other pass-through fees that are incurred by Fiserv in the performance of the Card Services. Client shall pay Fiserv the monthly minimums, if any, set forth in Attachment 1 each month that the fees that would otherwise be payable for Client's actual usage are less than the monthly minimum for the applicable Service.

6. INCENTIVES. Fiserv will provide or make available to Client the incentives described in Attachment 2 to this Schedule (all such incentives are referred to collectively, in the aggregate, as the "Card Services Incentives"). If any of the Card Services are terminated by Client prior to the expiration of their initial term, or if Client's usage of them is materially reduced for any reason other than decline in customer demand for reasons outside Client's control, or if any of the conditions precedent or conditions subsequent to Fiserv's provision of the incentives fails or ceases to be satisfied, then Client will immediately forfeit all unapplied Card

Services Incentives and those yet to be provided, and Client shall within 30 days reimburse Fiserv for the full amount of all previously applied or provided Card Incentives. Except as otherwise indicated in Attachment 2, all Card Services Incentives are in the form of credits that may be applied to future invoices for Card Services, and Fiserv will have no payment obligation to Client with respect thereto. CLIENT EXPRESSLY AND UNCONDITIONALLY ACKNOWLEDGES AND AGREES THAT THE CARD SERVICES INCENTIVES REPRESENT COSTS INCURRED BY FISERV IN PROVIDING CARD SERVICES TO CLIENT, AND THE AMOUNT OF ANY CARD SERVICES INCENTIVES THAT MUST BE REIMBURSED TO FISERV CONSTITUTE FISERV'S ACTUAL, DIRECT, AND COMPENSATORY DAMAGES IN THE EVENT ANY TRIGGER EVENTS OCCUR OR REQUISITE CONDITIONS ARE NOT MET.

7. SETTLEMENT ACCOUNTS/DEPOSITS.

(a) Client shall establish a demand deposit account at Client's institution, which is accessible by Fiserv (the "**Settlement Account**") and shall maintain at all times in the Settlement Account funds in the amount sufficient to enable Fiserv to perform the settlement procedures set forth herein. Client authorizes Fiserv, at Client's expense, to access the Settlement Account through the Automated Clearing House ("**ACH**") or by wire transfer in order to maintain Client's required Settlement Deposit (defined below), or for any purpose described in Section 7(c) below, and, similarly, for the transfer of funds owing to Client in the Settlement Account. Client guarantees that the funds in the Settlement Account shall at all times be accessible to Fiserv for the above-referenced purposes and shall ensure that Fiserv shall be able to make withdrawals and transfers required under this Schedule by providing overdraft protection for the Settlement Account in an amount reasonably required by Fiserv.

(b) Client shall provide to Fiserv, via wire transfer to an account controlled by Fiserv, an amount of funds (the "**Settlement Deposit**") equal to the Average Daily Net Settlement Position of Client multiplied by 2 days. The "**Average Daily Net Settlement Position**" is equal to the net sum of all Network settlement entries debited or credited to Client's Settlement Account during the month, divided by 30 days. If the Average Daily Net Settlement Position is a credit balance, then no Settlement Deposit will be required. The initial Settlement Deposit will be estimated by Fiserv prior to live date based on anticipated transaction volumes. Fiserv may adjust the Settlement Deposit from time to time upon prior written notice to Client, based on actual transaction volume history and seasonal factors. Fiserv is not obligated to deposit or maintain the Settlement Deposit in a separate or segregated account at Fiserv's depository institution(s), and Fiserv may combine the Settlement Deposit with Fiserv's other funds or other settlement deposits of other Fiserv clients as Fiserv deems appropriate. The Settlement Deposit will function as a security deposit, subject to reduction as set forth below.

(c) Fiserv may debit funds from Client's Settlement Account, and also may reduce Client's Settlement Deposit, in amounts that Fiserv is permitted to keep to fund any of the following:

(i) settlement of network transactions;

(ii) settlement of fees and assessments charged by the network (or network sponsor) with respect to Client's transactions;

(iii) settlement of any transaction activity after termination or expiration of this Schedule, including transaction adjustments or chargebacks;

(iv) as an offset against fees and expenses owed by Client to Fiserv under this Agreement for Services rendered, or the amount of any incentives due to be paid back to Fiserv under this Agreement.

(d) Fiserv shall pay Client the remaining amount of the Settlement Deposit, if any, after the end of the period through which Fiserv is required to process Client's trailing activity according to the network operating rules.

8. SERVICE REQUEST. If a Service Request prepared by Fiserv is signed by Client and accepted by Fiserv, then such Service Request and the Deliverables provided thereunder will be subject to the terms and conditions of this Schedule, and applicable terms contained elsewhere in the Agreement, regardless of whether Fiserv also signs such Service Request. Terms and conditions contained in a Service Request will apply only to the Deliverables set forth in the Service Request. For the purpose of clarity, all products and services provided by Fiserv to Client under a Service Request will be deemed to be "Deliverables" as such term is defined and used throughout the Agreement.

9. TERMINATION/SUSPENSION OF CARD SERVICES. In addition to termination rights provided elsewhere in the Agreement, Fiserv shall have the right to limit, alter, suspend, or terminate any or all Card Services upon written notice to Client: (A) to the extent Fiserv reasonably believes such action is necessary to ensure Client is in compliance of all obligations under the Agreement, (B) to the extent Fiserv reasonably believes that its continued provision of Card Services creates an unacceptable risk or harm to Fiserv, (C) in the event that there are insufficient funds then available to Fiserv in the Settlement Account to fund any and all settlements due, or should Client fail to meet Client's Compensating Balance obligation for ATM Managed Services set forth in Section 3(c)(i) above, (D) to the extent Fiserv reasonably believes such action is necessary to comply with all laws, rules, and regulations applicable to Fiserv, (E) to the extent any Card Services under this Schedule are prohibited by a Card Network or should Fiserv's provision of Card Services be substantially impaired by any Card Network agreement with Client or by Network Operating Rules; (F) should Client's membership rights in any applicable Card Network be terminated or suspended; or (G) should Client fail to satisfy any requirements of Fiserv or PCI-DSS with regard to security of cardholder information, or should Fiserv find the results of any Fiserv examination of Client unsatisfactory. In addition, Fiserv may suspend ATM Managed Services, without prior notice, upon Fiserv's determination or reasonable suspicion of the occurrence or potential occurrence of illegal, wrongful, or fraudulent activity or use, whether by Client, a Client customer, or any third party; and, Fiserv may terminate ATM Managed Services if Client does not agree to any change to the price, liability limit, or other terms of the ATM Managed Services requested by Fiserv after the effective date hereof.

**Attachment 1 to Card Services Schedule to ASP Services Exhibit**

**Fees**

DEBIT SERVICES

| DESCRIPTION | UNIT OF MEASURE | UNIT PRICE |
|---|---|---|
| **DEBIT - PIN TRANSACTION PROCESSING** | | |
| COMBINED ATM+POS TRANSACTIONS | PER TRAN | 0.0212 |
| **DEBIT - OTHER TRANSACTION SERVICES** | | |
| AUDIT REPORT ACCESS FEE | PER FI | 124.00 |
| **DEBIT - EMV** | | |
| EMV TRANSACTION AUTHORIZATION (MINIMUM $50) | PER EMV TRAN | 0.008 |
| EMV CONTACTLESS TRANSACTION | PER CONTACTLESS EMV TRAN | 0.002 |
| **DEBIT - TOKENIZATION** | | |
| TOKENIZATION MONTHLY FEE - APPLE PAY | PER WALLET | 25.00 |
| TOKENIZATION MONTHLY FEE - GOOGLE PAY | PER WALLET | 25.00 |
| TOKENIZATION MONTHLY FEE -  SAMSUNG PAY | PER WALLET | 25.00 |
| TOKENIZATION MONTHLY FEE - FITBIT PAY | PER WALLET | 25.00 |
| TOKENIZATION MONTHLY FEE - GARMIN PAY | PER WALLET | 25.00 |
| DIGITAL OTP - MONTHLY FEE | PER FI | 30.00 |
| PROVISIONING NOTIFICATION - EMAIL* | PER EMAIL | 0.32 |
| PROVISIONING NOTIFICATION - LETTER* | PER LETTER | 1.10 |
| *(*) If email is undeliverable, notification is by letter*<br>*(*) Postage is pass-through and will be invoiced to Client.* | | |
| **DEBIT - AUTHORIZATION AND HOST SUPPORT FEES** | | |
| HOST MONTHLY FEE | PER FI | 260.00 |
| FILE AUTH RECORD FEES - DEBIT | PER RECORD | 0.045 |
| **DEBIT - TRANSMISSION SERVICES** | | |
| SECURE FILE TRANSMISSIONS* | PER CARD | TIERED |
| WEBFILE TRANSFER - FILE EXCHANGE (MINIMUM $90)** | PER KILOBYTE | TIERED |
| *(*) Tiered Pricing. Details listed below.*<br>*(*) Pricing is per kilobyte, but price is determined by active card count at contract* | | |
| **DEBIT - CLIENT CENTRAL** | | |
| CWSI MONTHLY SERVICE FEE | PER FI | 150.00 |
| CWSI MONTHLY USER FEE* | PER USER | TIERED |
| CVI  - 12 MONTH ACCESS | PER FI | 56.50 |
| SOFT TOKEN LICENSE FEE* | PER USER | TIERED |
| *(*) Tiered Pricing. Details listed below.* | | |
| **DEBIT - PAYMENT NETWORKS** | | |
| NETWORK ACCESS PACKAGE - REGIONAL | REGIONAL PIN NETWORK PACKAGE | 50.00 |

| | | |
|---|---|---|
| NETWORK ACCESS PACKAGE - NATIONAL | NATIONAL PIN NETWORK PACKAGE | 50.00 |

*(*) Network Pass-through fees may apply*

**DEBIT - CARD RISK SERVICES**

| | | |
|---|---|---|
| RISK OFFICE ADVISOR* | PER SCORED TRAN | TIERED |
| AUTOMATED RISK EXEMPTION SERVICE (ARES) | PER EXEMPTION | 1.00 |
| PREMIUM TEXTING** | PER TEXT | TIERED |

*(*) Tiered Pricing. Details listed below.*
*(*) Includes EnFact Case Management, EnFact Real Time, TranBlocker, CardTracker, CaseTracker, Risk Office*
*(*) $50 Minimum will be invoiced*

**DEBIT - 3D SECURE**

| | | |
|---|---|---|
| 3D SECURE MONTHLY FEE | PER FI | 80.00 |
| 3D SECURE TRANSACTION FEE | PER TRAN | 0.075 |

**DEBIT - DISPUTE EXPERT**

| | | |
|---|---|---|
| CHARGEBACK SENT | PER REQUEST | 25.00 |
| PRE-COMP SENT | PER REQUEST | 25.00 |
| EFT ADJUSTMENT SENT | PER REQUEST | 3.00 |
| COPY REQUEST | PER REQUEST | 5.00 |
| GOOD FAITH | PER REQUEST | 5.00 |
| FRAUD ADVICE REPORTING | PER REPORT | - |

**DEBIT - CARD EXPERT**

| | | |
|---|---|---|
| CARD EXPERT TOOLKIT* | PER FI | TIERED |

*(*) Tiered Pricing. Details listed below.*

**DEBIT - CONTACT CENTER**

| | | |
|---|---|---|
| CONTACT CENTER - ESSENTIALS - IVR* | PER INTERACTION | 0.50 |
| CONTACT CENTER - ESSENTIALS - LIVE AGENT* | PER INTERACTION | 5.00 |

*(*) Incl. Standard IVR, Language Line, Lost/Stolen, Enfact Agent-Assisted, IVR Self Service,*
*Manual Activations, Tokenization Support, Identity Verification And Reporting Package*

**DEBIT - INSTANT ISSUE**

| | | |
|---|---|---|
| INSTANT ISSUE SUPPORT FEE - 3RD PARTY | PER FI | 100.00 |

**DEBIT - SPONSORSHIP SERVICES**

| | | |
|---|---|---|
| VISA SPONSORSHIP | PER FI | 200.00 |
| PLUS SPONSORSHIP | PER FI | 90.00 |

**DEBIT - ACCOUNT UPDATER SERVICE**

| | | |
|---|---|---|
| ACCOUNT UPDATER MONTHLY SERVICE FEE* | PER CARD | TIERED |

*(*) Tiered Pricing. Details listed below.*

**DEBIT - ADDITIONAL SERVICES**

| | | |
|---|---|---|
| SHARED BRANCHING - MONTHLY FEES | | 52.00 |
| | | 0.00 |

**ONE-TIME - CERTIFICATION**

| | | |
|---|---|---|
| INSTITUTION SETUP CERTIFICATION FEE - KEY | PER FI | 1,000.00 |

| | | |
|---|---|---|
| CERTIFICATION HOURS | PER HOUR | 290.00 |
| **ONE-TIME - TRANSMISSION SERVICES** | | |
| TRANSMISSION SERVICES SETUP | PER FI | 2,500.00 |
| **ONE-TIME - EMV** | | |
| EMV NEW PROGRAM SETUP FEE | PER BIN | 3,000.00 |
| EMV CONTACTLESS SETUP FEE | PER BIN | 2,000.00 |
| **ONE-TIME - TOKENIZATION** | | |
| TOKENIZATION SETUP FEE FOR FIRST WALLET PROVIDER | PER DEBIT BIN | 3,000.00 |
| DIGITAL OTP SETUP FEE | PER FI | 250.00 |
| **ONE-TIME - CLIENT CENTRAL** | | |
| CLIENT CENTRAL SETUP FEE (INCLUDES PROVISION OF USER IDS) | PER FI | 515.00 |
| SOFT TOKEN IMPLEMENTATION | PER FI | 580.00 |
| **ONE-TIME - PAYMENT NETWORKS** | | |
| PAYMENT NETWORK SETUP FEE | PER NETWORK | 515.00 |
| **ONE-TIME - CARD RISK SERVICES** | | |
| RISK ONE TIME BIN SETUP | PER BIN | 1,500.00 |
| RISK CARD LOADING FEE | PER RECORD | 0.03 |
| AUTOMATED RISK EXEMPTION SERVICE SETUP | PER BIN | 250.00 |
| **ONE-TIME - 3D SECURE** | | |
| 3D SECURE STANDARD CONFIGURATION | PER FI | 1,812.00 |
| **ONE-TIME - DISPUTE EXPERT** | | |
| DISPUTE EXPERT SETUP | PER FI | 1,500.00 |
| **ONE-TIME - CONTACT CENTER** | | |
| CONTACT CENTER SETUP | PER FI | 1,500.00 |
| **ONE-TIME - INSTANT ISSUE** | | |
| INSTANT ISSUE IMPLEMENTATION - NFV | PER FI | 5,000.00 |
| **ONE-TIME - SPONSORSHIP SERVICES** | | |
| NEW SPONSORSHIP SETUP FEE | PER FI | 500.00 |
| **ONE-TIME - OTHER SETUP FEES** | | |
| SHARED BRANCHING INITIAL SET-UP | OTHER #5 | 1,000.00 |
| **ONE-TIME - TRAINING** | | |
| INITIAL TRAINING AT FISERV LEARNING CENTER | PER PARTICIPANT | - |

| TIERED PRICING | TIER PRICE TYPE | UNIT PRICE |
|---|---|---|
| **SECURE FILE TRANSMISSIONS** | | |
| From 1 To 10,000 | FLAT CLIFF TIER | 90.00 |
| From 10,001 To 25,000 | FLAT CLIFF TIER | 295.00 |
| From 25,001 To 50,000 | FLAT CLIFF TIER | 620.00 |
| From 50,001 To 100,000 | FLAT CLIFF TIER | 800.00 |
| Over 100,000 | FLAT CLIFF TIER | 1,000.00 |

| | | |
|---|---|---|
| **WEBFILE TRANSFER - FILE EXCHANGE (MINIMUM $90)*** | | |
| From 1 To 10,000 | FLAT CLIFF TIER | 0.0012 |
| From 10,001 To 25,000 | FLAT CLIFF TIER | 0.0015 |
| From 25,001 To 50,000 | FLAT CLIFF TIER | 0.0014 |
| From 50,001 To 100,000 | FLAT CLIFF TIER | 0.0013 |
| Over 100,000 | FLAT CLIFF TIER | 0.0012 |
| **CWSI MONTHLY USER FEE** | | |
| From 1 To 50 | STEPPED TIER | 5.00 |
| Over 50 | STEPPED TIER | 5.00 |
| **SOFT TOKEN LICENSE FEE** | | |
| From 1 To 4 | STEPPED TIER | 3.50 |
| From 5 To 200 | STEPPED TIER | 2.50 |
| From 201 To 500 | STEPPED TIER | 2.00 |
| From 501 To 1000 | STEPPED TIER | 1.00 |
| Over 1,000 | STEPPED TIER | 0.75 |
| **RISK OFFICE ADVISOR** | | |
| From 0 To 165,000 | CLIFF TIER | 0.035 |
| From 165,001 To 1,000,000 | CLIFF TIER | 0.025 |
| Over 1,000,000 | CLIFF TIER | 0.015 |
| **PREMIUM TEXTING*** | | |
| From 0 To 500 | STEPPED TIER | 0.30 |
| From 501 To 1,000 | STEPPED TIER | 0.29 |
| From 1,001 To 2,500 | STEPPED TIER | 0.28 |
| From 2,501 To 5,000 | STEPPED TIER | 0.27 |
| Over 5,000 | STEPPED TIER | 0.25 |
| **CARD EXPERT TOOLKIT*** | | |
| From 1 To 125,000 | FLAT CLIFF TIER | 200.00 |
| From 125,001 To 500,000 | FLAT CLIFF TIER | 400.00 |
| From 500,001 To 1,000,000 | FLAT CLIFF TIER | 800.00 |
| From 1,000,001 To 3,000,000 | FLAT CLIFF TIER | 1,200.00 |
| **ACCOUNT UPDATER MONTHLY SERVICE FEE** | | |
| From 1 To 5,000 | FLAT CLIFF TIER | 25.00 |
| From 5,001 To 25,000 | FLAT CLIFF TIER | 50.00 |
| From 25,001 To 100,000 | FLAT CLIFF TIER | 75.00 |
| Over 100,000 | FLAT CLIFF TIER | 100.00 |

Stepped Tier: The billable amount is calculated as the sum of the unit price x qty for each filled or partially filled tier
Cliff Tier: The billable amount is calculated as the unit price of the highest applicable filled or partially filled tier x qty
Flat Cliff Tier: The billable amount is calculated as the price of the highest applicable tier

ACCEL NETWORK PARTICIPATION Except as set forth below, fees as per Section 3(d) of this Schedule

PIN POS Processing Fee: Waived

CARDHUB SERVICES

| FEE TYPE | AMOUNT |
|---|---|
| Monthly Fee | Per CardHub Active User: $0.65<br>Per CardHub Monthly Fee: $150.00 |

| FEE TYPE | AMOUNT |
|---|---|
| | Definition of a CardHub Active User:<br>A CardHub Registered User who has performed at least<br>1 card-based transaction during the month or<br>received at least 1 alert during the month or<br>logged into CardHub at least once during the month<br><br>Logging into CardHub is defined as a session created in the Ondot-Fiserv CardHub System by the cardholder via a Stand-Alone app or Web Interface or SDK or Linked App<br>A CardHub Registered User is a user that first registers into CardHub either through a Stand-Alone app or Web Interface or SDK or Linked App<br><br>*This fee includes an organic growth in the size of the card portfolio. It does not take into account any in-organic growth like a card portfolio acquisition. In the event of an in-organic growth these fees may need to be reviewed.* |
| Implementation Fee | $1,500.00 |
| Annual Maintenance Fee | Waived |
| Training and Professional Services | Conduct "Train the Trainer" training on the use of various Fiserv components like mConsole, if applicable, at no charge. Any additional training requirements must be mutually agreed to.<br><br>Any additional integrations not outlined in this solution would be billed on a time and materials (T&M) basis. |

All estimates set forth herein are based on anticipated quantities. Fees will be calculated based on actual usage.

Any One-Time Fees included herein represent initial one-time fees for those Services contemplated as of the effective date of this Schedule. Services added after the effective date of this Schedule may be subject to additional one-time fees/implementation charges.

**Attachment 2 to Card Services Schedule to ASP Services Exhibit**

**Card Services Incentives**

In consideration of Client's commitment to receive each of the Services to be provided under this Schedule through the expiration of the applicable initial term(s) of same, Fiserv extends the following Card Services Incentive(s):

A) **Flex Credit for Card Services:** Fiserv will provide Client with an incentive, in the form of an invoice credit, in the amount of [redacted] ("CS Flex Credit") upon Client's conversion to all Services under this Schedule as of its effective date, which Fiserv will apply to offset amounts due Fiserv for any Services under this Schedule, and for this application only. The CS Flex Credit will not be applied to reduce Client's obligations to pay third-party telecommunications costs, network pass-through fees, Taxes, or out-of-pocket expenses.

**Electronic Document Delivery Services Schedule**

**to ASP Services Exhibit**

1. DESCRIPTION OF SERVICES.

(a) Description of Services**.** For the fees set forth herein, Fiserv, itself and through its Affiliates and its applicable third party providers, will provide to Client and its end users electronic document delivery services (the "**Electronic Document Delivery Services**"). The Electronic Document Delivery Services include the following:

(i) 18 months Data retention; and

(ii) access to customer statements via the Fiserv hosted user interface; and

(iii) Enterprise View with System/User Administration functionalities for those employees authorized by the Client to contact Fiserv with web hosting support requests ("Client Contacts").

(iv) SSO to Electronic Document Delivery requires Online banking project resource

(b) Client Obligations and Responsibilities. In addition to all other obligations set forth in this Schedule and in the Agreement, Client will comply with the following Client Obligations in connection with its use of the Electronic Document Delivery Services:

(i) Client shall maintain adequate supporting materials (i.e. exact copies of items, records, and other data supplied to Fiserv) in connection with the provision of Electronic Document Delivery Services;

(ii) Client shall provide written notice of confirmation and/or verification of any instructions given by Client, its agents, employees, officers, or directors to Fiserv in connection with Fiserv's provision of Electronic Document Delivery Services;

(iii) Client hereby grants Fiserv a non-exclusive, worldwide, royalty-free license, for the duration of this Schedule and for use solely in connection with this Schedule and the Electronic Document Delivery Services provided hereunder to receive, edit, modify, adapt, translate, exhibit, publish, transmit, participate in the transfer of, reproduce, create derivative works from, distribute, perform, display and otherwise use any materials Client provides, directly or indirectly, for purposes of receiving the Electronic Document Delivery Services;

(iv) Prior to providing Fiserv any data, Client will obtain sufficient authority from end users to transmit and disclose their data to Fiserv for the purposes set forth in this Schedule;

(v) Client agrees that in its dealings with end users, Client will not make any representation or warranties in the name of Fiserv concerning the Electronic Document Delivery Services;

(vi) Client is responsible for completing all required configuration documents provided by Fiserv to configure the Electronic Document Delivery Services in a timely manner. This may include but is not limited to: (a) the data that the Client selects for processing, (b) the format of the data, and (c) a description of any codes used within the data (sort tables, page counts, etc.) Client shall, or shall cause its third party processor, to accurately and timely transmit such data to Fiserv. Any failure by Client or any non-Fiserv third party processor to provide any of the information required under this Schedule may result in delays, for which Fiserv shall not be responsible.

(vii) Client acknowledges that the acceptable format for data submission is, PDF with XML index. Client must notify Fiserv in writing of any changes in format or layout of data. In addition, samples of output must be submitted to Fiserv if any changes in the data or setup have taken place or are being requested. Failure to notify Fiserv may delay delivery of designated media. Client will be charged an additional set-up fee for each change.

(viii) Client acknowledges that all data to be processed by Fiserv should be delivered to Fiserv via encrypted FTP or other electronic format as approved by Fiserv. If data is sent via FTP, Client

shall, or shall cause its third party processor to, send a "DNE" or "STA" file with which Fiserv can confirm that the transmission is complete and verify the contents of the transmission.

2. FEES.

(a) Fees. Client agrees to pay Fiserv the fees set forth in the following table(s) for the Electronic Document Delivery Services (and other Deliverables provided under this Schedule):

(i) One-Time Fees:

| Electronic Document Delivery Services | Fees |
|---|---|
| Implementation Fee - One Account type. Includes up to 100 hours of Professional Services to be used for:<br>1) Setup one account type for return as PDF<br>2) The UAT and Production configuration and deployment of:<br>a) One Fiserv provided administrative portal (Fiserv Enterprise View)<br>b) One web service end-point for the retrieval of documents OR one Fiserv provided client portal (Fiserv Client View) for access via the Fiserv Single sign-on specification<br>c) Email notification configuration OR the configuration and return of metadata for use by Client in personalizing and triggering emails<br>3) Project Management<br><br>Additional hours and changes to scope to be billed at the hourly rates listed below. | $5,000 |
| One Time Set up to modify output file of composed statement file from DDS format to Nautilus Essential format, if required | By quote |

(ii) Recurring Fees:

| Electronic Document Delivery Services | Fees |
|---|---|
| Per Enrolled User + per account type (i.e.: Checking, Savings, Loan)<br>Includes statement ingestion (up to 500,000 images per month), 18 months retention, email notification to enrolled user indicating document availability) | $0.20 |
| Additional Image Fee - images in excess of 500,000 per month. | $.0033 |
| Monthly Hosting Fee - Two (2) access points, one Consumer and one for Back office users. | $250 |
| Extended Retention:<br>19 to 36 months<br>37 to 60 months<br>61 to 72 months | <br>$100 per month<br>$250 per month<br>$450 per month |

(1) An image is defined as a single side of an 8 1/2 x 11 sheet. For clarity, there is one (1) Image on a Simplex 1-up sheet, two (2) Print Images on a Simplex 2-up or Duplex 1-up sheet, and four (4) Print Images on a Duplex 2-up sheet.

(iii) Other Fees:

| Electronic Document Delivery Services | Fees |
|---|---|
| Software Development / Professional Services | $250/hour |

3. PERFORMANCE STANDARDS.

(a) Fiserv will perform the Electronic Document Delivery Services in accordance with the performance standards set forth herein ("Performance Standards"), subject to client meeting its obligations as set forth in this Schedule and the Agreement. Fiserv shall not be liable for any damages or losses to client for errors occurring within the limits of the Performance Standards.

(i) Turnaround Time is defined as the time it takes to post data to a web server. Start time begins upon the successful transmission of a complete and valid data file to a designated Fiserv server.

(ii) Standard processing turnaround for electronic statement presentment is 24 hours from receipt of valid statement data from client or client's print vendor.

(iii) The Fiserv System will maintain an average response time of less than four (4) seconds per search or retrieval request (applies to statements of two (2) pages or less in size).

(b) Fiserv will provide an Actual Uptime of 99% in each calendar month. For purposes of measuring this performance standard, Fiserv shall not be responsible for and shall exclude from any Actual Uptime calculation any failure by Fiserv to meet the performance standard if such failure is associated with or results from the following:

(i) pre-scheduled downtime, downtime during maintenance windows, or downtime during any preventative maintenance provided advance notice has been given to client for such downtime;

(ii) the acts of client or client Personnel, excluding Fiserv;

(iii) a Force Majeure event; and/or

(iv) failure of the data communications carrier lines between client's and Fiserv's System.

**File Exchange Services Schedule**
**to the ASP Services Exhibit**

1. Definitions.

In addition to the definitions in the Agreement and for purposes of this schedule, the following definition(s) will be added.

a) "**FRB**" means the Federal Reserve Bank.
b) "**Go Live Date**" means the date Client is first able to access in live production the File Exchange Services.
c) "**SOW**" means Statement of Work.

2. Description of Services. Fiserv agrees to provide Client the Services, from Fiserv's File Exchange suite of services known as "**File Exchange**," set forth below and described in the applicable attachment(s) (each, and "**Attachment**" and together, the "**File Exchange Services**"). Client and Fiserv may add Services and Attachment(s) to this Schedule at any later date by amending the Agreement to add such Services and Attachment(s) to this Schedule. Unless otherwise noted within an Attachment, the Fees, Performance, and Additional Terms in this Schedule apply to the selected services listed below or otherwise added by an amendment.

| Description |
|---|
| File Exchange: Deposit Essentials Integration Service |

3. Professional Services. Fiserv will provide implementation, training, consulting, or other professional services (collectively, "**Professional Services**").

a) Base Implementation Services. In exchange for Client's payment of the corresponding fees, Fiserv will provide certain base Professional Services for the implementation of the File Exchange Services ("**Initial Professional Services**").
b) Project SOWs. Any Professional Services, including without limitation additional training services and functionality customization requests, will be scoped, and quoted upon request, subject to Fiserv's resource availability. Any such agreed upon Professional Services project will be documented in an appropriate SOW for any such Professional Services project. Any such SOW will be governed by the terms of this Schedule and the Agreement and will be incorporated herein by reference accordingly. Any modifications to any SOW will be handled by Fiserv's then-current formal change control process. Professional Services fees will be included in any SOW.
c) Project Management. For the provision of a Professional Services Project both parties will maintain a project manager as the single point of contact for the party ("**Project Manager**"). Fiserv and Client will agree on a governance structure for the project. If the Client is unable to maintain progress according to the agreed project plan, then Fiserv shall charge any resulting additional time taken by its personnel at the Services then-current rates.
d) Client Responsibilities. Client agrees to reasonably cooperate in providing any necessary cooperation, information, access, and assistance in connection with the Professional Services to assist in facilitating the applicable project, including without limitation promptly deploying or completing any tools, input forms, scripts or other such materials Fiserv provides to Client as are necessary for Fiserv to properly perform and provide the Professional Services (collectively, "**Tools**"). If Client is unable to provide access to required facilities or personnel or is unable to timely meet its tasks, Fiserv will endeavor to reschedule its tasks to minimize the Non-Productive time arising and/or reassign its personnel to other suitable work. In this event, Client will not be charged for the time personnel were reassigned to other clients. Otherwise, all such Non-Productive time is chargeable to Client. "**Non-Productive Time**" means time during which Fiserv is unable to perform the Professional Services set forth in this Schedule or an SOW because Client either fails to provide Fiserv with access to Client's required facilities or personnel after scheduling

a mutually convenient time or Client does not timely perform its obligations so that Fiserv is able to perform the Professional Services.

e) Scheduling.

(i) Fiserv will work with Client in good faith to establish a mutually agreeable implementation schedule and Go Live Date, in accordance with the Client's desires and goals, subject to Fiserv's availability, which Go Live Date shall in any event be no later than nine (9) months following the effective date of this Schedule, unless otherwise agreed in writing by Fiserv.

(ii) Once a Go Live Date has been set and agreed to, if within 30 days of the scheduled Go Live Date Client notifies Fiserv of a need to delay its implementation, an additional fee equal to 50% of the implementation one-time charges set forth in this Schedule will apply. In addition, retraining costs, if applicable, will be limited to the lesser of Fiserv's standard hourly rate or $500 per session. The rescheduling fee is not applicable if the implementation delay is the result of any issue exclusively under Fiserv's control.

(iii) In the event Client does not implement the File Exchange Services within (nine) 9 months following the effective date of this Schedule, and such failure is not due exclusively to the fault of Fiserv, (i) Client agrees to pay Fiserv the Base Implementation Services Fee upon receipt of an invoice from Fiserv, and (ii) notwithstanding anything in the Agreement to the contrary, with written notice to Client, Fiserv may terminate this Schedule and Client agrees to pay early termination fees due pursuant to the ASP Services Exhibit and in connection with such termination upon receipt of an invoice from Fiserv.

f) All Professional Services provided under this Schedule will be for a mutually agreed upon scope and duration based on estimates conducted by Fiserv.

g) Training.

(i) To the extent applicable to the File Exchange Services, Fiserv shall provide training as Fiserv finds necessary to enable Client personnel to become familiar with File Exchange Services. Additional implementation training requested by Client and/or post-implementation training is available at the rates in the table herein:

| File Exchange Training Services: | Rate |
|---|---|
| Web Conference Training | $250/session |
| Client Location Training | $1,500/day plus travel expenses |

(ii) Any and all training provided by Fiserv will be considered Fiserv Confidential Information and Fiserv will retain all proprietary rights to such training as set forth in the Agreement. During any training provided by Fiserv, Fiserv may, at its discretion, record the training session(s). Fiserv will use such recordings solely for its own internal use.

(h) Additional Professional Services. Additional Professional Services are available at the prices set forth in the Fees Section below or as agreed upon by the parties in writing and will be provided in accordance with a mutually agreed to amendment.

4. Fees. Client shall pay Fiserv fees and other charges for the File Exchange Services specified in the applicable Attachments hereto. Client will also be responsible for the following charges:

a) Development or Network Resource Charges: Examples include, but are not limited to, program requests for file layouts to format and edit files to Client's data mapping specifications, remote access scripts and changes to file specifications as agreed by Fiserv. Resource tasks will be

estimated and provided to Client for approval via the Change Request procedures and charged at the current Fiserv Programming Rate in the Agreement.

b) Cancellation of Development or Network or Resource Charges: In the event of a cancellation of a requested resource, Client shall pay Fiserv for the hours incurred by Fiserv up to the time the cancelation request is received at Fiserv's then current professional service rates.

c) Expedite Fees. When available, an expedite fee may be offered to accommodate services with a requested completion that is earlier than what is reasonably available. All expedite fees will be approved by the Client prior to work initiation.

5. Performance.

a) Hours of Operations. File Exchange Services shall be accessible as set forth below.

| Hours | Time Period |
|---|---|
| File Exchange Services | 7 x 24 x 365 |

(ii) Files Exchange Services will not be accessible during the scheduled maintenance of Sunday 12:00 am to 3:00 am Central Time.

b) Support Services. Fiserv will:

(i) Provide a toll free number to Client and when directed, to Client's customers in order to provide support as it relates to the file transfers being performed during the File Exchange' Hours of Operations, as set forth above.
(ii) Pro-actively monitor file transfers to ensure they are received at specified times.
(iii) In the event of a delay, contact the applicable source point to determine the cause of a delay, provide assistance for the file transfer issues, and notify the end point of the new estimated arrival time for the file.
(iv) Pro-actively monitor the file transfers to the end point and work with the end point on file delivery issues to ensure successful delivery of the files.
(v) Re-set the files per Client's request.

6. Term. The initial term of File Exchange Services shall begin on the Effective Date of this schedule and shall end coterminous with the Agreement for the applicable File Exchange Service ("**File Exchange Term**").

7. Additional Terms.

a) Protection of Data. Pursuant to the Agreement, Fiserv utilizes commercially reasonable standards to protect Client files from unauthorized access in compliance with Fiserv standards. For the purpose of compliance with applicable Fiserv standards, Fiserv includes backups of Client files. Copies of files are maintained by Fiserv off premises in the event of a business continuity or disaster recovery event.

b) Provisions of Third-party Service Provider. Fiserv acting on behalf of Client as a Third-party Service Provider (as defined in the Nacha Rules) will transmit ACH files originated or received through the FRB ("**ACH Operator**") and shall comply with the rules, regulations and other requirements as defined by the National Automated Clearing House Association ("**Nacha**") (such rules, regulations, and requirements "**Nacha Rules**") in connection with Client Originating ACH entries. For ACH files originated by Client, Client will be the Originator and Originating Depository Financial Institution ("**ODFI**") and shall comply with Nacha Rules. The ODFI is solely responsible for entries originated by its employees. For ACH files received from the ACH Operator, Client will be the Receiving Depository Financial Institution and shall comply with Nacha Rules. Client shall designate Fiserv, and Fiserv will act, as an authorized sending and receiving point to the ACH Operator for ACH files that Fiserv processes for Client. Client will be responsible for ensuring their procedures are compliant with the Nacha Rules.

c) Connectivity. File Exchange utilizes industry standard secure protocols in accordance with Fiserv standards and the terms set forth in the Agreement.

d) Web site ("**File Exchange Web**") access includes:
  (i) Availability via the Internet.
  (ii) Menu options to pick up, deliver and confirm receipt of files with File Exchange.
  (iii) Ability to upload and download data files within system identified file size limitations via File Exchange supported secure protocols.

e) Data Processing includes.

  (i) Data editing, splitting, combining, mapping, or translation based on using an existing File Exchange Services code that performs edit check and data mapping on files ("**Formatter**").
  (ii) Detection of duplicate files using File Exchange system techniques.
  (iii) Automated verification of file delivery or receipt via email, which may include file amount totals.
  (iv) Any customization of existing Formatters or request for new Formatters will be estimated and provided to Client for approval via the Change Request procedures and charged at the current Fiserv Programming Rate.

f) Fiserv Responsibilities. Fiserv will be responsible for the following in connection with its provision of the File Exchange Services:

  (i) Provide industry standard methods of secure connectivity to Client's primary and recovery site and work with Client to establish connectivity to Fiserv's primary and recovery facilities.
  (ii) Implement and test all Client requested transmission setups on the File Exchange system.
  (iii) Retain transmission related data for a minimum of 90 days starting from the date each transmission goes live.
  (iv) If Client is accessing File Exchange secure File Transmission Protocol ("**FTP**") servers, Fiserv will maintain a white-list of Internet Protocol ("**IP**") addresses.

g) Client Responsibilities. Client will be responsible for the following activities in connection with its use of the File Exchange Services:
  (i) Client must select one of the communication methods provided by Fiserv for connectivity to either Client and/or its third party vendor.
  (ii) Client must provide file layouts for non-ACH files for setup and troubleshooting purposes, as applicable.
  (iii) Client must provide a schedule for delivery of files.
  (iv) At Client's expense, Client will acquire its own personal computers each of which will be equipped with Microsoft Internet Explorer compatible browser software and the capability to access the Internet in a manner that does not block communications with Fiserv systems for the purposes of File Exchange Services, or in the alternative, purchase a dedicated circuit and any required equipment.
  (v) Client must provide Fiserv with all third party vendor transmission information. Such information includes contacts, file data format and scheduling information for each data type. Client will notify Fiserv if Client's third party vendor makes a change to the file format, processing system or connectivity. Additional fees may apply to such change.
  (vi) Client shall ensure for each setup configuration that (i) the transmission end point can accept the source point file name and (ii) the transmission source point appends the File Exchange identifier to each transmission. Client will notify Fiserv if these conditions are not met. Additional development fees may apply for File Exchange to translate the file names between the source and end points. There is one setup configuration per file. Any customization of standard naming conventions or requests for new naming conventions will be estimated and provided to Client for approval via the Change Request procedures and charged at the current Fiserv programming rate.

(vii) Client must provide Fiserv with reasonable access to the hardware, telecommunication lines, equipment, and owned or leased software located at Client's facility for the performance of File Exchange Services. Client will obtain vendor consents necessary for Fiserv to use the hardware, telecommunication lines, equipment, or software for the limited purpose of performing the File Exchange Services. Client will be responsible for obtaining any such consent and for providing an alternative solution in the event a vendor refuses consent.

(viii) If for any reason Client declines or is unable to provide Fiserv with the right to access any hardware, telecommunication lines, equipment or software, Fiserv will be relieved of those affected obligations.

(ix) Client will verify Fiserv's receipt of Client's files by accessing the File Exchange Web or by email notification.

(x) Client will provide Fiserv with test data sets ("**Test Data**") for use in testing transmission setups during File Exchange implementation. Testing with live data is neither advised nor encouraged by Fiserv. Notwithstanding anything in the Agreement to the contrary, (i) Client is responsible for the breach of any Client Personally Identifiable Information ("**PII**") as a result of live customer data used as Test Data, (ii) Client understands and accepts all risks of transmitting Test Data, and (iii) Client releases, discharges, and shall indemnify and hold harmless Fiserv and its employees, officers, directors, agents, and Affiliates from and against all liability, obligation, damage, or other loss under this Schedule or otherwise suffered by or through Client or suffered by any of the indemnified entities arising out of the transmission, destruction, or loss of such Test Data, including without limitation any information security or privacy breach related to such Test Data.

(xi) If Client is accessing File Exchange secure FTP servers, Client shall provide the public IP address of the server(s) prior to production implementation.

h) Client acknowledges and agrees that as part of the File Exchange Services, Fiserv is authorized to transmit data to and from the core account processing system used by Client and to third parties designated by Client.

**File Exchange Deposit Essentials Integration Services Attachment**

1. Description of Services. Fiserv will provide Client the following File Exchange Services:

(a) File Exchange Deposit Essentials Integration Service: Provides the connectivity to the FRB for Deposit Essentials Account Opening purposes.

(i) Deposit Essentials ACH Service.

A. Integration with Fiserv Deposit Essentials for funding of account openings.

B. Assist Client with completing FedACH Participation Agreement.

2. Fees. The below table delineates the Fees for the File Exchange Services described in this Attachment.

(a) One-Time Fees Payment Timetable. Client shall pay the one-time fees listed herein as such fees are incurred. Client will not be billed additional File Exchange One-Time Fees without a corresponding Fiserv SOW signed by Client.

| File Exchange Deposit Essentials One-Time Fees | |
|---|---|
| Deposit Essentials Integration | $750 |

(b) Monthly Fees Payment Timetable. Client shall begin to pay the monthly fees listed herein upon the live production use of the service or when the File Exchange Services are made available in Client's production environment, whichever occurs first.

| File Exchange Deposit Essentials Integration | Recurring Monthly Fee (Asset size) [1] | |
|---|---|---|
| Monthly Fee based on Asset Size | Asset Size | Monthly Fee |
| | Up to $250M | $300 |
| | $250M to $500M | $400 |
| | $500M to $950M | $500 |
| | $950M to $2B | $600 |
| | Greater than $2B | Quote |

**[1]** Fees may be adjusted by Fiserv no more than once annually based on Client asset size. Client agrees to provide Fiserv with notice annually of Client's then current asset size.

## Output Solutions Card Services Schedule

## to ASP Services Exhibit

1. DESCRIPTION OF SERVICES.

(a) Description of Services. For the fees set forth herein, Fiserv, itself and through its Affiliates and its applicable third party providers ("**Providers**"), will provide to Client the printing, personalization and/or mailing services, as further described in the Services Description Attachment(s) to this Schedule (the "**Output Solutions Services**").

(b) Client Obligations and Responsibilities.

(i) Unless otherwise set forth in a Services Description Attachment hereto, prior to the provision of Output Solutions Services hereunder and subject to the terms of this subsection and subsection 3(a) below, Client agrees to provide Fiserv a postage advance equal to the anticipated amount of 2 months postage (the "**Advance**"). The parties will review the amount of the Advance quarterly to ensure that the amount of the Advance is appropriate for the volume of Output Solutions Services required.

(ii) Client or its customers will provide to Fiserv any trademarks, trade names, service marks, service names, third party links, information, specifications, materials, designs, logos, copy or other such works, marks or other such content Client desires to be used in the provision of the Output Solutions Services (collectively "**Client Content**").

(iii) Client expressly acknowledges and agrees that it is solely responsible for providing all requested data, materials, instructions and guidance (collectively, "**Instructions**") necessary for the performance of the Services and that Fiserv will rely upon and act in accordance with all such Instructions as provided, as Client acknowledges and agrees that the Services and deliverables resulting therefrom are purely administrative print/fulfillment services performed pursuant to Client Instructions at Client's direction. Client assumes all risk and responsibility for the consequences of all Instructions Client gives (or fails to give) and Fiserv's reliance thereon. Client is responsible for the accuracy, completeness and adequacy of all Instructions and Fiserv's use of the Instructions in its performance of Services and any deliverables resulting therefrom. Notwithstanding any other obligation, express or implied, elsewhere in this Agreement (any statements of work, exhibits, appendices, attachments, or addenda hereto), Client expressly acknowledges and agrees that Fiserv shall have no obligation to check for any errors or omissions in any Instructions and/or to correct, cancel or amend any action once Fiserv has received Instructions to complete such action or to otherwise ensure that the Instructions, or the Services of deliverables created in conformance therewith, comply with applicable laws. Client represents and warrants that all Instructions shall comply with all applicable laws, rules and regulations, including, without limitation, GLB, HIPAA and HITRUST. Client shall indemnify, defend and hold harmless Fiserv, its affiliates and their respective employees, subcontractors and agents from and against any and all claims (including, without limitation, any claims made by or through any Client customers, consumers or regulators) arising from or related to any Instructions which Client provides or fails to provide, as the case may be, or arising from any Services or deliverables created by Fiserv in reliance upon any Instructions, and further, any indemnity in the Agreement by Fiserv in favor of Client or any other third party shall be abrogated to the extent that any claim or action is based upon or arises from (i) use of any Instructions, including Services or deliverables created or based upon Fiserv's adherence to Instructions, and (ii) modifications to any Services or deliverables made by Client or any third party. In the event of a conflict between this provision

and the provisions of any statements of work, exhibits, appendices, attachments, or addenda hereto, this provision shall control.

2. FEES.

(a) Fees. Client agrees to pay Fiserv the fees set forth in the applicable Services Description Attachment for the Output Solutions Services (and other Deliverables) provided under this Schedule.

(b) Materials. Subject to and in accordance with the terms of a Services Description Attachment, Fiserv may (i) procure and/or manufacture for Client ("**Fiserv Supplied Materials**") and/or (ii) obtain from Client or a third party directed by Client ("**Client Supplied Materials**"), certain materials, including but not limited to, paper, envelopes, plastic card stock, brochures or inserts (Fiserv Supplied Materials and Client Supplied Materials are hereinafter referred to collectively as, "**Materials**"). Notwithstanding anything to the contrary elsewhere in the Agreement, Client understands and agrees that fees and costs in respect of Fiserv Supplied Materials are not fixed or otherwise guaranteed for the term of this Schedule.

3. ADDITIONAL TERMS AND CONDITIONS.

(a) Notwithstanding anything to the contrary in the Agreement, all Output Solutions Services shall be deemed to have been accepted by Client unless Client provides Fiserv with written notice describing (with reasonable particularity) any failure of the Output Solutions Services to comply with the terms of this Schedule within 15 days following Fiserv's performance of the Output Solutions Services ("**Defect Notice**"). Fiserv shall, at no additional cost to Client, reprint and remail, if applicable, any item(s) that fail, due to the fault of Fiserv, to comply with the terms of this Schedule within a reasonable time following receipt of the Defect Notice. Notwithstanding any other performance obligations or any other terms set forth in the Agreement, Client agrees that, if an item(s): (i) fails, due to the fault of Fiserv, to comply with the terms of this Schedule or (ii) is lost or damaged while in Fiserv's custody, Client's sole remedy under this Schedule shall be for Fiserv to reproduce and remail, if applicable, such item(s) in accordance with this Section.

(b) Regarding the Advance, Client understands and acknowledges that (i) the Advance will be used by Fiserv as necessary to fund the postage required for the performance of Output Solutions Services and (ii) the Advance will not be maintained in a separate account for the benefit of Client. Client will be invoiced on a monthly basis for postage charges. All payments made by Client in respect of postage will be used to replenish the Advance so that the Advance shall, at all times, be equal to or greater than the amount set forth above, or such other amount as agreed upon in writing by the parties. Upon termination of this Schedule, Client shall be entitled to a credit against the final invoice hereunder in the amount of the then-current Advance. If the amount of the Advance exceeds the amount due Fiserv under the final invoice, Fiserv will remit to Client a check in the amount of the difference. Fiserv shall be under no obligation to render Output Solutions Services hereunder until it has received the Advance as prescribed in subsection 1(b)(i) hereof and Fiserv reserves the right to suspend the performance of the Output Solutions Services if the Advance is, at any time, insufficient to cover the postage charges in a given month. If the amount of the Advance is found to be insufficient Fiserv will notify Client of the anticipated shortfall and shall provide Client with 5 days in which to provide required funds. Fiserv reserves the right to increase the amount of the Advance as necessary to cover anticipated postage in the event that volumes are anticipated to exceed the standard daily volumes contemplated herein.

(c) During the Term of this Schedule, and solely for the purpose of providing the Output Solutions Services and/or Materials, Client hereby grants to Fiserv a non-exclusive, worldwide, royalty-free right and license to copy and use all the elements of the Client Content in accordance with Client's instructions. Client shall indemnify and hold harmless Fiserv, its officers, directors, employees, and affiliates against any third party claim or action alleging infringement of a copyright, trademark or other proprietary right of such third party to the extent such claim or action arises out of or in connection with any information, specifications, materials,

designs, Client Content, copy or other items provided to Fiserv by Client, its customers or any third party on behalf of client or its customers, as the case may be.

(d) Client agrees that access to Fiserv's online job tracking portal (the "**Portal**") shall be given only to Client's employees on a need to know basis, and only after informing such employees of the terms and conditions of the Agreement relative to use, disclosure and ownership. Client shall cause all parties to whom Client gives access to the Portal to adhere to all applicable provisions of the Agreement. Client shall be responsible for any breach thereof by any party to whom Client provides access to the Portal.

(e) Client acknowledges and agrees that, once Fiserv has submitted an order to a third party for or begun manufacture of, as the case may be, Fiserv Supplied Materials (each an "**Order**"), cancellation of such Order will not relieve Client of its obligations to pay for such Order. Amounts paid by Client for Fiserv Supplied Materials are non-refundable. Title to Fiserv Supplied Materials shall pass to Client upon receipt of the same at Fiserv's warehouse or a designated third party warehouse. In the event that Client directs that Materials be delivered to a location for storage by Fiserv (hereinafter, "**Client Inventory**"), Fiserv will use reasonable care in the storage and protection of such Client Inventory. Client shall be solely responsible for Client Inventory obsolescence. Notwithstanding anything to the contrary set forth elsewhere in the Agreement, Fiserv's sole responsibility as the custodian of Client Inventory will be the replacement of any Client Inventory in Fiserv's possession which is damaged or lost as a result of either (a) an act of God (for example, but without limitation, fire, flood, earthquake, tornado or other forces of nature) or (b) Fiserv's failure to use reasonable care as the custodian of Client Inventory.

(f) For purposes of Section 7 of the Agreement, the parties hereby acknowledge and agree that "TOTAL FEES" excludes taxes and any fees, costs or expenses paid by Client in connection with products, Materials or supplies, including without limitation, amounts paid for postage or freight.

(g) If the terms of any Services Description Attachment hereto conflict with the terms of this Schedule, this Schedule shall control unless the applicable Services Description Attachment expressly states that its terms control with respect to the conflicting term(s).

**Services Description Attachment**

**to the Output Solutions Services Schedule**

**Card Production Services**

1. Description of Services.

Client agrees to place orders for, and Fiserv agrees to provide for Client, its customers' requirements for card personalization of plastic cards ("**Card Production Services**") offered by Fiserv in accordance with the Fiserv Card Personalization Program. If the terms of any Exhibit, Schedule, or Attachment conflict with these terms, it is expressly agreed that the terms of this section shall control.

Fiserv Card Personalization consists of the following features:

Fiserv will receive orders in an agreed upon secure electronic format.

(a) Standard Service: Regular daily card production files received by Fiserv Output Solutions prior to 12:00 pm Eastern Time, will generally be processed within two business days. Files received after 12:00 noon Eastern Time shall be considered received the following business day. For example, a file received Monday before 12:00 noon Eastern Time shall ship Tuesday. A file received Monday at 1:00 p.m. Eastern Time shall ship Wednesday

Fiserv's aggregate daily volume commitment for all regular daily Card Production Services to be provided pursuant to Services Description Attachment (inclusive of both EMV chip enabled and non-EMV chip enable cards) shall not exceed 120% of Client's average daily volume as calculated based upon Client's "standard" daily volumes (specifically excluding any monthly reissue or special issuance services volumes, including but not limited to, volumes associated with card compromise reissues) during the immediately preceding 90 day period. Fiserv shall use commercially reasonable efforts to produce any volumes in excess of the daily volume commitment specified herein, but in no event shall Fiserv be deemed to be in violation of its obligations with respect to the Card Production Services for any failure to produce any such excess volumes within the turn-times contemplated by this Services Description Attachment. Requests for cards in excess of the daily commitments specified herein shall be produced on a first-in-first-out basis unless otherwise agreed by Fiserv and Client.

(b) Monthly Reissue Service: Regular monthly reissue files will generally be produced within 7-10 business days following Fiserv's receipt of the monthly reissue file.

(c) Fiserv's aggregate volume commitment for all monthly reissue Card Production Services to be provided pursuant to Services Description Attachment (inclusive of both EMV chip enabled and non-EMV chip enabled cards) shall not exceed 120% of Client's average monthly reissue volumes as calculated based upon Client's monthly reissue volumes (specifically excluding any regular daily or special issuance services volumes, including but not limited to, volumes associated card compromise reissues) during the immediately preceding 90 day period. Fiserv shall use commercially reasonable efforts to produce any volumes in excess of the monthly reissue volume commitment specified herein, but in no event shall Fiserv be deemed to be in violation of its obligations with respect to the Card Production Services for any failure to produce any such excess volumes within the turn-times contemplated by this Services Description Attachment. Requests for cards in excess of the monthly reissue commitments specified herein shall be produced on a first-in-first-out basis unless otherwise agreed by Fiserv and Client.

With respect to Special Issuance Services (for either EMV cards, Mag Stripe cards, or both), which such services shall include, but shall not be limited to, services with respect to card compromises or initial roll-outs, in addition to the terms set forth elsewhere in the Services Description Attachment, Client agrees that Client will not submit requests for Special Issuance Services as part of daily files. All such requests shall be submitted independently to Fiserv for scheduling.

(d) Card Collection™ Artwork: Fiserv agrees to provide Card Collection from Fiserv Artwork ("**Artwork**") to Client for the purpose of creating advertising materials. Client agrees that Fiserv will maintain ownership for the Artwork for the purpose of creating advertising materials. Client agrees that Fiserv will maintain ownership for the Artwork and that Fiserv must approve each use of the Artwork, in writing. Client agrees that Fiserv must

approve all advertising materials, which incorporate the Artwork, prior to production and/or publication. Fiserv will provide Artwork in its current format. Client will be billed at a rate of $150.00 per hour for any changes Client requests made to the Artwork. Fiserv may periodically refresh the look of the Card Collection offering. These changes may result in designs being discontinued or altered in appearance. When notification is received of discontinued designs, Client must promptly discontinue use of the discontinued images for any purpose. This includes but is not limited to printed materials, websites, and other electronic media.

(e) MyCardCreation®: Subject to Client's compliance with the terms that follow, Client shall be permitted to use Fiserv's MyCardCreation® mark solely for the purpose of creating advertising materials in support of the MyCardCreation® services provided by Fiserv to Client hereunder. MyCardCreation® must be used as one word with the registration mark following the name. Do not capitalize all letters. The official registration notice ® must accompany the mark when it is used in advertising, promotional materials and within the service itself.

(f) Advance: The parties hereby acknowledge and agree that the Advance described in Section 1(b)(i) of the Output Solutions Services Schedule will not be required for the Card Production Services to be provided pursuant to this Services Description Attachment. Fiserv shall invoice Client for postage and Client shall pay the same in accordance with the invoicing and payment provisions set forth in the Agreement.

(g) Term: The term of this Services Description Attachment shall end upon the later of: (i) the expiration of the term of Debit Services under the ASP Services Exhibit's Card Services Schedule, or (ii) the expiration of the term of Credit Services under the ASP Services Exhibit's Card Services Schedule.

2. Fees: Client agrees to pay Fiserv the fees set forth below for Card Production Services. Such fees will be invoiced to Client on a monthly basis unless otherwise indicated. Pricing information for Materials will be sent to Client for approval prior to Fiserv placing orders for Materials.

**Personalization services descriptions (per card)**

**Vault ATM and Temporary secure debit Personalization services includes:**
Encode card mag stripe, emboss and tip or flat graphics. Calculate and maintain database of starting and ending PAN number, package cards in bulk, include printout of PAN numbers

**ATM/Visa/Mastercard Personalization services includes:**
Encode card mag stripe, emboss and tip or flat graphics. Standard components: Ultraform carrier and #10 double window envelope, imprint standard carrier and computer match card to carrier, Insert card and carrier in envelope

**Print On-Demand:**
Static or dynamic edge-edge image printing; Personalization services also includes those items specified above.

**MyCardCreation®:**
Personalized image, edge-edge image printing using Fiserv's standardized, end-to-end image upload solution; Personalization services also includes those items specified above.

Ultragraphics/tipping colors available: front: black, white, silver or gold; back: black.
Standard Ultraform carrier size included is 8.5" x 11"; non-standard carrier sizes available (8.5' x 14' and 11' x 17').

**Personalization services – magnetic stripe**

| | |
|---|---|
| Vault ATM | .32 |
| Temporary secure debit | .49 |
| ATM | .59 |
| Visa/Mastercard | .68 |

| | |
|---|---|
| Print on demand ("POD") ATM/Visa/Mastercard | 2.10 |
| MyCardCreation® ("MCC") edge-edge ATM/Visa/Mastercard | 4.10 |
| Image content checking – required for MCC® only | .32 |

**EMV/Contactless services** – incremental to Personalization services fees above

| | |
|---|---|
| EMV contact chip | .54 |
| EMV contactless/dual interface | .59 |

**Secure calculations**

| | |
|---|---|
| Calculate secure values (i.e. CVV/C, CVV/C2) | .05/ea. |

**Label services (pay-as-you-go)**

| | |
|---|---|
| Black printing only | .06 |
| Application of activation label | .06 |

**Back of card personalization -** incremental to Personalization services fees above

| | |
|---|---|
| Available in black or white | .10 |

**Order processing/production set-up**

| | |
|---|---|
| Per order/program | 7.50 |
| Per order/program - MCC program | 3.00 |

**Fiserv owned plastic stock (pay-as-you-go) – ATM/Visa/Mastercard**

| | |
|---|---|
| Card Collection™ | |
| ATM magnetic stripe only | 1.00 |
| Visa/Mastercard magnetic stripe only | 1.78 |
| EMV contact chip | 2.98 |
| EMV contactless/dual interface | 4.08 |
| White plastic for POD/MCC | |
| Magnetic stripe only | .89 |
| EMV contact chip | 2.39 |
| EMV contactless/dual interface | 3.59 |

**Carrier services** (non-standard 11" x 17" carriers are 4 pages)

| | |
|---|---|
| Print message on carrier/PIN mailer | .05/ea. |
| Add color Client logo | .15/page |
| Black printed custom template/text | .12/page |
| Color printed, custom template/text | .20/page |

**Metal Card services (incremental to personalization and EMV services)**

| | |
|---|---|
| Laser engraving (first side) | .75 |
| Laser engraving (second side) | .45 |
| Hand affixing / insertion | 1.00 |
| Cardholder-initiated metal card destruction (includes postage-paid return envelope and metal card destruction (fee per outbound card mailed) | 3.50 |
| Laser profile optimization and testing (requires 5 sample cards) | 250.00 |
| New laser profile (requires 15 sample cards) | 3,448.00 |

**Additional services (if applicable)**

| | |
|---|---|
| Calculate natural or cardholder selected PIN or offset with printed mailer | .25 |
| EMV contact insert | .15 |
| EMV contactless/dual interface insert (radio frequency (RF) shielding) | .22 |
| RF-shielding Tyvek card sleeve | .20 |
| Inserting | .05 |
| Additional graphics per side (included on Card Collection/POD/MCC) | .07 |

| | |
|---|---|
| Protective overlay for flat graphics (included on POD/MCC) | .05 |
| Pull request | 5.00 |
| Rush request | 30.00 |

**Postage**

| |
|---|
| Postage will be charged at the then-current applicable USPS rate base. Overnight Freight is additional for each individual package shipped. |

**Mail Services**

| | |
|---|---|
| Return/Undeliverable Mail destruction – cards only, per piece destroyed<br>Undeliverable envelopes counted, securely destroyed per PCI requirements, and reported | 3.85 |

**WC3 portal connectivity (per order/program)**

| | |
|---|---|
| Client access to review and create reports for card order history, client owned inventory, order ship dates, and courier tracking numbers. The WC3 portal is also used to submit special handling requests. | 1.00 |

**Inventory receiving and management**

| | |
|---|---|
| Fiserv procured plastic/paper | N/C |
| Receiving for client supplied paper or magnetic stripe plastic materials | .02/ea. |
| Receiving for client supplied EMV chip plastic materials (requires Fiserv chip compatibility) | .03/ea. |
| Management for client supplied paper or plastic materials (per inventory item, per month) | 20.00 |

**Program file set-up one time fees (per card program)**

| | |
|---|---|
| Vault ATM or temporary secure debit magnetic stripe | 850.00 |
| Temporary secure debit – EMV contact chip | 1,250.00 |
| Personalized magnetic stripe | 850.00 |
| Personalized EMV contact chip or dual interface/contactless | 2,500.00 |
| MyCardCreation® (MCC) -- 1st program/each additional program | 6,000.00/1,750.00 |
| Mail services – 1st program/each additional program | 300.00/150.00 |

**Proofing fees (per proof, including initial proof and all consecutive/reproofs)**

| | |
|---|---|
| Card Collection™ | 250.00 |
| White plastic (for POD/MCC) | 250.00 |
| Black printing, custom carrier template | 150.00 |
| Color printing, custom carrier template | 150.00 |
| Activation label, pay-as-you-go | 150.00 |

**Maintenance, programming, discontinuation, and key related fees**

| | |
|---|---|
| Maintenance update or file changes (per change) – examples provided below | 65.00 |
| Programming (per hour) ** - examples provided below | 250.00 |
| Mail Services Annual fee for Change of Address Processing Acknowledgement Form | 50.00 |
| Magnetic stripe program key management (per key type, per program) | 175.00 |
| Generate or share EMV KEK or KMC key (release and processing fee) for plastic card stock to be used on Clients instant issue equipment. | 1500.00 |
| Generate Issuer public/private key pair (per pair) | 500.00 |
| Request Issuer public key certificate (per certificate, does not include Association fee) | 250.00 |
| Encrypt EMV keys (per key, i.e. MDK, IMK, PEK) | 1,150.00 |
| EMV program modification (e.g. EMV stock changes due to chip version changes, changes to risk parameters) | 850.00 |
| Program termination or discontinuation from Fiserv (per program after test card approval date) | 300.00 |

Pricing does not include: tax, shipping or handling.

**Examples of typical programming/change requests:

| **Type of Request** | **Associated fees** |
|---|---|
| Embossing to flat print personalization | Option 1:<br>- Full testing, peer review, client sign off, validate truncation rules. Physical plastic provided.<br>- 5 hours of programming ($750)<br>Option 2:<br>- Create and send client appearance proof only, or visual of sample card.<br>- 2 hours of programming ($300) |
| Carrier Message or Return Address Changes | Maintenance Change of $40/set up |
| Carrier, Label, or Insert Stock Changes | Maintenance Change of $40/set up<br>+ Applicable Proof fees |
| Misc. Maintenance Changes | Maintenance Change of $40/set up |
| Name Change | 5 hours of programming ($750)<br>+ Applicable Proof Fees |
| Mass Reissue Handling<br>i.e. Compromise file with insert change | 2 hours of programming ($300)<br>+ Applicable Maintenance Change Fees |

**Originate Services Schedule**

**to ASP Services Exhibit**

1. SERVICES.

(a) Fiserv agrees to provide the services set forth in Attachment 1 ("**Originate Services**"). Client may engage Fiserv for the following additional services pursuant to the terms of a separate schedule: funding, and validation functionality (e.g., automated clearinghouse origination, credit or debit card, and OFAC checking).

(b) Interfaces. Fiserv agrees to make available to Client access to certain interfaces identified in Attachment 1 and any additional interfaces as agreed by the parties from time to time, in accordance with the terms set forth in this subsection and subject to 3(g) of the ASP Services Exhibit ("**Third Party Interfaces**"). Fiserv agrees to work with Client to determine whether Fiserv, Client or the applicable third party can develop and support such Third Party Interfaces, whether such Third Party Interfaces are based on extracts that Client, Fiserv or the third party will provide, or whether such Third Party Interfaces are web service interfaces to be provided by Fiserv, Client or an applicable third party. Access to any Third-Party Interface and any development by Fiserv or the third party with respect thereto is subject to Fiserv entering into a reasonable confidentiality or other agreement with such third party, and such agreement remaining in full force and effect. Any such development by Fiserv is also subject to Fiserv's resource availability. Upon completion of such agreement and development of such Third-Party Interface, Fiserv will certify the Third-Party Interface with the third party. Fiserv shall not be liable for any delay or failure to receive access or use of such Third-Party Interface. Client agrees that Fiserv may provide any Client Information to any third party with whom Fiserv has a Third-Party Interfaces used by or accessed for Client. Notwithstanding anything in the Agreement to the contrary, Third Party Interfaces and access thereto are provided "as is" and Fiserv shall not be liable for any damages, whether direct, indirect, incidental, or consequential arising from use of or access to any Third Party Interfaces.

(c) Implementation and Related Services. The Fees for Implementation Services are set forth in Attachment 1. Fiserv will provide its standard implementation and training services ("**Implementation Services**") as described in a statement of work. As part of such statement of work, the parties will agree upon a mutually acceptable date for commencement of the Implementation Services ("**Project Start Date**"), which shall be no later than nine (9) months from the effective date of this Schedule ("**Conversion Date**").

(i) Implementation Schedule. If Client notifies Fiserv within 30 days of the scheduled Project Start Date of the need to delay its implementation, an additional fee equal to 50% of the implementation one-time charges set forth in Attachment 1 will apply ("**Rescheduling Fee**"). The Rescheduling Fee is not applicable if the implementation delay is the result of any issue solely under Fiserv's control. If Client does not implement Originate Services by the Conversion Date, and such failure is not solely Fiserv's fault, (1) Client agrees to pay Fiserv the applicable implementation fees in Attachment 1 upon receipt of invoice, and (2) notwithstanding anything in the Agreement to the contrary, upon written notice to Client, Fiserv may terminate the Originate Services for which such delay is experienced and Client agrees to pay early termination fees pursuant to Section 8(c) of the ASP Services Exhibit in connection with such termination.

(ii) Client Obligations and Responsibilities.

A. Client will provide to Fiserv any content and branding it intends for Fiserv to use in connection with Originate Services. Client acknowledges that Fiserv will not monitor, review or approve any Client content, including without limitation grammar, spelling, copyrighted information and claims regarding services and products. Client shall review the user interface and promptly inform Fiserv if there are any errors or inaccuracies in the website. Client hereby grants to Fiserv a non-exclusive, non-assignable right to use Client's trademarks, trade names, service marks, service names (collectively, "**Trademarks**"), and other content provided in connection with Fiserv's provision of Originate Services. Client will indemnify and hold harmless Fiserv, its officers, directors, employees, designated supplier, and affiliates against any claims or actions arising out of Fiserv's use of Trademarks and/or Client provided content.

B. Client shall be solely responsible for, (a) registering and maintaining its Internet site(s) used in connection with Originate Services, including without limitation maintaining all Internet addresses relating thereto, and (b) providing reasonable security for such Internet site(s) and users of such Internet site(s). Client shall have sole editorial control over its Internet sites, and Client shall be responsible for providing access through its Internet sites to Fiserv for the provision of Originate Services.

C. Client acknowledges that it has certain notice requirements to its customers in connection with its use and provision to such customers of Originate Services. Client acknowledges and agrees that it is responsible for ensuring its customers are provided with any applicable privacy disclosures prior to such customers' enrollment and use of Originate Services.

D. Client is solely responsible for third party data communications costs, and for establishing and maintaining an internal authentication program regarding its accounts, including without limitation the establishment and funding of accounts through Originate Services that meet all obligations required by applicable law, rule or regulation, as well as Client's internal business requirements and standards.

E. Client is, and shall remain, solely and exclusively responsible for any and all financial transaction risks associated with its accounts and customers, including without limitation insufficient funds, fraudulent transactions and transitions resulting from improper input data associated with Originate Services and any other Deliverables provided under this Schedule.

F. Client shall obtain appropriate licensing for use of any fillable PDF loan forms provided to Fiserv for use with Originate Services. Management of all functions and services with the third party vendors are the responsibility of Client. Client is responsible for contacting the third party vendors in the event of technical issues. If Fiserv resources are required for consultation or to resolve issues caused by the third party vendors, and those issues are determined not to have been caused by Fiserv, Client shall pay Fiserv actual hours incurred at Fiserv's then current fees for such services.

2. FEES.

(a) In exchange for access to Originate Services, Client agrees to pay Fiserv the fees set forth in Attachment 1. Fees do not include data communications charges or third party pass-through fees that are incurred by Fiserv in the performance of Originate Services.

3. PERFORMANCE.

(a) Hours. Fiserv will use reasonable efforts to make Originate Services available to Client 24 hours a day, 7 days a week, subject to scheduled maintenance, scheduled downtime, and causes beyond Fiserv's reasonable control.

(b) Technical Support. Client is responsible for first level technical support to its end users and Fiserv (or Service Provider, if applicable) will provide second level technical support to Client's designated support representatives (meaning Fiserv will accept an initial technical support inquiry from Client, but not any end users), and initiate a troubleshooting process in accordance with the Fiserv's standard support services. Such support will be available during Fiserv's standard business hours. Fiserv will use commercially reasonable efforts to address issues caused by Client's failure to fulfill its responsibilities in this Schedule at its then current rates and will not be obligated to address or circumvent such issues in any designated time frames. Fiserv shall have no obligation to address or support issues caused by Client modifications to Originate Services; services that are not currently supported; Originate Services problems caused by Client's negligence, abuse, or misapplication; or use of Originate Services other than as specified in this Schedule or the documentation applicable to such Originate Services.

(c) Releases. Fiserv may, from time-to-time, automatically release new version(s) of the Fiserv System used to provide the Originate Services. Release schedules are published by Fiserv and are available to Client. Client will cooperate with Fiserv as to any necessary corresponding Client System changes outside Fiserv's control.

(d) Supported Browsers. Fiserv will use commercially reasonable efforts to support the most commonly used browsers in the United States as determined by Fiserv's research. Notwithstanding the previous sentence, Fiserv will only support the use of those browsers that undergo Fiserv's quality assurance testing services (each, a "**Supported Browser**"). If a new version or release of a Supported Browser is Backward Compatible, Fiserv will remedy issues arising from accessing Originate Services through the new version or release of such Supported Browser. If the new version or release of a Supported Browser is not Backward Compatible, the browser will cease to be a Supported Browser, and Fiserv will need to perform additional quality assurance and development services on a time and materials basis to reestablish such browser as a Supported Browser. "**Backward Compatible**," as used herein, means the software continues to provide all the functionality and application programming interfaces (APIs) provided by the previous release(s) or version(s) of the software, enabling applications that worked with the previous release or version to continue working, without modification, with the new release or version.

4. ADDITIONAL TERMS AND CONDITIONS.

(a) Term. The initial term of Originate Services shall begin on the Conversion Date and shall end May 31, 2027. Unless written notice of non-renewal is provided by either party at least 180 days prior to expiration of the initial term or any renewal term, Originate Services shall automatically renew for additional term(s) of three (3) years.

(b) Third Party Delays. If Fiserv's performance of Originate Services relies upon the provision of services or information from third parties, including without limitation credit reporting agencies, credit scoring service providers, consumer reporting agencies, or credit bureaus, Client acknowledges that the delivery of Originate Services may be delayed due to delays or unavailability of such third party inputs.

(c) Threatening Condition. If Fiserv reasonably believes Client's use of Originate Services poses an imminent or actual threat to a Fiserv System ("**Threatening Condition**"), Client agrees that Fiserv may suspend any and all use of the applicable Originate Services until such Threatening Condition is cured, provided that Fiserv notifies Client in writing prior to such suspension or as soon as commercially practicable thereafter.

(d) Third Party Provided Services. Client agrees that it is purchasing certain third party provided services through Fiserv as set forth in Attachment 1 ("**Third Party Services**"), and Client agrees that such Third Party Services are subject to the additional terms as set forth in this Section. Fees for such Third Party Services are set forth in Attachment 1, and remain subject to increase based on this Agreement and/or the agreement Client has with the applicable Third Party Services provider. In connection with the Third Party Services, Fiserv will remit payment of fees paid by Client that are due to the applicable Third Party Services provider. FISERV HEREBY DISCLAIMS ALL WARRANTIES, EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE, WITH RESPECT TO THE THIRD PARTY SERVICES. EXCEPT FOR THE IMPLEMENTATION AND SUPPORT OBLIGATIONS EXPRESSLY PROVIDED BY FISERV HEREUNDER AND ITS OBLIGATIONS TO REMIT PAYMENT RECEIVED FROM CLIENT TO THE THIRD PARTY SERVICES PROVIDER, FISERV WILL HAVE NO LIABILITY WHATSOEVER IN CONNECTION WITH THE THIRD PARTY SERVICES. IN NO EVENT WILL FISERV BE LIABLE FOR ANY INDIRECT, SPECIAL, INCIDENTAL, CONSEQUENTIAL AND/OR OTHER DAMAGES WHATSOEVER, WHETHER BASED ON BREACH OF CONTRACT, TORT (INCLUDING NEGLIGENCE), PRODUCT LIABILITY, OR OTHERWISE, AND WHETHER OR NOT FISERV HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGE.

(e) Originating Depository Financial Institution. For Originate Services that may be used to originate ACH transactions, this provision shall apply. Fiserv, acting on behalf of Client (and for purposes of this Schedule, Client is Originating Depository Financial Institution "**ODFI**"), as a Third-party Service Provider (as defined in the NACHA Rules), will process ACH files originated to the Federal Reserve ("**ACH Operator**") and shall comply with the rules, regulations and other requirements as defined by NACHA ("**NACHA Rules**") in connection with Client originating ACH entries. For ACH files originated by Client, Client will be the originator, ODFI and Receiving Depository Financial Institution ("**RDFI**"), and shall comply with the NACHA Rules. The ODFI is solely responsible for entries originated by its employees or members. Client shall designate Fiserv, and Fiserv will act, as authorized sending and receiving point to the ACH Operator for ACH files that Fiserv

processes for Client. Client will be responsible for ensuring its procedures are compliant with the NACHA Rules.

(f) Templates/Forms. Any sample notices or disclosure documents generated by Fiserv or its Service Providers and any accompanying guidance therewith ("**Forms**") are provided for demonstration purposes only and were not drafted for any specific organization or customized for Client. Client is responsible for reviewing and bear all risk for use of the Forms and modifying the content of such Forms to meet its needs and regulatory requirements. Forms are provided "AS IS" and Fiserv and Services Providers expressly disclaim all warranties, express or implied, in connection with the Forms. Client shall be responsible for all charges and fees incurred for customized forms, supplies and delivery charges.

(g) Conflicts. If the terms of this Schedule conflict with any other terms of the Agreement, this Schedule shall govern in relation to Originate Services and any other Deliverables provided under this Schedule.

**Attachment 1 to Originate Services Schedule**

**Services; Fees**

1. Payment Terms.

(a) One-time Fees. All one-time fees set forth below shall be due and payable 50% upon the effective date of this Schedule and the remaining 50% due upon implementation.

(b) Recurring Monthly Services Fees. Recurring monthly fees set forth below shall commence on the Conversion Date.

(c) Recurring Annual Fees. Recurring annual fees set forth below shall commence on the Schedule effective date, with such fees due and payable annually in advance on such date and the anniversary thereof.

2. Services; Fees.

| PRODUCT CODE | DESCRIPTION | FREQUENCY | QUANTITY | UNIT OF UNIT | PRICE | AMOUNT |
|---|---|---|---|---|---|---|
| | **Deposit Essentials Monthly Hosting** | | | | | |
| 117-161 | Monthly Hosting | Monthly | 1 | Per FI | 293 | 293 |
| | **Deposit Essentials Per Transaction Fees** | | | | | |
| 117-162 | From 0 To 50 Transactions | Monthly | TBD | Per Tran | 15 | TBD |
| 117-162 | From 51 To 100 Transactions | Monthly | TBD | Per Tran | 13 | TBD |
| 117-162 | From 101 To 250 Transactions | Monthly | TBD | Per Tran | 12 | TBD |
| 117-162 | From 251 To 500 Transactions | Monthly | TBD | Per Tran | 11 | TBD |
| 117-162 | From 501 To 1,000 Transactions | Monthly | TBD | Per Tran | 10 | TBD |
| | Over 1,000 Transactions | Monthly | TBD | Per Tran | 8 | TBD |
| | Minimum Fee | Monthly | 1 | Per FI | 350 | 250 |
| | **Monthly Total** | | | | | **$543** |
| | **Pricing Type** | | | | | |
| | Cliff Tier: The billable amount is calculated on the total volume level tier x unit price. | | | | | |
| | **Implementation** | | | | | |
| 117-160 | Deposit Essentials Implementation | One Time | 1 | Per FI | 12,000 | 12,000 |
| | **One Time Total** | | | | | **$12,000** |
| | **Optional** | | | | | |
| | **Acuant AssureID and Acuant Face Standard** | | | | | |
| | **Option 1** | | | | | |
| | Includes 25 Transactions | Monthly | 1 | Per FI | 50.00 | 50.00 |
| | 25+ Transactions | Monthly | 1 | Per Tran | 2.27 | 2.27 |
| | Transactions expire when used or at the end of the month, whichever comes first. | | | | | |
| | OR | | | | | |
| | **Option 2** | | | | | |
| | Includes 300 Transactions | Annual | 1 | Per FI | 600.00 | 600.00 |
| | Transactions expire when used or after 12 months from the purchase date, whichever comes first. If Customer uses 300 transactions within 12 months, Customer has the option to switch to monthly billing or purchase another 300 transactions for $600 | | | | | |

**Statement Processing Services Schedule**
**to the ASP Services Exhibit**

**1. SERVICES**

(a) Description of Services. Fiserv will provide Client with certain print and creation services, as further described in the Services Description Attachment(s) to this Schedule (the "**Statement Processing Services**"). Client shall also, during the term of this Schedule, have the non-exclusive right to use and access Fiserv's Web Client Control Center ("**WC3**") application.

(b) Client Obligations and Responsibilities.

(i) Client shall designate appropriate Client personnel to act as the Fiserv contact, shall supply Fiserv with reasonable access to Client's site during normal business hours, and shall cooperate with Fiserv personnel in their performance of Statement Processing Services.

(ii) In the event the Client modifies Client Equipment utilized in production or transmission of statement data, Client shall notify Fiserv 30 days prior to any modification.

(iii) In the event the format of statement data is modified from its original format, Client will notify Fiserv 90 days prior to any such change to provide for testing and verification of statement data. The Client is responsible for all programming costs as they relate to any change in statement format after initial setup if the change is made by Client. If Fiserv modifies its format of statement data, it will be responsible for all format costs.

(iv) Client or its customers will provide to Fiserv any trademarks, trade names, service marks, service names, third party links, information, specifications, materials, designs, logos, copy or other such works, marks or other such content Client desires to be used in developing the Statement Processing Services (collectively "**Client Content**").

(v) Client will also provide any specifications and instructions and otherwise comply with any additional responsibilities set forth in the Services Description Attachment to this Schedule.

(vi) Client is the owner of their data and as such is responsible for the accuracy of all data contained in statement extracts.

**2. FEES**

(a) Fees. Client will pay Fiserv the fees set forth in the Services Description Attachment to this Schedule for the Statement Processing Services. Such fees will be invoiced to Client on a monthly basis unless otherwise indicated.

(b) Materials Costs. Notwithstanding anything to the contrary in the Agreement, Client understands that fees and costs in respect of materials purchased through Fiserv ("**Materials**") are not fixed or otherwise guaranteed for the term of this Schedule.

(c) Annual Adjustment. Fiserv's fees for Services may be increased annually effective each January 1 beginning at the start of the following year upon and with 30 days' notice to Client. Each increase shall be limited to the increase in the U.S. Department of Labor, Consumer Price Index for All Urban Households ("CPI") for the most recently available 12-month period proceeding such 30-day notice period or 5% whichever is greater provided; however, that CPI shall not exceed 5% in any given year.

**3. PERFORMANCE**

(a) Notwithstanding anything to the contrary in the Agreement, all Statement Processing Services shall be deemed to have been accepted by Client unless Client provides Fiserv with written notice describing (with reasonable particularity) any failure of the Statement Processing Services to comply with the terms of this Schedule within 15 days following Fiserv's performance of the Statement Processing Services ("**Defect Notice**"). Fiserv shall, at no additional cost to Client, reprint and remail, if applicable, any item(s) that fail, due to the fault of Fiserv, to comply with the terms of this Schedule within a reasonable time following receipt of the Defect Notice. Notwithstanding any other performance obligations or any other terms set forth in the Agreement, Client agrees that, if an item(s): (i) fails, due to the fault of Fiserv, to comply with the terms of this

Schedule or (ii) is lost or damaged while in Fiserv's custody, Client's sole remedy under this Schedule shall be for Fiserv to reproduce and remail, if applicable, such item(s) in accordance with this Section.

**4. UNITED STATES POSTAL REGULATION**

(a) All provisions of this Agreement shall be subject to governing regulations of the United States Postal Service, and laws of the United States. Where mandated by such laws or regulations, this Agreement shall be deemed to be modified in whole or in part to comply with any requirements imposed by such laws or regulations. This Agreement shall be subject to renegotiation in the event of rate increases for qualified first-class presort mailings, as may from time to time be established by the United States Postal Service. In the event presort discounts are terminated by the United States Postal Service, any portion of this Agreement regarding presort services shall become null and void.

**5. ADDITIONAL TERMS AND CONDITIONS**

(a) Client acknowledges and agrees that it is responsible for providing all requested instructions and guidance necessary to perform the Services contemplated by this Schedule and that Fiserv will rely upon and act in accordance with all such instructions as provided, and Client assumes all risk for the consequences of any such instructions Client gives (or fails to give) and Fiserv's reliance thereon. Fiserv shall have no obligation to check for any errors or omissions in any such instructions and/or to correct, cancel or amend any action pursuant to any Service(s) provided under this Schedule once Fiserv has received instructions to complete such action.

(b) During the Term of this Schedule, and solely for the purpose of providing the Statement Processing Services, Client hereby grants to Fiserv a non-exclusive, worldwide, royalty-free right and license to copy and use all the elements of the Client Content in accordance with Client's instructions. Client shall indemnify and hold harmless Fiserv, its officers, directors, employees, and affiliates against any third party claim or action alleging infringement of a copyright, trademark or other proprietary right of such third party to the extent such claim or action arises out of or in connection with any information, specifications, materials, designs, Client Content, copy or other items provided to Fiserv by Client, its customers or any third party on behalf of client or its customers, as the case may be.

(c) Client agrees that WC3 access shall be given only to Client's employees on a need to know basis, and only after informing such employees of the terms and conditions of the Agreement relative to use, disclosure and ownership, including without limitation those set forth in Section 3 of the Agreement. Client shall cause all parties to whom Client gives WC3 access to adhere to all applicable provisions of the Agreement, the ASP Services Exhibit and this Schedule. Client shall be responsible for any breach thereof by any party to whom Client provides access to WC3.

(d) For purposes of Section 7 of the Agreement, the parties hereby acknowledge and agree that "TOTAL FEES" excludes any fees, costs or expenses paid by Client in connection with products, Materials or supplies, including without limitation, amounts paid for postage or freight.

(e) Client acknowledges that access to the Statement Processing Services shall be across public and private lines and that Fiserv has no control over such lines or the information available from non Fiserv sources.

(f) Client shall not use the Statement Processing Services for any activities in violation of any laws or regulations, including without limitation, wrongful transmission of copyrighted material, sending of threatening or obscene materials, or misappropriation of exportation of trade or national secrets.

(g) Fiserv shall provide to Client, at no additional charge, statement compliance changes as required and mandated by Federal regulation and deliver them to the Client by the required compliance date as outlined within the law or regulation. Such compliance changes will only be implemented and available if the Client's account processing system has made such changes and they are available within the statement data file.

(h) If the terms of this Schedule conflict with any other terms of the Agreement, this Schedule shall govern in relation to the Statement Processing Services and any other Deliverables provided under this Schedule.

Services Description Attachment
to the Statement Processing Services Schedule

1. **Description of Print and Fulfillment Services:** Fiserv will provide Client with certain print, electronic and creation services as further described below (collectively, "**Statement Services**").

1.1. Composition and Statement Print: Fiserv will provide statement services to the Client that includes the composition using a current statement layout for the creation of the statement document. The statement will be created from an initial data file created following each statement cycle by Fiserv's Account Processing Service or from a qualified Account Processing System approved by Fiserv.

1.2. Preprocessing and Data Preparation: Fiserv will receive Client data as transmitted from the Client or from the Client's data processor and initiate the necessary data preparation to achieve the Client's desired output format and document composition elements for statements and notices. Preprocessing includes alteration of the Client's data to achieve an output appearance that varies from the original format. It also includes, but is not limited to; applying of Post Net bar coding, page grouping, and/or account sorting and application of managed content via "onserts" or other such direct-print method.

1.3. Web Client Control Center (WC3) Access: As part of the Statement Services, Client shall, during the term of this Attachment, have the non-exclusive right to use and access Fiserv's WC3 web application. Client will be trained to utilize WC3 which is a technology provided by Fiserv to support the workflow monitoring and statement messaging capabilities of the Service. Client should consult WC3 following the creation of any cycle to insure files are promptly received by the Service and are in process. This system includes structured sections of the Client's statement for onserts and custom messaging which the Client will update/maintain once the training period has been completed.

1.4. Mailing Services: Fiserv will appropriately page sort, group, nest, fold, insert Client statements and notices and deliver to the U.S. Postal Service for delivery. The process includes, but is not limited to, sorting of documents in order to obtain the lowest possible postage rate, weighing said materials and applying appropriate postage necessary for the mail piece to reach the intended recipient.

1.5. Special Handling: Fiserv will ship to the selected destination any diverted statement as defined in the special request system, including bulk to destination, suppress from print, and divert to destination. Foreign mail is determined by state code and split into separate jobs for proper USPS postage and handling. Bulk selected statements can be presented to the client selected destination and can be folded and inserted in an unsealed envelope and without postage.

**1.6.** Image Archival: As required, Fiserv will provide hosting and/or delivery of electronic statements.

**1.7.** Fees:

Plus:

| | |
|---|---|
| Set-up Fee | Previously paid |
| Per Page Fee | $0.10 each |
| Postage | Standard rates |

**Web Signatures for Credit Unions Services Schedule**
**to the ASP Services Exhibit**

**1. Description of Services:**

(a) Web Signatures for Credit Unions Services are designed to enable Client to deliver documents electronically, enable the recipients of those documents to sign those documents electronically, continue to sign documents in-branch, and store the electronically signed documents. The Web Signatures for Credit Unions Services are designed to perform the following functions:

- Allow Authorized Users (as defined below) to upload eContracts for review by a Client's End User (as defined below).
- Approve the eContracts for viewing by the End User and notify the End User of eContract availability.
- Enable the End User to view, print, download, and/or electronically sign the eContracts set forth in Envelopes uploaded by Client for such End User.
- Allow End User to access and view all eContracts set forth in the Envelope that have been released for viewing and signature by the Client.
- Allow Client to designate signer types as allowed by Fiserv System functionality.
- Allow Client to have a mix of in-branch and web-based signatures.
- Authorized Users may designate signer authentication methods, the order in which documents are presented for signing through the Web Service, and the order in which signers must sign the documents.
- Confirm the End User has received and opened the documents sent to them.
- Provide a mechanism to capture electronically the End User's confirmation that they wish to receive eContracts electronically from Client and have the ability to electronically sign the documents as permitted by the Client through acknowledgment of the ESIGN consent document as a precondition to accessing eContracts.
- Provide a mechanism to allow Client to present to the End User the Client's specific terms and conditions relative to the End User's request to receive documents electronically, with an electronic signature option, including the End User's right to "opt out" from electronic delivery of documents at any time following the Client-prescribed procedure to notify Client of such a decision by the End User by providing a mechanism for Client to upload documents of their own choosing for each order.
- Provide a method to allow Client to specify which documents the Client has made available to the End User through the Web Signatures for Credit Unions Services that may be electronically signed by the End User through the use of Client-maintained eContract parameters.
- Provide a method for each Authorized User to determine on a document by document level which eContracts the End User will electronically sign and which eContracts will only be viewed online or print for ink signature on paper, as enabled to do so by the Client maintained eContract parameters.
- Provide a method for each End User to confirm the End User's decision to electronically sign an eContract. The sign button and the confirm signing button is the method for the End User to confirm again their intent to sign the eContract.
- Capture the electronic signature of each End User and bind it to the eContract.

The above description of the Web Signatures for Credit Unions Services is subject to change as Fiserv enhances the Fiserv System and/or the Services from time to time. Fiserv shall provide Client with advance notice of any material change.

For purposes of this Schedule, the following terms have the following meanings:

(i) "Authorized User" means the Client's employees, as identified by a unique email address and user name, authorized to use Web Signatures for Credit Unions.

(ii) "eContract" means a contract, notice, disclosure, or other record or document deposited into the Fiserv System by an Authorized User for processing as part of the Web Signatures for Credit Unions Services.

(iii) "End-User" means Client's member or customer that is authorized by Client to access the Fiserv System to sign documents electronically, and who has agreed to and accepted the applicable Terms of Use of the Fiserv System.

(iv) "Envelope" means an electronic record containing one or more eContracts consisting of a single page or a group of pages of data uploaded to the Fiserv System.

(v) "Terms of Use" shall mean the terms and conditions to govern Client's, Authorized Users' and End Users' access to the Fiserv System.

(vi) "Web Service" means a method of communication between two electronic devices over the web (internet).

(b) Fiserv Responsibilities.

(i) As of the effective date of this Schedule, the Fiserv System only supports the following Topaz Signature Pad models during the embedded signing process:

- SignatureGem LCD 4x3 (*T-L755)/(T-LBK755BHSB-R)*
- Topaz LinkSign1X5 base unit *(T-RLB100-P6B-R)*
- Topaz 1X5 Sig Pad USB *(T-LBK462-HSB-R)*
- Topaz SigLite 4X3 *(T-LBK750SEBHSB-R)*

Fiserv will provide Client with notice (which may be via email) of any additional models supported by the Fiserv System.

(ii) Fiserv warrants that the formation of an eContract not involving any individual End User will be sufficient under the Electronic Signatures in Global and National Commerce Act, 15 U.S.C. §§ 7001 et seq. (the "ESIGN Act") to support the validity of such information, to the extent provided in the ESIGN Act; provided that the foregoing warranty shall only apply if there is proper use of the Fiserv System and Web Signatures for Credit Unions Services by Client, Authorized Users and End Users, and proper use of the Web Signatures for Credit Unions Services in accordance with the applicable Terms of Use.

(iii) Fiserv warrants that the formation of the eContract involving an individual End User will be sufficient under the ESIGN Act to support the validity of such formation, to the extent provided in the ESIGN Act; provided that the foregoing warranty shall only apply if there is proper use of the Fiserv System and the Web Signatures for Credit Unions Services by Client, Authorized Users and End Users, proper use of the Web Signatures for Credit Unions Services in accordance with the applicable Terms of Use, and Client, its Authorized Users and End Users comply with all special requirements for End User eContracts, including those described in this Schedule.

(c) Client Responsibilities.

(i) Client shall designate Authorized Users. Client shall ensure that only Authorized Users access and use the Web Signatures for Credit Unions Services. Each Authorized User shall be one natural person.

(ii) Client acknowledges and agrees that Fiserv will not maintain control or access to the contents of any eContract, and the content, quality, and format of any eContract is completely within the exclusive control of the Authorized User that deposits an eContract into the Fiserv System ("Depositing Party") and is the responsibility of Client.

(iii) In the event Client elects to receive optional services that are designed to verify the identity of the intended recipient of an eContract deposited into the Fiserv System ("Authentication Measures"), Fiserv (A) will only apply those Authentication Measures (if any) selected by Depositing Party; (B) makes no representations or warranties regarding the appropriateness of the Authentication Measures; and (C) assumes no liability or responsibility for a party's inability or failure to satisfy any particular Authentication Measure or for any circumvention of such Authentication Measures effected by any third party.

(iv) Client acknowledges and agrees that use of the Web Signature for Credit Unions Services is only a tool to be used within Client's overall processes and procedures for providing documents to End Users in accordance with the regulatory and compliance considerations applicable to the business transaction between Client and End User. Fiserv strongly encourages Client to review their

processes in detail, in order to assure that its processes address the legal requirements of using electronic records and electronic signatures with End Users.

(v) Client acknowledges and agrees that Fiserv assumes no responsibility for determining whether any particular eContract is an exception to any applicable electronic signature law, subject to an agency promulgation, or whether it can be legally formed by electronic signatures.

(vi) Client agrees that it is solely responsible for making available to third parties (including parties to its eContracts), all contracts, documents and other records required by applicable law, including without limitation, electronic signature laws and other laws that may require records relating to a transaction to be retained or made accessible for a certain period of time.

(vii) Client acknowledges and agrees that certain laws or regulations may impose special requirements with respect to electronic transactions involving End Users, which may include without limitation, obtaining appropriate consents. Client further acknowledges and agrees that Fiserv shall not have any responsibility to (A) determine whether any particular transaction involves an End User; (B) to furnish or obtain any consents or determine if any consents have been withdrawn; (C) to provide information or disclosures in connection with any attempt to obtain any consents; (D) to provide legal review of, or to update or correct any information or disclosures currently or previously provided; (E) to provide any copies or access for transactions; or (F) otherwise to comply with any such requirements.

(viii) Client acknowledges and agrees that Fiserv shall not be held liable for Client's business processes and procedures, including without limitation (A) obtaining the End User's initial agreement to receive eContracts electronically; (B) obtaining the End User's valid email address and entering that email address correctly without typographical errors into the Client's system of record to be transmitted as part of the Web Signatures for Credit Unions Services; (C) reviewing undeliverable emails sent using the Fiserv System; (D) providing the End User with detailed requirements on what the End User needs to do to notify the Client that they wish to opt-out of receiving eContracts electronically from Client; (E) reviewing the various queues on a regular basis to see the End User's activity on the Fiserv System; (F) uploading Client's eContracts intended for the End User, and monitoring the transmission of eContracts and other information from the Client's origination system, for any errors during transmission or upload of eContracts; (G) providing End Users with paper copies of disclosures and other documents, and/or switching End Users to the paper delivery of documents, upon the End User's request; or (H) terminating End User access to the Web Signatures for Credit Unions Services.

(ix) Client agrees that Fiserv shall not be liable for and Client shall pay Fiserv fees for every Create Envelope action performed by the Authorized User.

(x) Client agrees to comply with all applicable laws, rules, and regulations in connection with the receipt of Web Signatures for Credit Unions Services, including without limitation, with respect to the formation of eContracts and receipt of any End User consents that may be required.

(xi) Client agrees that it will not use the Web Signatures for Credit Unions Services to send unsolicited mass mailings, including without limitation, all statutory and other common definitions for "unsolicited mass mailings" including all Commercial Electronic Marketing Messaged as defined in the U.S. CAN SPAM Act.

(xii) Client acknowledges and agrees that it is solely responsible for the nature and content of all materials, works, data, statements, and other visual, graphical, video, written or audible communications of any nature submitted by any user or otherwise processed by the Fiserv System.

(xiii) Client acknowledges and agrees that it will not use the Web Signatures for Credit Unions Services (A) to communicate any message or material that is defamatory, harassing, libelous, threatening, or obscene; (B) in a way that violates or infringes upon the intellectual property rights or the privacy or publicity rights of any person or entity or that may otherwise be unlawful or give rise to civil or criminal liability (other than contractual liability of the parties under eContracts processed through the Web Signatures for Credit Unions Services); (C) in any manner that is likely to damage, disable, overburden, or impair the Fiserv System or interfere in any way with the use or enjoyment

of the Web Signatures for Credit Unions Services by others; or (D) in any way that constitutes or encourages conduct that could constitute a criminal offense. Although Fiserv does not actively monitor the content processed through the Fiserv System, Fiserv may at any time, suspend any use of the Web Signatures for Credit Unions Services and/or remove or disable any content as to which Fiserv reasonably suspects or confirms is a violation of this subsection.

(xiv) Client will facilitate timely cooperation between any necessary third parties in order for Fiserv to provide access to Web Signatures for Credit Unions Services.

(xv) Client will access, and will instruct its Authorized Users and End Users to access, Web Signatures for Credit Unions Services in accordance with the Terms of Use.

(xvi) Client assumes exclusive responsibility for the consequences of any instructions it may give to Fiserv, for Client's or its Authorized User's and End User's failures to access Web Signatures for Credit Unions Services properly in a manner prescribed by Fiserv, and for Client's failure to supply accurate input information, including, without limitation, any information contained in a consent.

(xvii) Client is expressly prohibited from extending any warranty or warranties on Fiserv's behalf to any person.

(xviii) Client acknowledges and understands its responsibility and liability as they relate to Client's access to the Internet. Fiserv assumes no liability or control over the Internet access of Client's on-site systems and remote employee or affiliate access.

(xix) Client will assign a Project Manager to be the primary liaison with Fiserv throughout the implementation process and work closely with the Fiserv project team to plan, monitor and control the entire project. This person must know Client's internal organization, have an excellent understanding of procedures and workflows, and be empowered to make decisions that are important to the overall project. Client will commit adequate resources to meet the implementation project schedule and ensure timely completion of tasks assigned to Client.

**2. Fees:**

(a) Transaction Fees. The Web Signatures for Credit Unions Fees are charged as follows:

| **5. Member Size** | **6. Web Signature Per Envelope** | **7. Web Signature Monthly Minimum** | **8. In-Branch Monthly Fee** |
|---|---|---|---|
| **9. 0 – 2,500** | **10. $4.00** | **11. $75.00** | **12. $ 72.00** |
| 13. 2,501 – 5,000 | 14. $4.00 | 15. $75.00 | 16. $125.00 |
| 17. 5,001 – 10,000 | 18. $4.00 | 19. $75.00 | 20. $165.00 |
| 21. 10,001 – 25,000 | 22. $4.00 | 23. $75.00 | 24. $200.00 |
| 25. 25,001 – 50,000 | 26. $4.00 | 27. $75.00 | 28. $250.00 |
| 29. 50,000+ | 30. $4.00 | 31. $75.00 | 32. $500.00 |

Phone Authentication ……………………..……$0.95 per End User
Knowledge Base Authentication ...………….. $2.50 per End User

For purposes of calculating transaction fees hereunder, the following terms have the following meanings:

(i) "Knowledge Base Authentication" means the additional authentication used, per End User, by using Fiserv's or its subcontractor's public database for such purposes. Knowledge Base Authentication is an optional Service.

(ii) "Monthly Fee" means the flat fee for signing eContracts in the branch; this Fee will begin after Fiserv has made the Web Signatures for Credit Unions Services available to Client for use.

(iii) "Phone Authentication" means the additional authentication used, per End User, by using a phone number for such purposes. Phone Authentication is an optional Service.

(iv) "Web Signature Per Envelope" means each Envelope containing one or more eContract consisting of a single page or a group of pages of data uploaded to the Fiserv System for the End User. A click charge will occur when eContracts are sent through the Web Service.

(v) "Web Signature Monthly Minimum" means the minimum monthly fee the Client will pay for the use of the Web Signatures for Credit Unions Services, once Fiserv has made the Web Signatures for Credit Unions Services available to Client for use.

(b) Web Signatures for Credit Unions Setup Fees.

100% of the Setup Fees are due on the effective date of this Schedule. These fees include implementation and training.

| 33. Member Size | 34. Setup Fee |
|---|---|
| **35. 0 – 2,500** | **36. Previously paid** |
| 37. 2,501 – 5,000 | 38. $4,750 |
| 39. 5,001 – 10,000 | 40. $6,000 |
| 41. 10,001 – 25,000 | 42. $7,500 |
| 43. 25,001 – 50,000 | 44. $9,500 |
| 45. 50,000+ | 46. $12,500 |

Fiserv will provide the following services to Client to setup the Web Signatures for Credit Unions Services (20 hours):

- Setup account in Web Services and give the Client access.
- Map existing forms, as identified by the Client, currently in the Client's document library. Additional forms mapping will be provided upon request subject to payment by Client of additional fees at Fiserv's then current rates.
- Development of a detailed implementation project schedule with Client's project representative.

*Estimated Hours and Fees. The hours and fees set forth herein are estimates based upon the scope of the services described in this Section 2(b). All services-related hours worked in excess of the hours quoted in this Section 2(b) shall be billed at Fiserv's then-current professional services rate, and are due and payable in accordance with the payment terms set forth herein.*

*Travel-Related Expenses. In addition to the fees identified in this Schedule, additional charges may include reasonable out of-pocket travel-related expenses incurred in connection with the services provided herein. All travel-related expenses shall be billed on a monthly basis as incurred, and are due and payable upon receipt of invoice.*

**3. Additional Terms:**

(a) As of the effective date of this Schedule, the Web Signatures for Credit Unions Services are provided through Fiserv's subcontractor, DocuSign, Inc. ("DocuSign"). In the event Fiserv's agreement with DocuSign terminates for any reason, Fiserv may terminate the portions of this Schedule applicable to DocuSign and the services provided by DocuSign. During the term of this Schedule, Fiserv may provide written notice to Client that it is offering a product and/or service of substantially similar functionality and use as all or any portion of the Services described herein. Following such notice, either party may elect to transition Client to such product or service, subject to (i) providing the other party with written notice at least 90 days prior to such transition, and (ii) if applicable Fiserv and Client entering into a separate Schedule to the Agreement for such product and/or service.

(b) As long as DocuSign is providing all or any portion of the Web Signatures for Credit Unions Services described under this Schedule, the following terms and conditions apply:

(i) Client agrees to comply with DocuSign's Terms of Use located at the following URL or any successor URL provided to Client in writing or via email: http://www.docusign.com/company/terms-of-use. Thereafter, Client agrees to comply with Fiserv's Terms of Use.

(ii) Client has the right to store, reproduce, display, perform, transmit, print out or otherwise make printed copies of the reports, results, or other information or materials generated from Client's use of the Web Signatures for Credit Unions Services and to provide copies of such reports to its End Users, prospective End Users, partner financial institutions and applicable regulatory authorities.

(iii) Fiserv or DocuSign will store all eContracts until the earlier of expiration or termination of Fiserv's agreement with DocuSign or expiration or termination of this Schedule. Stored eContracts may be retrieved by Fiserv or Client at any time during the term of Fiserv's agreement with DocuSign. Client may at its option and solely at Client's risk, direct that any eContract be deleted or purged, through the API, when the status of the eContract is either "Sent or Delivered".

(iv) Fiserv or DocuSign may delete an uncompleted eContract from the Fiserv System immediately and without notice upon the earliest to occur of (A) expiration of the Envelope where an expiration date has been set forth such Envelope, not to exceed 365 days, or (B) expiration or termination of this Schedule, or (C) expiration or termination of Fiserv's agreement with DocuSign.

(c) Third Parties. In the event any of Fiserv's obligations under this Schedule are directly or indirectly dependent on entering into an agreement with a third party, or otherwise directly or indirectly dependent on the actions or omissions of a third party, Fiserv shall use commercially reasonable efforts to enter into such agreement on reasonable terms and conditions, or use commercially reasonable efforts to obtain such action, and provided that Fiserv has complied with the terms hereof and if Fiserv is unable to enter into an agreement with such third party or obtain such action, Fiserv's obligations hereunder shall immediately terminate and Fiserv shall not be liable for its inability to perform such obligations and shall be relieved of any such obligations hereunder.

(d) Conflict. In the event of a conflict between the terms of the Agreement and this Schedule, this Schedule shall control.

**Zelle® Payment Services Schedule**
**To ASP Services Exhibit**

1. Term. On the terms and subject to the conditions set forth below, Fiserv and Client hereby enter into this Zelle® Payment Services Schedule (this "**Schedule**"), and agree that this Schedule shall be incorporated into and made subject to the provisions of the Agreement. The initial term of this schedule shall commence on the date the Services are first used by Client in live production and continuing thereafter coterminous with the Account Processing Services Schedule. Unless written notice of non-renewal is provided by either party at least one hundred eighty (180) days prior to the expiration of the initial term or any renewal term, this Schedule shall automatically renew for additional term(s) of one (1) year. If Fiserv's agreement with its service provider, Early Warning Services, LLC or its successor ("**Early Warning**"), terminates and Fiserv thereafter no longer receives services from Early Warning in support of the Services under this Schedule, then this Schedule will automatically terminate. This Schedule is subject to Early Warning's approval and Fiserv's sponsor bank's approval of Client for purposes of receiving the Services under this Schedule. In the event of any conflict, ambiguity or inconsistency between this Schedule and the Agreement, or any other document which may be annexed hereto, the terms of this Schedule shall govern.

2. Services. Fiserv, itself and through its Affiliates and service providers, will provide to Client the Services described below (collectively, the "**Services**" for purposes of this Schedule) for the Fees set forth in this Schedule. Client may make the Services available to its members or customers, as applicable, (collectively, "**End Users**") who have properly enrolled for an applicable Service, and who are authorized to use that Service by Client, in accordance with the terms of this Schedule and the Agreement. In order to receive the Services, participants in Early Warning's Zelle Network® ("**Zelle Network**") must be financial institutions that are insured by either the Federal Deposit Insurance Corporation or the National Credit Union Administration, or otherwise approved by Early Warning as a participant in the Zelle Network. For purposes of this Schedule, "**Deposit Account**" means a checking, savings or money market account. For the avoidance of doubt, all services indicated as provided by Fiserv to End Users (including the collection of required account information of a Receiver or Recipient, whether from the End User, Receiver or Recipient) are provided by Fiserv solely in its capacity as a service provider for, and on behalf of, Client, and are "Services" for purposes of this Schedule.

1. Zelle® Person to Person Services.

   (a) Description. Fiserv and Early Warning will provide the payment services described herein ("**Zelle**") that may include: (a) payments to a third party ("**Recipient**") where the End User ("**Sender**") provides the contact information of the Recipient or Receiver through which such Recipient or Receiver receives transaction notifications (e.g., an email address and/or mobile phone number) (a "**Token**"); (b) payments to Recipients, where the Sender provides the required account information of the Recipient, as further described in the specifications made available by Fiserv (the preceding subsections (a) and (b) are referred to as "**Send Money**"); and (c) sending requests for payment ("**Request Money**") through the Service to the Token of other persons and the ability to view as well as pay requests for payment received through such Service from such persons. For the Request Money functionality, the End User may be a Receiver and/or a Requestor. For purposes of this Schedule, a "**Receiver**" means a person who receives a Request Money request through the Zelle Service and a "**Requestor**" means a person who sends a Request Money request to a Receiver through the Zelle Service; if such request is accepted, Requestors subsequently become Recipients.

   (b) Zelle Real-Time Payments. Fiserv will enable the use of Fiserv's NOW Network to facilitate the transmission of Zelle Service transactions on behalf of End Users ("**Zelle Real-Time Payments**"). Zelle Real-Time Payments constitute a portion of the Zelle Services. Fiserv will specifically use the NOW Network via mutually-agreed upon connectivity to debit or credit funds to the Deposit Account of the End User, as applicable. In certain cases, such connectivity may require Client to license additional Fiserv software, subject to a separate Schedule or agreement with Fiserv; Fiserv will promptly inform Client of any such requirement upon request. Fiserv does not represent or warrant that Zelle Real-Time Payments are delivered instantaneously. Applicable payments may be subject to delays from third party networks, such as debit card networks ("**Debit Card Networks**"), and other delays not within Fiserv's control, including without limitation delays resulting from funds availability policies of third party financial institutions.

2. Consulting Services. Fiserv will provide implementation, integration, training and support services for any of the Services described above in this Schedule, including any implementation of new or expanded functionalities for such Services, if any, as requested by Client and subject to the mutual, written agreement of the parties in a statement of work or similar document. That statement of work shall specify the terms for such services, including without limitation the Fees for such services and the location of performance for such services. Client will reasonably cooperate with Fiserv in the implementation of the Services. At any time during the Term of this Schedule, if Client requests any additional Services outside the scope of those agreed to in the applicable statement of work, such Services will be provided based on the availability of Fiserv's resources and at Fiserv's then-current rates. Specifically for any training services provided in connection with the Customer Care System, Fiserv will provide such training services to Client's trainers (in a 'train the trainers' environment) as mutually agreed in writing. Client's trainers will be responsible for training Client's associates. Unless expressly stated in the applicable statement of work, all professional services will be performed during Fiserv's standard business operating hours at a site designated by Fiserv.

3. FEES. Client will pay the fees set forth in the Fee Exhibit attached hereto.

4. Performance.

1. Support. As elected by Client in the CheckFree bill payment service Schedule between the parties, and subject to payment of any applicable fees set forth therein, Fiserv will provide first level support to Client's End Users (available only through CheckFree RXP). Such support will be available during Fiserv's standard business hours. If Fiserv determines, in its reasonable discretion, that any support issues are caused by any action of Client or its End Users, including without limitation abuse or misuse of the Services, any modification or addition to the Services not authorized or performed by Fiserv or any failure of Client to maintain its technology or the Services, or any other circumstance outside of Fiserv's control, then Fiserv reserves the right to charge for any work performed by Fiserv in investigating such problem at Fiserv's then-current rates. Any troubleshooting or assistance requested by Client in connection with any such problems shall be provided at Fiserv's sole discretion and at Fiserv's then-current rates.

2. Customer Service Database. Fiserv may provide Client with one or more identification numbers, passwords and/or other means of identification and authentication (collectively "**Password**") to access Fiserv's customer service database. Client agrees to: (i) take reasonable steps to safeguard the confidentiality and security of the Password; (ii) limit access to its Password to persons who have a need to know such information; (iii) notify Fiserv promptly if Client has any reason to believe the security or confidentiality required by this provision has been or may be breached; and (iv) immediately change the Password if Client knows or suspects that the confidentiality of the Password has been compromised in any way. Fiserv may provide Client with access to an online database containing recipient information (e.g., name and bank name) in connection with the Services. Client agrees to access the database only: (1) to effect, administer, or enforce transactions that result from the Services; (2) to protect against or prevent actual or potential fraud, unauthorized transactions, claims, or other liability related to the Services; (3) for internal audit and regulatory examination purposes; (4) to resolve consumer disputes or inquiries involving transactions that result from the Services; or (5) as permitted to access certain customer and transaction information in Fiserv's possession and shall only use the recipient information of non-Client users within such database to complete Service transactions and for regulatory purposes. Client shall limit access to such database to its trusted employees and shall closely and regularly monitor such employees' use of such database to ensure compliance with this provision. Client shall protect the database from security breaches at Client by establishing, maintaining and updating policies, procedures, equipment and software that are designed to safeguard the security and integrity of Client computer systems used to access the database.

3. Current Release. Client will perform duties reasonably necessary to be on the then-current commercially-available release of the Services.

5. Risk Management.

1. Risk Procedures. Fiserv will abide by its standard risk and fraud detection procedures and processes related to End Users' use of the Services as may be updated or modified from time to time ("**Risk Procedures**"). Fiserv will make available a summary of its then-current Risk Procedures to Client upon request. Client shall reasonably cooperate with Fiserv's Risk Procedures, and for all funds transfer services included in this Schedule, Client shall (A) promptly respond to Fiserv's reasonable requests to verify account

ownership or any Fiserv fraud investigation with respect to a Deposit Account held at Client, regardless of the transaction origin; (B) promptly send returns information to Fiserv via an ACH returns file, chargeback process, or daily batch feeds, as mutually agreed; and (C) request and obtain a Written Statement of Unauthorized Debit signed and completed by its claimant or End User prior to initiating a debit return pursuant to the ACH Rules. With respect to the Zelle Services, Fiserv's Risk Procedures and Section 5.3 only apply to Zelle transactions that are initiated via End User interfaces hosted by Fiserv or APIs provided by Fiserv (i.e., not transactions that are processed by Early Warning via ZellePay.com or the Zelle® app).

2. Transaction Losses. For purposes of this Schedule, a "**Transaction Loss**" is a loss that occurs because the associated transaction was rescinded as unauthorized or has been returned and is un-collectable.

(a) Zelle Services. Fiserv shall not be liable for any Transaction Losses incurred by Client for the Zelle Services, including but not limited to fraud losses or risk of loss, arising out of Client's use of the Zelle Services; Participant liability for Zelle Network related Transaction Losses is addressed in Early Warning's Zelle Network® Participation Rules (the "**Zelle Network Rules**").

(b) Trial Deposits. Client shall be responsible for all losses incurred by Fiserv related to trial deposits sent to External Accounts that cannot be recouped by Fiserv from the External Account.

3. Recovery of Transaction Losses.

(a) Regardless of who bears the Transaction Loss on a particular transaction, Fiserv may, in its capacity as a service provider for, and on behalf of Client, attempt to recover the Transaction Loss from the End User for transactions that are greater than $500 and initiated as exceptions through a payment network (e.g., ACH or Debit Card Network). Client shall provide Fiserv with reasonable assistance in recovering such loss.

(i) Resubmission and Offsets. If pursuant to the Service a credit is released and the corresponding debit or a portion of any such debit fails, Fiserv reserves the right to resubmit or issue a new debit transaction for the uncollected portion of such debit. If Fiserv is unable to recover the uncollected portion of the debit, then Fiserv may additionally debit any of the End User's other accounts that are accessible via the Services to offset the uncollected portion.

(ii) Compensation and Assignment. If Fiserv is unable to recover the Transaction Loss from the End User, then Client shall compensate Fiserv for such loss within thirty (30) days of receiving a reclamations statement from Fiserv.

(b) Suspensions. Fiserv may suspend or deny access to End Users, Requestors (if applicable), Receivers (if applicable) and/or accounts associated with such End Users, Requestors, Receivers and/or any counterparties if it receives any returns from an account associated with them whether with Client or another financial institution, if Fiserv is owed Transaction Losses in connection with the applicable End User, or if Fiserv anticipates any potential losses arising from any such account(s), including without limitation due to concerns regarding fraud.

(c) LOIs. In the event that Fiserv has to provide a Letter of Indemnity, hold harmless letter or related documentation (each an "**LOI**") to another financial institution to recover Transaction Losses and there is a claim made under the LOI, then Client shall be responsible for all amounts relating to such claim pursuant to the ACH Rules.

(d) NOW Network and Debit Card Networks. Notwithstanding anything to the contrary in the Agreement, NOW Network and Debit Card Network settlements are final except as set forth in the applicable NOW Network Rules and Debit Card Network rules and recovery may not be possible; however, if such applicable rules allow for reversal of funds, Fiserv may attempt to recover such funds from the destination account.

4. Limits. This Section is only applicable for funds transfer services included in this Schedule. For purposes of this Schedule, "**Limits**" means default transaction and Service limitations, which may or may not include, without limitation, amount limitations, velocity limits and, if applicable to the Service, transaction speed limitations that are documented within the Service.

(a) Establishment of Limits. Fiserv will provide default Limits within the Fiserv system for the Services. Client and Fiserv shall mutually agree upon any modifications to such Limits. End Users of the Fiserv Services may perform transfers only within the Limits.

(b) Limit Adjustments. If Fiserv (1) identifies a sudden unanticipated increase in Transaction Losses and believes it prudent to take immediate action to reduce Limits; or (2) identifies an unanticipated risk increase as to an individual End User, based on Fiserv's risk assessment tools, then as to each of the preceding cases, Fiserv shall have the right at any time, but not the obligation, to (x) reduce Limits in an amount and for a duration determined by Fiserv in its sole discretion, (y) process transactions using a "good funds only" model, and/or (z) suspend the affected Service. Client will promptly work with Fiserv to analyze the cause(s) of such losses and to take appropriate measures to remedy such cause(s).

5. Access by Client Employees. If Client employees or associates access the Services on behalf of End Users, then Client shall be responsible for the authentication and authorization of such employees and associates, as well as all resulting access and use of the Services and the User Data and other End User, Recipient, Receiver and Requestor information, if applicable.

6. Threatening Conditions. If Fiserv reasonably believes that any Services, or Client's or any End User's conduct in using the Services (including without limitation an End User intentionally initiating fraudulent or unauthorized transfers, account access or violating any agreement under which it has been provided access to the Services) violates any applicable laws, rules, regulations or industry standards, or otherwise poses a threat to Fiserv or any Fiserv client's system (including without limitation any Fiserv System), security, equipment, processes, intellectual property or reputation ("**Threatening Condition**") and if, in the reasonable and good faith determination of Fiserv, the Threatening Condition poses an imminent or actual threat (including without limitation regulatory investigation, inquiry or penalty), Client agrees that Fiserv may suspend any and all use of the applicable Service until such Threatening Condition is cured. Fiserv will promptly notify Client of such suspension, including the identity of the affected End User(s) as needed, and both parties will use reasonable efforts to cure or cause the correction of the Threatening Condition following such notice. Fiserv may terminate Client's and/or End User's use of the Services without further requirement of notice if the Threatening Condition remains uncured more than thirty (30) calendar days after Fiserv notifies Client of the Threatening Condition.

7. Obligations to End Users, Recipients and Receivers.

(a) As between Client and Fiserv, Client will be solely liable to End Users and Recipients for completion of the funds transfers described in Section 2 hereof by payment of good funds in the correct amount and in a timely manner to the designated bank account (regardless of whether the bank account information was provided by End User or collected from the Recipient) and is the "financial institution" for purposes of funds transfer transactions and their compliance with applicable laws. Without limiting the preceding sentence, Client will at all times remain responsible for making any consumer whole in connection with any failure to transmit money through the Services.

(b) Notwithstanding anything to the contrary in the Agreement, Client will indemnify, defend, and hold harmless and release Fiserv and its Affiliates and their officers, directors, and employees from and against any claims, actions and other proceedings by an End User relating to the Services or arising out of or relating to Client's breach of its obligation to make any consumer whole as set forth in the preceding sentence in Section 5(g)(i). The foregoing indemnification obligation shall not be subject to any limitations on Client's liability otherwise set forth in the Agreement. Client shall, at its own cost and expense, not subject to reimbursement, defend all such actions, suits or proceedings, and satisfy all judgments, orders or decrees with respect to the foregoing, and Fiserv shall provide Client with prompt notice of any claim for indemnification, cooperation in the defense and settlement of such claim, and grant Client control over the defense or settlement of such claim.

6. Additional Terms and Conditions.

1. U.S. Only Services. Client will only make the Services available to End Users who hold U.S. accounts with Client. As of the Effective Date of this Schedule, Service transactions via Debit Card Networks are only available in the 50 states of the United States and the District of Columbia.

2. Compliance.

(a) Warranties. Client represents and warrants to Fiserv that it has taken and will continue to take whatever action may be necessary to comply with all applicable laws, rules, statutes and regulations (and any interpretations thereof and rules promulgated thereunder), including, but not limited to, the USA Patriot Act, the federal Bank Secrecy Act, federal and state laws and regulations relating to money transmission, currency reporting and the prevention of money laundering, any rule or regulation issued by a regulatory body, including the U.S. Office of Foreign Assets Control, the Electronic Fund Transfer Act and its implementing Regulation E, and the bylaws and operating regulations of any payment network or organization through which transactions are being processed, to enable it to offer and provide the Services to its End Users, and to otherwise register and activate End Users to make use of the Services and other Fiserv services that may be provided under this Schedule, including, but not limited to, any necessary pre-registrations, consents and authorizations from and notices to its End Users. The parties acknowledge and agree that Fiserv is relying on Client's performance as described in this Section in Fiserv's performance of the Services.

(b) Indemnification. Notwithstanding anything to the contrary in the Agreement, Client will indemnify, defend, and hold harmless and release Fiserv and its Affiliates and their officers, directors, and employees from and against any claims, actions and other proceedings, damages, liabilities, costs, and expenses (including reasonable attorneys' fees) arising from or related to any breach of the preceding representation and warranty or this clause. The foregoing indemnification obligation shall not be subject to any limitations on Client's liability otherwise set forth in the Agreement. Client shall, at its own cost and expense, not subject to reimbursement, defend all such actions, suits or proceedings, and satisfy all judgments, orders or decrees with respect to the foregoing, and Fiserv shall provide Client with prompt notice of any claim for indemnification, cooperation in the defense and settlement of such claim, and grant Client control over the defense or settlement of such claim.

(c) Records. Client shall maintain all records and prepare and file any necessary forms, reports or other documentation, including without limitation, suspicious activity reports or currency transaction reports required to be filed in accordance with laws applicable to Client. Client shall immediately notify Fiserv of instances of suspected fraud, money laundering, terrorist financing, or other illegal activities determined within Client's reasonable discretion and involving the Services. Client will not use End User Social Security numbers or Federal Employer Identification Numbers in any unique identifiers (e.g., customer ID) that Client designates within the Services; Fiserv will not be responsible for any resulting liability if Client violates this sentence.

(d) Receipts. Receipts for applicable Services provided to End Users by Client will be provided by Client and contain contact information for Client and no details regarding Fiserv.

3. Required Modifications. If any modification to any Services is required by law or governmental regulation, or is necessary based on any payment processing requirements, Fiserv and Client shall use commercially reasonable efforts to comply in a timely manner. Fiserv may make any modifications, changes, adjustments or enhancements to the Services that Fiserv deems to be suitable.

4. ACH Rules.

(a) Client acknowledges that with respect to Services transactions resulting in Automated Clearing House (ACH) payments ("**ACH Payments**"), (A) Client is the Originator under the Operating Rules of the National Automated Clearing House Association ("**ACH Rules**") for ACH Payments that an End User submits for processing and Client will have all responsibilities and liabilities of an

Originator under the ACH Rules for such ACH Payments; and (B) neither Fiserv nor Early Warning is the Originator under the ACH Rules.

(b) Fiserv will be a Third-Party Sender (as defined in the ACH Rules) with respect to such ACH Payments and will have all of the responsibilities and liabilities of a Third-Party Sender under the ACH Rules with respect to such ACH Payments.

(c) Client will comply with all applicable ACH Rules and will not originate transactions in violation of any applicable law.

(d) Fiserv will facilitate processing ACH Payments submitted by End Users by transmitting ACH files to one or more ODFIs that have agreed to originate ACH Payments for the Service. Client authorizes Fiserv and the ODFI to originate entries on behalf of Client to the accounts designated in the information provided for a payment to be made for the Service ("**Payment Instructions**"). When Fiserv receives a Payment Instruction, Client authorizes Fiserv to debit the End User's account for the amount of any such Payment Instruction plus any related fees in effect (and as disclosed by Client to the End User) at the time the End User initiates the Payment Instruction, and to remit funds on Client's behalf. Client also authorizes Fiserv to credit the End User's account for the receipt of payments, including but not limited to those payments returned from Receivers (as defined in the ACH Rules) to whom the End User sent payment(s) and those payments that were cancelled and returned to the End User.

(e) Client agrees that the ODFI has the right to review and monitor Client's ACH Payments, and audit Client's compliance with this Section and the ACH Rules. Client agrees to respond promptly to Fiserv in connection with inquiries or requests for information, including from the ODFI or NACHA, related to any ACH Payments originated by Client.

5. User Data.

(a) Client and End Users may be required to share certain data with Fiserv, including without limitation: (A) the Recipient's or Receiver's name, e-mail address, mobile phone number and other token information; and (B) Account or Deposit Account information (e.g., financial data, user identification, login and password and personal information (including without limitation birth date, IP address and social security number), as well as the ABA Routing and Transit Number that are specific to an End User's or Recipient's Account or Deposit Account) (collectively, "**User Data**"). Fiserv and its service providers may use the User Data solely for the performance of the Services on behalf of Client, in accordance with the Gramm-Leach-Bliley Act, its implementing regulations and other applicable laws, including (without limitation) any use to effect, administer or enforce a transaction or to protect against or prevent actual or potential fraud, unauthorized transactions, claims, or other liability. Provided that the source of the information is not disclosed and the information is used in conjunction with other independent information, Fiserv may use, store and disclose User Data and other such information acquired in connection with the Services in statistical form for pattern recognition, modeling, enhancement and improvement, system analysis and to analyze the performance of the Services.

(b) Fiserv may supply User Data to any law enforcement agency if Fiserv or any Fiserv client has suffered or may reasonably be expected to suffer a loss as a result of fraudulent or suspicious activity performed by the End User, Recipient, Receiver or Requestor. Client shall identify a representative as a point of contact or a subject matter expert if such law enforcement agency requires supplementary information on such End User, Recipient, Receiver or Requestor.

(c) Fiserv may retain all User Data during and after the Term of this Schedule or the Agreement for audit, regulatory compliance, risk management purposes and as permitted by applicable law and regulations and/or to the extent it is required to do so in connection with payment network or organization rules and regulations or similar applicable industry requirements.

(d) Without limiting anything herein or any provisions of the Agreement, for the avoidance of doubt, the parties hereby agree that the User Data of End Users is customer information of Client for purposes of the Gramm-Leach-Bliley Act and its implementing regulations.

6. Terms of Service and Enforcement.

(a) Client will enter into a written agreement regarding the Services with End Users ("**Terms of Service**"). Client acknowledges that the Terms of Service are between Client and its End Users, not Fiserv.

(b) As part of Fiserv's standard product documentation it generally provides to its financial institution clients, Fiserv may make available to Client sample general terms and conditions that Client may consider in establishing the Terms of Service. Any terms that are required by Fiserv to be present in such terms and conditions without substantial modification will be marked as such; Client will not substantially modify such marked terms and conditions without the prior, written approval of Fiserv. Furthermore, if Fiserv provides sample terms and conditions and Client elects to modify such terms and conditions, then Fiserv will not be obligated to host such modified terms and conditions, unless the parties agree otherwise in writing.

(c) In its Terms of Service or other governing agreement between Client and the End Users for the Services, Client will include (A) disclaimers of incidental, indirect, consequential, special, punitive, and exemplary damages; and (B) quantified limitations on direct damages that, with respect to both (A) and (B), may be claimed or alleged by such End Users arising out of or relating to the Services. Such disclaimers and limitations must extend to Client's third party suppliers or providers (but do not need to specifically reference Fiserv). Client will enforce such disclaimers and limitations in claims, lawsuits and proceedings brought by Client's End Users. In addition, Client shall disclose in the Terms of Service that (X) Client is the sole party liable to End Users for transfers conducted using the Services; and (Y) as between Client and the End Users, Client is solely liable to Recipients to the extent any liability attaches in connection with transfers to such parties through the Services.

7. Credentials. For certain Services, Fiserv will provide one or more identification numbers, passwords and/or other means of identification and authentication (collectively "**Credentials**") to access certain functionalities of the Services. All Credentials shall at all times be considered Fiserv Information.

8. Termination/Non-Renewal. In the event of termination or non-renewal of this Schedule or the Agreement, Client shall: (i) comply with all applicable laws, including laws governing notification of End Users prior to discontinuation of the use of the Services; and (ii) be financially responsible for any transactions returned on any of its End Users' Deposit Accounts after the termination date, whether or not the returns are proper and timely. Following receipt of Client's written certification of Client's compliance with the foregoing, Fiserv will, for a period not to exceed sixty (60) days, continue to process transactions that were initiated prior to the effective date of termination (e.g., returns).

9. Press Release. Fiserv may include Client's name and logo in Fiserv-issued marketing materials (including a press release) that identifies Client as a Fiserv customer of the Zelle Services provided under this Schedule.

10. ETES. Client will utilize the event triggered email service ("**ETES**"), a Fiserv messaging program service operated by Fiserv at no additional charge that is designed to increase usage and continued adoption of the Zelle Services among Customers, so long as Fiserv offers ETES.

11. Post-Launch Marketing. Upon implementation of the Zelle Services, Client will execute a post-launch marketing program, leveraging the pre-approved marketing resources available at no additional cost on the Fiserv Impact Marketing Portal (or any successor site), for the promotion of the Zelle Services to its End Users. As part of such program, Client will leverage Fiserv offered marketing resources that Fiserv makes available to drive the adoption of the Zelle Services.

12. Vetting and Compliance. Client agrees to complete all Zelle Services vetting and compliance requirements within thirty (30) days of the Amendment Effective Date.

7. Third Party Terms (cannot be modified by Client)

1. End User Verifications. Fiserv is authorized to rely on data provided by third parties and is not responsible for the accuracy of such data in connection with its performance of the Services. Client further acknowledges and agrees that: (i) third party data is obtained from databases whose accuracy, timelines and coverage are not guaranteed; (ii) the data used to verify an End User is obtained from third parties; (iii) Fiserv does not warrant or guarantee the identity of the End User, but merely receives a result from a third party provider ("**Result**") which is derived, in part, from information entered by the End User; (iv) Fiserv will use the Result to attempt to verify the identity of the End User; and (v) the Result and related verification and authentication services will be only used for the purpose of verifying the identity of the End User and will not be used, in whole or in part, as a basis for determining the eligibility of an End User for credit, insurance or employment or to take 'adverse action,' as defined in the Fair Credit Reporting Act or similar laws. Client will not copy or retain any authentication questions or the End Users' answers to such questions or use such questions for purposes other than identity verification and End User authentication, except (1) as required by law and (2) that Client shall be permitted to use and retain the pass/fail indication returned by the Services along with any related explanatory information/codes for risk management or other internal purposes permitted by law. Client will not reverse engineer or create derivative works based on the identity verification and authentication elements of the Services (or the technology used to provide such Services). Client acknowledges and agrees that Fiserv and its third party providers referenced above recommend that Client use a manual verification process if a Result does not meet or exceed the threshold for a positive verification, as defined solely by Client, or if Client receives a flag (indicating a possible match) from a fraud detection database.

2. End User License and Consent. Client hereby consents to Fiserv's disclosure of the User Data to certain Fiserv supplier(s) solely in connection with the verification and authentication of the End Users and subject to the terms and conditions of this Schedule and the Agreement. Client acknowledges that such verification and authentication services are proprietary and confidential and shall be treated as Fiserv Information under the Agreement. Client grants to Fiserv and Fiserv's applicable supplier(s) a non-exclusive, non-transferable, except as provided herein, right to use, copy, store, modify and display the User Data solely to the extent necessary to provide the Services pursuant to this Agreement. Client represents that it has obtained all necessary End User agreements or consents as may be reasonably required to grant such license rights to Fiserv and its suppliers.

3. Early Warning. Use of the Zelle Services is subject to Client's compliance with Attachment 1; provided, however, that if Client holds more than $8 Billion in assets in its depository accounts, or exceeds such $8 Billion threshold at any point during the Term of this Schedule, Client must execute a Zelle Network Participant Agreement ("**Early Warning Participant Agreement**"), a copy of which will be provided to Client upon request, prior to utilizing the Zelle Services. In the event Client's asset size exceeds the $8 Billion threshold during the Term of this Schedule, Fiserv's continued provision of the Zelle Services to Client is contingent on Client's payment of Fiserv's then-current rates for the Zelle Services for financial institutions that hold over $8 Billion in assets. Each affiliate of Client that will offer the Zelle Services to its End Users must sign an Early Warning Participant Agreement if such affiliate holds over $8 Billion in assets in its depository accounts, and must also be a financial institution that is insured by either the Federal Deposit Insurance Corporation or the National Credit Union Administration. For purposes of the Network Rules, Client agrees that Fiserv is Client's Processor as to the Services under this Schedule. Client agrees that Early Warning, LLC, and any of its affiliates involved in providing the Zelle Services are intended third-party beneficiaries of the terms set forth in this Schedule, including Attachment 1, and any Early Warning Participant Agreement.

4. Boku Identity – Phone Ownership Verification. Client must ensure that End Users agree to the following (or substantively the same clause using corresponding definitions from Client's terms with End Users), except as Fiserv and Client otherwise agree in writing:

> End User authorizes End User's wireless carrier to disclose information about End User's account, such as name, billing address, email, phone number, location information, subscriber status, payment method and device details, if available, to Client and Client's third party providers to support identity verification, fraud avoidance and other uses in support of transactions for the duration of End User's business relationship with Client. This information may also be shared with other companies to support End User's transactions with Client and for identity verification and fraud avoidance purposes.

In the event Boku Identity's (or its successors') mobile carriers determine subsequent changes to the above requirements are required, Fiserv will provide written notice detailing such changes to Client, and Client agrees to implement such changes to the above requirements within a commercially reasonably time frame.

5. Iovation – Device Intelligence Data. Client must ensure that End Users agree to the following (or substantively the same clause using corresponding definitions from Client's terms with End Users), except as Fiserv and Client otherwise agree in writing:

> Client may share certain personal information and device-identifying technical data about End User and End User's devices with third party service providers, who will compare and add device data and fraud data from and about End User and End User's devices to a database of similar device and fraud information in order to provide fraud management and prevention services, and identify and block access to the applicable service or Web site by devices associated with fraudulent or abusive activity. Such information may be used by Client and its third party service providers to provide similar fraud management and prevention services for services or Web sites not provided by Client. Client will not share with service providers any information that personally identifies the user of the applicable device.

**Fee Exhibit**
**to Zelle® Personal Payment Services Schedule**

1. Zelle Person to Person Implementation Fees (based on Client's current level of DDAs).

   a) Implementation Fee. The Discounted Implementation Fee is payable on the date this Schedule is incorporated into the Agreement.

| | DDAs | Fee | | DDAs | Fee |
|---|---|---|---|---|---|
| ☒ | Up to 2,500 | $1,000 | ☐ | 112,001 – 136,000 | $18,000 |
| ☐ | 2,501 - 5,000 | $1,500 | ☐ | 136,001 – 160,000 | $20,000 |
| ☐ | 5,001 - 10,000 | $2,500 | ☐ | 160,001 – 208,000 | $25,000 |
| ☐ | 10,001 - 15,000 | $3,500 | ☐ | 208,001 – 272,000 | $30,000 |
| ☐ | 15,001 - 25,000 | $5,000 | ☐ | 272,001 – 336,000 | $35,000 |
| ☐ | 25,001 - 40,000 | $6,000 | ☐ | 336,001 – 400,000 | $40,000 |
| ☐ | 40,001 - 75,000 | $8,000 | ☐ | 400,001 – 464,000 | $45,000 |
| ☐ | 75,001 – 88,000 | $12,000 | ☐ | 464,001 – 554,000 | $50,000 |
| ☐ | 88,001 – 112,000 | $14,000 | ☐ | > 554,000 | **By Quote** |

(Place an "x" in the box next to Client's current level of DDAs. If a box is not checked below, Fiserv will invoice Client based on information reasonably available to Fiserv regarding the total number of such accounts of Client.)

   b) Implementation Fee Promotional Discount. The Discounted Implementation Fee set forth above includes the application of a 50% promotional discount that is based on Client's agreement to (i) complete all Zelle Services vetting and compliance requirements (including submission of a completed Zelle Questionnaire (PACQ)) on or before December 31, 2022, and (ii) commit resources to implement the Zelle Services into production on or before June 1, 2023. In the event that (i) Client has not completed all Zelle Services vetting and compliance requirements (including submission of a completed Zelle Questionnaire (PACQ)) on or before December 31, 2022; or (ii) the Services are not implemented into production on or before June 1, 2023 due to Client's inaction, then Fiserv shall invoice Client the difference between the standard Implementation Fee and the Discounted Implementation Fee (i.e., the amount of the 50% promotional discount), and Client shall pay such amount in accordance with the terms of the Agreement.

2. ☐ NOW Network Connectivity Fee for In-house Fiserv Core Clients: $6,000
(Place an "x" in the box above if Client's core is not hosted by Fiserv. This fee is applicable to Client if it has installed a Fiserv-core within its data center; it does not apply to clients for whom Fiserv hosts the Fiserv-core.) This NOW Network Connectivity Fee is payable on the Amendment Effective Date hereof.

3. Zelle Person to Person Monthly Subscription Fees. (place an "x" in the box next to Client's current level of DDAs. If a box is not checked, Fiserv will invoice Client based on information reasonably available to Fiserv regarding the total number of such accounts of Client.).

| | DDAs | Monthly Fee | Transactions Included per Month* |
|---|---|---|---|
| ☒ | Up to 1,000 | $150 | Unlimited |
| ☐ | 1,001 - 2,500 | $220 | Unlimited |
| ☐ | 2,501 - 5,000 | $340 | Unlimited |
| ☐ | 5,001 - 10,000 | $480 | Unlimited |
| ☐ | 10,001 - 15,000 | $560 | 200 |
| ☐ | 15,001 - 25,000 | $850 | 400 |
| ☐ | 25,001 - 40,000 | $1,100 | 600 |
| ☐ | 40,001 - 75,000 | $1,900 | 1,000 |
| ☐ | >75,000 | By Quote | By Quote |

*The Monthly Fee includes the $0.75 and the $0.60 transaction fee set forth in Section 4(a) below on an aggregated basis; all other fees associated with such "Included" transactions are specifically excluded from the Monthly Fee and will be charged in accordance with this Fee Exhibit.

4. Zelle Person to Person Usage Fees:

a) Zelle Transaction Fees.

| Usage Type | Fee |
|---|---|
| Send Money transaction to a person, or Request Money transaction, regardless of speed; Out of Network receive money transaction, regardless of speed | $0.75 per transaction, subject to Section 5(b) below, plus any applicable Debit Card Network Transaction Fees. This fee applies only to the transactions in excess of the number of transactions included in the Monthly Subscription Fee in Section 3 above. |
| Send Money transaction to a Small Business (as defined in the Zelle Network Rules), regardless of speed. | $0.60 per transaction, subject to Section 5(b) below, plus any applicable Debit Card Network Transaction Fees. This fee applies only to the transactions in excess of the aggregated number of transactions included in the Monthly Subscription Fee in Section 3 above. |
| Debit Card Network Transaction Fees | Additional $0.07 per applicable debit or credit transaction, subject to Section 5(a) below. |

b) Additional Fees and Credits:

| Transaction Type | Fee |
|---|---|
| Stop Payment (In-Process Transaction Cancellation Fee) | $10.00 each |
| ACH Return, Chargeback or NOC Fees | $25.00 each |
| NACHA – Unauthorized Entry Fee | $4.50 each |
| Payment Investigation/Claims Fee | $35.00 each |
| New User Enrollment Fee [applied to all End Users upon acceptance of the Zelle Terms of Service, including without limitation previous Popmoney users and net new End Users] | $1.00 per End User |
| Zelle Small Business Incentive Fee Credit<br>Early Warning Small Business Service incentive credit (credited to Client's invoice for each completed Client End User payment transaction sent to a Small Business Customer through the Zelle Network) | $0.10 per transaction, subject to Section 5(c) below (to be credited on Client's monthly invoice after Fiserv's receipt of the credit from Early Warning) |

5. Additional Fee Terms.

a) Debit Card Services Networks. Notwithstanding any fee increase restrictions in the Agreement, Fiserv shall have the right to pass through all Debit Card Network-associated fees (including without limitation from the Debit Card Network and the sponsoring institution) to Client for payment, without any mark-up.

b) Early Warning. If Early Warning increases its fees or otherwise requires the payment of additional fees for the use of its Zelle Service, then Fiserv will have the right to pass through such fee increases or additional fees to Client for payment, without any mark-up.

c) Early Warning Small Business Incentive Fee Credit. If Early Warning modifies the Small Business Incentive Fee Credit amount or associated terms, then Fiserv will pass through such credit modification to Client.

d) NACHA Fees. If NACHA increases its fees or otherwise requires the payment of additional fees for the use of the Automated Clearing House, then Fiserv will have the right to pass through such fee increases or additional fees to Client for payment, without any mark-up.

e) Real-Time Payments. All other fees set forth in the Agreement that apply to Zelle shall otherwise apply to Zelle Real-Time Payments.

f) Transaction Fees. In the event Client desires to charge End Users transaction fees for the Service (“**End User Transaction Fees**”), Fiserv will directly debit the End User account for the applicable End User Transaction Fee. Fiserv will include any End User Transaction Fees debited from End Users as a credit to the fees payable to Fiserv in the applicable invoice for the Services The applicable End User Transaction Fees will be those as set by Client and established in Fiserv’s systems.

g) Monthly Fee. The Monthly Fee above goes into effect when the Service is in production or one year following the date this Schedule is incorporated into the Agreement, whichever occurs first. The Monthly Fee is for up to the number of demand deposit or share draft accounts in the applicable tier. In the event Client’s number of such accounts increases above such number, Client shall be invoiced for the Monthly Maintenance Fee associated with the applicable higher tier.

h) Invoicing. Fiserv shall invoice Client monthly for fees and expenses incurred during the previous month for the Services.

## Attachment 1

## REAL-TIME NETWORK PARTICIPATION AGREEMENT

1. Authorized Use of the Service.

a) Upon the Amendment Effective Date, Client shall comply with and be subject to all provisions of: (a) the Zelle Network® Participation Rules ("**Zelle Network Rules**") and the other Network Documents (as defined in the Zelle Network Rules), and (b) the NOW℠ Network Real-Time Participation Rules ("**NOW Network Rules**"), each of (a) and (b) as amended from time to time in accordance with the provisions thereof, (c) Applicable Law, and (d) any Network Technical Specifications promulgated by Fiserv, each of (c) and (d) as defined in the NOW Network Rules. Client acknowledges receipt of the Network Documents from Fiserv. Capitalized terms used but not otherwise defined in this Attachment 1 shall have the meaning set forth in the Zelle Network Rules or the NOW Network Rules, as applicable.

b) Client acknowledges that, by executing this Attachment it makes all representations, warranties and covenants given under the Network Documents, and that such representations, warranties and covenants shall be enforceable against it.

c) Client agrees to use the Zelle Service solely for the purposes, and subject to the terms and conditions, set forth in the applicable Zelle Network Rules and NOW Network Rules.

d) Client acknowledges and agrees that Fiserv is acting as Client's Processor, as defined in the Zelle Network Rules.

e) Client acknowledges and agrees that Fiserv is acting as the Network Operator, as defined in the NOW Network Rules.

f) Client acknowledges and agrees to the data contribution requirements with respect to the contribution of Account Owner Elements Data set forth in the Zelle Network Rules. Contribution may be direct to Early Warning, through Fiserv, or through a third party technical integrator that has been approved by Early Warning and has entered into an agreement with Fiserv.

2. Fees. With the exception of Noncompliance Fees assessed under the Zelle Network Rules, notwithstanding anything in the Zelle Network Rules or NOW Network Rules, all fees for Client's use of the Zelle Service will be established by and billed to Client by Fiserv.

CLIENT: Polam FCU

DocuSigned by:

Signature: Jennifer Audette

213751ED14F0437...

Print Name: Jennifer Audette

Title: CEO

Date: December 22, 2022 | 12:32 CST

**Software Products Exhibit to Master Agreement**

1. Software Products. The parties shall add individual Schedules to this Exhibit for Fiserv's license of software Products and provision of related software maintenance services to Client. The terms of this Exhibit shall apply to any such Products and related services covered by Schedules to this Exhibit.

2. Defined Terms.

(a) "**Computer System**" means the computer equipment and specified operating environment required for operation of the Software when installed, as identified in each Schedule and/or in the Documentation.

(b) "**Documentation**" means the technical end-user documentation for the Software, as delivered by Fiserv to Client with the Software, as may be updated by Fiserv from time to time as part of Maintenance Services.

(c) "**Enhancements**" means modifications made to Software that add program features or functions not originally within the Software and that are provided upon payment of additional license fees.

(d) "**Location**" means only the Client premises identified as such on each Schedule.

(e) "**Maintenance Fee**" means the annual (unless otherwise specified) fee set forth in each Schedule for Maintenance Services.

(f) "**Maintenance Services**" means maintenance services described in Section 4 below. Maintenance Services are provided for only the current release of Software.

(g) "**Non-conformity**" means a failure of Software to perform in substantial accordance with the functions described in the Documentation, for which Client has provided sufficient information for Fiserv to replicate on a computer configuration that is comparable to the Computer System and under Fiserv's control.

(h) "**Open Source Component**" means software which Fiserv or its Affiliates includes in Software or other Deliverables that is subject to an Open Source License.

(i) "**Open Source License**" means a license identified as an open source license by the Open Source Initiative (www.opensource.org) or any substantially similar license.

(j) "**Professional Service Rates**" means Fiserv's then current hourly or daily rates for Fiserv's provision of implementation, conversion, and/or training services to Client in connection with the Software.

(k) "**Software**" means the standard, unmodified computer programs in object code (unless otherwise specified on the applicable Schedule), as specified in each Schedule, and any Open Source Components or Third Party code embedded in the Software.

(l) "**Software System**" means the Software and Third Party Software.

(m) "**Third Party**" means any party other than Fiserv and its agents and subcontractors, and Client.

(n) "**Third Party Software**" means the object code version of software that is owned or licensed by Third Parties and provided to Client by Fiserv. Third Party Software shall be identified as such on the applicable Schedule hereto. Third Party Software does not include Open Source Components, or Third Party code (if any) that Fiserv embeds in the Software.

(o) "**Updates**" means, when and if made available through Maintenance Services to Fiserv's other clients at no additional charge, changes to the Software made to correct Non-conformities, to maintain compatibility with new system software releases, or to improve existing features and functions, but does not include Enhancements or other new modules or products for which Fiserv charges a license fee. Updates provided hereunder are subject to all license rights and related restrictions set forth in this Exhibit with respect to the Software, but provision of Updates does not commence new warranty periods for the Software.

(p) "**Use**" means copying, installing or operating any portion of the Software. Use is limited to operations described in the Documentation solely to process Client's own work, and is subject to any other restrictions or

limitations set forth in each Schedule. Use specifically excludes any service bureau, time-share, training, or facilities management services to Third Parties without Fiserv's prior written consent and Client's payment of additional fees in accordance with mutually agreed terms. Use further excludes any right to enhance, modify, improve or create derivative works of the Software unless any such right is expressly granted in the applicable Schedule.

(q) "**Warranty Period**" means the period of time ending 90 days after the effective date of the applicable Schedule.

3. License.

(a) In exchange for Client's payment of the license fees set forth in the applicable Schedule, Fiserv agrees to furnish Software to Client and hereby grants to Client a non-exclusive, nontransferable, non-sublicensable, perpetual (subject to termination provisions set forth in this Exhibit and in the Agreement) license to Use the Software at the Location on the designated Computer System, subject to any additional limitations as to number of accounts, number of users, asset size, and other matters as specified in each Schedule ("**License Metrics**"). Any rights not expressly granted in this Exhibit are expressly reserved. Any transfer or assignment of this Exhibit (or any individual Schedule) by Client pursuant to Section 12(b) of the Agreement may result in additional license fees for such transfer, if applicable, at Fiserv's then current rates.

(b) Upon 60 days advance notice to Fiserv, Client may change the Location if Client transfers its operations to a new location within the same country. Client shall contemporaneously uninstall/delete the Software from the prior Computer System following such transfer to the alternative Client location. Assistance by Fiserv related to the transfer shall be chargeable at the Professional Service Rates plus any out-of-pocket expenses.

(c) Client shall not copy any portions of the Software System, other than Open Source Components provided under an Open Source License that permits copying, except that Client may copy reasonable quantities of any Documentation, and may utilize non-production copies of the Software at the Location for archive, back-up, or emergency restart purposes or to replace copy made on defective media. The original, and all copies of Software and Documentation, and all parts thereof, are Fiserv's property and shall include Fiserv's copyright and other proprietary notices.

(d) Client shall maintain any such copies and the original at the Location and one Client archive site in the same country ("**Archive Site**"). Client may transport or transmit a copy of Software from the Location or the Archive Site to another location in the same country as the Location for back-up use when required by Computer System malfunction in an emergency or disaster situation, provided that (i) Client must promptly inform Fiserv of the emergency or disaster (but in no event later than 5 days following the commencement of such use), (ii) Client must stop using such copy promptly after the Computer System and facility affected by the emergency or disaster is restored, and (iii) the copy or original is destroyed or returned to the Location or Archive Site when the malfunction is corrected.

(e) Client shall not decompile, disassemble, or otherwise reverse engineer the Software System. This restriction shall not apply to an Open Source Component whose Open Source License terms prohibit this restriction.

(f) In order to Use the Software, Client shall obtain and maintain at its own expense the Computer System, as well as any necessary data processing communications equipment and interfaces, that are both compatible with and required to access and Use the Software System, in accordance with specifications provided by Fiserv or otherwise approved by Fiserv. Client is responsible for the supervision, control, expense and management of its use of the Software, including: (i) assuring a proper Computer System configuration, and (ii) following industry standard procedures for the security of data, accuracy of input and output, and back-up plans, including restart and recovery in the event of hardware or software error or malfunction.

(g) Third Party Software is provided to Client under the following supplemental terms:

(i) Use of Third Party Software shall be restricted to use as part of the Software System.

(ii) Third Party Software is provided "as is", and Third Party Software owners shall not be liable for any damages, whether direct, indirect, incidental, or consequential arising from the use of Third Party Software. Fiserv's aggregate liability for a default relating to any Third Party Software shall be limited to the amount paid by Client to Fiserv for the applicable Third Party Software and Fiserv shall not be liable for any indirect, incidental or consequential damages associated with use of Third Party Software.

(iii) Publication of benchmark tests of Third Party Software is permitted only in a writing signed by an authorized officer of Fiserv and the Third Party Software owner.

(iv) Third Party Software owners are hereby designated as third party beneficiaries of this Exhibit as it relates to their software.

(v) Fiserv will not provide maintenance or support for Third Party Software, but agrees to pass through to Client any Third Party Software warranties provided by the applicable Third Party Software owner, to the extent Fiserv is able to do so without negatively impacting or diminishing its contractual rights with such Third Party Software owner.

4. Maintenance and Technical Support.

(a) During each annual period for which Client has paid the Maintenance Fee, Fiserv will provide the following Maintenance Services to Client:

(i) Telephone support during normal business hours for reasonable operator support to Client's employees duly trained in the Use of the Software. If telephone support requests are excessive or made outside of Fiserv's normal business hours, Client will be charged the Professional Service Rates.

(ii) Software program fixes or workarounds with respect to Non-conformities will be provided within a reasonable period of time following receipt of notice from Client. Client agrees to provide Fiserv with reasonable assistance and information in connection therewith.

(iii) Updates will be provided to Client and shall be installed by Client within the time frame specified by Fiserv. Training for Updates may be offered to Client at the Professional Service Rates.

(b) The initial term for Maintenance Services shall begin upon the effective date of the applicable Schedule and shall continue for the period of time set forth in the Schedule. Thereafter, Maintenance Services shall automatically renew for successive 1-year terms at Fiserv's then current fees for all modules then licensed, unless either party provides written notice of non-renewal to the other party at least 90 days prior to expiration of the then current term.

(c) Fiserv may utilize remote diagnostic software and Internet or other data connectivity in providing Maintenance Services.

(d) Should Fiserv's review of the Non-conformity indicate, in Fiserv's reasonable opinion, that the reported problem is not a Software defect but is due to other problems, including without limitation input not in accordance with the Documentation, Client's abuse or misuse of the Software System, a modification or addition to the Software System not performed by Fiserv, Client's failure to properly maintain the Computer System, or Client's failure to install the required current system software release, Update, fix or workaround as instructed by Fiserv, then:

(i) Client agrees to reimburse Fiserv for the related costs of work performed by Fiserv in investigating the problem at the Professional Service Rates, and

(ii) At Client's request, Fiserv shall advise Client whether Fiserv can correct or assist in resolving such problem, and the terms under which Fiserv shall undertake the same. Upon acceptance by Client, Fiserv shall correct or assist in resolving the problem in accordance with such terms.

(e) Maintenance Fees shall be payable annually in advance. Maintenance Fees shall be subject to annual increases commencing in the second year of the maintenance term upon 30 days' notice to Client, provided

that any such annual increase shall not exceed 10%. Maintenance Fees may also be increased: (i) upon changes in accounts processed, user seats, or other license limitations set forth in the applicable Schedule, (ii) upon delivery of new Software releases, Enhancements, or custom Software modifications or additions provided by Fiserv as a result of Client-requested development services, and (iii) to implement the charge under Section 2(d) of the Agreement.

(f) Maintenance Services do not cover network-related problems, errors in non-production environments, or maintenance of or repairs to the Computer System. If Fiserv provides such services, or any other maintenance services beyond those specified in this Section, Client shall pay for such services at the Professional Service Rates.

5. Performance.

(a) Client agrees to train current and future support staff employees on Software technical and user operations, and shall require employees to complete ongoing training to maintain minimal proficiency.

(b) Work in determining the nature of any problem or in making Software corrections, amendments, or additions may be carried out at Fiserv premises or the Location, at Fiserv's option.

(c) Upon Fiserv's request, Client shall provide Fiserv with written certification of the following relating to Client's Software Use: (i) total number of Software copies and Documentation related thereto; (ii) total number and location of workstations and servers on which the Software is installed, operated, or accessed; and (iii) total number of accounts, users, or other measurement of Software use for the licensing restrictions set forth in the applicable Schedule. Fiserv reserves the right to audit such certification pursuant to paragraph (d) below.

(d) Client shall permit Fiserv's authorized representatives at all reasonable times during Client's normal hours of operation to audit Client's Use of the Software (such audit may occur at Client's premises) to confirm compliance with the provisions of this Exhibit and the Agreement. Any such audit shall be conducted in such a manner as to minimize the disruption to Client's business and/or the Use of the Software. If such audit reveals any misuse by Client, Client shall immediately terminate such use unless Fiserv otherwise agrees in writing to allow correction of the misuse by payment of appropriate additional fees. If such noncompliance by Client is material, Client shall also pay Fiserv its costs of conducting the audit.

6. Warranties.

(a) Fiserv warrants that, during the Warranty Period, the Software will perform without the occurrence of a Non-conformity when operated on the Computer System and in compliance with the Documentation, this Exhibit, and the Agreement. Fiserv will provide replacements or corrections to Software that does not so perform where such failure is material, provided Fiserv is notified in writing of such failure during the Warranty Period. This warranty shall not apply if the Non-conformity results from modification or addition to the Software by Client or any Third Party, use of the Software in combination with non-Fiserv provided software, Client's failure to properly maintain the Computer System, Client's failure to install a current software system release, Update, fix or workaround as instructed by Fiserv, incorrect Use of the Software or Use of the Software not in accordance with the Documentation. Client acknowledges that the Software System is designed to operate on the Computer System and that the warranties given by Fiserv are conditioned upon the procurement and maintenance by Client of the Computer System in accordance with the then current specified configuration.

(b) Fiserv warrants that Fiserv personnel will exercise due care in provision of the Maintenance Services. If Client notifies Fiserv in writing of any alleged warranty defect hereunder within 30 days after the date the services were performed, then Fiserv shall reperform the services at no additional charge to Client.

(c) FISERV DOES NOT WARRANT THAT ALL NON-CONFORMITIES CAN BE CORRECTED. IN NO EVENT SHALL FISERV BE LIABLE FOR LOSS OF OR DAMAGE TO CLIENT'S DATA RESULTING FROM CLIENT'S USE OF THE SOFTWARE. Client acknowledges that it is responsible for the results obtained from use of the Software, including without limitation the completeness, accuracy and content of such results. Client acknowledges further that it is responsible for independent verification and testing of any such results prior to using them in its business.

(d) OPEN SOURCE COMPONENTS USED SEPARATELY FROM THE SOFTWARE OR OTHER DELIVERABLES ("**STAND ALONE USAGE**") ARE PROVIDED ON AN "AS IS" BASIS AND ARE LICENSED PURSUANT TO THE APPLICABLE OPEN SOURCE LICENSE. FISERV DISCLAIMS, AND CLIENT EXPRESSLY WAIVES, ALL REPRESENTATIONS, CONDITIONS AND WARRANTIES, EXPRESS AND IMPLIED, WITH RESPECT TO THE STAND ALONE USAGE, INCLUDING WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT AND ANY ARISING BY STATUTE OR FROM A COURSE OF DEALING OR USAGE OR TRADE. IN NO EVENT SHALL FISERV BE LIABLE FOR ANY DAMAGES HOWEVER ARISING WITH RESPECT TO THE STAND ALONE USAGE OF OPEN SOURCE COMPONENTS.

7. Termination.

(a) If Client violates Section 3 of this Exhibit, or Sections 3 or 12(b) of the Agreement in relation to the Software, and fails to remedy any such breach within 5 days of notice thereof from Fiserv, Fiserv may terminate this Exhibit or the applicable Schedule without further notice.

(b) If Client fails to pay the Maintenance Fee under any applicable Schedule, Fiserv may terminate Maintenance Services for the Software licensed under such Schedule upon notice to Client. Notwithstanding Section 8(b) of the Agreement, Client's failure to pay Maintenance Fees alone (in the absence of any other material breach by Client with respect to the Software or other Deliverables) shall not result in termination of the applicable Schedule for such Software, this Exhibit or the Agreement.

(c) Upon termination of the Agreement or this Exhibit or any individual Schedule for any reason other than by Client under Section 8(b)(i) of the Agreement, all remaining Maintenance Fees through the end of the then current term of Maintenance Services shall be accelerated, and Client shall pay all such accelerated fees to Fiserv pursuant to the payment terms set forth in the Agreement. The parties agree that Fiserv losses incurred as a result of early termination of any Schedule hereunder would be difficult or impossible to calculate as of the effective date of the applicable Schedule. Accordingly, the amounts set forth in this Section 7(c) represent a reasonable pre-estimate of losses and are not a penalty.

(d) The termination of the Agreement or this Exhibit or any individual Schedule hereto shall automatically, and without further action by Fiserv, terminate and extinguish the license(s) granted under the applicable Schedule and Fiserv's obligation to provide Maintenance Services with respect to such Software. Unless Client destroys all copies of the Software and provides written certification to Fiserv of said destruction within 10 days after receipt of written notice from Fiserv following termination of the applicable Schedule, Fiserv shall have the right to take immediate possession of the Software and all copies thereof wherever located without further notice or demand.

8. Export. Client shall not export, or re-export, directly or indirectly, any Software or any technical data derived therefrom to any country if such export or re-export is prohibited or where the United States Government or any agency thereof may require an export license or other government approval without first acquiring that license or approval, and Client will comply with all export regulations regarding the Software and technical data.

# AMENDMENT TO AGREEMENT

AMENDMENT ("**Amendment**") dated as of the last date signed below ("**Amendment Effective Date**") between **Fiserv Solutions, LLC**, a Wisconsin limited liability company with offices located at 255 Fiserv Drive, Brookfield, WI 53045 ("**Fiserv**"), and **Polam Federal Credit Union**, with offices located at 589 N. Larchmont Boulevard, Los Angeles, CA 90004 ("**Client**"), to the Master Agreement dated June 1, 2014, between Fiserv and Client (as amended through the date hereof, the "**Agreement**").

WHEREAS, Fiserv and Client entered into the Agreement for Fiserv's provision of various Services and Products to Client; and,

WHEREAS, Fiserv and Client wish to amend the Agreement to include additional Deliverables.

NOW, THEREFORE, Fiserv and Client hereby agree as follows:

1. Defined Terms. Unless otherwise defined herein, capitalized terms used herein shall have the same meanings assigned them in the Agreement.

2. Additional and Replacement Deliverables. The Schedule listed below and attached hereto is hereby added to the Agreement for Fiserv's provision of such Deliverables to Client. To the extent a corresponding Schedule to the Agreement already exists, the attached Schedule shall replace and otherwise supersede the existing Schedule in its entirety. The TransferNow Services Schedule specifically supersedes and replaces in its entirety any and all agreements between Fiserv and Client for the Account-to-Account Transfer Service (via CheckFree RXP) ("**CheckFree A2A Service**") or any similar service.

- TransferNow Services Schedule to ASP Services Exhibit

3. CheckFree A2A Service Term Extension. Fiserv previously provided notice to Client of the non-renewal/sunset of the CheckFree A2A Service under the Agreement (the "**Termination Letter**"). Notwithstanding anything to the contrary in the Agreement or the Termination Letter, the term of the CheckFree A2A Service is extended until the earlier of (i) November 15, 2024, or (ii) such date Client is in live production with the TransferNow Services referenced in Section 2 above ("**New CheckFree A2A Termination Date**"). Client agrees that Fiserv may terminate and decommission the CheckFree A2A Service on the New CheckFree A2A Termination Date and that Client is responsible for providing all legally required notices to Client's End Users. Client may terminate the CheckFree A2A Service prior to the New CheckFree A2A Termination Date by providing advanced written notice to Fiserv at A2ASunset@Fiserv.com at least forty-five (45) days prior to such earlier termination date, and upon such notice, Fiserv and Client shall work in good faith to finalize the new decommission date for the CheckFree A2A Service.

4. Amendment. Except as expressly modified herein, the Agreement shall remain in full force and effect. In the event of a conflict between the terms of this Amendment and the Agreement, this Amendment shall control. Unless signed by Client on or before **November 1, 2023**, Fiserv reserves the right to immediately reject the terms of Amendment without notice to Client and this Amendment shall be null and void.

IN WITNESS WHEREOF, the parties have caused this Amendment to be executed by their duly authorized representatives as of the Amendment Effective Date.

| **Polam Federal Credit Union** | | **Fiserv Solutions, LLC** | |
|---|---|---|---|
| By: | DocuSigned by: Jennier Audette A08482119D0E402... | By: | DocuSigned by: Mike Milman 30F23D91F45740B... |
| Name: | Jennier Audette | Name: | Mike Milman |
| Title: | CEO | Title: | Authorized Signatory |
| Date: | October 27, 2023 \| 13:51 CDT | Date: | October 27, 2023 \| 13:53 CDT |

**To initiate the service listed above, please email this executed form to billpay@fiserv.com.**

**TransferNow Services Schedule**
**to ASP Services Exhibit**

1. Term. On the terms and subject to the conditions set forth below, Fiserv and Client hereby enter into this TransferNow Services Schedule (this "**Schedule**") and agree that this Schedule shall be incorporated into and made subject to the provisions of the Agreement. The initial term of this Schedule shall end May 31, 2030. Unless written notice of non-renewal is provided by either party at least one hundred eighty (180) days prior to the expiration of the initial term or any renewal term, this Schedule shall automatically renew for additional term(s) of one (1) year. In the event of any conflict, ambiguity or inconsistency between this Schedule and the Agreement, or any other document which may be annexed hereto, the terms of this Schedule shall govern.

2. Services. Fiserv, itself and through its Affiliates and service providers, will provide to Client the Services described below (collectively, the "**Services**" for purposes of this Schedule) for the Fees set forth in this Schedule. Client may make the Services available to its members or customers, as applicable, (collectively, "**End Users**") who have properly enrolled for an applicable Service, and who are authorized to use that Service by Client, in accordance with the terms of this Schedule and the Agreement. For purposes of this Schedule, "**Deposit Account**" means a checking, savings or money market account. For the avoidance of doubt, all services indicated as provided by Fiserv to End Users are provided by Fiserv solely in its capacity as a service provider for, and on behalf of, Client, and are "Services" for purposes of this Schedule.

(a) TransferNow Funds Transfer Services. Fiserv will provide transfer services ("**TransferNow**") to Client's End Users that allow such End Users to transfer funds between such End User's Deposit Accounts the End User maintains with Client and those Deposit Accounts the End User holds at separate U.S. financial institutions in which the End User has an ownership interest and/or the right to transfer funds to or from the Deposit Account or via an agent at Client's call center. End Users may register Deposit Accounts domiciled at third party financial institutions ("**External Accounts**") with the Fiserv System (defined in the ASP Exhibit) via the Services described above to perform transfers between External Accounts and Deposit Accounts maintained at Client. Such registration requires verification of access and/or ownership of the External Account in accordance with Fiserv's Risk Procedures (defined below in the Risk Management Section). If enabled by Client and Fiserv pursuant to a mutually agreed upon statement of work, (i) TransferNow will support a Client End User's transfer of funds from an External Account to a loan account maintained at Client by the End User (i.e., inbound transfers only); and (ii) Client will be responsible for ensuring any funds transfers to loan accounts are properly credited to the End User's loan account pursuant to applicable law, including Regulation Z.

(b) Consulting Services. Fiserv will provide implementation, integration, training and support services for any of the Services described above in this Schedule, including any implementation of new or expanded functionalities for such Services, if any, as requested by Client and subject to the mutual, written agreement of the parties in a statement of work or similar document. That statement of work shall specify the terms for such services, including without limitation the Fees for such services and the location of performance for such services. Client will reasonably cooperate with Fiserv in the implementation of the Services. At any time during the Term of this Schedule, if Client requests any additional Services outside the scope of those agreed to in the applicable statement of work, such Services will be provided based on the availability of Fiserv's resources and at Fiserv's then-current rates. Specifically for any training services, Fiserv will provide such training services to Client's trainers (in a 'train the trainers' environment) as mutually agreed in writing, and Client's trainers will be responsible for training Client's associates. Unless expressly stated in the applicable statement of work, all professional services will be performed during Fiserv's standard business operating hours at a site designated by Fiserv.

3. Fees. Client will pay the fees set forth in the Fee Attachment attached hereto.

4. Performance.

(a) Support. Fiserv will provide second level support to Client's designated support representatives (meaning Fiserv will accept an initial support inquiry from Client, but not the End Users, and initiate a troubleshooting process). Such support will be available during Fiserv's standard business hours. If Fiserv determines, in its reasonable discretion, that any support issues are caused by any action of Client or its End Users, including without limitation abuse or misuse of the Services, any modification or addition to the Services not authorized or performed by Fiserv or any failure of Client to maintain its technology or the Services, or any other circumstance outside of Fiserv's control, then Fiserv reserves the right to charge for any work performed by Fiserv in investigating such problem at Fiserv's then-current rates. Any troubleshooting or assistance

requested by Client in connection with any such problems shall be provided at Fiserv's sole discretion and at Fiserv's then-current rates.

(b) Customer Service Database. Fiserv may provide Client with access to an online database containing recipient information (e.g., name and bank name) in connection with the Services. Client agrees to access the database only: (i) to effect, administer, or enforce transactions that result from the Services; (ii) to protect against or prevent actual or potential fraud, unauthorized transactions, claims, or other liability related to the Services; (iii) for internal audit and regulatory examination purposes; (iv) to resolve consumer disputes or inquiries involving transactions that result from the Services; or (v) as permitted to access certain customer and transaction information in Fiserv's possession and shall only use the recipient information of non-Client users within such database to complete Service transactions and for regulatory purposes. Client shall limit access to such database to its trusted employees and shall closely and regularly monitor such employees' use of such database to ensure compliance with this provision. Client shall protect the database from security breaches at Client by establishing, maintaining and updating policies, procedures, equipment and software that are designed to safeguard the security and integrity of Client computer systems used to access the database. Fiserv may provide Client with one or more identification numbers, passwords and/or other means of identification and authentication (collectively "**Password**") to access Fiserv's customer service database. Client agrees to: (A) take reasonable steps to safeguard the confidentiality and security of the Password; (B) limit access to its Password to persons who have a need to know such information; (C) notify Fiserv promptly if Client has any reason to believe the security or confidentiality required by this provision has been or may be breached; and (D) immediately change the Password if Client knows or suspects that the confidentiality of the Password has been compromised in any way.

(c) Current Release. Client will perform duties reasonably necessary to be on the then-current commercially-available release of each Service.

5. Risk Management.

(a) General.

(i) Risk Procedures. Fiserv will abide by its standard risk and fraud detection procedures and processes related to End Users' use of the Services as may be updated or modified from time to time ("**Risk Procedures**"). Fiserv will make available a summary of its then-current Risk Procedures to Client upon request. Client shall reasonably cooperate with Fiserv's Risk Procedures, and for all funds transfer services included in this Schedule, Client shall: (A) promptly respond to Fiserv's reasonable requests to verify account ownership or any Fiserv fraud investigation with respect to a Deposit Account held at Client, regardless of the transaction origin; (B) promptly send returns information to Fiserv via an ACH returns file, chargeback process, or daily batch feeds, as mutually agreed; and (C) request and obtain a Written Statement of Unauthorized Debit signed and completed by its claimant or End User prior to initiating a debit return pursuant to the ACH Rules.

(ii) Transaction Losses. For purposes of this Schedule, a "**Transaction Loss**" is a loss that occurs because the associated transaction was rescinded as unauthorized or has been returned and is un-collectable.

A. TransferNow. Client shall be responsible for all Transaction Losses incurred through the Services regardless of the amount or circumstance of the loss and Fiserv shall not be responsible for any Transaction Losses.

B. Trial Deposits. Client shall be responsible for all losses incurred by Fiserv related to trial deposits sent to External Accounts that cannot be recouped by Fiserv from the External Account.

(iii) Recovery of Transaction Losses.

A. Regardless of who bears the Transaction Loss on a particular transaction, Fiserv may, in its capacity as a service provider for, and on behalf of Client, attempt to recover the Transaction Loss from the End User for transactions that are greater than $500 and initiated as exceptions through a payment network (e.g., ACH or Debit Card Network). Client shall provide Fiserv with reasonable assistance in recovering such loss.

(1) Resubmission and Offsets. If pursuant to the Service a credit is released and the corresponding debit or a portion of any such debit fails, Fiserv reserves the right to resubmit or issue a new debit transaction for the uncollected portion of such debit. If Fiserv is unable to recover the uncollected portion of the debit, then Fiserv may additionally debit any of the End User's other accounts that are accessible via the Services to offset the uncollected portion.

(2) Compensation and Assignment. If Fiserv is unable to recover the Transaction Loss from the End User, then Client shall compensate Fiserv for such loss within thirty (30) days of receiving a reclamations statement from Fiserv.

B. Suspensions. Fiserv may suspend or deny access to End Users and/or accounts associated with such End Users and/or any counterparties if it receives any returns from an account associated with them whether with Client or another financial institution, if Fiserv is owed Transaction Losses in connection with the applicable End User, or if Fiserv anticipates any potential losses arising from any such account(s), including without limitation due to concerns regarding fraud.

C. LOIs. In the event that Fiserv has to provide a Letter of Indemnity, hold harmless letter or related documentation (each an "**LOI**") to another financial institution to recover Transaction Losses and there is a claim made under the LOI, then Client shall be responsible for all amounts relating to such claim pursuant to the ACH Rules.

(iv) Limits. This Section is only applicable for funds transfer services included in this Schedule. For purposes of this Schedule, "**Limits**" means default transaction and Service limitations, which may or may not include, without limitation, amount limitations, velocity limits and, if applicable to the Service, transaction speed limitations that are documented within the Service.

A. Establishment of Limits. Fiserv will provide default Limits within the Fiserv system for the Services. Client and Fiserv shall mutually agree upon any modifications to such Limits. End Users of the Fiserv Services may perform transfers only within the Limits.

B. Limit Adjustments. If Fiserv (1) identifies a sudden unanticipated increase in Transaction Losses and believes it prudent to take immediate action to reduce Limits; or (2) identifies an unanticipated risk increase as to an individual End User, based on Fiserv's risk assessment tools, then as to each of the preceding cases, Fiserv shall have the right at any time, but not the obligation, to (x) reduce Limits in an amount and for a duration determined by Fiserv in its sole discretion, (y) process transactions using a "good funds only" model, and/or (z) suspend the affected Service. Client will promptly work with Fiserv to analyze the cause(s) of such losses and to take appropriate measures to remedy such cause(s).

(v) Access by Client Employees. If Client employees or associates access the Services on behalf of End Users, then Client shall be responsible for the authentication and authorization of such employees and associates, as well as all resulting access and use of the Services and the User Data and other End User information, if applicable.

(b) Threatening Conditions. If Fiserv reasonably believes that any Services, or Client's or any End User's conduct in using the Services (including without limitation an End User intentionally initiating fraudulent or unauthorized transfers, account access or violating any agreement under which it has been provided access to the Services) violates any applicable laws, rules, regulations or industry standards, or otherwise poses a threat to Fiserv or any Fiserv client's system (including without limitation any Fiserv System), security, equipment, processes, intellectual property or reputation ("**Threatening Condition**") and if, in the reasonable and good faith determination of Fiserv, the Threatening Condition poses an imminent or actual threat, (including without limitation regulatory investigation, inquiry or penalty), Client agrees that Fiserv may suspend any and all use of the applicable Service until such Threatening Condition is cured. Fiserv will promptly notify Client of such suspension, including the identity of the affected End User(s) as needed, and both parties will use reasonable efforts to cure or cause the correction of the Threatening Condition following such notice. Fiserv may terminate Client's and/or End User's use of the Services without further requirement of notice if the Threatening Condition remains uncured more than thirty (30) calendar days after Fiserv notifies Client of the Threatening Condition.

(c) Obligations to End Users.

(i) As between Client and Fiserv, Client will be solely liable to End Users for completion of the funds transfers described in Section 2 hereof by payment of good funds in the correct amount and in a timely manner to the designated bank account (regardless of whether the bank account information was provided by End User) and is the "financial institution" for purposes of funds transfer transactions and their compliance with applicable laws. Without limiting the preceding sentence, Client will at all times remain responsible for making any consumer whole in connection with any failure to transmit money through the Services.

(ii) Notwithstanding anything to the contrary in the Agreement, Client will indemnify, defend, and hold harmless and release Fiserv and its Affiliates and their officers, directors, and employees from and against any claims, actions and other proceedings by an End User relating to the Services, or arising out of or relating to Client's breach of its obligation to make any consumer whole as set forth in the preceding sentence in Section 5(c)(i).

6. Additional Terms and Conditions.

(a) U.S. Only Services. Client will only make the Services available to End Users who hold U.S. accounts with Client.

(b) Compliance.

(i) Warranties. Client represents and warrants to Fiserv that it has taken and will continue to take whatever action may be necessary to comply with all applicable laws, rules, statutes and regulations (and any interpretations thereof and rules promulgated thereunder), including, but not limited to, the USA Patriot Act, the federal Bank Secrecy Act, federal and state laws and regulations relating to money transmission, currency reporting and the prevention of money laundering, any rule or regulation issued by a regulatory body, including the U.S. Office of Foreign Assets Control, the Electronic Fund Transfer Act and its implementing Regulation E, and the bylaws and operating regulations of any payment network or organization through which transactions are being processed, to enable it to offer and provide the Services to its End Users, and to otherwise register and activate End Users to make use of the Services and other Fiserv services that may be provided under this Schedule, including, but not limited to, any necessary pre-registrations, consents and authorizations from and notices to its End Users. The parties acknowledge and agree that Fiserv is relying on Client's performance as described in this Section in Fiserv's performance of the Services.

(ii) Indemnification. Notwithstanding anything to the contrary in the Agreement, Client will indemnify, defend, and hold harmless and release Fiserv and its Affiliates and their officers, directors, and employees from and against any claims, actions and other proceedings, damages, liabilities, costs, and expenses (including reasonable attorneys' fees) arising from or related to any breach of the preceding representation and warranty or this clause. The foregoing indemnification obligation shall not be subject to any limitations on Client's liability otherwise set forth in the Agreement. Client shall, at its own cost and expense, not subject to reimbursement, defend all such actions, suits or proceedings, and satisfy all judgments, orders or decrees with respect to the foregoing, and Fiserv shall provide Client with prompt notice of any claim for indemnification, cooperation in the defense and settlement of such claim, and grant Client control over the defense or settlement of such claim.

(iii) Records. Client shall maintain all records and prepare and file any necessary forms, reports or other documentation, including without limitation, suspicious activity reports or currency transaction reports required to be filed in accordance with laws applicable to Client. Client shall immediately notify Fiserv of instances of suspected fraud, money laundering, terrorist financing, or other illegal activities determined within Client's reasonable discretion and involving the Services. Client will not use End User Social Security numbers or Federal Employer Identification Numbers in any unique identifiers (e.g., customer ID) that Client designates within the Services; Fiserv will not be responsible for any resulting liability if Client violates this sentence.

(iv) Receipts. Receipts for applicable Services provided to End Users by Client will be provided by Client and contain contact information for Client and no details regarding Fiserv.

(c) Required Modifications. If any modification to any Services is required by law or governmental regulation, or is necessary based on any payment processing requirements, Fiserv and Client shall use

commercially reasonable efforts to comply in a timely manner. Fiserv may make any modifications, changes, adjustments or enhancements to the Services that Fiserv deems to be suitable.

(d) ACH Rules.

(i) Client acknowledges that with respect to Services transactions resulting in Automated Clearing House (ACH) payments ("**ACH Payments**"), (A) Client is the Originator under the Operating Rules of the National Automated Clearing House Association ("**ACH Rules**") for ACH Payments that an End User submits for processing and Client will have all responsibilities and liabilities of an Originator under the ACH Rules for such ACH Payments; and (B) neither Fiserv nor Early Warning is the Originator under the ACH Rules.

(ii) Fiserv will be a Third-Party Sender (as defined in the ACH Rules) with respect to such ACH Payments and will have all of the responsibilities and liabilities of a Third-Party Sender under the ACH Rules with respect to such ACH Payments.

(iii) Client will comply with all applicable ACH Rules and will not originate transactions in violation of any applicable law.

(iv) Fiserv will facilitate processing ACH Payments submitted by End Users by transmitting ACH files to one or more ODFIs that have agreed to originate ACH Payments for the Service. Client authorizes Fiserv and the ODFI to originate entries on behalf of Client to the accounts designated in the information provided for a payment to be made for the Service ("**Payment Instructions**"). When Fiserv receives a Payment Instruction, Client authorizes Fiserv to debit the End User's account for the amount of any such Payment Instruction plus any related fees in effect (and as disclosed by Client to the End User) at the time the End User initiates the Payment Instruction, and to remit funds on Client's behalf. Client also authorizes Fiserv to credit the End User's account for the receipt of payments, including but not limited to those payments returned from Receivers to whom the End User sent payment(s) and those payments that were cancelled and returned to the End User because the processing of the Payment Instruction could not be completed.

(v) Client agrees that the ODFI has the right to review and monitor Client's ACH Payments, and audit Client's compliance with this Section and the ACH Rules.

(e) User Data.

(i) Client and End Users may be required to share certain data with Fiserv, including without limitation: (A) the End User's name, e-mail address, mobile phone number and other token information; and (B) Account or Deposit Account information (e.g. financial data, user identification, login and password and personal information (including without limitation birth date, IP address and Social Security number), as well as the ABA Routing and Transit Number that are specific to an End User's Account or Deposit Account) (collectively, "**User Data**"). Fiserv and its service providers may use the User Data solely for the performance of the Services on behalf of Client, in accordance with the Gramm-Leach-Bliley Act, its implementing regulations and other applicable laws, including (without limitation) any use to effect, administer or enforce a transaction or to protect against or prevent actual or potential fraud, unauthorized transactions, claims, or other liability. Provided that the source of the information is not disclosed and the information is used in conjunction with other independent information, Fiserv may use, store and disclose User Data and other such information acquired in connection with the Services in statistical form for pattern recognition, modeling, enhancement and improvement, system analysis and to analyze the performance of the Services.

(ii) Fiserv may supply User Data to any law enforcement agency if Fiserv or any Fiserv client has suffered or may reasonably be expected to suffer a loss as a result of fraudulent or suspicious activity performed by the End User. Client shall identify a representative as a point of contact or a subject matter expert if such law enforcement agency requires supplementary information on such End User.

(iii) Fiserv may retain all User Data during and after the Term of this Schedule or the Agreement for audit, regulatory compliance, risk management purposes and as permitted by applicable law and regulations and/or to the extent it is required to do so in connection with payment network or organization rules and regulations or similar applicable industry requirements.

(iv) Without limiting anything herein or any provisions of the Agreement, for the avoidance of doubt, the parties hereby agree that the User Data of End Users is customer information of Client for purposes of the Gramm-Leach-Bliley Act and its implementing regulations.

(f) Terms of Service and Enforcement.

(i) Client will enter into a written agreement regarding the Services with End Users ("**Terms of Service**"). Client acknowledges that the Terms of Service are between Client and its End Users, not Fiserv.

(ii) As part of Fiserv's standard product documentation it generally provides to its financial institution clients, Fiserv may make available to Client sample general terms and conditions that Client may consider in establishing the Terms of Service. Any terms that are required by Fiserv to be present in such terms and conditions without substantial modification will be marked as such; Client will not substantially modify such marked terms and conditions without the prior, written approval of Fiserv. Furthermore, if Fiserv provides sample terms and conditions and Client elects to modify such terms and conditions, then Fiserv will not be obligated to host such modified terms and conditions, unless the parties agree otherwise in writing.

(iii) In its Terms of Service or other governing agreement between Client and the End Users for the Services, Client will include (A) disclaimers of incidental, indirect, consequential, special, punitive, and exemplary damages; and (B) quantified limitations on direct damages that, with respect to both (A) and (B), may be claimed or alleged by such End Users arising out of or relating to the Services. Such disclaimers and limitations must extend to Client's third party suppliers or providers (but do not need to specifically reference Fiserv). Client will enforce such disclaimers and limitations in claims, lawsuits and proceedings brought by Client's End Users. In addition, Client shall disclose in the Terms of Service that Client is the sole party liable to End Users for transfers conducted using the Services.

(g) Credentials. For certain Services, Fiserv will provide one or more identification numbers, passwords and/or other means of identification and authentication (collectively "**Credentials**") to access certain functionalities of the Services. All Credentials shall at all times be considered Fiserv Information.

(h) Termination/Non-Renewal. In the event of termination or non-renewal of this Schedule or the Agreement, Client shall: (i) comply with all applicable laws, including laws governing notification of End Users prior to discontinuation of the use of the Services; and (ii) be financially responsible for any transactions returned on any of its End Users' Deposit Accounts after the termination date, whether or not the returns are proper and timely. Following receipt of Client's written certification of Client's compliance with the foregoing, Fiserv will, for a period not to exceed sixty (60) days, continue to process transactions that were initiated prior to the effective date of termination (e.g., returns).

(i) Early Termination; Convenience.

(i) If early termination is permissible under the Agreement, should Client elect to terminate this Schedule early for any reason other than Fiserv's uncured material breach ("**Early Termination**"), the amount of the early termination fees for this Schedule will be determined by multiplying the sum of the estimated monthly billing for the Service received hereunder by 80% times the remaining months of the Term, plus any unamortized conversion fees or third party costs existing on Fiserv's books on the date of termination plus 100% of other non-processing related credits, if any, provided by Fiserv to Client. In addition to the foregoing fees, at the time of Early Termination, Client shall reimburse Fiserv for all credits, rebates, discounts, and incentives granted on all Services under this Schedule in their entirety. Notwithstanding anything to the contrary in the Agreement, (i) in the event Fiserv collects fees from End Users on behalf of Client ("**Client End User Fees**"), and remits these fees to Client in the form of a credit to Client's monthly invoices, such Client End User Fees shall not be included in the calculation of any applicable early termination fees; and (ii) any non-monthly recurring fees (e.g., annual maintenance fees) shall be prorated to monthly amounts and included in the calculations of early termination fees.

(ii) Client understands and agrees that Fiserv losses incurred as a result of Early Termination of this Schedule would be difficult or impossible to calculate as of the effective date of termination since they will vary based on, among other things, the number of clients using the Services on the date the Schedule terminates. Accordingly, the amounts set forth in the preceding paragraph represent

Client's agreement to pay and Fiserv's agreement to accept as liquidated damages (and not as a penalty) such amount for any such Early Termination.

7. Third Party Terms (cannot be modified by Client).

(a) End User Verifications. Fiserv is authorized to rely on data provided by third parties and is not responsible for the accuracy of such data in connection with its performance of the Services. Client further acknowledges and agrees that: (i) third party data is obtained from databases whose accuracy, timelines and coverage are not guaranteed; (ii) the data used to verify an End User is obtained from third parties; (iii) Fiserv does not warrant or guarantee the identity of the End User, but merely receives a result from a third party provider ("**Result**") which is derived, in part, from information entered by the End User; (iv) Fiserv will use the Result to attempt to verify the identity of the End User; and (v) the Result and related verification and authentication services will be only used for the purpose of verifying the identity of the End User and will not be used, in whole or in part, as a basis for determining the eligibility of an End User for credit, insurance or employment or to take 'adverse action,' as defined in the Fair Credit Reporting Act or similar laws. Client will not copy or retain any authentication questions or the End Users' answers to such questions or use such questions for purposes other than identity verification and End User authentication, except (1) as required by law and (2) that Client shall be permitted to use and retain the pass/fail indication returned by the Services along with any related explanatory information/codes for risk management or other internal purposes permitted by law. Client will not reverse engineer or create derivative works based on the identity verification and authentication elements of the Services (or the technology used to provide such Services). Client acknowledges and agrees that Fiserv and its third party providers referenced above recommend that Client use a manual verification process if a Result does not meet or exceed the threshold for a positive verification, as defined solely by Client, or if Client receives a flag (indicating a possible match) from a fraud detection database.

(b) End User License and Consent. Client hereby consents to Fiserv's disclosure of the User Data to certain Fiserv supplier(s) solely in connection with the verification and authentication of the End Users and subject to the terms and conditions of this Schedule and the Agreement. Client acknowledges that such verification and authentication services are proprietary and confidential and shall be treated as Fiserv Information under the Agreement. Client grants to Fiserv and Fiserv's applicable supplier(s) a non-exclusive, non-transferable, except as provided herein, right to use, copy, store, modify and display the User Data solely to the extent necessary to provide the Services pursuant to this Agreement. Client represents that it has obtained all necessary End User agreements or consents as may be reasonably required to grant such license rights to Fiserv and its suppliers.

(c) Boku Identity – Phone Ownership Verification. Client must ensure that End Users agree to the following (or substantively the same clause using corresponding definitions from Client's terms with End Users), except as Fiserv and Client otherwise agree in writing:

> End User authorizes End User's wireless carrier to disclose information about End User's account, such as name, billing address, email, phone number, location information, subscriber status, payment method and device details, if available, to Client and Client's third party providers to support identity verification, fraud avoidance and other uses in support of transactions for the duration of End User's business relationship with Client. This information may also be shared with other companies to support End User's transactions with Client and for identity verification and fraud avoidance purposes.

In the event Boku Identity's (or its successors') mobile carriers determine subsequent changes to the above requirements are required, Fiserv will provide written notice detailing such changes to Client, and Client agrees to implement such changes to the above requirements within a commercially reasonably time frame.

(d) Iovation – Device Intelligence Data. Client must ensure that End Users agree to the following (or substantively the same clause using corresponding definitions from Client's terms with End Users), except as Fiserv and Client otherwise agree in writing:

> Client may share certain personal information and device-identifying technical data about End User and End User's devices with third party service providers who will compare and add device data and fraud data from and about End User and End User's devices to a database of similar device and fraud information in order to provide fraud management and prevention services and identify and block access to the applicable service or Web site by devices associated with fraudulent or abusive activity. Such information may be used by Client and its third party service providers to provide similar fraud management and prevention

services for services or Web sites not provided by Client. Client will not share with service providers any information that personally identifies the user of the applicable device.

**Fee Attachment**
**to TransferNow Services Schedule**

For the avoidance of doubt, Client is free to set and charge any fees to End Users in its sole discretion.

1. TransferNow Implementation and Monthly Fees (based on Client's current level of DDAs).

| | DDAs | Implementation Fee | Monthly Fee (Includes Set Number of Standard (3-Day) Transactions) | Number of Standard (3-Day) Transactions included in Monthly Fee |
|---|---|---|---|---|
| ☒ | Up to 1,000 | ~~$3,750~~ $0 | $140 | 35 |
| ☐ | 1,001 - 2,500 | ~~$3,750~~ $0 | $170 | 50 |
| ☐ | 2,501 - 5,000 | ~~$3,750~~ $0 | $220 | 50 |
| ☐ | 5,001 - 10,000 | ~~$4,375~~ $0 | $285 | 100 |
| ☐ | 10,001 - 15,000 | ~~$6,250~~ $0 | $335 | 100 |
| ☐ | 15,001 - 25,000 | ~~$7,500~~ $0 | $400 | 150 |
| ☐ | 25,001 - 40,000 | ~~$9,375~~ $0 | $450 | 150 |
| ☐ | 40,001 - 75,000 | ~~$9,375~~ $0 | $550 | 300 |
| ☐ | >75,000 | Per Quote | | |

2. Usage Fees.

| Account to Account Transfers – Risk Monitored | Fee |
|---|---|
| Wholesale Transaction Fees: | |
| 3 Day (Standard) | $0.35 per transaction |
| Next Day (Expedited) | $2.50 per transaction |
| Account Verification Attempt | $2.50 per attempt |
| ACH Return, Chargeback, or NOC Fees | $25.00 each |
| NACHA – Unauthorized Entry Fee | $4.50 each |
| Fraud Investigations | Fiserv's then-prevailing hourly rate |

3. Additional Fee Terms.

(a) NACHA. If NACHA increases its fees or otherwise requires the payment of additional fees for the use of the Automated Clearing House, then Fiserv will have the right to pass through such fee increases or additional fees to Client for payment, without any mark-up.

(b) Transaction Fees. In the event Client desires to charge End Users transaction fees for the Service ("**End User Transaction Fees**"), Fiserv will directly debit the End User account for the applicable End User Transaction Fee. Fiserv will include any End User Transaction Fees debited from End Users as a credit to the fees payable to Fiserv in the applicable invoice for the Services The applicable End User Transaction Fees will be those as set by Client and established in Fiserv's systems.

(c) Monthly Fee. The Monthly Fee above goes into effect when the Service is in production or one year following the date this Schedule is incorporated into the Agreement, whichever occurs first. The Monthly Fee is for up to the number of demand deposit or share draft accounts in the applicable tier. In the event Client's number of such accounts increases above such number, Client shall be invoiced for the Monthly Fee associated with the applicable higher tier.

(d) Invoicing. Fiserv shall invoice Client monthly for fees and expenses incurred during the previous month for the Services.

DocuSign

## Certificate Of Completion

Envelope Id: FD14538E8FB8472F83BA81C886756EBF

Status: Completed

Subject: Complete with DocuSign: Polam Federal Credit Union - (Amendment, TransferNow) (2023-10-19 fiser...

Business Unit Name: Electronic Payments

Counterparty Name: Polam Federal Credit Union, Fiserv

Short Description of Agreement: TransferNow Amendment

Source Envelope:

Document Pages: 10

Certificate Pages: 2

AutoNav: Enabled

EnvelopeId Stamping: Enabled

Time Zone: (UTC-06:00) Central Time (US & Canada)

Signatures: 2

Initials: 0

Envelope Originator:
Karl Matthew DelRosario
225 Fiserv Dr
Brookfield, WI 53045
karlmatthew.delrosario@fiserv.com
IP Address: 96.242.127.251

## Record Tracking

| | | |
|---|---|---|
| Status: Original<br>10/20/2023 9:26:55 AM | Holder: Karl Matthew DelRosario<br>karlmatthew.delrosario@fiserv.com | Location: DocuSign |

## Signer Events

| Signer Events | Signature | Timestamp |
|---|---|---|
| Jennier Audette<br>Jennifer@polam.org<br>CEO<br>Security Level: Email, Account Authentication (None) | DocuSigned by:<br>Jennier Audette<br>A88482110B6E482...<br>Signature Adoption: Pre-selected Style<br>Using IP Address: 64.79.137.84 | Sent: 10/20/2023 9:29:39 AM<br>Viewed: 10/27/2023 1:44:02 PM<br>Signed: 10/27/2023 1:51:48 PM |

**Electronic Record and Signature Disclosure:**
Not Offered via DocuSign

| Signer Events | Signature | Timestamp |
|---|---|---|
| Mike Milman<br>mike.milman@fiserv.com<br>Finance Vice President<br>Fiserv Solutions, LLC<br>Security Level: Email, Account Authentication (None) | DocuSigned by:<br>Mike Milman<br>30F23D91E45740B...<br>Signature Adoption: Pre-selected Style<br>Using IP Address: 24.126.179.67 | Sent: 10/27/2023 1:51:50 PM<br>Viewed: 10/27/2023 1:53:42 PM<br>Signed: 10/27/2023 1:53:50 PM |

**Electronic Record and Signature Disclosure:**
Not Offered via DocuSign

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

| Editor Delivery Events | Status | Timestamp |
|---|---|---|

| Agent Delivery Events | Status | Timestamp |
|---|---|---|

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|

| Certified Delivery Events | Status | Timestamp |
|---|---|---|

| Carbon Copy Events | Status | Timestamp |
|---|---|---|
| Karl Matthew DelRosario<br>karlmatthew.delrosario@fiserv.com<br>Security Level: Email, Account Authentication (None) | COPIED | Sent: 10/20/2023 9:29:39 AM<br>Resent: 10/27/2023 1:53:52 PM |

**Electronic Record and Signature Disclosure:**
Not Offered via DocuSign

| Carbon Copy Events | Status | Timestamp |
|---|---|---|
| Rowland Adebiyi<br>babafemi.adebiyi@fiserv.com<br>Security Level: Email, Account Authentication (None)<br>**Electronic Record and Signature Disclosure:**<br>Not Offered via DocuSign | COPIED | Sent: 10/20/2023 9:29:40 AM |

| Witness Events | Signature | Timestamp |
|---|---|---|

| Notary Events | Signature | Timestamp |
|---|---|---|

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | 10/20/2023 9:29:40 AM |
| Certified Delivered | Security Checked | 10/27/2023 1:53:42 PM |
| Signing Complete | Security Checked | 10/27/2023 1:53:50 PM |
| Completed | Security Checked | 10/27/2023 1:53:50 PM |

| Payment Events | Status | Timestamps |
|---|---|---|